UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

J. MARK LANE, et al.,

               Plaintiffs,

          v.

MIRIAM E. ROCAH, in her official capacity as District
Attorney for the County of Westchester, New York, and
DOMINICK L. CHIUMENTO, in his official capacity as
Acting Superintendent of the New York State Police,

               Defendants.

_____

Civil Action No.:
7:22-cv-10989-KMK

# MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

FPC ACTION FOUNDATION
Attorneys for Plaintiffs
5550 Painted Mirage Rd.
Ste. 320
Las Vegas, NV 89149
(916) 378-5785

Cody J. Wisniewski, Esq.
  -Of Counsel-

SECOND AMENDMENT
FOUNDATION
Attorneys for Plaintiffs
12500 NE 10th Place
Bellevue, WA, 98005
(800) 426-4302

Adam J. Kraut, Esq.
  -Of Counsel-

FLUET
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
(703) 590-1234

Nicolas J. Rotsko, Esq.
  -Of Counsel-

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

    I.  New York Bans Common Semiautomatic Firearms .............................................. 3

    II.  The Firearm Ban's Effect on Plaintiffs ................................................................ 4

ARGUMENT ................................................................................................................. 5

    I.  The Firearm Ban Regulates Conduct Falling Within the Plain Text of the Second Amendment. ...................................................................................... 5

    II.  The Firearm Ban Is Inconsistent with This Nation's History of Firearm Regulation. ................................................................................... 7

        A.  Arms in Common Use Cannot Be Banned Consistent With the History of Firearm Regulation. ............................................................. 7

        B.  The Banned Firearms Are In Common Use For Lawful Purposes. .............. 10

CONCLUSION .............................................................................................................. 18

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                          <u>**Page**</u>

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) ...........................................................................................10

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J. (ANJRPC)*,
   910 F.3d 106 (3d Cir. 2018)...............................................................................12

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) ....................................................................................16, 17

*Counterman v. Colorado*,
   600 U.S. 66 (2023) .............................................................................................10

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ...............................................1, 2, 6, 7, 8, 9, 10, 16

*Duncan v. Becerra*,
   970 F.3d 1133 (9th Cir. 2020)............................................................................ 2

*Duncan v. Becerra*,
   988 F.3d 1209 (9th Cir. 2021)............................................................................ 2

*Friedman v. City of Highland Park*,
   136 S. Ct. 447 (2015)..........................................................................................12

*Heller v. District of Columbia* (*Heller II*),
   670 F.3d 1244 (D.C. Cir. 2011) ............................................................ 11, 12, 16

*New York State Rifle & Pistol Association v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015)..........................................................................3, 12

*New York State Rifle & Pistol Association v. Bruen*,
   597 U.S. 1 (2022) ................................................... 1, 2, 5, 6, 7, 9, 10

*People v. Webb*,
   131 N.E. 3d 93 (Ill. 2019) ..................................................................................17

*Planned Parenthood of Columbia/Willamette v. Am. Coal. of Life Activists*,
   290 F.3d 1058 (9th Cir. 2002) ...........................................................................10

*Ramirez v. Commonwealth*,
   94 N.E. 3d 809 (Mass. 2018) .............................................................................17

*Staples v. United States*,
   511 U.S. 600 (1994) ...........................................................................................11

*Stenberg v. Carhart*,
   530 U.S. 914 (2000) ...........................................................................................11

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023) .......................................................................1, 2, 9

*Teter v. Lopez*,
   93 F.4th 1150 (9th Cir. 2024)............................................................1, 2

**Statutes**

U.S. Const. amend. II ............................................................................5, 6

N.Y. Penal Law
   § 70.02........................................................................................... 4
   § 265.00(22)(a)–(f).......................................................................3, 4
   § 265.02(7)...................................................................................... 4
   § 265.10.......................................................................................... 4

**Other Authorities**

*2019 Firearms Retailer: Survey Report*, NSSF (2019),
   *available at Miller v. Becerra*, No. 3:19-1537 (S.D. Cal.), Doc. 22-13 ..........................15

