UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                        :

J. MARK LANE and JAMES SEARS,      :
                        :

          Plaintiffs,       :
                        :

      - against -       :
                        :    Case No. 22 Civ. 10989 (KMK)

STEVEN G. JAMES, in his official capacity as  :
Acting Superintendent of the New York State  :
Police, and MIRIAM E. ROCAH, in her official  :   **ORAL ARGUMENT**
capacity as District Attorney for the County of  :   **REQUESTED**
Westchester, New York,       :
                        :

         Defendants.     :
------------------------------------------------------------- X


# SUPERINTENDENT JAMES' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT


LETITIA JAMES
Attorney General
State of New York
*Attorney for Superintendent Steven G. James*
28 Liberty Street
New York, New York 10005
(212) 416-6295

Suzanna Publicker Mettham
Brenda E. Cooke
James M. Thompson
Yuval Rubinstein
Assistant Attorneys General
  *Of Counsel*

## <u>TABLE OF CONTENTS</u>

Page(s)

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ..........................................................................................2

APPLICABLE STANDARD ........................................................................................4

ARGUMENT ..............................................................................................................5

POINT I     PLAINTIFFS FAILED TO ADDUCE SUFFICIENT ADMISSIBLE
            EVIDENCE ...........................................................................................5

POINT II:   PLAINTIFFS BRING A DISFAVORED FACIAL CHALLENGE ………… ......6

POINT III:  ASSAULT RIFLES ARE OUTSIDE THE SECOND AMENDMENT'S
            SCOPE ..................................................................................................7

            A.   Accessories Are Not "Arms" Under the Term's Original Public Meaning .........9

            B.   Assault Rifles and Firearm Accessories Are Not in Common Use for
                 Self-Defense .............................................................................................10

            C.   Assault Rifles Are Dangerous and Unusual Weapons............................................15

POINT IV:   THE PROHIBITION ON ASSAULT RIFLES IS CONSISTENT WITH
            AMERICAN LEGAL HISTORY AND TRADITION ...............................................18

            A.   The Technological Advancement and Lethality of Assault Rifles Are
                 Unparalleled ...............................................................................................19

            B.   American Legislatures Have Consistently Regulated New & Dangerous
                 Weapons .....................................................................................................21

            C.   States May Regulate Weapons That Cause Public Terror.....................................27

POINT V:    AN INJUNCTION SHOULD BE DENIED, OR ALTERNATIVELY, LIMITED
            TO THE PARTIES AND STAYED PENDING APPELLATE REVIEW...........30

CONCLUSION.................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                                         **Page(s)**

*Antonyuk v. Chiumento* 89 F.4th 271 (2d Cir. 2023) ................................................................ 5, 19

*Aymette v. State*, 21 Tenn. 154 (1840) ...........................................................................................28

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ...................................................passim

*Caetano v. Mass.*, 577 U.S. 411 (2016) .........................................................................................13

*Celotex v. Catrett*, 477 U.S. 317 (1986) ..........................................................................................4

*Cockrum v. State*, 24 Tex. 394 (1859) ...........................................................................................23

*D.C.  v. Heller*, 554 U.S. 570 (2008)................................................................................2, 25, 26

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Homeland Sec.*, 664 F.Supp.3d 584 (D. Del. 2023) .... 8, 27

*English v. State*, 35 Tex. 473 (1872)..............................................................................................15

*Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011) ...............................................................................6

*Hanson v. D.C.*, 671 F.Supp.3d 1 (D.D.C. 2023).............................................................23, 25, 26

*Hartford v. Ferguson*, 676 F.Supp.3d 897 (W.D. Wash. 2023) ............................................ 24, 26

*Harvey v. Katz*, 2023 WL 8810608 (E.D.N.Y. Dec. 20, 2023) ........................................... 7, 8

*Heller v. D.C. ("Heller I")*, 698 F.Supp.2d 179 (D.D.C. 2010)....................................................18

*Heller v. D.C. ("Heller II")*, 670 F.3d 1244 (D.C. Cir. 2011) ......................................................18

*Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178 (2d Cir. 2017) .....................................6

*Kane v. de Blasio*, 19 F.4th 152 (2d Cir. 2021) ..............................................................................29

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017).......................................................................... 12, 18

*Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996) ......................................................................4

*Maryland v. King*, 567 U.S. 1301 (2012) .......................................................................................30

*McDonald v. Chicago*, 561 U.S. 752 (2010) .......................................................................12, 13, 23

*Nat'l Ass'n for Gun Rights v. Lamont*, 2023 WL 4975979 (D. Conn. Aug. 3, 2023),
  *appeal pending*, No. 23-1162 (2d Cir.)...............................................................................passim

*NYSRPA v. Bruen*, 597 U.S. 1 (2022) ........................................................................................passim

*NYSRPA v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)................................................................passim

*O'Neill v. State*, 16 Ala. 65 (1849)................................................................................15

*Ocean State Tactical, LLC v. Rhode Island*, 646 F.Supp.3d 368 (D.R.I. 2022),
    *aff'd on other grounds*, 95 F.4th 38 (1st Cir. 2024) ...................................................... 8, 10

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024)...................................passim

*Or. Firearms Fed'n v. Kotek*, 682 F.Supp.3d 874 (D. Or. 2023)............................................passim

*Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012),
    *vacated sub nom. Hollingsworth v. Perry*, 570 U.S. 693 (2013) ..............................................6

*Porter v. Quarantillo*, 722 F.3d 94 (2d Cir. 2013)..............................................................5

*Rupp v. Bonta*, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024)......................................14, 22, 24

*State v. Lanier*, 71 N.C. 288 (1874)..............................................................................15

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023)...................................................................11

*Union Crowdfunding, Inc. v. New Street Enter., Inc.*, 507 F.Supp.3d 547 (S.D.N.Y. 2020) ...........................5

*United States v. Berger*, 2024 WL 449247 (E.D. Pa. Feb. 6, 2024) ....................................... 10, 11

*United States v. Gonzalez*, 2024 WL 96517 (S.D.N.Y. Jan. 9, 2024) ........................................8

*United States v. Pickett*, 2024 WL 779209 (E.D.N.Y. Feb. 26, 2024) .......................................8

*United States v. Rowson*, 652 F.Supp.3d 436 (S.D.N.Y. 2023) ........................................ 27, 28

*United States v. Veasley*, 2024 WL 1649267 (8th Cir. Apr. 17, 2024) .....................................27

*United States v. West*, 2023 WL 8091984 (E.D. Pa. Nov. 21, 2023) .......................................27

*United States v. Zaleski*, 489 Fed. App'x 474 (2d Cir. 2012) ..............................................16

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982)...................................6

*Vt. Right to Life Comm. v. Sorrell*, 758 F.3d 118 (2d Cir. 2014) ...........................................6

*Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138 (2d Cir. 2002) .......................................4

**Statutes**

1699 N. H. Acts & Laws ch. 1 ...............................................................................28

1786 Va. Laws 35 ...................................................................................................28

1795 Mass. Acts & Laws 436 .................................................................................28

1801 Tenn. Acts 260-61 ..........................................................................................29

2000 N.Y. Laws ch. 189 ...........................................................................................2

692 Mass. Acts & Laws no. 6 .................................................................................28

**Other Authorities**

2 Edw. 3 .................................................................................................................28

20 Ric. 2, 93, ch. 1 (1396).......................................................................................22

3 Bird Wilson, *The Works of the Honourable James Wilson, L.L.D.* 79 (Lorenzo Press 1804) ...................28

33 Hen. 8 Ch. 6 (1541) ............................................................................................

4 Sir William Blackstone, *Commentaries on the Laws of Eng.* 149 (16th ed. 1825) ......................28

7 Rich. 2 ch. 13.......................................................................................................22

Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 Wash. U. L. Rev. 1 (2023).....23

Charles Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822)..........16

Henry J. Stephen, Summary of the Criminal Law 85 .............................................16

William Blackstone, 4 Commentaries on the Laws of England 55, 148–149 (1769)...........................15

Defendant Steven G. James, in his official capacity as Superintendent of the New York State Police, by his attorney Letitia James, Attorney General of the State of New York, respectfully submits this memorandum of law, along with accompanying Local Civil Rule 56.1 Statement ("56.1"), and the annexed declarations, in opposition to Plaintiffs J. Mark Lane and James Sears' ("Plaintiffs") motion for summary judgment, Dkt. No. 71, and in support of his cross-motion for summary judgment. For the reasons set forth below, this Court should find as a matter of law that New York's prohibition on assault rifles is constitutional.

## PRELIMINARY STATEMENT

Plaintiffs bring a facial challenge to New York's prohibition on the subset of semiautomatic rifles outfitted with detachable magazines and certain enumerated military-style accessories, such as pistol grips and grenade launchers. Although the Second Circuit upheld the constitutionality of New York's law against these assault weapons in *NYSRPA v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), Plaintiffs maintain that the Supreme Court's subsequent decision in *NYSRPA v. Bruen*, 597 U.S. 1 (2022), entitles them to sweeping declaratory and injunctive relief. To the contrary, nothing in *Bruen* suggests that States are prohibited from regulating the possession of weapons that present an exceptional risk of mass casualties, as the weapons at issue in this case do.

