UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

J. MARK LANE and JAMES SEARS,

                          Plaintiffs,

                - against -

STEVEN G. JAMES, in his official capacity as
Acting Superintendent of the New York State
Police, and MIRIAM E. ROCAH, in her official
capacity as District Attorney for the County of
Westchester, New York,

                          Defendants.

No. 22-cv-10989 (KMK)

**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANT STEVEN G. JAMES' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1(b) of the Local
Rules of the United States District Court for the Southern and Eastern Districts of New York,
Defendant Steven G. James, Superintendent of the New York State Police, respectfully submits the
following Statement of Undisputed Material Facts in support of his Motion for Summary Judgment:

**A.      Overview of Assault Weapons**

1.      The AR-15 was developed by the ArmaLite corporation in the 1950s, at the request of
the U.S. Army, and began to be adopted for military use in the mid-1960s. *See* Declaration of James
Yurgealitis ("Yurgealitis Dec.") ¶¶ 71-75.

2.      After a series of engineering changes, the AR-15 rifle was given a new designation: the
M-16, and would become one of the primary weapons carried by infantrymen in the Vietnam War. *Id.*
¶ 75.

3.      The "AR-15 platform" is a popular configuration of rifle that allows for a wide variety of cosmetic or mechanical modifications. Yurgealitis Dec. ¶ 83.

4.      AR-type rifles are easily customized to suit an owner's personal preference. Yurgealitis Dec. ¶ 85.

5.      The AR-15 retains the same performance characteristics (in terms of factors such as muzzle velocity and range) as the military M-16 and its variants, with the exception of automatic fire. Yurgealitis Dec. ¶ 76.

6.      Semiautomatic fire remains the preferred mode for military use, however, with the U.S. Army manual on the M-16 emphasizing that semiautomatic fire is the most effective mode for the weapon, and indeed that "[t]he most effective use of the M-16 at ranges beyond 25 yards is rapid semi-automatic fire—not full-automatic fire." *Id.* ¶ 161 (citing U.S. Army Manual 3-22.9, "Rifle Marksmanship M-16A1, M-16A2/3, M-16A4, and M4 Carbine" (April 2003)).

7.      An AR-15 need not meet the statutory definition of an "assault weapon," and there are AR-15-platform rifles broadly available at gun stores across New York that comply with State law. *See* Declaration of Suzanna Publicker Mettham ("SPM Dec."), Exhibit A, Deposition of Plaintiff James Sears ("Sears Dep.") 94:6-9.

8.      A magazine holds the ammunition for a firearm before it is chambered and fired. Yurgealitis Dec. ¶ 46.

9.      Semi-automatic rifles can be manufactured with either fixed internal magazines or a capacity to accept detachable external magazines. Yurgealitis Dec. ¶ 26.

10.     Detachable magazines facilitate faster reloading compared to internal fixed magazines. Yurgealitis Dec. ¶ 46.

11.     Folding and telescoping stocks allow the operator to more easily conceal or maneuver the weapon in a confined space such as a vehicle, and facilitate easier or more comfortable firing from positions other than the shoulder. Yurgealitis Dec. ¶ 110.

12.     Folding stocks were added to the M1 carbine in World War II for paratrooper use, and more recent variants of the M-16 (M-4 carbine) have incorporated telescoping stocks as a standard feature. Yurgealitis Dec. ¶ 110.

13.     A semi-automatic rifle that includes a pistol grip (without a shoulder stock) increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in a confined space such as a vehicle. Yurgealitis Dec. ¶ 111.

14.     The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator). Yurgealitis Dec. ¶ 111.

15.     During the time the Federal Assault Weapons Ban was in effect (from 1994 to 2004), a number of AK-style firearms (amongst others) were equipped with thumbhole stocks to circumvent the ban's prohibition on pistol grips. Yurgealitis Dec. ¶ 111.

16.     A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low-light conditions and also helps to conceal the flash from view. Yurgealitis Dec. ¶ 112.

17.     The flash allows the operator to more easily acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash, and also helps conceal the shooter's position. Yurgealitis Dec. ¶ 112.

18.     A threaded barrel allows for attachment of a suppressor (commonly referred to as a silencer) which allows the operator to better conceal themselves from their target by reducing the report of their firearm. Yurgealitis Dec. ¶ 114.

19.     A threaded barrel also allows the attachment of some flash suppressors. *Id.*

3

20.    A secondary handgrip allows increased stability of the firearm by the operator by better controlling recoil and muzzle climb, thus increasing the shooter's hit probability for successive shots. Yurgealitis Dec. ¶ 115.

