UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                     :

J. MARK LANE and JAMES SEARS,       :
                                     :

                 Plaintiffs,      :

                                     :

        - against -        :

                                     :     Case No. 22 Civ. 10989 (KMK)

STEVEN G. JAMES, in his official capacity as  :
Acting Superintendent of the New York State  :
Police, and MIRIAM E. ROCAH, in her official  :
capacity as District Attorney for the County of  :
Westchester, New York,                  :

                                     :

                 Defendants.    :
---------------------------------------------------------- X

## <u>DECLARATION OF DR. BRENNAN RIVAS</u>

Pursuant to 28 U.S.C. § 1746, I, Dr. Brennan Rivas, declare and state as follows:

1.     I have been asked to render an opinion by the Office of the Attorney General of New York render about the history of firearms restrictions enacted in the nineteenth century, especially as it relates to assault weapons. I have also been asked to provide information about firearms or other weapons that might have been considered unusual or especially dangerous during that time period, as well as additional contextual information about societal attitudes towards deadly weapons.

2.     This declaration is based on my own personal knowledge, research, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.     I am a historian and currently work as a Senior Postdoctoral Researcher at the Center for the Study of Guns and Society at Wesleyan University in Middletown, Connecticut.

During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

4.      My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles in the Southwestern Historical Quarterly, and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the UC Davis Law Review. I am currently completing a book manuscript based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

5.      I have provided expert witness testimony in the following cases: *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); Angelo v. District of Columbia, No. 22-cv-01878 (D.D.C.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 1:22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22 cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, No. 21 Civ. 5334 (NSR) (S.D.N.Y.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Siegel v. Platkin*, No. 22-cv-7463 (RMB) (AMD) (D.N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Or. Firearms Fed'n, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Chavez v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.) (f/k/a Jones v.

Bonta); *Nguyen v. Bonta*, No. 3:20-cv-02470-WQH-BGS (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC (E.D. Cal.); *Nichols v. Bonta*, No. 3:11-cv-09916-SJO-SS (C.D. Cal.); *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Wolford v. Lopez*, No. 1:23-cv-00265-LEK-WRP (D. Haw.); *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-JLK (D. Col.); *Kipke v. Moore*, No. 1:23-cv-01293-GRL (D. Md.); *Ohio v. City of Columbus*, No. 22-cv-00657 (Com. Pleas, Fairfield Cnty., Ohio); *Schoenthal v. Raoul*, No. 3:22-cv-50326 (N.D. Ill.); *May v. Bonta*, No. 8:23-cv-01696 CJC and No. 1:23-cv-01798 CJC (C.D. Cal.); *State of Washington v. Gator's Custom Guns, Inc.*, No. 23-2-00897-08 (Sup. Ct., Cowlitz Cty., Wash.); *California Rifle & Pistol Assoc. v. Bonta*, No. 2:23-cv-10169, C.D. Cal.); *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL (S.D. Cal.); *Hartford v. Ferguson*, No. 3:23-cv-5364 (W.D. Wash.); *Birney v. Delaware Department of Safety and Homeland Security*, C.A. No. K23C-07-019 RLG (Sup. Ct., Del. St.). I am currently working on potential expert witness reports and declarations that may be provided in other jurisdictions. I have been deposed and testified at trial in one matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.), and I have been deposed in *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL (S.D. Cal.).

6.      I am being compensated by the New York Office of the Attorney General at a rate of $200/hour for document review and consultation, $250/hour for research, $300/hour for writing and editing materials, and $350/hour for deposition, testimony, and related activities.

## METHODOLOGY

7.      This declaration is a work of historical scholarship, informed by analysis of primary and secondary sources. Having studied the subject of historical gun regulations for several years now, I have drawn upon knowledge gained from reading numerous peer-reviewed, scholarly books and articles, in addition to law review articles and media such as blogs and news articles. I have

supplemented that with additional research into the development of firearms, cartridge, and magazine technologies during the late nineteenth and early twentieth centuries. I have read or consulted many books about the development of firearms and other weapons from the early modern period to the mid-twentieth century. In addition to online repositories like Westlaw, Hein Online, Hathi Trust, Chronicling America, and the Duke Repository of Historical Gun Laws, I have made use of digital collections housing government documents and rare newspapers.

## SUMMARY OF OPINIONS

8.     This report presents the story of weapon regulation across American history, showing that modern "assault weapons" restrictions—including New York's—descend from historical regulations that date back at least as far as the early 1800s. This report explains this history by reviewing some of the major developments in firearm technology and weapon regulation throughout the nineteenth century. It begins by defining the knives and pistols that nineteenth-century Americans generally referred to as deadly weapons and singled out for regulation. It then turns to the social problems posed by deadly weapons, and the resulting regulation of them during the nineteenth century. Americans of that era condemned the violence and bloodshed associated with knives and pistols, and in response they elected officials who enacted regulations designed to protect the public and discourage the use and carrying of deadly weapons.

9.     The Civil War Era was a significant turning point in the history of guns and their regulation in the United States, as is explained in more detail in this report. The political instability associated with Reconstruction, combined with the tremendous manufacturing capacity for firearms in a rapidly industrializing country, had the tragic effect of creating an unprecedented wave of gun violence. This report then discusses nineteenth-century weapon regulations,

including: public carry laws, personal and occupation taxes, sales restrictions, and sales prohibitions. I emphasize regulatory approach and provide examples of each, but the report does not claim to provide comprehensive lists of historical regulations. Of significant interest to this case are sales prohibitions, and prohibitive taxes assessed upon the sale of or dealing in deadly weapons. Examples of these regulatory methods can be found in both the antebellum and postbellum periods.

10.     Even as the United States confronted its first crisis of gun violence in the post-Civil War era, technological innovations in the gun-making industry produced a bevy of improvements to firearms and their ammunition. Cap and ball revolvers gave way to cartridge revolvers, repeating rifles (particularly lever-action designs) became commercially successful, and center-fire cartridges increased the range, accuracy, and firepower of guns. And yet, American gun manufacturers—with exceedingly few exceptions—did not produce firearms like modern "assault weapons" that carry large-capacity magazines.

11.     A semiautomatic pistol's or rifle's capacity to accept a detachable magazine is an essential feature of New York's challenged "assault weapons" legislation. For that reason, this report includes information about historical magazine capacities and the development of detachable magazines. My research shows that the few examples of nineteenth-century firearms capable of firing more than ten rounds without reloading were not only outliers, but inherently different from the detachable magazines that have become more widely used in recent decades. From the initial development of self-loading firearms near the turn of the twentieth century to at least 1950, American-made semiautomatic firearms as a general rule did not have magazine capacities greater than ten. Because American gun-makers rarely produced large capacity magazines, and because American hunters, target-shooters, and other gun enthusiasts opted for

firearms without large magazine capacities, the American people had no reason to establish rules regarding the subject until well into the twentieth century.

12.     The "assault weapons" restriction put in place by the State of New York is in line with the historical precedent of firearm and weapon regulation in the United States. Nineteenth-century Americans—who strictly regulated the carrying of weapons, developed the first handgun licensing programs, established minimum age requirements, and sometimes banned the sale of certain weapons—embraced a view of state police power that would not have objected to restrictions on the sale of "assault weapons" as defined by statute had they existed and posed a problem at the time.

## DEFINING DEADLY WEAPONS

13.     Americans living in the nineteenth century generally distinguished between two types of weapons: arms suitable for militia service or hunting, and concealable weapons associated with interpersonal violence and known as deadly weapons. In the decentralized, agricultural environments that characterized early American life, hunting knives, rifles, muskets, and shotguns were important tools present in most rural homes. Men used these firearms for militia service and for the occasions when they were required to participate in local policing efforts through the posse comitatus, but they would have much more frequently used such weapons for hunting. Rifles, muskets, and shotguns were not likely to be used in the commission of crimes, especially crimes of passion that resulted in murder or manslaughter. Those offenses were much more likely to be committed with bare hands, blunt instruments, or other types of weapons such as concealable knives and pistols.

14.     A series of socio-economic and political factors prompted Americans of the nineteenth century to be more likely than their eighteenth-century predecessors to publicly carry

and use deadly weapons such as dirks, bowie knives, and pocket pistols. Rates of homicide, violence, and crime were rising in many parts of the country, and weapon technology rose in tandem. The greater prevalence of deadly weapons in public spaces, and the bloody consequences of it, prompted American people across the country to turn to weapon regulations as a solution. These regulations tended to focus upon readily concealable "deadly weapons" like knives and pistols rather than the firearms used for militia and hunting purposes. Deadly weapons were associated with crime and needless bloodshed, and the people habitually carrying them were presumed to be ruffians, burglars, and assassins—those ready to settle personal difficulties with blood rather than by reason and law. The other feature shared by deadly weapons was their suitability for concealment, and in fact, deadly weapons were often referred to as "concealed weapons" for that very reason. An 1886 law journal synthesized this point by saying:

> A statute making it indictable for one to carry concealed about his person any 'pistol, bowie-knife, razor, or other deadly weapon of the like kind,' embraces a butcher's knife. The words 'other deadly weapon of the like kind' imply similarity in the deadly character of weapons, such as can be conveniently concealed about one's person, to be used as a weapon of offence and defense.

15.     During this time "deadly weapons" primarily included large knives, "pocket pistols," and, later, revolvers ranging from 4-shot to 6-shot. The phrase could also apply to various other small or readily concealable weapons.