*2021 Firearms Retailer: Survey Report*, NSSF (2021), https://bit.ly/3gWhI8E ............... 14, 15

Shawna Chen, *10 states with laws restricting assault weapons*,
   Axios (Apr. 28, 2023), https://bit.ly/3pukU02  ........................................... 11, 12

*Crime Data Explorer: Expanded Homicide Offense Characteristics in the United States*,
   FBI, U.S. Dep't of Just. (2023), https://bit.ly/3IF5A6M ...................................16

William English, *2021 National Firearms Survey: Updated Analysis Including Types of
   Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw ................................. 13, 14

*Firearm Production in the United States With Firearm Import and Export Data*,
   Nat'l Shooting Sports Found. (NSSF) (2020), https://bit.ly/3v5XFvz  ...........11

*Firearm Production in the United States With Firearm Import and Export Data*,
   NSSF (2023), https://bit.ly/42qYo7k  ......................................................15

Emily Guskin, *Why do Americans own AR-15s*, Wash. Post (Mar. 27, 2023),
   https://wapo.st/3IDZG5I  .................................................................13

Stephen P. Halbrook, America's Rifle: The Case for the AR-15
   (Google Books ed. 2022)..................................................................12

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue:
   Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*,
   60 Hastings L.J. 1285 (2009)........................................................ 12, 13

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*,
   20 J. Contemp. L. 381 (1994) ...........................................................11

Frank Miniter, The Future of the Gun (2014) .............................................15

*Modern Sporting Rifle: Comprehensive Consumer Report*,
   NSSF (July 14, 2022), https://bit.ly/3GLmErS .......................................14

*Poll of current gun owners*, Wash. Post-Ipsos (2022), https://bit.ly/46CqzRa ...................13

iv

Alan I. Leshner, et al., *Priorities for Research to Reduce the Threat of Firearm-Related Violence*,
    NAT'L RSCH. COUNCIL (2013), https://bit.ly/48ZYjcm ........................................14

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts
    Have Defied Heller in Arms-Ban Cases-Again*, HARV. J. L. & PUB. POL'Y
    PER CURIAM (Sep. 27, 2023), https://bit.ly/49KhTKQ .....................................8, 9

*Sport Shooting Participation in the U.S. in 2020*,
    NSSF (2021), https://bit.ly/3sPuEQl ..................................................................14

N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828),
    *available at* https://bit.ly/3TclVoq .......................................................... 6

## INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Supreme Court "employ[ed] and elaborate[d] on the text, history, and tradition test that *Heller* and *McDonald* require[d] for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense." 597 U.S. at 79 (Kavanaugh, J., concurring). *Bruen* thus made more explicit *how Heller* had arrived at its test for determining whether a ban on a type of firearm is consistent with the Second Amendment, but it did not disturb *Heller*'s test. And application of that test in this case makes clear that New York's ban on some of the most popular firearms in American history is unconstitutional.

*Bruen* explained that Second Amendment analysis starts with the text. And that is what the Court did in *District of Columbia v. Heller*, 554 U.S. 570 (2008). The key aspect of the text at issue here is "arms," and, evaluating Founding-era dictionaries, *Heller* interpreted "arms" to mean "weapons of offence, or armour of defence." 554 U.S. at 581 (cleaned up). "Arms" thus includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," *id.*, and it unequivocally includes "all firearms," *id*. New York's ban therefore implicates the plain text of the Second Amendment.

As *Bruen* explains, once the plain text of the Second Amendment is implicated, the government bears the burden to establish that the challenged law "is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. Here, however, *Heller* already has determined what the applicable tradition of firearm regulation is in a case involving a ban on certain types of firearms: "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. Because only "dangerous and unusual" weapons can be banned, the government bears the burden to show both that a

1

banned weapon is dangerous (i.e., that it has "uniquely dangerous propensities," *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023), *vacated by* 93 F.4th 1150 (9th Cir. 2024)), and that it is unusual (i.e., that it is "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625). There is a necessary corollary to this dangerous and unusual test: arms that are "in common use" are "protected," because such arms by definition cannot be unusual. *Id*.