Plaintiffs fail in the first instance because they have not carried their burden to demonstrate that assault weapons are "in common use today for self-defense," a necessary condition to be an "arm" within the Second Amendment's scope. *Id.* at 32. Plaintiffs have failed to adduce *any* admissible evidence about assault weapons' features, usage, or role in American society. Instead, they cite to a handful of hearsay sources (many funded by the gun industry) without testimony from an expert or declarant with personal knowledge, claiming that these assertions are "legislative facts" to which the Federal Rules of Evidence do not apply. Simply put, there is no evidence in the record for the proposition that assault weapons are used for self-defense, and a great deal of evidence—particularly

the expert declarations of James Yurgealitis and Louis Klarevas—demonstrating they are ill-suited for that purpose.

The record evidence demonstrates that assault rifles are "dangerous and unusual" weapons not covered by the Second Amendment, with a lethal capacity well beyond what Americans understand to be appropriate for self-defense. AR-15-style rifles are fundamentally military weapons, functionally identical to the M-16 rifle that the Supreme Court has already declared to be outside constitutional bounds. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). The unusual danger posed by assault weapons is exemplified by their role as the weapon of choice for mass shooters: persons seeking to commit mass murder are increasingly likely to choose an assault weapon for the purpose, because persons armed with assault weapons are likely to kill more people, quicker.

Even if Plaintiffs had demonstrated that assault weapons were "arms" under the Second Amendment's text, New York's law would still pass *Bruen* scrutiny because it is fully "consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. Americans in the Founding Era or the Fourteenth Amendment Era never encountered anything like the assault weapons that fuel mass shootings today, but American history and tradition demonstrates that our ancestors did not hesitate to regulate or ban new weapons technologies once they became particularly associated with mass violence or criminality. State assault weapons laws like New York's are fully consistent with that tradition, as federal court after federal court has held.

## STATEMENT OF FACTS

In 2000, New York enacted a ban on assault weapons, *see* 2000 N.Y. Laws ch. 189, tracking the text of then-existing federal law, which prohibited *inter alia* semiautomatic rifles with the capacity to accept a detachable magazine and certain "combat-designed features" such as stocks, grips, bayonet mounts, flash suppressors, or grenade launchers—features which "serve specific, combat-functional ends." 56.1 ¶¶ 26, 28. New York maintained the prohibition on assault weapons even after the federal

ban expired in 2004. To meet the statutory definition of an "assault weapon" under New York Penal Law § 265.00(22), a rifle[1] must have **each** of three characteristics:

- It must be **semiautomatic**, which allows it to fire a bullet each time the trigger is pulled without the shooter taking any additional action. *See* N.Y. Penal Law §§ 265.00(21), (22)(a).

- It must have "an ability to accept a **detachable magazine**," allowing for reloading within seconds. *See* N.Y. Penal Law § 265.00(22)(a). "A magazine is a 'container that holds ammunition for a firearm,' typically by holding bullets and feeding the ammunition into the firearm, but does not contain a firing mechanism. A detachable magazine may be removed and replaced with another fully loaded magazine; fixed magazines are typically reloaded by reloading bullets into the magazine attached to the firearm." *Nat'l Ass'n for Gun Rights v. Lamont*, 2023 WL 4975979, at *5 (D. Conn. Aug. 3, 2023) *("NAGR"), appeal pending*, No. 23-1162 (2d Cir.) (internal citations omitted).

- Third, it must have one or more "**enumerated military-style features**," *Cuomo*, 804 F.3d at 262, namely (i) "a folding or telescoping stock;" (ii) "a pistol grip that protrudes conspicuously beneath the action of the weapon;" (iii) "a thumbhole stock;" (iv) "a second handgrip . . . that can be held by the non-trigger hand;" (v) "a bayonet mount;" (vi) "a flash suppressor, muzzle break, [or] muzzle compensator;" or a "threaded barrel designed to accommodate [those features]," or (vii) "a grenade launcher." N.Y. Penal Law § 265.00(22)(a).

Plaintiffs are residents of Westchester County. Plaintiffs' Statement of Undisputed Material Facts ("Pl. 56.1"), Dkt. No. 73, at ¶¶ 1, 9. Plaintiff Lane alleges that "if allowed," he would purchase a Springfield Armory Saint rifle, while Plaintiff Sears would purchase an LMT MARS-L 5.56 rifle. *Id.* at ¶¶ 3, 11. Both rifles are AR-15 platform rifles chambered for the 5.56x45mm NATO cartridge, capable of accepting a detachable magazine, with a telescoping stock, pistol grip, and muzzle device. *Id.* at ¶¶ 3-4, 11-12. Plaintiffs allege that they would already have purchased these rifles, but for fear of being arrested and prosecuted for violating the laws at issue in this case. *Id.* at ¶¶ 5, 13.

The "AR-15 platform" is a popular configuration of rifle that allows for a wide variety of cosmetic or mechanical modifications to suit an owner's personal preference. 56.1 ¶¶ 3-4. The AR-15 was developed in the 1950s, at the request of the U.S. Army, for military use that began in the mid-

---

[1] The statutory definition of an assault weapon can also include "a semiautomatic shotgun" or "a semiautomatic pistol" with similar features. *See* N.Y. Penal Law §§ 265.00(22)(b)–(c). This memorandum focuses its discussion on assault rifles, as Plaintiffs' sole basis for standing is their desire to purchase "an AR-15 style rifle."

1960s. *Id.* ¶ 1. After a series of changes, the AR-15 was redesignated the "M-16," and became one of the primary weapons carried by infantrymen in the Vietnam War and subsequent conflicts. *Id.* ¶ 2. The AR-15 retains essentially the same characteristics as the military M-16, with the exception of automatic fire.[2] *Id.* ¶ 5. Not every AR-15 contains the features to meet the statutory definition of an "assault weapon," and there are AR-15-platform rifles available at gun stores in New York that comply with State law. *Id.* ¶ 7. Both Plaintiffs already own legal semiautomatic rifles (including in Plaintiff Sears' case an AR-15), *see id.* ¶¶ 32-33, but seek rifles that meet the definition of "assault weapon."

## APPLICABLE STANDARD

In a motion for summary judgment, the Court determines whether, viewing the record evidence presented by the parties and inferences in the light most favorable to the non-moving party, the absence of genuine issues of material fact entitles the moving party to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 145 (2d Cir. 2002). "[C]onclusory statements, conjecture, or speculation by the party resisting the motion" will not defeat a motion for summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

## ARGUMENT

## I.   PLAINTIFFS FAILED TO ADDUCE SUFFICIENT ADMISSIBLE EVIDENCE

As an initial matter, Plaintiffs have not met their burden on summary judgment—either as a movant or a non-moving party—because they have not adduced any admissible evidence establishing the essential elements of their claim to relief. In particular, Plaintiffs have adduced no admissible

---

[2] Semiautomatic fire remains the preferred mode for military use, however, with the U.S. Army manual on the M-16 emphasizing that semiautomatic fire is the most effective mode for the weapon, and indeed that "[t]he most important firing technique during modern, fast moving combat is rapid semiautomatic fire." 56.1 ¶ 6.

evidence that the weapons they desire "are weapons 'in common use' today for self-defense," a showing required by *Bruen* for the plain text of the Second Amendment to apply, *see* 597 U.S. at 32, and on which Plaintiffs bear the burden of proof. *See Antonyuk v. Chiumento* 89 F.4th 271, 383 (2d Cir. 2023); *accord Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023). Similarly, Plaintiffs have adduced no admissible evidence indicating that the assault rifles they desire are anything other than "dangerous and unusual weapons" outside the Second Amendment's scope. *Heller*, 554 U.S. at 627.

To the extent that Plaintiffs discuss these factual issues, they do so only through a handful of references to books, law review articles, blog posts, and surveys (generally conducted by the National Shooting Sports Foundation, the gun industry's lobbying body) in the argument section of their brief. *See* Plaintiffs' Memorandum of Law ("Pl. Memo."), Dkt. No. 72, at 11-16. Plaintiffs rely on these citations to support the proposition that AR-15 rifles are prevalent in the United States and used for self-defense. However, the cited statements—made without any attribution to a declarant with personal knowledge—are "out-of-court statement[s] offered to prove the truth of the matter asserted in the statement[s]," and therefore "inadmissible."[3] *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (citing Fed. R. Evid. 802). "[A] party cannot rely on inadmissible hearsay in support of or in opposition to a motion for summary judgment" because "courts may consider only evidence that would be admissible at trial." *Union Crowdfunding, Inc. v. New Street Enter., Inc.*, 507 F. Supp. 3d 547, 571 (S.D.N.Y. 2020) (quotation omitted) (citing Fed. R. Civ. P. 56(c)(1)(B), (2)).