21.    A protruding foregrip is not a feature found on traditional sporting firearms. It appeared on some versions of AK-based rifles, but it was not until the advent of the Rail Attachment Systems (RAS) and acceptance by the U.S. military that foregrips for semi-automatic rifles became more widespread. Yurgealitis Dec. ¶ 115.

22.    A bayonet mount provides an attachment point for a bayonet which, on a military rifle, provides an additional weapon for close quarter combat. Yurgealitis Dec. ¶ 116.

23.    Bayonet mounts and bayonets are not a feature commonly found on sporting rifles or shotguns. Yurgealitis Dec. ¶ 116.

24.    A grenade launcher allows a combatant to launch an indirect fire intermediate range weapon which, if deployed in a civilian event, would likely result in mass casualties. Yurgealitis Dec. ¶ 117.

25.    Rifle launched grenades are not, as with bayonet mounts, a feature found on traditional sporting firearms. Yurgealitis Dec. ¶ 117.

**B.    The State of New York's Longstanding Regulation of Assault Rifles and Accessories**

26.    In 1994, Congress enacted a ban on assault weapons that defined such weapons as, inter alia, semiautomatic rifles with the capacity to accept a detachable magazine and certain "combat-designed features" such as certain stocks, grips, bayonet mounts, flash suppressors, or grenade launchers— – all features which "serve specific, combat-functional ends." *See* Yurgealitis Dec., Ex. D, H.R. Rep. No. 103-489 (1994), at 19.

27.     Congress recognized that "[t]he net effect of these military combat features is a capability for lethality-more wounds, more serious, in more victims-far beyond that of other firearms in general, including other semiautomatic guns." *Id.* at 19-20.

28.     In 2000, New York adopted a substantially identical assault weapon prohibition, with the legislation passing both the Republican-majority State Senate and the Democratic-majority State Assembly before being signed into law by Governor George Pataki. *See* SPM Ex. N, 2000 N.Y. Laws Ch. 189.

29.     To meet the statutory definition of an "assault weapon" under § 265.00(22) of the New York State Penal Law, a rifle must have each of three characteristics:

> (a) it must be semiautomatic, which is defined as a "repeating" weapon "which utilizes a portion of the energy of a firing cartridge or shell to extract the fired cartridge or spent shell and chamber the next round," allowing for the weapon to fire a bullet each time the trigger is pulled without the shooter needing to take any additional action. See N.Y. Penal Law §§ 265.00(21), (22)(a);

> (b) it must have "an ability to accept a detachable magazine," allowing for reloading within seconds. *See* N.Y. Penal Law § 265.00(22)(a). "A magazine is a 'container that holds ammunition for a firearm,' typically by holding bullets and feeding the ammunition into the firearm, but does not contain a firing mechanism;

> (c) it must have one or more one or more enumerated features, namely (i) "a folding or telescoping stock;" (ii) "a pistol grip that protrudes conspicuously beneath the action of the weapon;" (iii) "a thumbhole stock;" (iv) "a second handgrip . . . that can be held by the non-trigger hand;" (v) "a bayonet mount;" (vi) "a flash suppressor, muzzle break, [or] muzzle compensator;" or a "threaded barrel designed to accommodate those features," or (vii) "a grenade launcher." N.Y. Penal Law § 265.00(22)(a).

30.     New York's prohibition on assault weapons is subject to an exception for persons who owned assault weapons prior to the enactment of the relevant legislation as well as active or retired law enforcement officers who utilized the weapons "in the course of his or her official duties."  N.Y. Penal Law § 400.00(16-a); *see also* N.Y. Penal Law § 265.00(22)(g) (listing exceptions).

31.     Persons who legally own assault weapons are required to register them with the New York state police, and to periodically recertify that registration. *See* N.Y. Penal Law § 400.00(16-a)(a).

**C.     Plaintiffs' Challenge to New York's Assault Weapons Ban**

32.     Plaintiff Lane possesses semiautomatic rifles, including Ruger 10-22s. *See* SPM Dec. Ex. B, Deposition of J. Mark Lane ("Lane Dep.") 53:11-17.

33.     Plaintiff Sears possess semiautomatic rifles, including an AR-compatible Smith & Wesson M&P 15 Sport. *See* SPM Dec. Ex. A, Sears Dep.  21:16-22:6.

34.     Plaintiff Lane testified that a reason he wants to purchase an assault rifle is that if a person sees one, that person would "think twice," and that a handgun does not have that impact. Lane Dep. 137:9-16.