### I.     Large Knives

16.     Prior to the widespread availability of revolvers near the mid-nineteenth century, large knives were considered the most dangerous weapon around. There were so many different styles and names of knives that Americans sometimes struggled to define them and distinguish them from one another. The "dirk knife" originated in Scotland as a knife carried into battle or for martial ornamentation by soldiers. It has come to be identified as having a straight blade. "Dagger" is an older word, and generally connotes a double-edged blade. Bowie knives were often associated

with long blades that curved and became double-edged near the tip. An "Arkansas toothpick," on the other hand, was more likely to be a knife that was as long as a bowie, double-edged, and sharply tapered. The narvaja was of Spanish origin and tended to refer to a large folding blade. To make matters even more complicated, these definitions might vary geographically, change over time, and were not set in stone during the nineteenth century.[1]

17.    By far the bowie knife became the style most widely known, used, and discussed by Americans in the nineteenth century. These knives could be easily concealed within a pocket or tucked into a waistband, notwithstanding their length. In 1827, Jim Bowie, for whom the blade is named, used it to great effect in a duel that turned into a melee and became the subject of nationwide news coverage.[2] His death at the Alamo in 1836 cemented the legend of his namesake knife,[3] which became one of the most widely denounced deadly weapons of the antebellum nineteenth century.

18.    Fighting knives were certainly not new in the 1830s, and the exact styling of the original Bowie knife remains unknown, but Bowie's life story became a vehicle for Americans to discuss and address the growing problem of knife-violence. As rates of violence rose during the nineteenth century, people were more likely to carry and use large knives; the increased presence of knives—even if ostensibly carried for personal defense—had the regrettable consequence of

---

[1] Worthen, *Arkansas Made*, I:267–268.
[2] "Terrible Recontre," *Niles' Register* (Baltimore, Maryland), November 17, 1827, 182: https://archive.org/details/sim_niles-national-register_1827-11-17_33_844/page/182/mode/1up. The same article was also reprinted here: https://chroniclingamerica.loc.gov/lccn/sn83045110/1827-10-31/ed-1/seq-2/.
[3] William R. Williamson, "Bowie, James," *Handbook of Texas Online*, accessed February 25, 2023, https://www.tshaonline.org/handbook/entries/bowie-james. Published by the Texas State Historical Association.

exacerbating the problem.[4] This was especially notable in southern areas, where bowie knives were quite common and known to be associated with needless bloodshed.[5]

19.    The response on the part of Americans confronting knife-violence was the regulation of such weapons. Going back to 1801, nineteenth-century weapon restrictions regulated the presence of knives larger than a regular pocket knife in public places.[6] As homicide rates increased and the popularity of bowie knives grew, so did laws restricting bowie knives.[7]

## II.    Pocket Pistols and Revolvers

20.    Over the course of the nineteenth century, revolvers became the most problematic deadly weapon within American communities. During that timeframe, pistols evolved from single-shot devices to revolving repeaters, and they generally became smaller and more readily

---

[4] *See* "Another Victim of the Bowie Knife," *Cheraw Gazette* (Cheraw, South Carolina), September 6, 1837, 3: https://chroniclingamerica.loc.gov/lccn/sn88084121/1837-09-06/ed-1/seq-3/.

[5] For examples, see "Carrying Concealed Weapons," *Daily Picayune* (New Orleans, Louisiana), July 25, 1840 (denouncing those who "go habitually armed, making an arsenal of their persons" and that "where offence is given or injury sustained, even the code of *honor* has laid down other means of redress than an instant appeal to the Bowie knife," and questioning "incessantly carrying concealed weapons."); "The Bowie Knife," *Southern Argus* (Columbus, Mississippi), June 7, 1842 ("The small dagger worn in former times, has given place to this more formidable invention, and the Bowie knife, throughout the West, is now the most common weapon of attack or defence."); and "Bowie Knife," *The Slave's Friend* 3, no. 2 (1838), 17 ("People in slave states often carry such knives about them," and "When they get angry they draw the knife, and sometimes *stab one another!*").

[6] Tenn. 1801 ch. 22 § 6 (prohibiting "privately" carrying "any dirk, large knife, pistol or any other dangerous weapon."). Similar laws existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife . . . ." *See also* 1838 Vir., ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . ."; 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun . . ."; 1819 Ind., ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon . . ."); 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons . . ."); 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane . . ."; 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon,"; Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon . . ."); Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon . . ."). This is not an exhaustive list.

[7] As a general rule, public carry laws included knives within their purview, and some jurisdictions prohibited the sale of bowie knives as well.

concealable as well. Not only did the full-sized pistols in use by mounted soldiers decrease in size, but manufacturers produced more models that were purposefully small and concealable.

21.     Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzle-loading devices modeled after designs that appeared in the eighteenth century.[8] After being fired, they were useful only as clubs until they could be reloaded through a process that took upwards of fifteen seconds.[9] The largest of these muzzle-loading pistols were called "horse" pistols and had been adapted to cavalry and dragoon[10] service in the early modern era. Horse pistols measured a foot or more in length and were carried in holsters that attached to a saddle; they were not designed to be carried on the person.[11] Mid-sized pistols were designed to be carried either on the belt (sometimes attached by a ring on the firearm), in the pocket of a greatcoat, or in a portable case. One of the main uses of these seven-to-ten-inch pistols prior to the nineteenth century was for defensive purposes while traveling.[12] The smallest size, measuring approximately five or six inches in length, was the pocket pistol. As the name suggests, these firearms were purposefully designed to be carried within the pockets of everyday attire.[13]

22.     In the early nineteenth century, popular outrage and concern over bowie knives overshadowed concerns about pocket pistols. Still, pistols lent themselves to the same violent ends as fighting knives, and regulatory strategies attempted to discourage their presence in public

---

[8] Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116.
[9] For example, see the website: https://timothyrjeveland.com/how-to-load-and-fire-a-musket-or-flintlock-pistol-explained-briefly-with-appropriate-jargon/.
[10] Dragoons emerged in the early modern era as a type of unit that could fight both mounted and dismounted. In many instances, they rode to battle on horseback but fought on foot. Dragoon units within the US Army were organized in 1833 and stationed in the West (initially Fort Smith, Arkansas) where Indian conflicts necessitated mounted warfare. *See* https://www.nps.gov/fosc/learn/education/dragoon5.htm.
[11] Blair, *Pollard's History*, 104, 119.
[12] *Id.* at 117–118.
[13] *Id.* at 116–118; ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire," p. 117).

spaces. Concern about pistols grew over time as revolvers became more readily available to American consumers. Even though Samuel Colt obtained his first patent in 1836, it took until about midcentury for Colt revolvers be produced in sufficient numbers to begin saturating the American market. That process accelerated as a result of two things: 1) the loss of his patent in 1857, which allowed new entrants into the market; and 2) the development of a large manufacturing capacity due to wartime production throughout the Civil War. These factors caused the Civil War Era, stretching from 1850 to 1870, to see a dramatic rise in the availability of these weapons. Even though it took several decades, the revolver eventually overtook dirks and bowie knives as the weapon considered most problematic in American communities.[14]

23.     The Colt revolver diverged from pistols widely available at the time in two critical ways. First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading). Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.[15] The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process. By about the 1870s, technological developments in the design and functionality of ammunition meant that later-model revolvers could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more efficient—a boon on the battlefield, but a new danger in other contexts.

24.     Revolvers were produced in the three historical sizes or styles: "horse," "belt," and "pocket" models. By Colt's era, "horse" pistols tended to be called "army" or "holster" pistols because they were used by mounted soldiers and kept in saddle holsters. Army pistols became

---

[14] On the life of Samuel Colt and the history of his firearm manufacturing companies, *see* Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).

[15] Revolvers' firing capacity could range anywhere from four to seven shots depending on the manufacturer and design of the firearm in question.

slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, and they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras. The "belt" or midsized pistol would have been worn in a hip holster attached to a belt, or tucked within a belt or sash. Colt's version of it came to be called the "navy"[16] model and may have been the most common type of revolver among civilians around the time of the Civil War. The first pocket pistol produced by Colt was released in 1848 and had five shots.[17] In later decades, pocket revolvers could be purchased in small sizes and calibers and at a relatively low cost. Cheap revolvers, especially imitation brands of a lesser quality, could be had for a few dollars, with used ones selling for even less.[18]

### III.  Slung Shots and Other Deadly Weapons

25.   Revolvers and bowie knives were the most notoriously problematic deadly weapons in nineteenth-century American communities, but they were not the only ones. Others included sword-canes and loaded canes, as well as metal knuckles (often referred to as "knucks") and slung shots. A slung shot was a makeshift weapon associated with organized crime and street gangs. Unlike a sling shot that we might think of today, a slung shot was a weapon in which a weighted ball could be swung from a cord or handle in a striking motion. The Oxford English Dictionary defines it as "[a] shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon," and attributes it to the United States.[19] The phrase could describe various kinds of

---

[16] The label "navy" may have been derived from the fact that the model featured an engraving of a naval battle. The name may also have been related to its having a smaller size and caliber that were more suited to being used in naval engagements. It is not entirely clear why Colt named the midsized belt pistol the "navy" model.

[17] Haven and Belden, *Colt Revolver*, 63–73.