To the extent there could have been any doubt about these principles, *Bruen* resolved them. In describing *Heller*, *Bruen* explained that "we found it fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time." 597 U.S. at 21 (quotation marks omitted). *Bruen* dispensed with any further analysis of the types of arms at issue because no one "dispute[d] that handguns are weapons in common use today for self-defense." *Id*. at 32 (quotation marks omitted). And *Bruen* distinguished colonial laws that arguably restricted the carrying of handguns by reasoning that "whatever the likelihood that handguns were considered dangerous and unusual weapons during the colonial period, they are indisputably in common use for self-defense today." *Id*. at 47. In sum, *Bruen* makes clear that arms that are in common use for lawful purposes are protected by the Second Amendment and cannot be banned.

These principles resolve this case, because New York bans common semiautomatic firearms, the paradigmatic example of which is the AR-15 type rifle, the "most popular rifle in American history." *Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020), *vacated by* 988 F.3d 1209 (9th Cir. 2021). AR-15s and similar semiautomatic rifles are the second-best selling firearm in the country of any type (behind semiautomatic handguns) at approximately 20%

of sales, and they are overwhelmingly owned for lawful purposes such as self-defense, training, and hunting. New York simply cannot show that firearms that are the most popular in the country are dangerous and unusual. Indeed, the Second Circuit in *New York State Rifle & Pistol Association v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), found that the banned firearms "are 'in common use' as that term was used in *Heller*" at a time when approximately four million AR-15 and similar rifles had been manufactured, 804 F.3d at 255; today that figure is over 28 million.

Because the arms banned by New York are in common use, no historical evidence the State could put forward could possibly justify its law, and summary judgment should be granted in Plaintiffs' favor.

## **BACKGROUND**

### **III. New York Bans Common Semiautomatic Firearms.**

New York categorically prohibits the possession of firearms that it has tendentiously labeled "assault weapons." *Cuomo*, 804 F.3d at 247. As relevant here, New York calls an "assault weapon" the following:

> (a) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the following characteristics:
> (i) a folding or telescoping stock;
> (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
> (iii) a thumbhole stock;
> (iv) a second handgrip or a protruding grip that can be held by the non-trigger hand;
> (v) a bayonet mount;
> (vi) a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator;
> (vii) a grenade launcher; or
> . . .
> (e) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon defined by [New York Penal Law § 265.00(22)(e)(v) as that section

read under] the laws of [2000 and otherwise lawfully possessed] prior to
September [14, 1994]; or
(f) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol
or weapon defined [above] in [sub]paragraph (a), (b), or (c) [and] possessed
prior to [January 15, 2013].

N.Y. PENAL LAW §§ 265.00(22)(a)–(f). Possession of a banned firearm is a Class D felony

punishable by up to seven years in prison and a fine between $2,000 and $10,000. *Id.* §§

265.02(7), 265.10, 70.02.

### IV. The Firearm Ban's Effect on Plaintiffs

Plaintiffs J. Mark Lane and James Sears are law-abiding United States citizens and

residents of Westchester County, New York. Plaintiffs' Statement of Undisputed Material

Fact ¶¶ 1, 9 ("SUMF"). Sears possesses a New York state semiautomatic rifle license. SUMF

¶ 16. Lane does not, because such a license would not permit him to acquire the firearms at

issue in this lawsuit, but would apply for one if it did. SUMF ¶ 8. Lane wishes to acquire (and

would have already purchased, if not for the Firearm Ban) a Springfield Armory Saint rifle,

which is an AR-15 platform semiautomatic rifle capable of accepting a detachable magazine

and which has a telescoping stock, pistol grip, and muzzle device. SUMF ¶¶ 2–4. Sears wishes

to acquire (and would have already purchased, if not for the Firearm Ban) an LMT MARS-