Plaintiffs try to sidestep these evidentiary issues in a footnote to their Rule 56.1 Statement, contending that,

> [o]ther than those facts that relate to the standing of the parties, all of the facts relevant to the outcome of this case are 'legislative facts' which are not concerned with the particular facts of the parties but are rather generalized facts about the world. . . . such facts are appropriately related in the argument portion of Plaintiffs' brief in support of summary judgment.

---

[3] Each Plaintiff acknowledged at his deposition that he was not an expert or testifying as an expert. 56.1 ¶¶ 81-82.

Pl. 56.1 at 1 n.1 (quoting Fed. R. Evid. 201, 1972 Advisory Comm. Note; citing *Ezell v. Chicago*, 651 F.3d 684, 697 (7th Cir. 2011)).[4] In reality, "[a]djudicative facts are . . . the types of 'facts that go to a jury in a jury case,' or to the factfinder in a bench trial." *Perry v. Brown*, 671 F.3d 1052, 1075 (9th Cir. 2012), *vacated sub nom. Hollingsworth v. Perry*, 570 U.S. 693 (2013). "Legislative facts, on the other hand, are 'those which have relevance to legal reasoning and the lawmaking process.'" *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 885-86 & n.2 (D. Or. 2023) (rejecting documents with "legislative facts" as "inadmissible hearsay" that "deserve no weight in this case"). Here, Plaintiffs have not assembled the adjudicative facts on which they rely in their Rule 56.1 Statement, but rather pepper them throughout their brief with citations to partisan internet sources. The hearsay sources offered by Plaintiffs address factual questions that both parties are asking this Court to answer, including the commonality of assault weapons and their use (or lack of use) for self-defense, and should be given no weight in this case.

## II.    PLAINTIFFS BRING A DISFAVORED FACIAL CHALLENGE

A long line of Second Circuit precedent establishes that a "pre-enforcement" challenge to a state law, defined as a case like this one brought "before [any plaintiffs] have been charged with any violation of law," is properly considered a facial challenge. *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 184 (2d Cir. 2017) (citing *Cuomo*, 804 F.3d 242). This is "the most difficult challenge to mount successfully," because, "to succeed on a facial challenge, the challenger must establish *that no set of circumstances* exists under which the regulation could be valid." *Id.* (brackets omitted, emphasis in original). Accordingly, "[a] facial [] challenge will succeed only when the challenged law can never be validly applied." *Vt. Right to Life Comm. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)). As a result, Plaintiffs must show

---

[4] Plaintiffs' citation to *Ezell* makes little sense, as no part of that case concerns the distinction between legislative and adjudicative facts, let alone their admissibility.

unconstitutionality in all aspects, meaning that each and every feature merits Second Amendment protection and fails the *Bruen* historical test. They cannot meet that high burden.

## III.   ASSAULT RIFLES ARE OUTSIDE THE SECOND AMENDMENT'S SCOPE

Plaintiffs' challenge fails because they do not satisfy their threshold burden under *Bruen* to demonstrate that the law applies to conduct covered by the Second Amendment. Although this action is the first federal case directly adjudicating[5] the constitutionality of New York's assault weapon law after *Bruen*, the legal analysis is not done on a blank slate. The Second Circuit already upheld this statute's constitutionality in *Cuomo*, which "hold[s] that the core provisions of the New York and Connecticut laws prohibiting possession of semiautomatic assault weapons and large-capacity magazines do not violate the Second Amendment." 804 F.3d. at 247. Although the Circuit found, based on the record evidence before it, that "the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*," *id.* at 255, the plaintiffs failed to establish the second prong necessary to demonstrate that the Second Amendment's text applies. *See id.* at 257 ("reliable empirical evidence of lawful possession for lawful purposes was 'elusive,' beyond ownership statistics."). Assuming, without deciding, that the Second Amendment's text applied and applying the then-governing intermediate scrutiny test, the Circuit noted that,

> [a]t least since the enactment of the federal assault-weapons ban, semiautomatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims. These weapons are disproportionately used in crime, and particularly in criminal mass shootings like the attack in Newtown. They are also disproportionately used to kill law enforcement officers.

*Id.* at 262. The court noted "the dearth of evidence that law-abiding citizens typically use these weapons for self-defense" before concluding that the law "passes" the constitutional "test." *Id.* at 263.

---

[5] *Harvey v. Katz*, 2023 WL 8810608 (E.D.N.Y. Dec. 20, 2023), considered the law's constitutionality in the context of potential exceptions to *Younger* abstention, noting that a plaintiff's contention that "*Bruen* invalidated state prohibitions on assault weapons" was "unlikely to succeed." *Id.* at 3. Judge Block cited to the Seventh Circuit's "well-reasoned decision" in *Bevis*, 85 F.4th at 1192-1202 as "provid[ing] ample evidence that *Bruen* does not render New York's ban on assault weapons to be 'flagrantly and patently' unconstitutional in any and all circumstances."

Where the Second Circuit "has spoken directly to the issue presented by [a] case," a district court is "required to follow that decision unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." *United States v. Gonzalez*, 2024 WL 96517, at *3 (S.D.N.Y. Jan. 9, 2024). "Against this backdrop, the precise question for this Court is not whether *Bruen*'s reasoning supports a finding that [the assault weapons ban] is unconstitutional, but whether *Bruen* so conclusively supports that finding that the Second Circuit or the Supreme Court is all but certain to overrule [*Cuomo*]." *United States v. Pickett*, 2024 WL 779209, at *3 (E.D.N.Y. Feb. 26, 2024) (internal citation omitted). Whatever questions *Bruen* may have raised about the legal standard applicable to Second Amendment claims, there is no basis to conclude that *Bruen* "fatally abrogated" *Cuomo* or that the Circuit is "all but certain" to overrule it, *Pickett*, 2024 WL 779209 at *3, particularly when the overwhelming majority of federal courts have upheld the constitutionality of State assault weapon prohibitions. *See, e.g.*, *NAGR*, 2023 WL 4975979; *Bevis*, 85 F.4th 1175; *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Homeland Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023); *see also Harvey*, 2023 WL 8810608, at *2.

### A. Accessories Are Not "Arms" Under the Term's Original Public Meaning

The text of the Second Amendment extends only to "arms" as that term was historically understood. *Bruen*, 597 U.S. at 28. Plaintiffs bear the threshold burden to establish that detachable magazines and the firearm accessories listed in § 265.00(22)(a)(i)–(vi) constitute "arms." *See Or. Firearms Fed'n*, 682 F. Supp. 3d at 888 n.4; *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 374 (D.R.I. 2022), *aff'd on other grounds*, 95 F.4th 38 (1st Cir. 2024).

Plaintiffs fail to proffer any facts to satisfy their threshold burden. They simply declare that *Heller* "already answered" the question regarding the meaning of "arms" at the Founding because "all firearms are arms" and that, because New York's statute "bans firearms," the Second Amendment's

"plain text is implicated." Pl. Memo. at 6. Yet Plaintiffs fail to explain how the text of § 265.00(22) bans "arms." Indeed, New York's assault weapons law does not ban rifles, but rather a combination of features, and Plaintiffs therefore misstate the law when they refer to the challenged measure as a "Semiautomatic Firearm Ban," Complaint, Dkt. No. 1, ¶ 13, or assert that "New York bans common semiautomatic firearms, the paradigmatic example of which is the AR-15 type rifle." Pl. Memo. at 2; *cf. Cuomo*, 804 F.3d at 260 ("Plaintiffs nonetheless argue that the legislation does prohibit 'firearms of a universally recognized type—semiautomatic. Not so."). New Yorkers can and do purchase semiautomatic rifles with detachable magazines so long as they do not include one or more of the enumerated military-style features; similarly, New Yorkers can and do purchase semiautomatic rifles with any or all of those features so long as the weapon has a fixed magazine. Semiautomatic rifles, including the AR-15, remain widely available to the public in gun stores across New York State. Plaintiffs themselves own semiautomatic rifles, including an AR-15 platform semiautomatic rifle owned by Plaintiff Sears, that comply with New York Law. 56.1 ¶¶ 32-33.

Plaintiffs' assertion that *Heller* is dispositive is also mistaken, as the threshold question is whether the combination of accessories *attached* to an assault rifle are themselves "arms." *See Capen v. Campbell*, 2023 WL 8851005, at *17 (D. Mass. Dec. 21, 2023). *Heller* did not address this, let alone resolve it. The factual and historical evidence demonstrates that detachable magazines and the accessories in § 265.00(22)(a)(i)–(vi) are not "arms" covered by the plain text the Second Amendment. The historical sources quoted in *Heller* define "arms" as "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* The combination of accessories prohibited by § 265.00(22) fall well outside of this historical definition.