35.     Plaintiff Sears testified that, while he typically carries a pistol concealed with him anywhere for which he is legally permitted to do so, he would not publicly carry an assault rifle because it would cause fear in others. Sears Dep. 87:3-88:15.

36.     Plaintiff Lane did not have personal knowledge of any incidents where someone used an AR-15 style rifle in defense of themselves or others. Lane Dep. 165:5-166:9.

37.     Plaintiff Sears did not have personal knowledge of any incidents where someone used an AR-15 style rifle in defense of themselves or others. Sears Dep. 89:7-13.

38.     In support of their belief that AR-15 style rifles are used in self-defense, Plaintiffs' interrogatory answers cite 12 inadmissible news articles, without any supporting information, spanning 14 years from 2010 to today. *See* SPM Dec. Ex. C, at Response to Interrogatory No. 5.

39.     Most of the articles indicate that the weapons used were AR-15s, but do not indicate whether they meet the definition of an assault weapon under New York law, the articles indicate that the weapon was never fired, and all of the articles appear to have been published within days of the events at issue, without the benefit of trials, completed investigations, or testimonial evidence.  *Id.*

40.     Plaintiff Sears testified that he believes it is unconstitutional to prohibit civilians from possessing M-16 military rifles, drones with Hellfire missiles, and intercontinental ballistic missiles. Sears Dep. 43:19-45:16.

41.     Plaintiff Lane testified that when he fires his rifles, he never needs to fire more than one shot, and that only once did his son need to fire two shots. Lane Dep. 92:4-14.

42.     Plaintiff Sears testified the reason a fixed magazine is insufficient for his purposes is that, if a bullet jams, it is easier to replace the magazine than it is to clear the jam. Sears Dep. 58:12-18.

43.     Plaintiff Sears testified that a detachable magazine could have the same jam with the next magazine. Sears Dep. 40:22-25.

44.     Plaintiff Sears testified that he does not have any firsthand knowledge of telescoping stocks being necessary for self-defense, and testified that he has seen on the news people grabbing their husbands' or spouses' rifles and fitting it to themselves. Sears Dep. 66:20-67:3.

45.     Plaintiff Lane testified that his wife and children do not have access to the single key used to access the multiple gun safes he maintains in his home, in which all of his weapons are stored. Lane Dep. 43:23-44:16.

46.     Plaintiff Sears testified that he believes a muzzle device is a safety feature, in that using a suppressor or silencer on a semiautomatic rifle could decrease the chance of hearing loss if fired in a small room. Sears Dep. 74:9-75:6.

47.     When asked how a suppressor is necessary for self-defense, Plaintiff Sears testified that the "main reason" is to spare his hearing. Sears Dep. 76:19-24.

**D.     Magazines and Firearm Accessories Are Not Bearable "Arms" As That Term Was Historically Understood**

48.     At the Founding, "Arms" was used as general term for weapons such as swords, knives, rifles, and pistols. *See* Declaration of Professor Dennis Baron ("Baron Dec.") ¶ 10.

49.     "Arms," when used as a stand-alone term, referred to weapons. Baron Dec. ¶ 32. "Arms" almost never referred to ammunition or ammunition storage containers such as cartridge boxes. Baron Dec. ¶ 32.

50.     The "cartridge box" or "cartouch box," which was the precursor to today's "magazine," was typically mentioned in lists of accoutrements, often in connection with other items worn with a soldier's uniform. Baron Dec. ¶ 33.

51.     "Arms" did not refer to other weapons accessories, such as flints and ramrods. Baron Dec. ¶ 35.

52.     Even though repeating rifles date to approximately the mid-nineteenth century (with a few outliers predating even that time frame), the Winchester rifles of the 1860s and 1870s were the first repeating rifles with a magazine capacity greater than ten which were produced in sufficient numbers to be available for purchase by Americans. Declaration of Brennan Rivas ("Rivas Dec.") ¶ 52; Declaration of Brian DeLay ("DeLay Dec.") ¶¶ 57-60 (discussing advent of Winchester firearms in 1860s and 1870s).

**E.     Assault Rifles and Accessories Are Not in Common Use Today for Civilian Self-Defense**

53.     Assault weapons, as defined by Penal Law § 265.00(22), are "are a poor choice for civilian self-defense." Yurgealitis Dec. ¶ 142.

54.     Situations involving home defense and/or self-defense (including on the street or commercial robberies) are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire. Yurgealitis Dec. ¶ 144.