[18] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

[19] "Slung-shot," Oxford English Dictionary.

homemade weapons and did not have a single, nationwide definition. A commenter from the South during the 1870s described a slung shot as being "made by putting stones in woolen stockings."[20] Around the same time, a Native American "war-club" was also referred to as a type of slung-shot with "the stone ball hanging loosely from the handle in a bag of buckskin."[21] Testimony in a Texas trial (1908) offered an explanation of the slung shot's use and deadliness. "The only slung shot I ever saw was by having a ball of shot or metal covered with leather, and a band of elastic or leather, attached to such a ball, and made so that the same could be attached to the wrist or arm of a person[.] . . . [A]nd, when a person using them would strike with his fist, the ball or weight would extend beyond his fist and strike a person, and, by being covered, would cause no sound."[22]

26.     Unlike firearms and knives, which required specialized knowledge and equipment to manufacture, a slung shot could be made by just about anyone. Slung shots and other club-like instruments also had no military function and therefore did not receive the constitutional protection which certain types of firearms did (like rifles and muskets conducive to militia service, as well as horse pistols). Beginning in the 1840s, laws prohibiting the carry, use, and manufacture of slung shots began to appear in numerous states. These prohibitions usually existed in addition to public carry laws that applied to deadly weapons more broadly. In 1849, Vermont's legislature passed a law saying, "Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose or keep for sale or gift, or part with any instrument or weapon of the kind usually known as slung shot, or of any similar kinds, shall be deemed guilty of a

---

[20] Quoted in Richard Hopwood Thornton, *An American Glossary: Being an Attempt to Illustrate Certain Americanisms Upon Historical Principles*, 2 vols. (London: Francis & Company, 1912), II: 815. CITATION: https://books.google.com/books?id=wM44AQAAMAAJ&newbks=1&newbks_redir=0&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.
[21] Otis T. Mason, "American Indian Weapons," *Nature* (June 10, 1875), 107-108, Fig. 2.
[22] *Geary v. State*, 53 Tex.Crim. 38 (1908).

misdemeanor."[23] The law went on to punish carrying, using, attempting to use, and being "found in the possession of" a slung shot as a felony.[24] Similar laws went into effect in New York (1849), Massachusetts (1850), Florida (1868), Dakota Territory (1883), Minnesota (1885), and Oklahoma Territory (1890) among others.[25]

## CONTEXT OF AMERICAN VIOLENCE

27.      Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors. Where Americans failed to unite together based upon common interests and principles, and where they viewed governing institutions with skepticism, violence tended to rise.[26] The southern society predicated upon racial slavery made slaveholding states more violent places than northern counterparts. Across the nineteenth century, pervasive racism, rural poverty, and unrepresentative state and local governments meant that

---

[23] 1849 Vermont ch. 36, 26 § 1.

[24] 1849 Vermont ch. 36, 26 § 2.

[25] 1849 N.Y. ch. 278 § 1 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, or expose, or keep for sale or gift, or part with any instrument or weapon the kind usually known as slung shot, or of any similar kinds,"); 1850 Mass. ch. 194 § 2 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose for sale, any instrument or weapon of the kind usually known as slung shot,"); *Laws of Florida – First Session* (1868), Ch. VII, § 11 ("Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles,"); *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* (1883), ch. 38, § 455 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor." Repeated during statehood, *see Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311); *Penal Code of the State of Minnesota to Take Effect January 1, A.D. 1886* (St. Paul: Pioneer Press Co., 1885), § 333 ("A person who manufactures or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles,"); *Oklahoma, 1st Regular Session*, (1890), ch. 25, 475–76 § 18 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor."). This is not an exhaustive list. Political scientist Robert J. Spitzer identifies 71 state laws enacted during the nineteenth century related to slung shots, an as-yet undetermined number of which addressed manufacture. Declaration of Robert Spitzer filed in *Chavez v. Bonta*, Case No. 19-cv-1226-L-AHG (S.D. Cal.) (ECF No. 111-3) ¶ 51. Beyond that, municipal ordinances have not been preserved and digitized with the degree of comprehensiveness that state laws have, so there may be additional local regulations pertaining to the manufacture and sale of slung shots.

[26] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. *See* Roth, *American Homicide*, 17–26.

violence remained a staple of southern life. Northern cities and states were not immune from high levels of homicide and crime, either. They saw a sharp uptick in violence and homicide from about 1840 through the end of the Civil War, and then again in the closing decades of the century. Ethnic tension, political conflict, and the effects of industrialization (urbanization, poverty, lack of resources, etc.)—all of which eroded the cohesion of communities and citizens—fueled this trend.[27]

28.     The American Civil War worsened the United States' trajectory toward rising rates of homicide and violence. The war itself claimed many thousands of lives, but the entire era stretching from the road to war in the 1850s through the collapse of southern Reconstruction state governments in the 1870s marked a horrific period of violence, turmoil, and political instability. It coincided with the United States' divergence from the rest of the Western world in terms of homicide rates. When the nations of Western Europe were becoming less violent and homicidal, Americans were becoming more so. The proliferation of revolvers during this same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before. War Department patronage of gun manufacturers grew exponentially during the Civil War. By the time the conflict was over, gun-makers like Colt, Smith & Wesson, and Remington had achieved a tremendous capacity to manufacture firearms in staggering numbers. Some of their factories were producing thousands of guns per month.[28]

---

[27] On homicide in American history, particularly as broken down into northern and southern regions, *see* Roth, *American Homicide*, 297–326, 386–88 (for trends in northern areas); at 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); at 184 (complicating data from p. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[28] Bridesburg, a smaller company, produced 5,000 muskets per month during a part of the war. *See* Graham Smith, *Warman's Civil War Weapons* (Iola, WI: KP Books, 2005), 128–29. On firearms and revolvers as critical to industrialization and the American System of Manufacture, see Rasenberger, *Revolver*, 113–15, 287–88.

29.     When the armies stopped fighting, the chief buyer of these firearms—the United States military—no longer needed such a large supply. Manufacturers turned to the civilian market, promoting revolvers to potential buyers across the country. They marketed pocket pistols, which were primarily carried concealed, heavily. For instance, Colt produced both a "ladies' model" as well as a "house" pistol.[29] The explosion in production was all the more pronounced by the entry of imitation brands of pocket pistols sold at much lower prices.

30.     But the structural forces driving Americans to be more violent and homicidal did not go away in the post-Civil War period. Northern states experienced a brief reduction in homicide rates immediately following their victory (inspired largely by renewed faith in the American experiment), but socio-economic forces subsequently turned the tide once again toward instability, violence, and homicide. Industrialization, class stratification, urban living conditions, labor unrest, and ethnic division all combined to make American cities and manufacturing centers more dangerous places than in the antebellum era. Poverty begat crime, and the ease with which the criminally inclined could acquire pocket pistols led to more armed robberies and armed assaults.[30] In the southern states, rates of violence and homicide remained high throughout the Reconstruction and the Jim Crow eras.[31]

31.     The introduction of pocket revolvers into these political, racial, personal, and criminal conflicts was profound. The causes and kinds of violence were largely the same—racism, classism, desperation, manly honor, etc.—but the ease with which pocket pistols could be acquired made these conflicts more likely to be armed conflicts. Low prices, easy access, and concealable

---

[29] For example, *see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It* (1875), 23 (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of [robber baron Jim] Fisk").

[30] Roth, *American Homicide*, 386–88.

[31] Roth, *American Homicide*, 386–88.

sizes also acted to encourage men to carry a revolver in public (often contrary to law) even when they had not done so previously; having it about one's person was a great temptation to use it in a moment of anger, which ruined the lives of the combatants as well as their families.[32] The situation had a significant impact upon the justice system by forcing jurists, lawmakers, and even jurors to reevaluate the law of self-defense and the "heat of passion" defense. Eventually, legal opinion coalesced around the idea that having deadly weapons upon one's person "raises [a] presumption of guilt,"[33] regardless of whether the carrier intended to use them in an assault or not.[34]

## NINETEENTH-CENTURY WEAPON REGULATIONS

32.     When Americans of the nineteenth century confronted a scenario where there were more weapons and more instances of homicide and assault related to the use of those weapons, they took action. Americans turned to their governments to establish new rules that would protect the public from the dangers posed by widespread weapon-carrying. The primary mode of regulation was to restrict the ways in which people could lawfully carry weapons in public spaces. Scholars today call these "public carry" regulations. Nineteenth-century Americans also turned to taxation and sales restrictions to regulate deadly weapons. Prohibiting the sale of weapons was not

---

[32] *See* "The Deadly Revolver," *Stephenville Empire* (Stephenville, Texas) April 5, 1884, 2; reprinted from *Houston Post* (Houston, Texas) (that "the law of the land cannot afford to make the distinction" between "a murderer with a malice aforethought, and a homicide, whose hand in an unguarded moment pulls the trigger and discharges the contents of a deadly weapon into an adversary, even before the nature of the act is realized.").

[33] *State v. Reams*, 121 N.C. 556 (1897) ("The offense of carrying a concealed weapon about one's person, and off his own premises, consists in the guilty intent to carry it concealed, and not in the intent to use it; and the possession of the weapon raises the presumption of guilt, which presumption may be rebutted by the defendant.").

[34] Some legal guidebooks asserted that intent or motive for carrying deadly weapons was immaterial, while other commentators advocated inferring malicious intent from the act of carrying weapons in much the same way that carrying lockpicks and other tools of burglary were evidence of intent to burglarize. *See* "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 412; "Entirely Too Many Revolvers," *Albany News* (Albany, Texas), August 22, 1884, 5 ("The man who, while drunk, shoots and kills another may not be hanged, because he was not competent to premeditate. He was, however, competent to premeditate against all mankind when he armed in sober moment with a weapon which could be intended for no other purpose than to kill or seriously injure."); "Toy Pistols and Concealed Weapons," *The Sun* (Baltimore, Maryland), July 19, 1881, 2 ("but the mayor contends that any man carrying a concealed deadly weapon in Philadelphia 'carries it for a purpose not self-defense'."); "War on the Pistol," *Philadelphia Enquirer* (Philadelphia, Pennsylvania), July 25, 1881, 2 (Mayor's proclamation stating, "Whosoever carries *concealed* deadly weapons carries also the *concealed* thought of murder.").

unheard-of, with numerous states placing such restrictions upon slung-shots and other jurisdictions prohibiting the sale of particular deadly weapons.