L rifle, which is an AR-15 platform semiautomatic rifle capable of accepting a detachable

magazine and which has a folding stock, pistol grip, and threaded barrel for attaching a

muzzle device. SUMF ¶¶ 10–12. Both Lane and Sears would, if it were not for the Firearm

Ban, purchase these firearms immediately and lawfully use them for lawful purposes

including home defense and target shooting. SUMF ¶¶ 5, 7, 13, 15. Both have refrained from

acquiring and using these firearms because they fear Defendants' enforcement of the ban

against them, including through arrest, confiscation, prosecution, fine, and imprisonment. SUMF ¶¶ 6, 14.

## ARGUMENT

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Bruen*, the Supreme Court clarified the standard that is to be applied in all Second Amendment challenges:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

597 U.S. at 24 (internal quotation marks omitted). Applying that standard here is straightforward. Indeed, *Heller* already has done the work of interpreting the Second Amendment's text and identifying the relevant tradition (or lack thereof) of regulation for cases like this one. The firearms banned by New York are "arms," which means that possessing them is conduct covered by the plain text of the Second Amendment. And the banned firearms are in common use for lawful purposes, which means that banning them is not consistent with the historical tradition of regulating dangerous and unusual firearms.

### V. The Firearm Ban Regulates Conduct Falling Within the Plain Text of the Second Amendment.

The initial analysis under *Bruen* is whether the "plain text" of the Second Amendment protects the conduct in which the Plaintiffs wish to engage but is banned by the statute, here, owning certain semiautomatic rifles that New York has misleadingly labeled "assault weapons." *Bruen* repeatedly emphasized that the subject of this analysis is the Amendment's

"plain text," 597 U.S. at 17, 24, 32, 33, or "bare text," *id.* at 44 n.11. In other words, the focus is only upon the words of the amendment, their historical meaning, and what they fairly imply. Distinctions that do not appear on the face of the text cannot be found at this stage of the analysis and *must* be derived, if at all, later, through history.

The plain text of the Second Amendment states that it protects the right "keep and bear [a]rms." U.S. CONST. amend. II. The question here, then, is what was understood by the term "arms" at the Founding. *Heller* has already answered this question. "The 18th-century meaning is no different from the meaning today." *Heller*, 554 U.S. at 581. "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as 'weapons of offence, or armour of defence.'" *Id.* And "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* The Court also cited without quoting Webster's 1828 American Dictionary of the English Language, which gave as its first definition of arms "weapons of offense, or armor for defense and protection of the body," and said that "in law, arms are any thing which a man takes in his hand in anger, to strike or assault another." N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://bit.ly/3TclVoq. Firearms plainly are encompassed within "arms." Indeed, while the Court noted one anomalous Founding-era source that "limited 'arms' (as opposed to 'weapons') to 'instruments of offence generally made use of in war," the Court emphasized that "even that source stated that all firearms constituted 'arms.'" *Heller*, 554 U.S. at 581. In sum, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id.* at 582. And all firearms are arms. Because the New York law challenged here bans firearms, the plain text is implicated, and the burden is on the State to justify its law.

6

**VI. The Firearm Ban Is Inconsistent with This Nation's History of Firearm Regulation.**

    **C.  Arms in Common Use Cannot Be Banned Consistent With the History of Firearm Regulation.**

If the Firearm Ban is to survive, New York must prove that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Ordinarily, that would require the State to establish a relevant, Founding-era tradition of regulation, and then show that the Firearm Ban falls within that tradition. Here, however, the first part of that analysis has already been done by the Supreme Court and it has derived the rule, from history, that only dangerous and unusual weapons may be banned, so arms that are "in common use" for lawful purposes (therefore necessarily not dangerous and unusual) are protected and cannot be banned.