A detachable magazine merely "holds the ammunition for a firearm before it is chambered and fired." 56.1 ¶ 8. A magazine is not used as a "weapon of offence" in itself. *Ocean State Tactical*, 646

F. Supp. 3d at 386-87 ("[large capacity magazines], like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another'") (quoting *Heller*, 554 U.S. at 582). Thus, "[m]agazines are an *accessory* to firearms, rather than a specific type of firearm." *Or. Firearms Fed'n*, 682 F. Supp. 3d at 912. New York only prohibits assault rifles that accept detachable magazines. Plaintiffs may lawfully attach "fixed" magazines to what would otherwise be classified as an assault rifle. Plaintiffs do not (and indeed cannot) maintain that a detachable magazine is necessary to use a semiautomatic rifle, unlike with bullets. *Ocean State Tactical*, 646 F. Supp. 3d at 386 (noting that detachable magazines differ from bullets with respect to usefulness of a weapon).

The challenged accessories are also not "arms" encompassed by the Second Amendment's plain text, are not used as weapons themselves, and are not essential to operate a rifle. *See* 56.1 ¶¶ 48-51; *see also id.* ¶ 7. Plaintiffs effectively concede as much by asserting that telescoping stocks, pistol grips, and muzzle devices are "ergonomic and safety features." *See* Pl. 56.1, ¶¶ 3, 11. Indeed, the features are akin to silencers, which may reduce the noise emitted when a firearm discharges but are outside the Second Amendment's scope because they are not "necessary or integral to a firearm's operation." *United States v. Berger*, 2024 WL 449247, *16 (E.D. Pa. Feb. 6, 2024).

The distinction between weapons and accessories would have also been familiar to "ordinary citizens in the founding generation." *Heller*, 554 U.S. at 577. During the Founding Era, precursors to modern-day magazines were referred to as "accoutrements," not arms. 56.1 ¶ 50. The word "arms" almost never included ammunition, ammunition storage containers, or "detachables," such as flints and ramrods. *Id.* at ¶ 51. The original meaning of the term "arms" is discussed more fully in the accompanying declaration of Professor Dennis Baron. *Cf. Ocean State Tactical*, 646 F. Supp. 3d at 387-88 (looking to Dr. Baron as an authority on the difference between "'Arms' and 'accoutrements'").

## B. Assault Rifles and Firearm Accessories Are Not in Common Use for Self-Defense

### 1. Plaintiffs Bear the Burden Under "Step One" of *Heller* and *Bruen*

Plaintiffs must show that the assault rifles and accessories they seek to possess are "in common use today for self-defense." *Bruen*, 597 U.S. at 32; *see also Heller*, 554 U.S. at 624. Although Plaintiffs concede that *Heller* analyzed "common use" separately and prior to its historical analysis, they nonetheless assert that it is New York's burden under *Bruen* to demonstrate that assault rifles are not in common use as part of the "step two" historical analysis. Pl. Memo. at 8-9. Plaintiffs are mistaken. *Bruen* affirmed that *Heller*'s "common use" analysis remains part of the "step one" textual inquiry. 597 U.S. at 32; *see Berger*, 2024 WL 449247 at *6 (noting that Justice Thomas's majority opinion in *Bruen* "addressed whether handguns are weapons in common use today for self-defense at step one of the analysis," and emphasizing there is "no reason to believe that this happened accidentally"). Plaintiffs' suggestion that the inquiry has migrated from "step one" to "step two" under *Bruen* also runs counter to the overwhelming weight of authority.[6] *Berger*, 2024 WL 449247 at *3 (citing cases).

### 2. Plaintiffs Fail to Establish That Assault Rifles Are in Common Use for Self-Defense

The crux of Plaintiffs' argument is that assault rifles are in common use based upon their "popularity." Pl. Memo. at 12. Plaintiffs cite to surveys of gun owners, dealers, and manufacturers to conclude that "AR-style and similar rifles" are in common use because "millions of Americans own tens of millions of them[.]" *Id.* at 12-15. The biased survey data that Plaintiffs cite is inadmissible hearsay, and Plaintiffs cannot pass off these statistics as "legislative facts" that are immune from the Federal Rules of Evidence. *See* Point I, *supra*. Simply put, there is no admissible evidence in the record before the Court for the proposition that assault rifles are self-defense weapons.

In addition to this threshold evidentiary deficiency, Plaintiffs' reliance upon purported ownership statistics wrongly conflates *possession* and *use*. Plaintiffs claim "[t]he dispositive point under

---

[6] Plaintiffs cite a lone decision in support of their argument, *Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023). Pl. Memo. at 9-10. However, the Ninth Circuit granted Hawaii's petition for rehearing *en banc* and vacated the *Teter* panel's decision. 93 F.4th 1150 (9th Cir. Feb. 22, 2024). The *Teter* panel also did not address *Bruen*'s explicit reference to common use as part of the "step one" textual analysis.

*Heller* and *Bruen* is that millions of law-abiding citizens choose to *possess* firearms in this category." Pl. Memo. at 12 (emphasis added). But neither case supports Plaintiffs' interpretation of "common use" that amounts to a mere popularity test wholly divorced from a weapon's functionality.

The Supreme Court emphasized in *Heller* that "the right secured by the Second Amendment is not unlimited," and "was not a right to keep and carry any weapon whatsoever in any manner whatsoever *and for whatever purpose*." 554 U.S. at 626 (emphasis added). *Heller* held that self-defense is the "core lawful purpose" of the Second Amendment, its "*central component*," and the original motivation for codification. *Id.* at 630 (emphasis in original). *Heller* also made clear that the Second Amendment does not protect weapons that are "most useful in military service," such as "M-16 rifles," irrespective of their popularity. *Id.* at 627; *see Kolbe v. Hogan*, 849 F.3d 114, 142 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 597 U.S. at 19 n.4. *Bruen* reaffirmed the core holding of *Heller* and *McDonald v. Chicago*, 561 U.S. 752 (2010), that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." 597 U.S. at 21. *Bruen* also went a crucial step further by making it clear that only "weapons in common use today *for self-defense*" fall within the Second Amendment's ambit. *Id.* at 32 (emphasis added) (quotation omitted). The common use analysis must focus on the weapon's functionality and suitability for purposes of civilian self-defense. A counting exercise, particularly one drawn from dubious survey responses, will not suffice.

Plaintiffs' reliance on survey data attesting to the "popularity" of assault rifles is thus irrelevant to the "common use" analysis under *Heller* and *Bruen*, as these raw numbers do not come close to demonstrating that these weapons are actually commonly used in self-defense. Plaintiffs effectively concede that neither *Heller* nor *Bruen* supports their argument by citing to a dissent from denial of certiorari as well as three appeals court decisions that predate *Bruen*, including *Cuomo*. Pl. Memo. at 13. But the Second Circuit in *Cuomo* "agree[d]" that ownership statistics could not alone resolve the common use inquiry, and that "empirical evidence" regarding the "lawful purpose" of assault rifles

was "elusive." 804 F.3d at 256-57. Federal courts applying *Bruen* have further emphasized that ownership statistics alone cannot establish that a weapon is in common use for self-defense. *Ocean State Tactical*, 95 F.4th at 51; *Or. Firearms Fed'n*, 682 F. Supp. 3d at 915-16.

Plaintiffs are also wrong to maintain that an assault rifle is in common use if it serves *any* lawful purpose, including hunting and target shooting. Pl. Memo. at 15. Nothing in *Bruen* supports Plaintiffs' expansive understanding of "lawful purposes" as coterminous with "constitutionally protected purposes." *Or. Firearms Fed'n*, 682 F. Supp. 3d at 917; *see also Bruen*, 597 U.S. at 29 ("As we stated in *Heller* and repeated in *McDonald*, individual self-defense is 'the *central component*' of the Second Amendment right." (emphasis in the original)).[7] Plaintiffs also suggest that assault rifles are used for "lawful purposes" because they are "rarely used for [] violent crime," and cite to FBI statistics concerning the use of rifles in homicides. Pl. Memo. at 16. Plaintiffs, however, conspicuously fail to address the disproportionate use of assault rifles in recent mass shootings. *See* 56.1 ¶¶ 82-102; *NAGR*, 2023 WL 4975979, at *22 (rejecting plaintiffs' citation to FBI homicide statistics).