55.     Assault weapons, as defined by § 265.00(22), were designed to be effective at battlefield ranges of up to 500 yards, with the typical muzzle velocity of a .223-caliber bullet at 3,200 fps. Yurgealitis Dec. ¶ 144.

56.     Projectiles travelling at velocities found in these weapons pose a serious risk of overpenetration in most home construction materials, such as gypsum board/sheet rock and typical 2x4 lumber. Yurgealitis Dec. ¶ 144.

57.     When this cartridge was designed for the AR-15/M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards, not dozens of feet. Yurgealitis Dec. ¶ 144.

58.     In August 2014, the National Rifle Association's *American Rifleman* published an article by Stanton Wormley titled "The AR-15 for Home Defense: Penetration Tests." Yurgealitis Dec. ¶ 145.

59.     Wormley conducted penetration tests on nine different types of .223/5.56mm ammunition by firing them through simulated wall sections constructed of gypsum board/sheet rock and wooden 2x4 studs. Yurgealitis Dec. ¶ 145.

60.     When fired at a 90-degree angle to the walls, all nine types of ammunition (including "frangible" rounds designed to disintegrate when hitting a hard surface) easily penetrated the wall sections as well as the water jugs placed three feet behind them. Yurgealitis Dec. ¶ 145.

61.     The tests conducted by Wormley also included firing longitudinally through the wall sections, resulting in the penetration of three successive 2-inch-thick 2x4 studs by a number of the projectiles. Yurgealitis Dec. ¶ 146.

62.     The (former) NATO-issue M855 SS109 5.56mm is readily available for purchase by civilians, and was designed to penetrate up to 3mm of "soft" (non-hardened) steel. Yurgealitis Dec. ¶ 147.

63.     This capability is unnecessary for self-defense and poses substantial risks to individuals in adjoining rooms, neighboring apartments, or other attached dwellings. Yurgealitis Dec. ¶ 147.

64. During a stressful situation such as a home invasion or break-in, there may be multiple steps required by the operator to bring the weapon from a "safe" condition to a firing condition. Yurgealitis Dec. ¶ 148.

65. Manipulation of a charging handle, safety switch, or inserting a magazine may be difficult to accomplish under stress, particularly if the operator has not adequately trained or practiced with their firearm, while family members may not be familiar with bringing the weapon to a firing condition or fail to complete adequate steps to do so under duress. Yurgealitis Dec. ¶ 148.

66. Unloaded, an AR-platform rifle weighs approximately 6.5 to 7 pounds and requires two hands to aim and fire. Yurgealitis Dec. ¶ 148.

67. In a home-defense scenario, a homeowner would likely be attempting to call 911 while addressing the intruder, which is difficult if not impossible while wielding their AR-15 effectively and safely. Yurgealitis Dec. ¶ 148.

68. Additionally, it would hamper, if not prevent, leading a vulnerable adult away from danger or guiding/carrying a small child. Yurgealitis Dec. ¶ 148.

69. Detachable magazines are useful for offensive military applications in combat settings but are not necessary or suited for civilian self-defense. Yurgealitis Dec. ¶¶ 118-19.

70. Accessories to assault weapons, such as folding, telescoping, or collapsible stocks and forward pistol grips, serve military-style offensive purposes as opposed to traditional sporting or self-defense uses. Yurgealis Dec. ¶¶ 124-25.

71. The data in William English's inadmissible 2021 survey does not contain any evidence that rifles are the preferred firearm for defense of self, others, or property, not even for owners of AR-15-style rifles. *See* Declaration of Professor Louis Klarevas ("Klarevas Dec.") ¶ 69.

72. Nor is there any evidence in English's survey that AR-15-style rifles are used in Defensive Gun Uses ("DGUs"). Klarevas Dec. ¶ 69.

73.     The Federal Bureau of Investigation ("FBI") has been documenting active shooter incidents since 2000, and defines active shootings as violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area." Klarevas Dec. ¶ 71.

74.     Between January 1, 2000, and December 31, 2022, the FBI identified 456 active shootings occurring in the United States. Klarevas Dec. ¶ 72.

75.     Out of these 456 active shooter incidents, 18 incidents (3.9%) involved DGUs by civilians, excluding law enforcement or armed security.  Klarevas Dec. ¶ 72.

76.     Of these 18 DGUs, the firearm used by an armed private citizen intervening was identifiable in 17 incidents; 14 of the incidents involved handguns and the remaining three involved long guns (one shotgun, one bolt-action rifle, and one rifle that would qualify as an assault weapon. Klarevas Dec. ¶ 72.