## I.      Public Carry Laws

33.      In the nineteenth century, state legislatures responded to rising levels of violence by enacting new laws that restricted the carrying of weapons in public spaces. These new statutes built upon a deep tradition within English common law and expressed in the medieval Statute of Northampton. During the nineteenth century, new American public carry statutes generally took two forms. One, textually tied to the Statute of Northampton and broadly prohibiting "going armed," often invoked sureties and peace bonds rather than a criminal fine or imprisonment. The other developed in the Old Southwest and relied upon criminal penalties to restrict the carrying of certain enumerated deadly weapons. Taken together, the two regulatory strategies tightly restricted the public carrying of deadly weapons by prohibiting "going armed" without proper cause and forcing would-be carriers to wear their weapons very rudely or inconveniently in full open view. The challenges posed by these policies resulted in the growth of licensing laws that allowed people with prior approval to carry weapons despite the continuation of broad restrictions that applied to the rest of the population.

34.      In the eighteenth and early nineteenth centuries, some American states passed laws that essentially repeated elements of the Statute of Northampton, reiterating that the rule applied within their jurisdictions. [35] An particularly illuminating example of this process is a Massachusetts law enacted in 1795, which empowered justices of the peace to "cause to be staid and arrested" anyone who disturbed the peace, engaged in assault or affray, or "shall ride or go armed

---

[35] 1786 Virginia ch. 49 "An Act forbidding and punishing Affrays;" 1792 North Carolina ch. 3 "No Man shall come before the Justices, or go or ride armed."

offensively, to the fear or terror of the good citizens of this Commonwealth."[36] Much of the statute's text repeated phrasing and clauses from within the Statute of Northampton, and prohibited any carrying of arms into public spaces without a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety, which was itself part of the common law inheritance.[37] Between 1800 and 1850, Tennessee, Maine, and Delaware emulated this approach.[38]

35.    The 1795 Massachusetts law, which addressed going armed within the context of riot, affray, and disturbing the peace, was translated into a penal code edition published in 1836, and in that process the "going armed" portion was isolated into its own section. It read: "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon,

---

[36] 1795 Mass. Ch. 2, 436.

[37] The peace bond was one of many processes inspired by America's common law heritage. *See* Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73–74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

[38] 1801 Tennessee ch. 22, § 6 "That if any person…shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice…to bind such person…to their good behavior… ." 1821 Maine ch. 76, "An Act describing the power of Justices of the Peace in Civil and Criminal Cases," 285, §1. "That it shall be within the power, and be the duty of every Justice of the Peace within his county, to punish…all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State… ." *Revised Statutes of the State of Delaware, to the Year of Our Lord 1852* (Dover: S. Kimmey, 1852), Title XV, ch. 97, 333 § 13. "Any justice of the peace may also cause to be arrested and bind to surety of the peace all affrayers, rioters, breakers and disturbers of the peace, and all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous." On the historical significance of the phrase "to the terror of the people" and its inherent association with weapon-carrying, see Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555–56 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Patrick J. Charles, "The Fugazi Second Amendment: *Bruen's* Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (May 2023), 635 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.'").

without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided."[39] The statute clarified the law by showing that "going armed" was a separate offense from disturbing the peace, riot, and affray. And it maintained the previous policy that any carrying of arms in public "without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property" was out of bounds.[40]

36.     The early nineteenth century was a time when many states were drafting legal codes—making the law known and accessible to the people, which was part of the democratic spirit of the age. In undertaking that process, numerous states adopted verbatim the penal code version of the Massachusetts public carry law.[41] It was repeated in Wisconsin (1839), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), and Oregon (1853).[42] In all of these states, the act of "going armed" without a reasonable cause was a violation of the law. In much the same way that Massachusetts had, Maine's preexisting law followed the traditional model of the

---

[39] *Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835* (Boston: Dutton & Wentworth, 1836), ch. 134, 70 § 16. This section cites "Persons who go armed may be required to find sureties for the peace &c., 1794, 26 § 2," which appears to be a reference to 1795 Mass. ch. 2, 436.

[40] Ibid.

[41] In addition to the states listed in the following sentence, see John Purdon, et al, comps., *Digest of the Laws of Pennsylvania* (Philadelphia: Kay & Brother, 1862), 250, § 6 and accompanying notation.

[42] 1838-1839, Wisconsin, *Statutes of Wisconsin*, "An Act to Prevent the Commission of Crimes," 381 § 16; *Revised Statutes of the State of Maine, Passed October 22, 1840* (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of Crimes," 709 § 16; *Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846* (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to Prevent the Commission of Crime," 692 § 16; 1847 Virginia, 1847-1848 Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16; *Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851* (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18; 1853 Oregon, General Laws, 5th Regular Session, 220 § 17.

Statute of Northampton.[43] But for Wisconsin, Michigan, Minnesota, and Oregon, this was their first public carry law.

37.     Maine was not the only adopter of the 1836 Massachusetts statute to be updating their current weapon policy. Virginia had previously enacted a public carry law in 1838, but it diverged from the Statute of Northampton and in fact aligned with a regulatory approach that was gaining traction in the South and Old Southwest. The 1838 Virginia law explicitly prohibited the carrying of concealed weapons and punished such behavior by fine and/or jail time.[44] The extent to which this 1838 statute coexisted and overlapped with the 1847 "going armed" statute remains unknown[45], but the example of Virginia highlights the fact that there were different approaches to public carry legislation during the antebellum nineteenth century. The other approach—which was more common in southern states—also grew out of the Statute of Northampton, but tended to prohibit concealed weapons and require criminal penalties for violation rather than sureties to keep the peace.

38.     Tennessee presents an insightful example of the development of this concealed-carry approach. An 1801 public carry law made use of longstanding common law language and phrases providing that anyone who "shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" would be required to post a bond, go to jail, or "be punished as for a breach of the peace, or riot at common law."[46] This law was quite similar to the Statute of Northampton

---

[43] 1821 Maine ch. 76, 285, §1.
[44] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76 § 1. "That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation . . . ."
[45] It is unclear whether the 1847 Virginia penal code section pertaining to going armed effectively repealed the statute put in place in 1838.
[46] 1801 Tennessee ch. 22, § 6.

derivative adopted by Massachusetts and other states, but it innovated by prohibiting "privately" carrying certain enumerated weapons. A separate statute from 1821 read: "Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence."[47] The language had been simplified substantially, and the list of prohibited weapons formed the basis for this statute that broadly prohibited the carrying of certain weapons. In response to the emergent fear of assaults and murders with bowie knives, Tennessee lawmakers added another law that prohibited the concealed carrying and sale of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansaw [sic] tooth pick."[48] All three laws were incorporated into the state penal code editions of 1831, 1836, and 1857.[49] Tennessee's laws illustrate changes in regulatory approach over time, and taken together, they provided local officials with a suite of regulatory tools to take both preventive and remedial action to protect the peace and the public from the dangers posed by weapon-carrying.[50]

39. Tennessee was not the only state to adopt this language to regulate public carry during the antebellum nineteenth century. Similar weapon restrictions had been enacted in Louisiana and Kentucky in 1813, at a time when both states were experiencing dramatic population growth and economic expansion as a result of river transportation.[51] Like Tennessee's 1838 law,

---

[47] 1821 Tennessee ch. 13.

[48] 1838 Tennessee ch. 137. It is worth noting that the well-known antebellum public carry case, *Amyette v. State* (1840) concerned this knife-specific 1838 law—not the broader 1801 or 1821 prohibitions upon going armed, which remained in force until substantial policy changes occurred during Reconstruction.

[49] John Haywood, et al, *Statute Laws of the State of Tennessee* (Knoxville: F. S. Heiskell, 1831), 10-11; R. L. Caruthers, et al, *Compilation of the Statutes of Tennessee* (Nashville: Steam Press of James Smith, 1836), 99-101; Return J. Meigs, et al, eds., *Code of Tennessee Enacted by the General Assembly of 1857-8* (Nashville: E. G. Eastman and Co., 1858), 851-853.

[50] See 1825 Tennessee ch. 19, repeated in the arms- and weapon-related sections of the 1831, 1836, and 1857 penal codes.

[51] *See* 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1 ("any person who shall be found with any concealed weapon, such as a dirk, dagger, knife,

their statutes provided a list of prohibited deadly weapons that could not be concealed on the person and penalized violators with a fine and/or jail time.[52] States and territories following this model included: Indiana (1819), Florida Territory (1835), Georgia (1837), Arkansas (1837); Virginia (1838), Alabama (1839), Ohio (1859), New Mexico Territory (1859); Colorado Territory (1862); California (1863); Dakota Territory (1864); Montana Territory (1865); Nebraska (1873); Missouri (1874); Wyoming Territory (1875); Mississippi (1878); North Carolina (1879); South Carolina (1880); Delaware (1881); Illinois (1881); Washington Territory (1881); Maryland (1886); Oklahoma Territory (1890); District of Columbia (1892); Rhode Island (1893); and Alaska Territory (1896).[53]

40.     Idaho, West Virginia, and Texas emulated the structure of concealed-carry restrictions by enumerating weapons that should not be carried, but they (like the "going armed" laws) restricted open-carry as well. West Virginia's 1882 law penalized anyone who were to "carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or

---

pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view . . ."); 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1 (" any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less than one hundred dollars . . . .");.