The Supreme Court first elucidated this rule in *Heller*. Like this case, *Heller* involved a ban on a type of firearm (there, handguns). As explained above, *Heller* began by construing the plain text of the Second Amendment, from which the Court concluded that all firearms were "arms" and presumptively protected. More generally, the Court determined that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. In Part III of *Heller*, the Court turned to historical limitations on the textual scope of the right. *See id.* at 626–28; *see also id.* at 595 ("Before turning to limitations upon the individual right, however, we must determine whether the prefatory clause of the Second Amendment comports with our interpretation of the operative clause."). It was through examining this history that the Court concluded that, despite its expansive textual scope, ultimately the Second Amendment "was not a right to keep and carry any weapon whatsoever." *Id.* at 626. Rather, the type of arms that are protected is limited by "the

historical tradition of prohibiting the carrying of '*dangerous and unusual* weapons.'" *Id.* at 627 (emphasis added).

Because only dangerous and unusual weapons can be banned, it follows that arms "in common use at the time" are protected. *Id.* After all, an arm that is in common use cannot be both dangerous and unusual. This conclusion was supported by history as well, because normally "when called for [militia] service, [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 624 (brackets in original) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Although this particular quotation from *Heller* precedes its historical analysis, that is because this is the point of the opinion in which the Court was explaining that its textual interpretation of the Second Amendment was consistent with *United States v. Miller*. As part of that discussion, the Court stated that, "[w]e may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits." *Heller*, 554 U.S. at 624 (emphasis in original). Based in part on the quotation above about the use of common arms in militia service, the Court "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. That accords," the Court explained, "with *the historical understanding of the scope of the right*, see Part III, infra." *Id.* (emphasis added). Thus, even though this discussion took place outside of the Court's analysis of historical limits on the right, the Court made clear that those historical limits were what was being addressed.

*Bruen* confirms that the exception for "dangerous and unusual weapons" (and correlative *protection* for arms "in common use") is a rule derived from history. *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in*

*Arms-Ban Cases-Again*, Harv. J.L. & Pub. Pol'y Per Curiam (Sept. 27, 2023), https://bit.ly/49KhTKQ. When *Bruen* explained its framework, "common use" was the example it chose for how to use the "historical understanding of the Amendment to demark the limits on the exercise of th[e] right." 597 U.S. at 21. Once it was established that the arms at issue (handguns) were "in common use today for self-defense," there was no need for any further analysis of the type of arm at issue, textual or historical. *Id.* at 32. In distinguishing colonial laws that allegedly restricted the carrying of handguns, *Bruen* explained that regardless of what was true in colonial times, handguns are in common use today. That was significant because "colonial legislatures sometimes prohibited the carrying of dangerous and unusual weapons," and *in Heller*, "[d]rawing from this *historical tradition*, [the Court] explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47. If there was any doubt that *Heller*'s statements about "common use" were derived from history, *Bruen* put them to rest.

A panel of the Ninth Circuit recently correctly applied *Bruen* and *Heller* to a challenge to Hawaii's ban on butterfly knives. In that case, Hawaii pressed, but the court rejected, the argument that the allegedly "dangerous and unusual" nature of butterfly knives "means that they are not 'arms' as that term is used in the Second Amendment." *Teter*, 76 F.4th at 949. Instead, citing the same portions of *Heller* discussed above, the panel noted that "the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting [such] weapons.'" *Id.* at 949–50 (quoting *Heller*, 554 U.S. at 627) (emphasis in *Teter*). Therefore "whether butterfly knives are 'dangerous and unusual' is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis," and since

whether an arm is "dangerous and unusual" depends in part on "whether the weapon is commonly possessed by law-abiding citizens for lawful purposes," it was up to Hawaii to prove the arms were not in common use. *Id.* at 950 (quotations omitted).