Moreover, assault weapons are not, and never have been, in common use in New York. The weapons were prohibited under federal law from 1994 to 2004 and under State law since 2000, subject to very few exceptions (primarily for grandfathered assault weapons or weapons owned by members of law enforcement). 56.1 ¶¶ 26-30. Accordingly, lawful assault weapon ownership in New York is vanishingly rare, with only 24,720 individuals, or 0.12% of New Yorkers, having registered legal ownership of an assault weapon. 56.1 ¶ 77. Given that "few civilians owned AR-15s" prior to the federal ban in 1994, *Bevis*, 85 F.4th at 1199; *accord* Declaration ("Dec.") of Louis Klarevas ¶ 24, and few civilians in New York do today, Plaintiffs' "common use" argument is predicated on the idea that

---

[7] Plaintiffs cite Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), to argue that assault rifles "are in common use for a lawful purpose." Pl. Memo. at 16-17. The concurrence, however, emphasized that these weapons are "a legitimate means of self-defense." *Id.* at 420. Plaintiffs' focus on the "hundreds of thousands of stun guns" referenced by Justice Alito is also self-defeating given the greater number of lawfully registered machine guns, which have been consistently deemed unprotected by the Second Amendment. *Berger*, 2024 WL 449247, at *10. The two pre-*Bruen* state-court decisions Plaintiffs also cite did not hold that stun guns are in common use based only on ownership statistics.

the meaning of the Constitution in New York has changed due to the gun industry's sales patterns elsewhere. "This conclusion is essential to the plaintiffs' position, yet it lacks both textual and historical provenance." *Bevis*, 85 F.4th at 1199.

### 3. Assault Rifles Are Not Designed or Commonly Used For Civilian Self-Defense

While "a modern American citizen might want to possess a military-grade weapon" for self-defense, such a desire is insufficient to create a constitutionally protected right. *NAGR*, 2023 WL 4975979, at *26; *see also Bevis*, 85 F.4th at 1195. The record before the Court, in particular the Declarations of Mr. Yurgealitis and Dr. Klarevas, demonstrates that the weapons and accessories banned by New York law are *not* commonly used by civilians for self-defense. 56.1 at ¶¶ 53-76.

As Mr. Yurgealitis explains, assault weapons are "a poor choice for civilian self-defense," Yurgealitis Dec. ¶ 142; *accord Rupp v. Bonta*, 2024 WL 1142061, at *12 (C.D. Cal. Mar. 15, 2024) ("assault rifles are poorly suited to lawful self-defense—the core purpose of the Second Amendment"). The weapons were designed for use on battlefields at long range, but civilian self-defense situations are rarely conducted in similar conditions. *Id.* ¶¶ 144, 156. The high muzzle velocities of assault weapons will penetrate the walls of most homes, creating a threat to neighbors and family members in a self-defense scenario. *Id.* ¶¶ 144-47. The weapons are large, often cumbersome, sometimes difficult to change from a "safe" condition to a firing condition, and require two hands to use, making it difficult or impossible to call 911, lead a vulnerable adult out of danger, or carry a small child. 56.1 at ¶¶ 66-68. Indeed, although assault rifles are disproportionately used *offensively* to commit mass shootings, *see generally* Klarevas Dec. ¶¶ 37-50, Schildkraut Dec. ¶¶ 12-14, it is vanishingly rare to use them *defensively* to prevent harm. 56.1 at ¶¶ 53-76.[8] In the 23 years between 2000 and 2022, the FBI found only one

---

[8] Even the deeply biased, inadmissible, and methodologically opaque English report that Plaintiffs cite demonstrates that AR-15-style rifles are not well-suited to self-defense. According to that report, even among owners of AR-15-style rifles only 25% of defensive gun uses involved a rifle of any type. Klarevas Dec. ¶ 68. (There is no data as to what percentage of those incidents involved an AR-15-style rifle, or what percentage of *those* incidents involved an AR-15-style rifle that would meet New York's definition of an assault weapon.) Put another way, even according to the English study, those who own AR-15-style rifles overwhelmingly preferred handguns or shotguns in actual self-defense situations. *Id.* ¶¶ 67-69.

instance out of 456 active shooter incidents where an armed civilian intervened with an assault weapon. 56.1 at ¶¶ 74-76. And Plaintiffs Lane and Sears each admitted at their depositions that they had no personal knowledge of *any* instance where an assault weapon was used in self-defense. *Id.* at ¶¶ 36-37.

### C.  Assault Rifles Are Dangerous and Unusual Weapons

The Second Amendment has never protected "any weapon whatsoever," and has been understood to fit within "a historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626-27 (quoting William Blackstone, 4 Commentaries on the Laws of England 55, 148–149 (1769)). Plaintiffs misinterpret the phrase "dangerous and unusual" in *Heller* to mean that firearms can be prohibited only if they are both dangerous *and* unusual. Pl. Memo. at 1-2. However, the phrase, "dangerous and unusual" is best read to represent a single concept of "unusually dangerous." *NAGR*, 2023 WL 4975979, at *16. As Judge Arterton noted in *NAGR*, "[A]ll firearms are 'dangerous' in the sense that they are lethal," so the term "unusual" must refer to "some level of lethality or capacity for injury beyond societally accepted norms that makes it especially dangerous." *Id.* at *16; *see Ocean State Tactical* 95 F.4th at 50-51 (rejecting the idea that "states may permissibly regulate only unusual weapons" or that "a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is the sole measure of whether it is 'unusual.'"). Indeed, *Heller* itself refers to the term both disjunctively and conjunctively. *See* 554 U.S. at 623 ("dangerous or unusual weapons"); *id.* at 627 ("dangerous and unusual weapons"). State high courts in the 19th century likewise understood the terms to be disjunctive. *See, e.g.*, *O'Neill v. State*, 16 Ala. 65, 67 (1849); *State v. Lanier*, 71 N.C. 288, 289 (1874); *English v. State*, 35 Tex. 473, 476 (1872).[9]

---

[9] Other historical sources cited in *Heller* use the same disjunction. *See* Charles Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822) ("Riding or going armed with dangerous or unusual weapons, is a crime against the public peace . . . ."); Henry J. Stephen, Summary of the Criminal Law 85 (listing among "offences against the public peace" the crime of "[r]iding or going armed with dangerous or unusual Weapons").

Most of the weapons restricted by the challenged statutes are adaptations of the M-16 or AK-47, among the most commonly used military weapons in the world. 56.1 ¶ 5. The Supreme Court even highlighted the M-16 as exemplifying a "dangerous and unusual" weapon that falls outside the Second Amendment's protections. *Heller*, 554 U.S. at 627; *see United States v. Zaleski*, 489 Fed. App'x 474, 475 (2d Cir. 2012). Similarly, the original, automatic AR-15 was designed for combat use, not for civilian use, due to its "phenomenal lethality," and was "engineered to generate maximum wound effect." *NAGR*, 2023 WL 4975979 at *26, *27.

In keeping with their development for military use, assault weapons are fundamentally designed to kill large numbers of people in short periods of time, making them particularly desirable for persons intending to commit mass shootings. *See generally* Klarevas Dec. ¶¶ 37-50, Schildkraut Dec. ¶¶ 12-14. "Assault weapons have been used to perpetuate approximately one-third of the high fatality mass shootings in the past 32 years, and between 2014 and the end of 2022, that number has increased to approximately half." *NAGR*, 2023 WL 4975979, at *23 (citing Professor Klarevas); *see* Klarevas Dec. ¶ 48-49; *see also* Schildkraut Dec. ¶ 14.[10] Mass shootings carried out using an assault weapon are much more lethal than shootings with other firearms, resulting in significantly higher death counts. *See* Klarevas Dec. ¶ 49, Schildkraut Dec. ¶ 15. In addition to the higher death counts, the use of assault rifles in mass shootings results in more victims overall: as Professor Schildkraut notes, an average of 11.7 persons are injured in any given mass shooting involving an assault rifle, as compared to 3.3 persons in mass shootings involving other firearms. Schildkraut Dec. ¶ 16.

The speed with which assault weapons kill is key: the average mass shooting lasts less than five minutes before law enforcement intervenes, and the combination of semiautomatic fire, detachable

---

[10] Professors Klarevas and Schildkraut use slightly different definitions of the term "mass shooting" in their research, resulting in slightly different figures. *Compare* Klarevas Dec. ¶ 40 n.45 *with* Schildkraut Dec. ¶ 7; *see also id.* ("how the term 'mass shooting' is defined varies across researchers as well as governmental agencies"). Similarly, they utilize slightly different data sources, including their own separate, individually-maintained databases. *Compare* Klarevas Dec. ¶ 40 n.45 *with* Schildkraut Dec. ¶ 12. The overall trends of growing prevalence and greater lethality are clear in both scholars' work.

magazines, and military-style accessories allow shooters to use that time to fire off more shots and kill more people. *See* Schildkraut Dec. ¶ 28. Plaintiff Sears acknowledged at his deposition that the features Plaintiffs want to combine on their rifles are the same features that would make the weapons particularly useful for carrying out a mass shooting. 56.1 at ¶ 78. Potential mass shooters are well aware of these features of the weapon: over the decade between 2010 and 2019, the share of mass shooters who carried out their massacres seeking fame or notoriety nearly doubled, as did the share of mass shooters choosing to use assault weapons. *See* Schildkraut Dec. ¶ 26. Research shows that potential mass shooters frequently study prior shooters in order to plan their attack and emulate aspects of previous incidents that they view as "successful" in generating a large number of victims. *Id.* In contrast, shootings carried out with other weapons result in the shooter not being able to kill as many people as quickly, and in opportunities for potential victims to escape or fight back. *See* Klarevas Dec. ¶¶ 53-54.