77.     There are 24,720 individuals, or 0.12% of New Yorkers, with registered legal ownership of an assault weapon in New York State. *See* Declaration of Michael Deyo; U.S. Census Bureau, New York, https://data.census.gov/profile/New_York?g=040XX00US36. (2020 Census population of 20,201,249).

78.     Plaintiff Sears acknowledged at his deposition that semiautomatic fire, detachable magazines, and military-style accessories are features that would make the weapons particularly useful for carrying out a mass shooting. Sears Dep. 117:22-118:22.

79.     Plaintiff Sears testified that "there is something to be said, psychologically and socially, about the guy who is toting a rifle on his back," though carrying one in public means that "you are going to have the police called on you, because no one knows what your intentions are. You know, it doesn't look good in the community that we live in."  Sears Dep. 87:4-6, 87:24-88:4.

80.     Plaintiff Sears acknowledged at his deposition that he was not an expert or testifying as an expert. Sears Dep. 98:15-24.

81.     Plaintiff Lane acknowledged at his deposition that he was not an expert or testifying as an expert. Lane Dep. 143:18-144:3.

**F.      Assault Rifles Are the Weapon of Choice in Mass Shootings**

82.     The ten deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings. Klarevas Dec. ¶ 46. Nine of these ten incidents involved the use of assault weapons. *Id.* ¶ 48.

83.     Within the past five years, 50% of high-fatality mass shooting incidents and 58% of mass public shooting incidents involved the use of assault weapons. Klarevas Dec. ¶ 47; Figure 13 (showing growing share of high-fatality of mass shootings involving assault weapons).

84.     Within the past five years, 61% of high-fatality mass shooting deaths and 67% of mass public shooting deaths resulted from incidents involving assault weapons. Klarevas Dec. ¶ 47.

85.     Assault weapons were used in 69% of mass public shootings resulting in more than 12 deaths and 80% of such incidents resulting in more than 24 deaths. Klarevas Dec. ¶ 48.

86.     In addition, assault weapons were used in 78% of all high-fatality mass shootings resulting in more than 20 deaths and 100% of such incidents resulting in over 40 deaths. Klarevas Dec. ¶ 48.

87.     Of the 137 high-fatality mass shootings in the last 50 years in which the type of firearm used is known, 43 involved assault weapons, resulting in 540 deaths. Klarevas Dec. ¶ 49.

88.     The average death toll for these 43 incidents is 12.6 fatalities per shooting. Klarevas Dec. ¶ 49. The average death toll for the 94 incidents in which it is known assault weapons were not used (which resulted in 732 fatalities) is 7.8 fatalities per shooting. *Id.*

89.     In the 56 years from 1949 through 2004, there were a total of ten mass shootings resulting in double-digit fatalities. Klarevas Dec. ¶ 44.

90.     In the 19 years since the federal Assault Weapons Ban expired in 2004, there have been 22 double-digit fatality mass shootings. Klarevas Dec. ¶ 44.

91.     Nearly 8-in-10 (78%) of the mass shootings resulting in ten or more deaths involved assault weapons and/or Large Capacity Magazines (LCMs). Klarevas Dec. ¶ 45.

92.     In the time-period between January 1, 1990, and December 31, 2023, accounting for population, states with assault weapons bans in place experienced 60% fewer high-fatality mass shootings involving the use of assault weapons and 40% fewer mass public shootings involving the use of assault weapons. Klarevas Dec. ¶ 62.

93.     Jurisdictions with bans in effect experienced 67% fewer deaths resulting from high-fatality mass shootings perpetrated with assault weapons and 58% fewer deaths resulting from mass public shootings perpetrated with assault weapons. Klarevas Dec. ¶ 62.

94.     Nearly one out of every four (24.0%) mass shootings occurring between August 1, 1966, and December 31, 2023, were perpetrated using one or more semiautomatic assault-style rifles. *See* Declaration of Jaclyn Schildkraut ("Schildkraut Dec.") ¶ 13.

95.     In 46.8% of these cases, the semiautomatic assault-style rifle was the only type of firearm used, while in the remaining 53.2%, these weapons were used in conjunction with a handgun and/or shotgun. Schildkraut Dec. ¶ 13.

96.     In the 109 shootings where a semiautomatic assault-style rifle was used, there were 640 fatalities, averaging 5.9 fatalities per case. Schildkraut Dec. ¶ 15.

97.     In the 346 cases in which a semiautomatic assault-style rifle was not used, there were 996 fatalities, or an average of 2.9 deaths per shooting. Schildkraut Dec. ¶ 15.