[52] Kentucky mandated a fine of not less than $100, half of which to go to the informer. Louisiana provided for a fine of $20 to $50, with half to go to the informer; violations occurring before a court received a find of not less than $100 and imprisonment up to six months. *See* 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1; 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1.

[53] 1819 Indiana ch. 23; 1835 Florida Territory ch. 860; 1837 Georgia, 90; 1838 Virginia ch. 101; William McK. Ball, et al, eds., *Revised Statutes of the State of Arkansas* (Boston: Weeks, Jordan, 1838), 280, § 13; 1838 Alabama ch. 77; 1859 Ohio 3:56; 1859-1860 New Mexico Territory 94–99 (English and Spanish); 1862 Colorado Territory 56 (applied to "any city, town, or village"); 1863 California ch. 485; 1864 Dakota Territory 128, § 455; 1864 Montana Territory 355; 1873 Nebraska 724, § 25; 1874 Missouri 43; Wyoming Territory ch. 52 (applied to "any city, town or village"); 1878 Mississippi ch. 46; 1879 North Carolina ch. 127; 1880 South Carolina 447-448; 1881 Delaware ch. 548; 1881 Illinois 73-74; *Code of Washington* (Olympia: C. B. Bagley, 1881), 181, § 929; 1886 Maryland ch. 375; 1890 Oklahoma Territory 476, § 20; Ch. 159, 52 Congress, Public Law 52-159, 27 Stat. 116 (1892), § 1; 1893 Rhode Island ch. 1180; Fred F. Barker, *Compilation of the Acts of Congress & Treaties Relating to Alaska* (Washington, D. C.: U.S. Gov. Print Off., 1906), Appendix A, 139, § 117.

other false knuckles, or any other dangerous or deadly weapon of like kind or character."[54] The law did not use the word "concealed" and thereby did not limit its prohibition to weapons concealed within a person's clothing or accoutrements. The Texas public carry law, enacted in 1871, similarly declined to limit its scope to "concealed" weapons. It held "That any person carrying on or about his person, saddle, or in his saddle bags, any [enumerated deadly weapon]…, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing" would be guilty of a misdemeanor.[55] Idaho Territory took the same approach of prohibiting the carrying of deadly weapons generally, but the law also mimicked those of other Mountain West jurisdictions in that it applied only "within the limits or confines of any city, town or village or in any public assembly."[56]

41.    State-level public carry laws did not remain static across the nineteenth century, and the laws previously described or cited were in some instances modified, superseded, and supplemented. The example of Tennessee, with its separate statutes from 1801, 1821, and 1838, shows lawmakers choosing to adopt overlapping and seemingly contradictory weapon policies. Georgia's first deadly weapon law was poorly written and confusing. After the state's high court struck down certain portions of the law, the state code adopted in 1860 provided a clearer concealed-carry regulation that fell in line with what many other states were doing.[57] In Kentucky, the 1813 concealed-carry law was quite the trail-blazer in terms of weapon policy, but the high court also took on the role of trail-blazer by striking it down in 1822, in one of the first recorded

---

[54] 1882 West Virginia ch. 135, § 1.

[55] 1871 Texas 34, § 1.

[56] 1888 Idaho Territory 23.

[57] R. H. Cobb, et al, *Code of the State of Georgia* (Atlanta: J. H. Seals, 1861), 859, § 15. The section read: Any person having or carrying about his person, unless in an open manner and fully exposed to view, any pistol (except horseman's pistols), dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence, shall be guilty of a misdemeanor… ."). This section fell within Part 4, Title 1, which the prefatory pages of the code described as "for the Trial and Punishment of white persons." See Cobb, *Code of Georgia*, iv.

appellate public-carry cases.[58] As caselaw on the subject developed elsewhere in the nation, Kentucky's anti-regulation policy turned it into a national outlier.[59] When state leaders gathered to draft a new constitution in 1850, they shut the door on the court's way of thinking by expressly authorizing the legislature to "pass laws to prevent persons from carrying concealed arms."[60] Newly freed from the regulatory shackles imposed by the 1822 decision, Kentucky lawmakers of the 1850s enacted weapon regulations that would not have passed constitutional muster before— a concealed-carry law and a prohibition against "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung-shots, or any imitation or substitute therefore."[61] Arizona Territory's first law pertaining to weapons only punished the improper exhibiting and discharging of firearms, but a new enactment in 1889 prohibited arms at social gatherings while also criminalizing open- and concealed-carry within town limits.[62]

42.     Sometimes, state-level public carry restrictions coexisted with similar municipal ordinances. In Texas, some cities moved to suppress the carrying of weapons years before state lawmakers did. Galveston was a leader in that effort, prohibiting concealed-carry in 1866 amid a tumultuous and violent period that followed the Civil War.[63] Such a policy had been out of bounds before the war, but the branches of state government changed their minds in the face of the rampant

---

[58] *Bliss v. Commonwealth*, 12 Ky. 90 (1822).

[59] Charles, "Fugazi Second Amendment," 646-647 (explaining the *Bliss* decision and stating that "Subsequent Antebellum courts that examined the authority of legislatures to regulate armed carriage felt compared to square their analysis with that of *Bliss*… .").

[60] Third Constitution of Kentucky (1850), Article XIII, Sec. 25 "That the rights of the citizens to bear arms in defense of themselves and the State shall not be questioned; but the General Assembly may pass laws to prevent persons from carrying concealed arms."

[61] 1854 Kentucky ch. 1020 (punishing anyone who would "carry concealed any deadly weapons, other than an ordinary pocket knife," unless having reasonable cause to fear an attack, being a peace officer, or at night by persons "required by their business or occupation to travel during the night."); 1856 Kentucky ch. 636.

[62] 1867 Arizona Territory 21; updated in 1883 Arizona Territory 65; 1889 Arizona Territory 30.

[63] Ordinance printed in "Proceedings of City Council," *Flake's Bulletin* (Galveston, Texas), December 28, 1865. ("…it shall not be lawful for any person or persons (United States military and civil officers of the city and county of Galveston excepted,) to carry about his or their person or body, any concealed deadly weapon—under whatever name or character the same may be designated and called… .").

lawlessness that made Texas one of the most dangerous places in the country. Other cities took similar action, and soon enough the state legislature issued new municipal charters that explicitly protected city governments' authority to regulate weapon-carrying within city limits.[64] These municipal carry ordinances coexisted with the state's public carry law after it was passed in 1871.[65] The municipal-state overlap occurred in many places, including California. In 1863, that state enacted a concealed-carry law (which was subsequently repealed in 1870).[66] The City of Los Angeles, meanwhile, enacted its own ordinance in 1866 that prohibited the wearing and carrying of deadly weapons "concealed or otherwise, within the corporate limits of said city."[67] Other cities large and small across the country adopted public carry laws, and municipal charters from the mid- and late-nineteenth century vested local governments with such power.

43.     Nineteenth-century Americans employed regulatory methods other than public-carry laws. Notable policy approaches included locational restrictions, personal and occupation taxes, and point-of-sale restrictions. These laws often coexisted with public-carry laws, adding another regulatory layer to Americans' relationships to their weapons and their communities. These policies were designed to protect the public by discouraging people from being armed in public spaces, or established standards for dealers in firearms that could appropriately regulate the trade in and access to deadly weapons within American communities.

## II.     Taxation

---

[64] For example, see "Ordinances Passed," *Goliad Intelligencer* (Goliad, Texas), March 17, 1866 ("That the carrying of deadly weapons, by civilians, within the limits of the Town proper, except in passing through the corporation, is hereby prohibited.").

[65] 1871 Texas ch. 34.

[66] 1863 California ch. 484.

[67] Ordinance printed in *Los Angeles Tri-Weekly News* (Los Angeles, California), July 22, 1865, 2. Also available in the Duke Repository of Historical Gun Laws.

44.     Another mode of regulating weapons during the nineteenth century involved taxation. The taxing power exists to raise revenue, but it has also historically been exercised as part of the police power. Some taxes are more about discouraging certain behaviors, such as modern day taxes on tobacco and alcohol, deemed harmful to society rather than simply to raise revenue.[68] Americans living in the antebellum period sometimes turned to taxes upon the sale, possession, and use of deadly weapons as a mode of regulating them. In the latter nineteenth and early twentieth centuries, taxes relating to deadly weapons were more likely to take the form of occupation or sales taxes.

45.     In the antebellum period, taxes could be straightforward attempts to prohibit the carrying of weapons without saying so explicitly. This approach was practiced in Florida during its territorial phase and remained a policy option for much of the nineteenth century.[69] In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for "carrying arms openly, outside of all their clothes[.]"[70] Unsatisfied with the public carry law, leaders established a new series of prohibitive taxes designed to further reduce the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket-pistols, sword-canes, or bowie-knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay . . . a tax of ten dollars per annum[.]"[71]

---

[68] For historical understandings of the taxing power, see Thomas M. Cooley, *A Treatise on the Law of Taxation: Including the Law of Local Assessments* (Chicago: Callaghan, 1876), 396; Ernst Freund, *The Police Power: Public Policy and Private Rights* (Chicago: University of Chicago Press, 1904), 33–34.

[69] In some ways, possession taxes came close to being carry taxes or even proto-licensing policies. Taxation as a form of public carry regulation was considered in Texas in 1866 as well as in Tennessee in 1893. *See* Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PdD diss. (Texas Christian University, 2019), 50-52; "Tennessee State News," *Bolivar Bulletin* (Bolivar, Tennessee) February 10, 1893, 1. https://chroniclingamerica.loc.gov/lccn/sn89058007/1893-02-10/ed-1/seq-1/.

[70] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources.