### D. The Banned Firearms Are In Common Use For Lawful Purposes.

This case thus comes down to the question of whether the banned firearms are "dangerous and unusual"—which they cannot be if they are "in common use." So, it is New York's burden, to show that the Firearm Ban "is consistent" with this historical tradition, to demonstrate the arms it has banned are *not* in common use. *Bruen*, 597 U.S. at 24. Any doubt about the nature of this burden was removed by *Bruen*'s comparison of its analytic framework to First Amendment caselaw. To head off the complaint that it was unfair to put the government to its proof in defending a challenged law, the Court noted that this was precisely how things work in the First Amendment context where the government also generally bears the burden of "point[ing] to *historical* evidence about the reach of the First Amendment's protections." *Id.* at 24–25 (citing *United States v. Stevens*, 559 U.S. 460, 468–71 (2010)). In such a case, the government's work is not done merely because it establishes a certain type of speech is unprotected, it must *also* show that the speech covered by the challenged law (or at issue in the prosecution) is *of that type*. *Id.*; *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 246 (2002) ("[T]he Government must prove that the work, taken as a whole" is obscene.); *Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (true threats); *Planned Parenthood of Columbia/Willamette v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1107–08 (9th Cir. 2002) (incitement). So too here. New York can only support the Firearm Ban by proving that the arms it has banned are appropriate targets for prohibition under the relevant historical framework.

10

New York's task is impossible. Though the State refers to the firearms it has banned as "assault weapons," that is a pejorative term that does not refer to any identifiable class of firearm. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotation marks omitted). In reality, the State has targeted certain firearms that belong to the general category of semiautomatic firearms.

The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic firearm, a semiautomatic firearm will not fire continuously on one function of its trigger; rather, a semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). Semiautomatic firearms "traditionally have been widely accepted as lawful possessions." 511 U.S. at 612. Indeed, semiautomatic firearms have been commercially available for over a century. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994). According to industry estimates, there were 89 million semiautomatic handguns, 43 million semiautomatic rifles, and 12 million semiautomatic shotguns, for a total of 144 million semiautomatic firearms sold in the United States between 1990 and 2018. *See Firearm Production in the United States With Firearm Import and Export Data* at 17, NAT'L SHOOTING SPORTS FOUND. (NSSF) (2020), https://bit.ly/3v5XFvz. And currently the vast majority of States do not ban semiautomatic "assault weapons." In addition to New York, the only states that have enacted bans on "assault weapons" (with varying

11

definitions of that term) are California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, Delaware, and Washington. *See* Shawna Chen, *10 states with laws restricting assault weapons*, Axios (Apr. 28, 2023), https://bit.ly/3pukU02.

Even accepting New York's framing, if the banned firearms *are* considered as a separate category of arms rather than simply examples of semiautomatic firearms, they still easily satisfy the common use test. The dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess firearms in this category. *See Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting) (reasoning that "citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "[r]oughly five million Americans own" them and "[t]he overwhelming majority . . . do so for lawful purposes[.]"); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J. (ANJRPC)*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *Cuomo*, 804 F.3d at 255 ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use[.]'").

The popularity of these firearms can be demonstrated by looking at the AR-15 and similar modern semiautomatic rifles that epitomize the firearms the State lumps together in this category. The AR-15 is a semiautomatic, centerfire rifle that accepts a detachable magazine and comes standard with a pistol grip. *See* Stephen P. Halbrook, America's Rifle: The Case for the AR-15 at 9 (Google Books ed. 2022) (reproducing portions of the Colt patent for the AR-15). The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the

best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1296 (2009). Various sources demonstrate beyond doubt that AR-15 and similar types of firearms are in common use for lawful purposes.