History also shows that assault weapon bans save lives, prevent mass shootings, and render the mass shootings that do happen less effective. Mass shooting incidents went down significantly when the federal government banned assault weapons, from an average of 2.05 incidents per year before the ban to an average of 1.6 during it – before rising to 4.18 mass shootings per year after Congress allowed the ban to lapse. Schildkraut Dec. ¶ 23. And the shootings that did happen were less lethal, with 66% fewer fatalities and 82% fewer injuries per attack when the ban was in effect. *See id.* ¶ 24. State bans such as New York's are similarly effective in reducing both mass shooting incidents and the lethality of those mass shootings that do occur. *See* Schildkraut Dec. ¶ 25; Klarevas Dec. ¶¶ 61-62.

Assault weapons are "military-style weapons of war, made for offensive military use," "disproportionately likely to be used by criminals," and "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes." *Heller v. District of Columbia ("Heller II")*, 670

F.3d 1244 (D.C. Cir. 2011). Moreover, such weapons "are unusually dangerous because they place law enforcement officers at a particularly grave risk due to their high firepower." *Heller v. District of Columbia ("Heller I")*, 698 F. Supp. 2d 179, 194 (D.D.C. 2010), *aff'd in part, vacated in part, Heller II*. As such, "assault weapons . . . constitute weapons that are not in common use, are not typically possessed by law-abiding citizens for lawful purposes and are 'dangerous and unusual' within the meaning of *Heller*." *Id.* at 194; *see Kolbe*, 849 F.3d at 136.

## IV.   THE PROHIBITION ON ASSAULT RIFLES IS CONSISTENT WITH AMERICAN LEGAL HISTORY AND TRADITION

Even if the Court were to deem assault rifles to be "arms" under step one of the *Bruen* test, New York's prohibition on these weapons comfortably passes *Bruen's* second step, as the ban on these particularly deadly weapons is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Plaintiffs conflate the question of whether a weapon is in common use for self-defense (and thus one of the "arms" considered by the Second Amendment's text) with the entirely separate question of whether the challenged statute is historically justified, contending that "no historical evidence the State could put forward could possibly justify its law." Pl. Memo at 3. But federal courts have consistently rejected such invitations to allow the "common use" test to serve as a vehicle for ignoring history. *See, e.g.*, *Ocean State Tactical*, 95 F.4th at 51 ("Despite plaintiffs' fixation on the ownership rates . . . such statistics are ancillary to the [historical] inquiry the Supreme Court has directed us to undertake."). Plaintiffs' "proposed application of a 'common use' standard would effectively ignore an important underpinning of *Bruen*: that the meaning of the Second Amendment should be grounded in text, history, and tradition, not shifting modern attitudes, and that its protection should be categorical." *Capen*, 2023 WL 8851005 at *8 (citing *Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring)). And because Plaintiffs have declined to put forward any affirmative evidence about history in their case-in-chief, New York's extensive historical showing, detailed below, is uncontradicted.

**A.  The Technological Advancement and Lethality of Assault Rifles Are Unparalleled**

*Bruen* recognized that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27-28; *accord Antonyuk*, 89 F.4th at 302 ("courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction"). Such cases require reviewing courts to adopt a flexible approach to analogical reasoning, which does not demand "a distinctly similar historical regulation," but instead evaluates historical laws to determine whether they "'impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.'" *Id.* (quoting *Bruen*, 597 U.S. at 29).

The factual record before the Court, including the accompanying declarations of Professors Brian DeLay, Brennan Rivas, and Robert Spitzer, demonstrates that assault weapons are a fundamentally modern invention and that the mass shootings repeatedly committed with them are a fundamentally modern problem. Indeed, "[f]ounding-era society faced no risk that one person with a gun could, in minutes, murder several dozen individuals." *Ocean State Tactical*, 95 F.4th at 49. In contrast, "[t]he features of modern assault weapons—particularly the AR-15's radical increases in muzzle velocity, range, accuracy, and functionality—along with the types of injuries they can inflict are so different from colonial firearms that the two are not reasonably comparable." *Capen*, 2023 WL 8851005, at *12.

Semiautomatic rifles meeting New York's definition of an assault weapon only reached the civilian market in the mid-1960s, and it was not until well into the 21st century that they became commercially popular. 56.1 ¶ 107. In contrast, at the time of the Founding and well into the 19th century, the only firearms that Americans owned in significant numbers were single-shot muzzle-

loading smoothbore muskets, rifles, and pistols, which lacked the accuracy, reliability, or rate of fire to cause mass casualties. *Id.* ¶ 103. Weapon technology grew more sophisticated over the 19th century, with the advent and popularization of concealable bladed weapons, and then repeating pistols such as the Colt revolver.[11] *Id.* ¶ 104. Repeating rifles began to be manufactured in the 1860s and 1870s, but were almost exclusively sold to foreign militaries, with few in the hands of American civilians.[12] *Id.* ¶ 105. Self-loading machine guns and detachable magazines only came onto the market in the early 20th century, and when these weapons (such as the Thompson submachine gun, known as the "Tommy Gun") began to proliferate, states and the federal government passed laws banning them. *Id.* ¶ 106.

Assault rifles, meanwhile, are a modern innovation, with the semiautomatic AR-15 only being introduced on the civilian market in 1963, without achieving significant popularity. *Id.* ¶ 107. When, in 1994, the Federal Assault Weapons Ban made civilian possession of AR-15s unlawful, few civilians owned AR-15s. *Id.* ¶ 108; *see Bevis*, 85 F.4th at 1199. After the legislation was allowed to expire in 2004, these weapons began to occupy a more significant share of the market (outside New York). Indeed, most AR-15s now in use were manufactured in the past two decades. *Bevis*, 85 F.4th at 1199. Assault rifles thus represent a "dramatic technological change[]" that requires courts to take a flexible and "nuanced approach." *Bruen*, 597 U.S. at 27.

Likewise, the problem of high-casualty mass shootings carried out by a single perpetrator is an unprecedented societal concern, only made possible by 20th century advances in firearm technology. Indeed, it was not until 1949 when America first suffered an incident where a single

---

[11] Although these pistols and revolvers were technically "repeating" in the sense that the shooter did not need to manually load the pistol after each shot, they were not semiautomatic in the way we would understand today. A single-action Colt revolver, for instance, would require the shooter to pull back the weapon's hammer to rotate the chamber and position a new round for firing. Similarly, the revolvers of the 19th century did not have detachable magazines of the sort used in a modern handgun, instead requiring the shooter to load the cylinder one bullet at a time. *See* 56.1 ¶ 106, 133.

[12] The repeating rifles of the late 19th century bore little resemblance to a modern assault weapon as defined by N.Y. Penal Law § 265.00(22). The Winchester repeating rifle, for instance, met none of the statute's three criteria: it was not semiautomatic (instead requiring manual operation of a lever), did not accept a detachable magazine (instead having a fixed, tubular magazine with each round loaded by hand), and not include any of the additional military accessories enumerated in Penal Law § 265.00(22)(a)(i-vii). 56.1 ¶¶ 52, 133.

shooter killed more than ten people with a firearm. 56.1 ¶ 109. Over time, as assault weapons proliferated through the civilian population, more and more mass shootings followed. *Id.* ¶ 110. The increasing frequency and lethality of these mass shootings are intimately tied to the spread of assault weapon technology. As Professor Klarevas points out, between the ten-year-period of 1974-1983 and the ten-year-period of 2014-2023, the number of people killed in high-fatality mass shootings and mass public shootings has increased by 230% and 502%, respectively. *Id.* ¶ 111. This increase in lethality has come about at the same time as an increase in the use of assault weapons, with 50% of high-fatality mass shootings and 58% of mass public shooting incidents involving assault weapons. *Id.* ¶ 112. "Thus, the record supports the conclusion that mass shootings carried out with assault weapons [] that result in mass fatalities are a modern societal problem . . . spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers." *NAGR*, 2023 WL 4975979 at *29. This record requires "a flexible approach under *Bruen*." *Antonyuk*, 89 F.4th at 359 n.78.

### B. American Legislatures Have Consistently Regulated New & Dangerous Weapons

New York's assault weapons law is fully "consistent with this Nation's historical tradition of firearms regulation," *Bruen* 797 U.S. at 17, because that "historical tradition recognizes the need to protect against the greater dangers posed by some weapons (as compared to, for example, handguns) as a sufficient justification for firearm regulation." *Ocean State Tactical*, 95 F.4th at 49. This tradition is demonstrated in the uncontradicted expert declarations of Professors Spitzer, DeLay, and Rivas.