98.     In the 109 shootings involving a semiautomatic assault-style rifle, there were 1,272 people who sustained non-fatal gunshot injuries. Schildkraut Dec. ¶ 16. This translates to an average of 11.7 persons injured per shooting in which a semiautomatic assault-style rifle was used. *Id.* In the 346 shootings where such a firearm was not used, there were 1,131 people who sustained gunshot injuries, averaging 3.3 injured persons per case. *Id.*

99.     Semiautomatic assault-style rifles are considered high velocity, with projectiles traveling at rates between 1,500 and 4,000 feet per second, often exceeding 2,500 feet per second. Schildkraut Dec. ¶ 18.

100.    Bullets fired from handguns are lower velocity, traveling at rates between 700 and 1,500 feet per second, though generally less than 1,000 feet per second. Schildkraut Dec. ¶ 18.

101.    Higher muzzle (kinetic) energy leads to significantly more deaths in the context of mass shootings, with a difference of two more fatalities over low muzzle energy firearms and a 31% increase in the number of expected deaths. Schildkraut Dec. ¶ 19.

102.    Shootings conducted using firearms with high muzzle energy also produce significantly higher numbers of total casualties (fatalities plus injuries), with an average difference of nearly seven victims more than low energy firearms such as handguns and a 96% increase in the expected count of victims. Schildkraut Dec. ¶ 19.

## G.     Assault Weapons and Mass Shootings Are Fundamentally Modern Technological Problems

103.    At the time of the Founding and well into the 19th century, the only firearms that Americans owned in significant numbers were single-shot muzzle-loading smoothbore muskets, rifles, and pistols, which lacked the accuracy, reliability, or rate of fire to cause mass casualties.  *See* DeLay Dec. ¶¶ 31, 33.

104.    Weapon technology grew more sophisticated over the 19th century, with the advent and popularization of concealable bladed weapons, and then repeating pistols such as the Colt revolver.  *See* DeLay Dec. ¶¶ 5, 6, 87; Declaration of Robert Spitzer ("Spitzer Dec.") ¶¶ 13-15, 53-55.

105.    Repeating rifles began to be manufactured in the 1860s and 1870s, but were almost exclusively sold to foreign militaries, with few in the hands of American civilians.  *See* DeLay Dec. ¶¶ 56-61; Spitzer Dec. ¶¶ 56-57.

106.    Self-loading machine guns and detachable magazines only came onto the market in the early 20th century, and when these weapons (such as the Thompson submachine gun, known as the "Tommy Gun") began to proliferate, states and the federal government passed laws banning them. *See* DeLay Dec. ¶¶ 73-78; Spitzer Dec. ¶¶ 76-85.

107.    Assault rifles, meanwhile, are a modern innovation, with the semiautomatic AR-15 only being introduced on the civilian market after 1963, *see* Yurgealitis Dec. ¶¶ 76-77, without achieving significant popularity. *See* Klarevas Dec. ¶¶ 22 n.27, 24.

108.    When, in 1994, the Federal Assault Weapons Ban made civilian possession of AR-15s unlawful, few civilians owned AR-15s.  *See* Klarevas Dec. ¶ 24.

109.    Likewise, the problem of high-casualty mass shootings carried out by a single perpetrator is an unprecedented societal concern, only made possible by 20th century advances in firearm technology. Indeed, it was not until 1949 when America first suffered an incident where a single shooter killed more than ten people with a firearm. *See* Klarevas Dec. ¶ 41.

110.    Over time, as assault weapons proliferated through the civilian population, more and more mass shootings followed. *See* Klarevas Dec. ¶¶ 43-44, 47-50; *see also* Schildkraut Dec. ¶¶ 13-14.

111.    The increasing frequency and lethality of these mass shootings are intimately tied to the spread of assault weapon technology. As Professor Klarevas points out, between the ten-year-period of 1974-1983 and the ten-year-period of 2014-2023, the number of people killed in high-fatality

mass shootings and mass public shootings has increased by 230% and 502%, respectively. *See* Klarevas Dec. ¶ 46; *see also* Schildkraut Dec. ¶ 10 and Exs. C & D.

112.    This increase in mass shooting lethality has come about at the same time as an increase in the use of assault weapons, with 50% of high-fatality mass shootings and 58% of mass public shooting incidents involving assault weapons. *See* Klarevas Dec. ¶ 47; *see also* Schildkraut Dec. ¶ 14 (discussing how "[t]he use of semiautomatic assault-style rifles by mass shooting perpetrators has increased over time.").