[71] *Id.*; 1838 Fla., ch. 24. This tax is not included within the Duke Repository, indicating that that database captures only a portion of the occupation and personal taxes in force, even at the state/territorial level, during the nineteenth century. More research remains to be done on the subject.

In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[72] In a sparsely populated, rural environment, these prohibitively high taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively reducing the number of weapons carried in public spaces.[73]

46.    Other states used taxation to regulate deadly weapons. In 1837, Alabama lawmakers taxed the sale or gift of bowie knives and the like at $100 per instance (equivalent to approximately $3,195.27 today).[74] It appears as though occupation taxes became more widespread over the course of the nineteenth century. Sticking with the example of Alabama, occupation taxes emerged in the 1870s and continued to be in force through at least the end of the century. The initial tax rate upon "dealers in pistols, bowie-knives and dirk-knives," was $50, but thereafter was raised to $300 through 1897.[75] This annual licensing fee of $300 amounts to nearly $10,000

---

[72]   The amounts reach $319.14 and $6,382.73. *See*: https://www.in2013dollars.com/us/inflation/1838?amount=200.

[73] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly."

[74] 1837 Ala. 11, § 2 ("That for every such weapon [knife or weapon, known as Bowie Knives or Arkansaw Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie Knife or Arkansaw Tooth-pick], sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury[.]").

[75] Wade Keyes, et al., *Code of Alabama 1876* (Montgomery: Barrett & Brown, printers for the State, 1877), 292, § 494.15 ("For dealers in pistols, bowie-knives and dirk-knives, whether the principal stock in trade or not, fifty dollars."); 1886 Ala. ch. 4, § 5.17 ("For dealers in pistols or pistol cartridges, or bowie knives, or dirk knives, whether principal stock in trade or not, three hundred dollars."); Robert C. Brickell, et al., *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629.28 ("For dealers in pistols or pistol cartridges, or bowie knives, or dirk knives, whether principal stock in trade or not, three hundred dollars."); William L. Martin, *Code of Alabama* (Atlanta: Foote & Davies, 1897), 1137, § 4122.27 ("For dealers in pistols or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars."). The rate was lowered to $100 in 1898. *See* 1898 Ala. ch. 903, 190, § 16.66 ("For dealers in pistol [sic] bowie or dirk knives, whether principal stock in trade or not, one hundred dollars.").

today.[76] Georgia also pursued occupation taxes in the post-Civil War period, beginning with $25 per place of business in 1882, which was quickly raised to $100 per place of business in 1884.[77] Between 1886 and 1894, the rate fluctuated between $100 (equivalent to upwards $3,000.00 today) and $25 (equivalent to approximately $850.00 today).[78] Meanwhile, large hunting knives that might be deemed similar to a bowie knife or dirk (8-10 inches) cost anywhere from $3-4 in the 1880s.[79] For this tax to be money well spent, a dealer would have to sell upwards of 250 bowie knives to reach $1,000 of business. When an occupation tax also licensed the sale of pistols, the threshold of profitability could be more easily reached because well-made pistols cost upwards of $5.00.[80] These high taxes likely fell upon buyers of deadly weapons, further raising their retail price; high taxes also forced retailers to weigh the cost of selling knives and pistols, potentially narrowing the pool of sellers to those who specialized in hardware or hunting equipment. Other states imposing occupation taxes during the nineteenth century included Mississippi, Georgia, Virginia, and South Carolina.[81]

---

[76] *See* 1892 Alabama ch. 95, 183; Robert C. Brickell, et al., *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629. The $300 licensing fee was in effect some time prior to 1887, and an 1892 amendment closed a loophole for dealers in "pistol cartridges." The subsequent Article specifies that all licenses expire annually; *see* ch. 9, Art. II § 634.

[77] 1882 Ga. ch. 18, 37, § 2.18 ("And upon all dealers in pistols, revolvers, dirk or Bowie knives, the sum of twenty-five dollars for each place of business in each county where the same are sold, and said tax shall be for educational purposes. The tax provided by this paragraph shall be assessed against all dealers in the articles herein enumerated, on and after the first day of April., 1883, and such dealer shall not be liable for said tax of twenty-five dollars prior to the first of April, 1883."); 1884 Ga. ch. 52, 23, § 2.18 ("And upon all dealers in pistols, toy pistols, revolvers, pistol or revolver cartridges, dirks or bowie knives, the sum of one hundred dollars for each place of business in each county where the same are sold.").

[78] For inflation calculations, *see* https://www.in2013dollars.com/us/inflation/1890?amount=25 and https://www.in2013dollars.com/us/inflation/1890?amount=100.

[79] J. Palmer O'Neil & Company, *Illustrated Catalogue* (J. Palmer O'Neil & Co.), 40 (Showing 8-inch hunting knife listed at $3.00 each; publication date is estimated to be the 1880s, and hunting season dates make reference to 1882); Lester C. Dole and Company, *Catalogue and Price-List, 1883* (New Haven: Lester C. Dole and Co., 1883), 27 (Showing 8-inch hunting knives listed at $3.00, 9-inch at $3.50, and 10-inch at $4.00).

[80] The same catalogues include prices for certain pistols, which generally ranged from $5.00-10.00 each.

[81] For examples, see 1898 Mississippi ch. 5, § 63 (Assessing $25.00 annually on dealers in deadly weapons, shotguns and rifles excepted, and $5.00 annually on each firm or dealer in pistol cartridges); 1884 Georgia 23, § 18 (Assessing $100.00 annually per place of business for dealers in deadly weapons); 1895 Virginia ch. 772 (Imposing special license

47.     Occupation taxes and personal taxes on deadly weapons carried into the twentieth century. Louisiana levied a licensing tax upon weapon dealers in 1904, and in 1912 Mississippi created a special tax of $250.00 on pawnbrokers who sold fighting knives, sword canes, and metal knuckles.[82] One North Carolina county taxed possession of pistols at rates equal to the 1915 poll tax and made "failure to list [a pistol] for taxes" a misdemeanor crime.[83] In the early twentieth century, members of the Texas legislature put in place a 50% tax on the gross receipts from the sale of pistols. All dealers had to report quarterly the number sold along with payment, which functioned as an occupation tax for them to remain in business.[84] The intention of the measure was to make pistols prohibitively expensive, and a constitutional challenge upheld the law. The court described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society."[85] As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[86]

## III.   Sales Prohibitions

48.     At times, nineteenth-century lawmakers restricted the sale of certain problematic weapons. As bowie knives, revolvers, and other deadly weapons were becoming more popular and

---

requirements on dealers in pistols and pistol cartridges in Accomac and Northampton counties); 1890 South Carolina ch. 28, § 490 (Requiring dealers in pistols, metal knuckles, and cartridges less than .45-caliber to obtain a special license from the County Board of Commissioners). This is not an exhaustive list.

[82] 1904 Louisiana ch. 65, § 2 (Taxing dealers with gross sales of $5,000 or more in the amount of $200, gross sales of $2,000-5,000 in the amount of $150, and gross sales less than $2,000 in the amount of $100.); 1912 Mississippi ch. 98 (assessing $250.00 "On each pawnbroker or firm of such", plus $250.00 "On each pawnbroker who may receive in pawn any dirk, knife, sword, cane, brass or metallic knucks or pistol," plus $250.00 "on each person, firm or corporation who may sell or dispose of any second-hand dirk, knife, sword-cane, brass or metallic knucks or pistol" along with "the privilege tax paid by such person or firm as a pawnbroker.").

[83] This law applied to Pitt County, North Carolina. *See* 1915 N.C. ch. 51.

[84] 1907 Texas ch. 18, "An Act providing for the levy and collection of an occupation tax . . .[]" 485 § 12.

[85] *Caswell & Smith v. State*, 148 S.W. 1159 (Tex. App. 1912).

[86] Id.

more prevalent, Tennessee and Georgia prohibited their sale. In 1837, Georgia passed a statute combining a public carry law with a sales restriction. It was unlawful "for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense[.]".[87] The statute further held that "pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols[.]".[88] The following year (1838), Tennessee lawmakers did much the same with an updated public carry law that included a section prohibiting "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick."[89] In 1849, Vermont lawmakers prohibited the manufacture and sale of slung shots, which were makeshift weapons associated with organized crime and street gangs.[90] Numerous other jurisdictions did the same.[91] Kentucky

---

[87] Ga. 1837 ch. 90.

[88] Id.

[89] Tenn. 1838 ch. 137. This law was temporarily suspended during part of the Civil War. *See* Tenn. 1862 ch. 23.

[90] 1849 Vermont ch.36, 26 § 1. Slung shots were not like slingshots as we understand the term today. The *Oxford English Dictionary* identifies this as a nineteenth-century American phrase referring to "[a] shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon."