**Consumer surveys.** Several consumer surveys demonstrate the commonality of AR-15 and similar types of rifles. In 2022, Washington Post-Ipsos conducted a survey of a random sample of 2,104 gun owners. *Poll of current gun owners* at 1, WASH. POST-IPSOS (2022), https://bit.ly/46CqzRa ("WashPost Poll"). The survey asked whether individuals owned AR-15-style rifles. Twenty percent answered yes, *id.*, which suggests that "about 16 million Americans own an AR-15." Emily Guskin, *Why do Americans own AR-15s*, WASH. POST (Mar. 27, 2023), https://wapo.st/3IDZG5I. The survey also asked *why* individuals owned AR-15s. Reasons given included protect self, family and property (91%, with 65% stating this was a major reason), target shooting (90%), in case law and order breaks down (74%), and hunting (48%). WashPost Poll at 1–2. Sixty-two percent of AR-15 owners reported firing their AR-15 rifles at least a few times a year. *Id.* at 2.

In 2021, Georgetown Professor William English conducted a survey of 16,708 gun owners. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw. The English survey asked whether gun owners had "ever owned an AR-15 or similarly styled rifle?" *Id.* at 33. "30.2% of gun owners, about 24.6 million people," indicated that they had owned such a rifle. *Id.* Of those who owned such rifles, the average person had owned 1.8 and the median 1. *Id.* The English survey also asked why gun owners had owned such a rifle. Answers included

recreational target shooting (66%), home defense (61.9%), hunting (50.5%), and defense outside the home (34.6%). *Id.* at 33. English also asked about defensive use of firearms. The survey responses indicated that gun owners engage in 1.67 million defensive gun uses a year. *Id.* at 9. This is consistent with other survey data; "[a]lmost all national survey estimates indicate[d] that defensive gun uses by victims are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million[.]" Alan I. Leshner et al., *Priorities for Research to Reduce the Threat of Firearm-Related Violence* 15, NAT'L RSCH. COUNCIL (2013), https://bit.ly/48ZYjcm. English found that 13.1% of defensive gun users used a rifle, English at 14–15, which amounts to over 200,000 defensive uses of rifles a year.

Also in 2021, the National Shooting Sports Foundation (NSSF), the Firearm Industry Trade Association, conducted a survey of 2,185 owners of AR- and AK-platform rifles. *Modern Sporting Rifle: Comprehensive Consumer Report* at 10, NSSF (July 14, 2022), https://bit.ly/3GLmErS. Owners were asked to rate on a scale of 1 to 10 (with 1 being not at all important and 10 very important) how important various reasons were for owning the rifles. Responses included recreational target shooting (8.7), home/self-defense (8.3), and varmint hunting (5.8). *Id.* at 18. Sixty-seven percent of respondents indicated that they had used their rifle at least five times in the previous twelve months. *Id.* at 41. Another NSSF survey estimated that over 21 million Americans had trained with these types of rifles in 2020. *Sport Shooting Participation in the U.S. in 2020* at *iii*, NSSF (2021), https://bit.ly/3sPuEQl.

**Firearm Dealer Surveys.** In addition to surveying consumers, the NSSF also conducts surveys of firearm dealers. Results from the most recent survey were published in 2021. *See 2021 Firearms Retailer: Survey Report*, NSSF (2021), https://bit.ly/3gWhI8E. Retailers were

asked what percentage of firearms they sold were of various types. For 2020, at the top was semiautomatic pistols, at 44.2%. *Id.* at 9. AR/modern sporting rifle was second, at 20.3%, followed by shotgun (12.4%), traditional rifle (11.3%), and revolver (7.2%). *Id.* And 2020 was not an outlier. NSSF's 2019 retailer survey indicated that ARs and other similar rifles constituted between 17.7% and 20.3% of firearm sales in every year from 2011 from 2018 (excepting 2017, when no results were reported). *2019 Firearms Retailer: Survey Report* at 6, NSSF (2019), *available at Miller v. Becerra*, No. 3:19-cv-1537 (S.D. Cal.), Dkt. No. 22-13 at 107.

**Firearm Production Data.** NSSF also has analyzed firearm production data to determine how many AR- and AK-style rifles have been produced for the American market. *Firearm Production in the United States With Firearm Import and Export Data* at 7, NSSF (2023), https://bit.ly/42qYo7k. From 1990 to 2021, it estimates that number to be 28,144,000, with totals exceeding one million every year from 2012 to 2021, with an average of over two million per year over that time period. *See id.* at 7. Domestic production of AR-style and similar rifles accounted for approximately 20% of all domestic firearms produced for the American market for the decade of 2012 to 2021. *See id.* at 2–7.