As Dr. Spitzer explains, throughout American history "a specific relationship existed between the development of new weapons technologies, their spread into society, and subsequent regulation by the government, as part of a centuries-long effort to protect the public from harm and to dampen weapons-related criminality and violence." 56.1 ¶ 113. First, a new weapon or weapon technology is invented. Second, it may then be patented. Third, the technology is generally developed with a focus on military applications, rather than civilian use. Fourth, military-designed weapons may spread to the

civilian market. And fifth, if these weapons come to pose a threat to public safety, the people's elected representatives enact laws against their ownership or carriage. *Id.* ¶ 114. New weapon laws are not enacted when technologies are invented or conceived. They are enacted when those technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers.

That tradition extends at least as far back as medieval England, where in 1383 the crown prohibited the carrying of a launcegay, a sort of lightweight lance, declaring that "Launcegays [are] clearly put out within the said Realm, as a Thing prohibited by our Lord the King." *Rupp*, 2024 WL 1142061, at *20 (quoting 7 Rich. 2 ch. 13, attached to the Dec. of Suzanna Publicker Mettham ("SPM") as Ex. J). "A statute passed just over a decade later similarly provided that 'Launcegays shall be utterly put out within the said Realm." *Id.* (quoting 20 Ric. 2, 93, ch. 1 (1396), SPM Dec. Ex. K). *Bruen* viewed these laws as justified because launcegays were "generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace," in contrast to "smaller medieval weapons that strike us as most analogous to modern handguns" that "civilians wore [] for self-protection." *Bruen*, 597 U.S. at 41-42; *see Rupp*, 2024 WL 1142061 at *20. Parliament later made it unlawful for an individual, subject to certain exceptions, to 'keep in his or their houses' any 'crossbow' or 'handgun,' in response to 'shameful murders, robberies, [and] felonies' having been committed with those weapons." *Rupp*, 2024 WL 1142061, at *20 (quoting 33 Hen. 8 Ch. 6 (1541), SPM Dec. Ex. L). Parliament expanded the geographic reach of the law sixty years later, "making the ban even more comprehensive." *Id.* (quoting 4 Jac. I Ch. 1 (1606), SPM Dec. Ex. M).

The history of the United States likewise demonstrates a tradition where the People's elected representatives enact laws to curb or prohibit dangerous advances in weapons technology. *See generally*, 56.1 ¶¶ 104-05. The first broad example of this tradition was "the severe restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity

in the hands of murderers became apparent." *Ocean State Tactical*, 95 F.4th at 46. As described by

Professors Spitzer and Rivas, the "Bowie knife" was invented in the 1820s and became popular in the

following decade, due both to its notorious reputation and the fact that knives were a superior weapon

to the inaccurate and unreliable single-shot pistols of the time. *Id.* ¶ 103. As the First Circuit recently

noted, "[a]t that time, Bowie knives were considered more dangerous than firearms; the Texas

Supreme Court explained that, '[t]he gun or pistol may miss its aim, and when discharged, its

dangerous character is lost, or diminished at least . . . The bowie-knife differs from these in its device

and design; it is the instrument of almost certain death.'" *Ocean State Tactical*, 95 F.4th at 48 (quoting

*Cockrum v. State*, 24 Tex. 394, 402 (1859)). Small wonder that Early America responded with legislation

that was "nearly ubiquitous: [f]rom the beginning of the 1830s through the early twentieth century,

the District of Columbia[13] and every state except New Hampshire passed laws restricting Bowie

knives." *Id.*

    Although Bowie knives were the most dangerous of the new weapons technologies of the

early Republic, American states could and did similarly regulate the possession or carriage of other

dangerous handheld weapons "because they were dangerous weapons commonly used for criminal

behavior and not for self-defense." *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 17 (D.D.C. 2023).

Beginning in 1799, every state in the nation adopted laws restricting types of clubs or other blunt

weapons, including batons, billy clubs, blackjacks, and bludgeons, recognizing them as "wicked,

cowardly, Soaked in blood and cured in whiskey." 56.1 ¶ 119. Of particular concern was a "slungshot,"

a handheld weapon consisting of a piece of metal or stone attached to a flexible strap or handle, which

demonstrated the way Early America acted quickly to curb new weapons best suited for offensive or

---

[13] Historical laws adopted in the District of Columbia and the territories have particular doctrinal importance because
these federal jurisdictions were the only parts of the United States where the Second Amendment applied. *See* Andrew
Willinger, *The Territories Under Text, History, and Tradition*, 101 Wash. U. L. Rev. 1, 8-9 (2023). The Second Amendment was
not incorporated against the States until 2010. *See McDonald*, 561 U.S. 752.

criminal use. The first known use of a slungshot occurred in 1842 and the first state law banning them was enacted in 1850, with more than 40 states and the District of Columbia passing bans throughout the 19th century. *Id.* ¶ 121.

Colonial and early American legislatures also broadly regulated trap guns, "which were conventional firearms rigged with a wire or other device to fire without the firearm operator being physically present." *Or. Firearms Fed'n*, 682 F. Supp. 3d at 909. These weapons were first prohibited by the colony of New Jersey in 1771, and at least 24 more states would go on to enact their own measures. 56.1 ¶¶ 122-23. These laws were enacted throughout American history, from the colonial era through the late 19th and early 20th century, and are "relevantly similar" to assault weapons laws because they concern certain dangerous modifications to publicly available guns, and ban possession of the modified weapons outright. *See Rupp*, 2024 WL 1142061 at *23, 25, 28.

Firearms simply were not the weapon of choice for interpersonal violence during the colonial period or the early days of the Republic: they were too cumbersome, too time-consuming to load and reload, and too inaccurate or unreliable when compared to handheld or bladed weapons. 56.1 ¶ 125. But "[o]nce revolvers began to spread from the military to the civilian market following the Civil War and became associated with lawless violence, they were swiftly met by laws and regulations aimed at curbing their possession and use." *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 906 (W.D. Wash. 2023) (citing Dr. Spitzer). States and municipalities adopted laws banning the concealed carry of pistols and revolvers, penalizing their public display, or requiring licensure. 56.1 ¶ 128. By 1938, the carrying of concealed pistols was either absolutely prohibited or permitted only with a license in all but two states. *Id.* ¶ 129.

As rifles capable of a high rate of fire became available on the civilian market, after World War I and into the Prohibition Era, states and the federal government stepped in to protect the public. "The first handheld firearm that both (a) had a detachable magazine holding more than ten rounds

and (b) was commercially available to civilians in the United States was the Thompson submachine gun, introduced to the market in the 1920s." *Hanson*, 671 F. Supp. 3d at 19 (citing to Professor DeLay). When the Tommy gun and its close cousin the Browning Automatic Rifle, with their large ammunition capacities and automatic fire, began to circulate in the civilian market, they quickly became notorious for their use by gangsters. 56.1 ¶ 134. The guns' association with violence and criminality, rather than lawful self-defense, led the People's elected representatives to take action, with at least 36 states enacting anti-machine gun laws in the years between 1925 and 1935. *Id.* ¶ 135. Congress also acted, passing first a machine gun ban for the District of Columbia and then the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and circulation of fully automatic weapons. *Id.* ¶ 136.

Laws targeting weapons capable of firing automatically are particularly analogous "when we take into account how easy it is to modify the AR-15 [or other assault weapon] by adding a 'bump stock' (as the shooter in the 2017 Las Vegas event had done) or auto-sear to it, thereby making it, in essence, a fully automatic weapon." *Bevis*, 85 F.4th at 1196. These devices allow rates of fire comparable to the fully automatic M-16 rifle used by the American military, which the Supreme Court has already recognized to be outside the Second Amendment's scope. *See Heller*, 554 U.S. at 627; *cf. Capen*, 2023 WL 8851005 at *12 (discussing how these weapons were swiftly regulated "when their uniquely destructive capabilities became apparent as they found their way into civilian life."); *see also Hanson*, 671 F. Supp. 3d at 21-25.

Lastly, the assault weapon laws draw support from historical measures that prohibited semiautomatic fire or regulated magazine capacity. Although New York's assault weapon law does not prohibit semiautomatic rifles in the way Plaintiffs mischaracterize it, some jurisdictions did pass laws regulating semiautomatic rifles as a class. "At least five states in th[e Prohibition] era, plus the District of Columbia, defined 'machine gun' in their statutes to include semi-automatic weapons capable of

shooting a certain number of bullets without reloading." *Hanson*, 671 F. Supp. 3d at 21 (collecting historical statutes). "Indeed, D.C.'s ban—which Congress passed—was modeled heavily after the Uniform Act [to Regulate the Sale and Possession of Firearms], 'a model law' that the National Rifle Association endorsed." *Id.* at 21 (citing Professor Spitzer).