**G.    There is a Longstanding Historical Tradition of Regulating Dangerous Weapons**

113.    Throughout American history a specific relationship existed between the development of new weapons technologies, their spread into society, and subsequent regulation by the government, as party of a centuries-long effort to protect the public from harm and to dampen weapons-related criminality and violence. *See* Spitzer Dec. ¶ 4.

114.    First, a new weapon or weapon technology is invented. Second, it may then be patented, though the patenting of a design does not necessarily mean that the technology will spread. Third, the technology is generally developed with a focus on military applications, rather than directly for civilian acquisition or use. Fourth, military-designed weapons may spread to, or be adapted to, the civilian market. And fifth, if these weapons circulate sufficiently in society to pose a threat to public safety, the people's elected representatives enact laws against their ownership or carriage. Spitzer Dec. ¶ 5.

115.    The "Bowie knife" was invented in the 1820s and became popular in the following decade after the adventurer Jim Bowie famously used one in a 1827 duel, with their popularity only spreading after Bowie's death defending the Alamo in 1836. Spitzer Dec. ¶¶ 12-13; Rivas Dec. ¶ 17.

116.     From the beginning of the 1830s through the early twentieth century, the District of Columbia and every state except New Hampshire passed laws banning Bowie knives. Spitzer Dec. ¶ 15.

117.     These restrictions affected not only the public carry of Bowie knives, but also their sale. For example, in 1837, in Georgia, it was unlawful "for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense[.]" Rivas Dec. ¶ 48; DeLay Dec. ¶ 87.

118.     The following year (1838), Tennessee lawmakers did much the same with an updated public carry law that included a section prohibiting "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick." Rivas Dec. ¶ 48.

119.     Beginning in 1799, every state in the nation adopted laws restricting types of clubs or other blunt weapons, recognizing them as "wicked, cowardly, Soaked in blood and cured in whiskey." Spitzer Dec. ¶ 25. (quoting Robert Escobar, Saps, Blackjacks and Slungshots: A History of Forgotten Weapons (Gatekeeper Press 2018) at 1). These include batons, billy clubs, blackjacks, bludgeons, or just clubs more generally. *Id.* ¶¶ 25-28; *see also* Spitzer Dec. Ex. D (table of historical blunt object laws).

120.     Of particular concern was a "slungshot," a handheld weapon consisting of a piece of metal or stone attached to a flexible strap or handle, which developed in the 1840s. Spitzer Dec. ¶ 29; Rivas Dec. ¶ 25.

121. The first known use of a slungshot occurred in 1842 and the first state law banning them was enacted in 1850, with more than 40 states and the District of Columbia passing bans throughout the 19th century. Spitzer Dec. ¶¶ 29; Rivas Dec. ¶ 26.

122. Colonial and early American legislatures also broadly regulated trap guns, which were particularly dangerous because they did not need an operator present to fire, which meant that trap guns could fire at unintended targets or victims. Spitzer Dec. ¶¶ 35-39.

123. Also known as "man traps," "infernal machines," or "set guns," these weapons were first prohibited by the colony of New Jersey in 1771, and at least 24 more states would go on to enact their own measures. Spitzer Dec. ¶¶ 35-39; and Spitzer Ex. F.

124. Even though Samuel Colt obtained his first patent in 1836, it took until about midcentury for Colt revolvers be produced in sufficient numbers to begin saturating the American market as a result of two things: 1) the loss of his patent in 1857, which allowed new entrants into the market; and 2) the development of a large manufacturing capacity due to wartime production throughout the Civil War. Rivas Dec. ¶ 22.

125. Firearms were not the weapon of choice for interpersonal violence during the colonial period or the early days of the Republic: they were too cumbersome, too time-consuming to load and reload, and too inaccurate or unreliable when compared to handheld or bladed weapons. Spitzer Dec. ¶ 34.

126. The Colt revolver diverged from pistols widely available at the time in two critical ways. First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading). Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds. Rivas Dec. ¶ 23.

127. By about the 1870s, technological developments in the design and functionality of ammunition meant that later-model revolvers could use individual cartridges; these could be inserted

18

fairly quickly into the cylinder, which made the reloading process much more efficient—a boon on the battlefield, but a new danger in other contexts. Rivas Dec. ¶ 23.

128.    As firearms technology improved and pistols became more dangerous—particularly after the popularization of the Colt revolver and other repeating pistols in the late 1800s—states and municipalities adopted laws banning the concealed carry of pistols and revolvers, penalizing their public display, or requiring licensure. Spitzer Dec. ¶¶ 34, 61; DeLay Dec. ¶ 64 (noting that 285 regulations on carrying weapons were enacted between 1865 and 1900).