[91] 1849 N.Y. ch. 278 § 1 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, or expose, or keep for sale or gift, or part with any instrument or weapon the kind usually known as slung shot, or of any similar kinds,"); 1850 Mass. ch. 194 § 2 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose for sale, any instrument or weapon of the kind usually known as slung shot,"); *Laws of Florida – First Session* (1868), Ch. VII, § 11 ("Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles,"); *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* (1883), ch. 38, § 455 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor." Repeated during statehood, *see Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311); *Penal Code of the State of Minnesota to Take Effect January 1, A.D. 1886* (St. Paul: Pioneer Press Co., 1885), § 333 ("A person who manufactures or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes

31

lawmakers enacted a law that prohibited "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung shot, or any imitation or substitute therefor,"— essentially adopting the policies of all these states into one catch-all statute.[92] In the post-Civil War period, Tennessee pursued a range of deadly weapon policies, ultimately adopting an extremely strict public carry law that worked in conjunction with a ban upon the sale of certain kinds of pistols.[93] Lawmakers in nearby Arkansas implemented a nearly identical policy but went one step further by also prohibiting the sale of "any kind of cartridge[] for any pistol[.]".[94]

49.     When sales restrictions were challenged during the nineteenth century, they were generally upheld. The 1837 Georgia public carry law included a proscription against selling certain deadly weapons. A well-known case, *State v. Nunn*, challenged the public carry law and resulted in a defense of open-carry in Georgia. But the case did not address the accompanying sales restriction.[95] Postbellum sales restrictions in Arkansas and Tennessee were challenged, and in each case the state's high court affirmed the law as a reasonable exercise of police power. For the Tennessee court, the intent of the statewide sales restriction was to "put down the pernicious habit

---

of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles."); *Oklahoma, 1st Regular Session*, (1890), ch. 25, 475–76 § 18 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor."). This is not an exhaustive list. Political scientist Robert J. Spitzer identifies 71 state laws enacted during the nineteenth century related to slung shots, an as-yet undetermined number of which addressed manufacture. Declaration of Robert Spitzer filed in *Chavez v. Bonta*, Case No. 19-cv-1226-L-AHG (S.D. Cal.) (ECF No. 111-3) ¶ 51. Beyond that, municipal ordinances have not been preserved and digitized with the degree of comprehensiveness that state laws have, so there may be additional local regulations pertaining to the manufacture and sale of slung shots.

[92] Kentucky 1855 ch.636, 96 § 1.

[93] Between 1871 and 1879, Tennessee lawmakers made substantial changes to their state weapons policy, of which the 1879 sales restriction forms only a part. An 1870 statute prohibited "publicly or privately" carrying "a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver." When the state Supreme Court struck the measure down as unconstitutional for prohibiting the open carrying of militia arms known as "repeaters" (referring to army-sized revolvers), lawmakers quickly added an exception for army/navy pistols carried "openly in his hands." In 1879, lawmakers prohibited the sale of "belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol[s.]" *See* 1870 Tenn. 13, pp. 28-29; 1871 Tenn. 90, pp.81-82; *Andrews v. State*, 50 Tenn. 165 (1871); 1879 Tenn. 96 pp.135-136.

[94] Ark. 1881 ch. 96 § 3.

[95] *Nunn v. State*, 1 Ga. 243 (1846).

of going armed"[96] by declining to issue licenses to firearm dealers. In Arkansas, the sales restriction "was enacted as a measure of precaution for the prevention of crimes and calamities," and was "leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person."[97] Sales restrictions did not disappear at the turn of the century, and continued to coexist with indirect forms of regulation like licensing laws and tax requirements. For example, a 1911 Michigan law prohibited the sale of "any dirk, dagger, stiletto, metallic-knuckles, sand-bag or skull cracker" and made specific exception for "the selling or keeping for sale of hunting and fishing knives."[98]

50.     Overall, sales restrictions and taxes pertaining to deadly weapons were important avenues for regulating items that posed a danger to American communities. These policies emerged in the antebellum era and grew significantly after the Civil War. Postbellum regulatory strategies built upon policies that had gone before and harnessed the police power of the state government to address an unprecedented problem of gun violence and gun-toting in the United States.

### DEVELOPMENT OF LARGE CAPACITY REPEATERS

51.     New York's challenged law includes a semiautomatic firearm's capacity to accept a detachable magazine as part of its definition of the phrase "assault weapon." Though the regulation of newly available and socially problematic weapons is a longstanding feature of American history, the regulation of magazine capacity was novel to the twentieth century. Detachable magazines did not become a common feature on American firearms until that time, and large-capacity magazines (carrying more than ten rounds) are a product of the post-World War

---

[96] *State v. Burgoyne*, 75 Tenn. 173 (1881).
[97] *Dabbs v. State*, 39 Ark. 353 (1882).
[98] 1911 Michigan ch. 274, § 2. This law also laid out terms and conditions for obtaining a license to carry pistols.

II period. Reliable repeat-fire became a reality, but semiautomatic firearms designed for use with large-capacity magazines are qualitatively different from the lever-action, repeating rifles of the late nineteenth century. Furthermore, early semiautomatic rifles and pistols did not feature magazine capacities at or above ten rounds.

## I.   Lever-Action & Semiautomatic Rifles

52.   Even though repeating rifles date to approximately the mid-nineteenth century (with a few outliers predating even that time frame), the Winchester rifles of the 1860s and 1870s were the first repeating rifles with a magazine capacity greater than ten which were produced in sufficient numbers to be available for purchase by Americans. Their lever-action design usually featured a fixed, tubular magazine that was loaded through a loading port on the side of the firearm. While there are a handful of examples of these fixed tubular magazines capable of holding more than ten cartridges during that time period, such as the famous Winchester Model 1873 Repeating Rifle,[99] between each shot the user had to engage the lever action to discharge the spent shell and load a fresh cartridge from the magazine into the chamber. And when all rounds had been expended, the user had to individually load cartridges back into the magazine by inserting them through the loading port.

53.   In fact, as the nineteenth century drew to a close, newly designed lever-action rifles tended to be chambered for larger center-fire cartridges—which had the effect of reducing magazine capacity. Where the Winchester 1866 (and its predecessor, the Henry rifle) had been designed for 44-caliber rimfire cartridges, the Winchester 1873 was chambered for the 44-40 Winchester center-fire round.[100] It was slightly longer than the 44 Henry and 44 Rim Fire that the

---

[99] Thomas Henshaw, *The History of Winchester Firearms, 1866-1992* (Clinton, NJ: Winchester Press, 1993), 13-19.
[100] On these rifles, their magazines, and the associated cartridges, see Henshaw, *Winchester Firearms*, 6–8, 10-17; and Frank C. Barnes and Stan Skinner, *Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges* 11th ed. (Iola, WI: Gun Digest Books, 2009), 485, 96.

preceding models had used, but it was the beginning of a trend on Winchester's part to develop and produce rifles capable of firing stronger, larger center-fire cartridges.[101] The company was competing for sportsmen as consumers, and sportsmen were drawn to the single-shot rifles designed for large, heavy center-fire cartridges that were capable of taking down a large target (like deer, grizzlies, and buffalo) with one well-placed shot. For this reason, Winchester developed lever-action rifles for use with larger cartridges and even manufactured its first single-shot rifle in 1885.[102]

54.     Around the turn of the twentieth century, John M. Browning began working on the design of semi-automatic firearms, which functioned through a "blowback" method in which "The recoil from the exploded cartridge ejects the empty shell, cocks the hammer, and throws a fresh cartridge into the chamber."[103] This design was sometimes referred to as "automatic," though its function aligns with our current definition of "semi-automatic"; it was also referred to as "auto-loading" or "self-loading." Winchester released its Model 1903 Automatic Rifle, which employed this method, and featured a 10-round, fixed, tubular magazine for .22 caliber cartridges. According to its product description, "all that is necessary to do to shoot the ten cartridges that the magazine holds is to pull the trigger for each shot."[104] Winchester did not release a semi-automatic rifle featuring a detachable magazine until its Model 1905 Self-Loading Rifle, and that detachable box

---

[101] Subsequent Winchester models, including the Winchester 1883 Hotchkiss Repeater, chambered for the newer 45-70 US Government cartridge, had a magazine in the butt stock that held 6 rounds; and the Winchester Model 1894 Repeating Rifle, chambered for various center-fire cartridges, had a maximum magazine capacity was only 8 rounds. *See* Henshaw, *Winchester Firearms*, 23–24, 41; and Barnes and Skinner, *Cartridges of the World*, 96–97.

[102] On Winchester Repeating Arms Co. designing guns in competition with other manufacturers' single-shot rifles, *see* Henshaw, *Winchester Firearms*, 25–29.

[103] "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[104] Id.

magazine held only five cartridges in a single column.[105] The subsequent semi-automatic model, called the Model 1907 Self-Loading Rifle, featured a 5-round detachable box magazine.

55.    A major rival of Winchester was Marlin Firearms, a company that became a popular producer of lever-action rifles. Marlin did not begin manufacturing semi-automatic rifles until 1931 when the company (under new leadership) released the 22 Caliber Autoloading Rifle, also called the Model 50 / 50E.[106] It came with a six-round detachable clip magazine.[107]

56.    As the twentieth century wore on, both Marlin and Winchester featured semi-automatic rifles as a part of their regular lineup of hunting firearms, though lever-action, pump action, and bolt action designs tended to be more popular.[108] The magazine capacities of their semi-automatic models with detachable magazines remained at or below 10 rounds with very few exceptions.[109] One of those few outliers was the Marlin Model 89C, released in 1948 and chambered for .22 caliber long rifle rounds. It was originally sold with a standard 7-shot clip magazine, but beginning in 1953, new models were sold with two 5-shot clip magazines. In 1957, that changed once again when standard magazines for new manufactures was a 12-shot clip magazine.[110] Marlin ceased production of the Model 89C in 1961, and for the next two decades or more, the company's standard magazine sizes tended to max out at 7 rounds.[111] The Model 89C and its short-lived magazine capacity of twelve rounds was an outlier in Marlin's sales and production catalog.

---

[105] Henshaw, Winchester Firearms, 61.

[106] William S. Brophy, *Marlin Firearms: A History of the Guns and the Company that Made Them* (Harrisburg, PA: Stackpole Books, 1989), 300–301.

[107] Brophy, *Marlin Firearms*, 301.

[108] *See* the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s. Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[109] Id.

[110] Brophy, *Marlin Firearms*, 306–307.