In sum, AR-style and similar rifles unquestionably are in common use for lawful purposes: millions of Americans own tens of millions of them; they account for approximately 20% of all firearm sales in the past decade; and leading reasons for owning them include self-defense, target shooting, and hunting. Indeed:

> AR-style rifles are popular with civilians . . . around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves.

FRANK MINITER, THE FUTURE OF THE GUN 46–47 (2014).

Moreover, even though not directly relevant to this Court's analysis under *Heller* and *Bruen*, New York's purported reason for banning these common arms is deeply flawed. While AR-15 and similar rifles are in common use for lawful purposes, there is one thing they very rarely are used for: violent crime. From 2013 to 2022, rifles *of any kind* were used in an average of 356 homicides per year. *Crime Data Explorer: Expanded Homicide Offense Characteristics in the United States*, FBI, U.S. DEP'T OF JUST. (2023), https://bit.ly/3IF5A6M (select year "2022" and include previous years "past 10 years"). Assuming *every one* of these rifles was a different AR-15 or similar semiautomatic rifle, that would mean that over 99.99% of these rifles *are not* used in a homicide every year. And other items are used much more frequently in homicide, including: handguns (an average of 6,743 handgun murders from 2013 through 2022); knives (an average of 1,544), and hands and feet (an average of 671). *Id.* With handguns used nearly *twenty times* more often in murder than rifles, "if we are constrained to use [New York's] rhetoric, we would have to say that *handguns* are the quintessential 'assault weapons' in today's society[.]" *Heller II*, 670 F.3d at 1290 (Kavanaugh, J., dissenting). The modern semiautomatic firearms that New York bans are overwhelmingly used by law-abiding citizens for lawful purposes. If criminal misuse of handguns—"the overwhelmingly favorite weapon of armed criminals," *Heller*, 554 U.S. at 862—could not justify the District of Columbia's handgun ban, the relatively rare criminal misuse of semiautomatic rifles cannot possibly justify New York's ban in this case.

The Supreme Court's decision in *Caetano v. Massachusetts* further confirms that the arms banned by New York are in common use for lawful purposes. That case concerned Massachusetts' ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that such weapons are not protected by the Second Amendment.

16

*Caetano v. Massachusetts*, 577 U.S. 411 (2016). With a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id.* at 411–12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, *see id.*, Justice Alito filed a concurring opinion concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* at 420 (Alito, J., concurring) (cleaned up). Of course, that is far fewer than the millions of semiautomatic firearms sold to private citizens nationwide that the State bans.

The Massachusetts Supreme Judicial Court got the message. In a subsequent case, that Court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and is therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E. 3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the State to rebut the *prima facie* presumption of [S]econd [A]mendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019) (citation omitted). This reasoning is sound, and necessarily entails the invalidity of New York's ban, which restricts arms that are much more common than stun guns.

17

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant summary judgment in Plaintiffs favor, declare the Firearm Ban unconstitutional, and enjoin its enforcement.

Respectfully submitted, this 15th day of March 2024.

Cody J. Wisniewski, Esq.*
**FPC ACTION FOUNDATION**
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
5550 Painted Mirage Road, Suite 320
Las Vegas, Nevada 89149
(916) 517-1665
cwi@fpchq.org


Adam J. Kraut, Esq.*
**SECOND AMENDMENT
FOUNDATION**
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
12500 NE 10th Place
Bellevue, Washington 98005
(800) 426-4302
akraut@saf.org


*Admitted *pro hac vice*

**FLUET**
By: */s/ Nicolas J. Rotsko*
Nicolas J. Rotsko, Esq.
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
nrotsko@fluet.law
e-file@fluet.law