"Each of the above arms restrictions, . . . arose from the same historical pattern. The weapon was invented, perhaps for the military, became widely popular with civilians, was associated with criminal use, and was then regulated by the States." *Hartford*, 676 F. Supp. 3d at 906. The breadth and depth of these laws demonstrate how "our nation's historical tradition recognizes the need to protect against the greater dangers posed by some weapons (as compared to, for example, handguns) as a sufficient justification for firearm regulation." *Ocean State Tactical*, 95 F.4th at 49; *accord NAGR*, 2023 WL 4975979 at *2. This historical showing is uncontradicted, as Plaintiffs have adduced no history of their own in their case-in-chief. *See generally* Pl. Memo. Instead, they would have the Court ignore this history, simply contending that "[b]ecause the arms banned by New York are in common use, no historical evidence the State could put forward could possibly justify its law." Pl. Memo at 3. That extreme position is flatly inconsistent with *Bruen*, which "demands a test rooted in the Second Amendment's text, as informed by history," and directs courts to "use history to determine which modern "arms" are protected by the Second Amendment." 297 U.S. at 19, 28. It is also at odds with *Heller*, which recognized "the historical tradition of prohibiting the carrying of dangerous and unusual weapons," and that this tradition means that "M-16 rifles and the like[]may be banned." 554 U.S. at 627.

*Bruen* emphasizes that two of the key factors that justify a modern regulation are "how and why the regulations burden a law-abiding citizen's right to armed self-defense," and that the "how and why" analysis involves a consideration of "whether modern and historical regulations impose a comparable burden . . . and whether that burden is comparably justified." 597 U.S. at 29. Here, the

"how" of New York's assault weapon law is a reasonable and well-tailored measure that "bans only a subset of each category of firearms that possess new and dangerous characteristics that make them susceptible to abuse by non-law abiding citizens wielding them for unlawful purposes." *NAGR*, 2023 WL 4975979 at *33. The "why" of New York's measure is also "comparably justified" because New York's laws "were enacted in response to pressing public safety concerns regarding weapons determined to be dangerous." *Del. State Sportsmen's Ass'n*, 664 F. Supp. 3d at 603. New York's assault weapons law fully comports with historical tradition, particularly under the "more nuanced approach" that applies in "cases implicating unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 27. It must be upheld.

### C.  States May Regulate Weapons That Cause Public Terror

The prohibition on assault weapons is also supported by a separate and sufficient American tradition of "laws prohibiting 'bearing firearms in a way that spreads fear or terror among the people.'" *United States v. Rowson*, 652 F. Supp. 3d 436, 469 (S.D.N.Y. 2023) (quoting *Bruen*, 597 U.S. at 50); *see United States v. Veasley*, 2024 WL 1649267, at *8 (8th Cir. Apr. 17, 2024). "The crime of going armed 'to the terror of the people' dates to the common law. . . . Even when people could carry a firearm in public," as they can everywhere after the *Bruen* decision, "they could not do so in a manner injurious to the public peace." *United States v. West*, 2023 WL 8091984, at *4 (E.D. Pa. Nov. 21, 2023) (internal citation omitted). Blackstone recognized that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land," and traced its origin all the way back to ancient Greece, where "by the laws of Solon, every Athenian was finable who walked about the city in armour." 4 Sir William Blackstone, *Commentaries on the Laws of Eng.* 149 (16th ed. 1825), SPM Dec. Ex. D (emphasis omitted). The principle had been codified in English law since at least 1327, when the Statute of Northampton declared "[t]hat no Man great nor small" could "bring [] Force in affray of the Peace" or "go nor ride armed by Night nor by Day, in

Fairs, Markets, . . . nor in no Part elsewhere, upon Pain to forfeit their Armour to the King, and their Bodies to Prison at the King's Pleasure." 2 Edw. 3, SPM Dec. Ex. E. The legal tradition was carried over to America, with Justice James Wilson of the first Supreme Court recognizing that affrays "are crimes against the personal safety of the citizens" and that "[t]hey may, and ought to be suppressed by every person present." 3 Bird Wilson, *The Works of the Honourable James Wilson, L.L.D.* 79 (Lorenzo Press 1804), SPM Dec. Ex. F. Justice Wilson recognized that "there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally diffuse a terrour among the people." *Id.*

In keeping with this common-law tradition, many "laws enacted in the years immediately before and after the Second Amendment's adoption [] aimed to neutralize people who were armed in ways that could cause alarm." *Rowson*, 652 F. Supp. 3d at 468. The *Bruen* majority itself discussed several of these laws, finding that although they could not be read as "banning the public carry of all firearms," they instead "codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself." 597 U.S. at 46-47 (citing *inter alia* 692 Mass. Acts & Laws no. 6, pp. 11–12 and 1699 N.H. Acts & Laws ch. 1). Several other states passed similar laws around the time of the Founding, prohibiting the public carriage of weapons in ways that would disturb the peace. *See, e.g.*, 1786 Va. Laws 35, SPM Dec. Ex. G; 1795 Mass. Acts & Laws 436, SPM Dec. Ex. H (similar); 1801 Tenn. Acts 260-61 § 6, SPM Dec. Ex. I (similar). Case law from the relevant period demonstrates that our ancestors understood such laws to be constitutional. *See, e.g.*, *Aymette v. State*, 21 Tenn. 154, 159 (1840) (recognizing that state legislatures have a right to prohibit "wearing or keeping weapons dangerous to the peace and safety of the citizens" and may "preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce").

Assault weapon laws perform the same function because the public carriage of an assault rifle necessarily places persons in the area in apprehension of an imminent threat to their lives. As discussed in the accompanying declaration of Professor Schildkraut, mass shooters turn to assault weapons in order to make their attacks more effective, more notorious, and more lethal. *See* Schildkraut Dec. ¶¶ 26-27. After decades of massacres committed with assault weapons, the public has rightly come to associate them with mass murder, not self-defense. *See id.* ¶¶ 29-30. As a result, when an assault rifle is carried in public, that carriage causes fear in the public: people flee or call law enforcement; and schools and businesses lock down as members of the public justifiably take action to protect themselves from what the gunman may do. *See id.* ¶ 31. Plaintiffs Lane and Sears both recognized this aspect of the assault rifles they seek to buy, with Lane praising the "impact" of the "optics component" of the weapon, 56.1 ¶¶ 34-35, and Plaintiff Sears noting that "there is something to be said, psychologically and socially, about the guy who is toting a rifle on his back," though carrying one in public means that "you are going to have the police called on you, because no one knows what your intentions are. You know, it doesn't look good in the community that we live in." *Id.* at ¶ 79.

Simply put, public carriage of assault rifles "will naturally diffuse a terrour among the people," as Justice Wilson would have understood it. "The banned weapons are 'dangerous,' because they are unreasonably dangerous for ordinary purposes of self-defense due to their extreme lethality and high potential for collateral harm, and they are 'unusual' because it would be unusual for an ordinary citizen to carry such a weapon on his person on the street for self-defense." *Capen*, 2023 WL 8851005, at *16. Centuries of Anglo-American legal tradition establish that the People's elected representatives can prohibit these weapons to prevent their public carriage from disturbing the peace.

## V. AN INJUNCTION SHOULD BE DENIED, OR ALTERNATIVELY, LIMITED TO THE PARTIES AND STAYED PENDING APPELLATE REVIEW

In the event the Court were to rule in Plaintiffs' favor, any injunction should be limited to the Plaintiffs themselves. *See Kane v. de Blasio*, 19 F.4th 152, 173 (2d Cir. 2021) (collecting cases) ("as a

general rule, injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). Similarly, if the Court were to issue an injunction, Defendant respectfully requests that the Court stay the injunction pending appeal, or at a minimum, for fourteen days to allow him to seek emergency relief in the Second Circuit. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quotation omitted). The risk of catastrophic injury, including mass casualties, is especially heightened here given the extraordinarily dangerous nature of the weapons at issue and the practical impossibility of recovering any assault weapons sold during an injunction, particularly if they are diverted to the criminal market.

## **CONCLUSION**

Defendant respectfully requests that the Court deny Plaintiffs' motion for summary judgment, grant Defendant's cross-motion for summary judgment, dismiss the Complaint in its entirety and with prejudice, and grant such other and further relief as it deems just and proper.

Dated: New York, New York
   May 15, 2024

            Respectfully submitted,
            LETITIA JAMES
            Attorney General
            State of New York
            *Attorney for Superintendent Steven G. James*

            By:

            *Suzanna Publicker Mettham*
            Suzanna Publicker Mettham
            Brenda E. Cooke
            James M. Thompson
            Yuval Rubinstein
            *Assistant Attorneys General*
            28 Liberty Street
            New York, New York 10005
            suzanna.mettham@ag.ny.gov
            brenda.cooke@ag.ny.gov
            james.thompson@ag.ny.gov
            yuval.rubinstein@ag.ny.gov