129.    By 1938, the carrying of concealed pistols was either absolutely prohibited or permitted only with a license in every state but two. Spitzer Dec. ¶ 34.

130.    The Thompson submachine gun (commonly known as the "Tommy gun") had been developed for use in World War I as "purely a military weapon," it came too late in the war to have much effect. Spitzer Dec. ¶ 66 (quoting William J. Helmer, The Gun That Made the Twenties Roar (Highland Park, NJ: The Gun Room Press, 1969) at 75); DeLay Dec. ¶ 74.

131.    Around the turn of the twentieth century, John M. Browning began working on the design of semi-automatic firearms, which functioned through a "blowback" method in which "The recoil from the exploded cartridge ejects the empty shell, cocks the hammer, and throws a fresh cartridge into the chamber." Rivas Dec. ¶ 54.

132.    This design was sometimes referred to as "automatic," though its function aligns with our current definition of "semi-automatic." Rivas Dec. ¶ 54.

133.    Winchester did not release a semi-automatic rifle featuring a detachable magazine until its Model 1905 Self-Loading Rifle, and that detachable box magazine held only five cartridges in a single column. Rivas Dec. ¶ 54.

134.    When the Tommy gun and its close cousin the Browning Automatic Rifle (or BAR), with their large ammunition capacities and automatic fire, began to circulate in the civilian market,

they quickly became notorious for their use by gangsters, including in the infamous St. Valentine's Day massacre in Chicago in 1929, or by famous criminals such as Bonnie and Clyde. Spitzer Dec. ¶ 67.

135.    The guns' association with violence and criminality, rather than lawful self-defense, led at least 36 states to enact anti-machine gun laws in the years between 1925 and 1935. Spitzer Dec. ¶ 76.

136.    Congress organized a special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms," and passing first a machine gun ban for the District of Columbia and then the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and circulation of fully-automatic weapons. Spitzer Dec. ¶¶ 76-80.

137.    Blackstone's Commentaries on the Laws of England, published in 1769, recognized that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land," and traced its origin all the way back to ancient Greece, where "by the laws of Solon, every Athenian was finable who walked about the city in armour." 4 Sir William Blackstone, Commentaries on the Laws of England 149 (16th ed. 1825), SPM Ex. D (emphasis omitted).

138.    The principle had been codified in English law since at least 1327, when the Statute of Northampton declared "[t]hat no Man great nor small" could "bring [] Force in affray of the Peace" or "go nor ride armed by Night nor by Day, in Fairs, Markets, . . . nor in no Part elsewhere, upon Pain to forfeit their Armour to the King, and their Bodies to Prison at the King's Pleasure." 2 Edw. 3, SPM Ex. E.

139.    The legal tradition that began in Greece and was codified in England was carried over to America, with Justice James Wilson—one of the first four Justices appointed by President Washington to the Supreme Court and one of only six people to sign both the Constitution and the

Declaration of Independence—recognizing that affrays "are crimes against the personal safety of the citizens" and that "[t]hey may, and ought to be suppressed by every person present." 3 Bird Wilson, The Works of the Honourable James Wilson, L.L.D. 79 (Lorenzo Press 1804), SPM Ex. F.

140.    Justice Wilson recognized that "there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally diffuse a terrour among the people." 3 Bird Wilson, The Works of the Honourable James Wilson, L.L.D. 79 (Lorenzo Press 1804), SPM Ex. F.

141.    Several other states passed similar laws around the time of the Founding, prohibiting the public carriage of weapons in ways that would disturb the peace. *See, e.g.,* 1786 Va. Laws 35, SPM Ex. G (prohibiting anyone to "go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrested and committed to prison"); 1795 Mass. Acts & Laws 436, SPM Ex. H (similar); 1801 Tenn. Acts 260-61 § 6, SPM Ex. I (similar).


Dated:  New York, New York
        May 15, 2024

                                    LETITIA JAMES
                                    Attorney General
                                    State of New York
                                    *Attorney for Superintendent Steven G. James*

                                    By:

                                    *Suzanna Publicker Mettham*
                                    Suzanna Publicker Mettham
                                    Brenda Cooke
                                    James M. Thompson
                                    Yuval Rubinstein
                                    *Assistant Attorneys General*
                                    28 Liberty Street
                                    New York, New York 10005
                                    suzanna.mettham@ag.ny.gov
                                    brenda.cooke@ag.ny.gov
                                    james.thompson@ag.ny.gov
                                    yuval.rubinstein@ag.ny.gov