[111] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

57.     Even though Winchester produced semi-automatic rifles before Marlin, the company did not sell rifles with a standard clip magazine capacity over 10 rounds to civilians through at least 1996.[112] For a brief period in the 1970s (1974-1978), the company produced the Model 490 Repeating (Autoloading) 22 Rim Fire Rifle. These firearms came with a standard 5-round clip magazine and were shown with that magazine in Winchester catalogs; customers who wished to purchase magazines holding 10 or 15 rounds had to do so as accessories.[113] The dearth of Winchester company records makes it impossible to estimate how many of these accessory magazines were purchased, but it stands to reason that, had a standard capacity at or above ten been popular with consumers, Winchester likely would have sold at least some of their semiautomatic rifles that way.

58.     Records relating to the production and advertisement of rifles manufactured by two of the most popular brands shows that even though detachable clip/box magazines have been in existence since the early twentieth century, they were not generally sold with a capacity of more than 10 rounds until recently. In fact, these records show that during most of the twentieth century standard clip/box magazine sizes usually ranged from 3 to 7 rounds.[114]

## II.     Semiautomatic Pistols

59.     The technological developments that produced automatic and semi-automatic rifles and shotguns also made possible the automatic and semi-automatic pistol. In the 1890s, a German engineer designed the first fully functional semi-automatic pistol, but its unusual size and shape

---

[112] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[113] Henshaw, *Winchester Firearms*, 174. Winchester Catalogs 1970-1975, Folder 1/3, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[114] *See* the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s. Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

prevented it from being the financial success its manufacturers wanted.[115] The company commissioned Georg Luger to redesign it, which he did over the course of the 1890s.[116] Meanwhile, the American gun designer John Moses Browning developed various semi-automatic pistol designs. One of his designs, which seemed poised to receive US military contracts, was purchased by Colt's.[117] The company's developments began with a series of handguns chambered for .38 Auto, then .45 caliber rounds, each of which had a magazine capacity of less than ten rounds.[118] Efforts culminated in the development of the Colt Government Model .45 1911 Automatic—the standard-issue sidearm for American armed forces until the 1980s, which featured a magazine capacity of seven rounds.

60.    Browning's other semi-automatic pistol design was purchased by Fabrique Nationale d'Armes de Guerre (FN), a Belgian arms manufacturer. The FN Browning M1900 was released at the turn of the twentieth century and sold quite successfully in Europe. It was chambered for .32 caliber cartridges and had a magazine in the hand-grip which held seven rounds. In Continental Europe, these "Browning pistols" were associated with a tremendous rise in crimes, accidents, and deaths related to firearms, and particularly the anarchist movement that carried out numerous assassinations there.[119]

61.    FN subsequently approached Browning to design another semi-automatic handgun that might be purchased in large numbers by the French army. One of the requirements for consideration was that the firearm have a magazine capacity greater than ten rounds. Browning

---

[115] Nathan Gorenstein, The Guns of John Moses Browning: The Remarkable Story of the Inventor Whose Firearms Changed the World (New York: Scribner, 2021), 119–120.
[116] The company was Deutsche Waffen- und Munitionsfabriken (DWM), which owned a controlling interest in the Belgian armsmaker Fabrique Nationale d'Armes de Guerre (FN). *See* Gorenstein, *The Guns of John Moses Browning*, 128.
[117] Gorenstein, The Guns of John Moses Browning, 123–125.
[118] Charles T. Haven and Frank A. Belden, A History of the Colt Revolver, and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940 (New York: Bonanza Books, 1940), 205–207, 209, 210–213.
[119] Gorenstein, The Guns of John Moses Browning, 130–33.

was initially reluctant to participate in the endeavor but soon changed his mind. An engineer from FN, Dieudonne Saive, developed a functional "double-stacked" magazine prototype, which offset cartridges in two separate columns to double the capacity.[120] The resulting hand-grip was significantly wider than those of previous models, but it held thirteen 9mm cartridges.[121] The FN Browning M35 Hi-Power pistol went into production after John M. Browning passed away in the 1930s, but FN produced the weapon (even though it was not initially selected by the French military) until 2018. When the Nazis occupied Belgium, they took over the FN factory and produced some of these pistols for their own use during World War II.[122]

62.     Even though American companies and designers proved to be trailblazers in the development of semi-automatic handguns, American consumers were not quickly won over by them. Through at least the World War II era, Americans seem to have preferred revolvers to semi-automatic designs; this was in sharp contrast to Europe, where semi-automatic pistols were favored over revolvers.[123] Browning M35 Hi-Power pistols were sold in the United States and some Americans purchased them with magazine capacities greater than ten rounds, but by far most semi-automatic firearms on the American market maxed out at ten.[124] Brands like Colt's and Smith & Wesson produced several semi-automatic models for target shooting, police, military, and personal defense, and these firearms generally had a capacity of six to ten rounds.

63.     By 1940, Colt's still had not produced a handgun with a magazine capacity greater than ten,[125] and by 1944 the inaugural issue of Gun Digest (which published advertisements for

---

[120] *Id.* at 209–210.
[121] Henry M. Stebbins, Albert J. E. Shay, and Oscar R. Hammond, *Pistols: A Modern Encyclopedia* (Harrisburg, PA: The Stackpole Company, 1961), 140.
[122] Stebbins, Shay, and Hammond, *Pistols*, 139–40.
[123] Gorenstein, The Guns of John Moses Browning, 130–33.
[124] My examination of firearms books, catalogs, archival records, and digitized copies of magazines like Gun Digest supports the assertion that most American semiautomatic firearms models produced between 1900 and 1990 had a standard magazine capacity of ten rounds or less.
[125] Haven and Belden, A History of the Colt Revolver, 219–25.

the best-selling American handguns) did not feature one.[126] By 1951, Gun Digest included the
Browning Hi-Power in its lineup of "military small arms," but it was an outlier among the other
sixteen semi-automatic handguns with magazine capacities of ten or less.[127] The section featuring
foreign handguns included two models with magazine capacities over ten out of a total of nine
semi-automatic models.[128] By 1969, the selection of handguns featured in Gun Digest had grown
substantially, but only two models had a capacity of more than ten rounds.[129]

## CONCLUSIONS

64.     This report has laid out the history of gun and weapon regulation in the United
States during the nineteenth century. During this time frame, Americans developed a list of deadly
weapons, which identified knives and pistols (among others) as non-militia arms and therefore
subject to regulation in the name of public health, peace, and safety. Deadly weapons were
regulated during the antebellum period through public carry, taxation, and sales restrictions. These
laws could prohibit the purchase or sale of certain problematic weapons.

65.     The proliferation of pocket-sized revolvers after about 1850 had a dramatic impact
upon American social life and produced the country's first gun violence crisis in the post-Civil
War era. The needless bloodshed and development of habits deemed corrosive to morality and

---

[126] The Gun Digest: Complete Guide to American Rifles, Shotguns, Handguns and Accessories, The Encyclopedia for Shooters, 1944 First Annual Edition (Chicago: Follett Publishing Company, 1944, repr. 1963), 155-127.

[127] John T. Amber, ed., *The Gun Digest: 5th Edition—1951* (Northfield, IL: DBI Books, Inc., 1950, repr. 1977), 131–32.

[128] These were the Ranger .22 Automatic with a magazine capacity of 11 shots and the Starr Automatic Target Pistol with a magazine capacity of 11 shots. *See* Amber, ed., *The Gun Digest: 5th Edition*, 146–47.

[129] The two models with magazine capacities greater than ten were the Browning M35 Hi-Power (13 rounds) and the Universal Enforcer Auto Carbine (30 shot magazine). All other handguns maxed out at 10 round magazine capacities. *See* John T. Amber, ed., *Gun Digest: World's Greatest Gun Book, The Shooter's Encyclopedia of Handguns, Rifles, Shotguns and Accessories, Twenty-Third Anniversary DeLuxe Edition, 1969* (Chicago: The Gun Digest Company, 1968), 294–306. That year's selection of foreign-made handguns featured only two models that could come with a standard magazine capacity greater than ten rounds. The Luger .22 Auto Pistol had "a 12-shot capacity with one round in the chamber," and the MAB Autoloading Pistol could be purchased with a magazine capacity of either 8 or 15 rounds. *See* Amber, ed., *Gun Digest 1969*, 345, 344–51.

public order (namely the habitual carrying of deadly weapons) prompted a strong response from elected representatives. Regulatory policies that had been in place in preceding decades were adopted in new jurisdictions, and some of them were amended or refined to be more effective. These included public carry regulations, personal and occupation taxes, and sales restrictions.

66.     Detachable magazines, which form an essential part of "assault weapons" as they are defined, were not featured in nineteenth-century firearms. Some few rare examples may exist, but the kinds of pistols, muskets, rifles, and shotguns which Americans of the nineteenth century had access to were not semiautomatic, and were either single-shot devices or repeaters that made use of other cartridge containment designs (like fixed magazines, or revolvers). Lever-action rifles such as the Winchester Model 1873 that were capable of holding more than ten rounds were qualitatively different than semiautomatic firearms, and their higher magazine capacities featured in models from the 1860s and early 1870s were short-lived outliers that disappeared in the face of larger, more powerful center-fire cartridges that emerged by 1880. Even in the early twentieth century, semiautomatic rifles marketed to civilians almost without exception came with standard magazine capacities below ten.

67.     It is my opinion that New York's "assault weapons" restriction aligns with the American tradition of regulating deadly weapons that pose a danger to society.

I, Brennan Rivas, declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May 14, 2024, in Fort Worth , Texas .

_____
DR. BRENNAN RIVAS