UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                              :

J. MARK LANE and JAMES SEARS,       :
                                              :

                    Plaintiffs,       :

                                              :

              - against -          :

                                              :     Case No. 22 Civ. 10989 (KMK)

STEVEN G. JAMES, in his official capacity as    :
Acting Superintendent of the New York State    :
Police, and MIRIAM E. ROCAH, in her official    :
capacity as District Attorney for the County of    :
Westchester, New York,                         :

                                              :

                    Defendants.      :
------------------------------------------------------------ X

## **<u>DECLARATION OF PROFESSOR ROBERT SPITZER</u>**

Robert J. Spitzer, being duly sworn, deposes and says, pursuant to 28 § U.S.C. § 1746, that the following is true and correct:

1.       I have been asked by the Office of the Attorney General of New York State to render an opinion on the history of firearms restrictions pertaining to restrictions on modern semi-automatic assault weapons, including those pertaining to fully automatic and semiautomatic firearms, the origins of multi-shot firearms, and the historical regulation of these and other dangerous weapons.

2.       This declaration is based on my own personal knowledge, research, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.       I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I am currently an adjunct professor at the College of William and Mary School of Law. I was also a visiting professor at Cornell University for thirty years. I earned my Ph.D. in Government from Cornell University. I am the author of 16 books on American politics subjects, including six on gun policy. I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, policy, and criminology. The ninth edition of the

---

[1] Robert J. Spitzer, "Shooting Down Gun Myths," *America* (June 8, 1985), 468-69.

book was published by Routledge Publishers (2024). My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on gun-related matters. For nearly thirty years, I have been a member of both the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence). I am being compensated at a rate of $500/hour for my work on any written materials, and $750/hour for any testimony or depositions in connection with this matter. A copy of my curriculum vitae is attached as Exhibit A.

## SUMMARY OF OPINIONS

4.      Gun ownership is as old as America, but so are gun laws. From the 1600s through the early twentieth century, the colonies, states, and localities enacted literally thousands of gun laws of every imaginable variety.[2] In this document, I demonstrate that a specific relationship existed between the development of new weapons technologies, their spread into society, and subsequent regulation by the government as part of a centuries-long effort to protect the public from harm and to dampen weapons-related criminality and violence. This pattern, including as seen in contemporary restrictions on assault weapons, is not new; in fact, it is a tradition that can be traced back throughout the Nation's history.

5.      I examine a number of specific examples of weapons that illustrate a pattern seen repeatedly throughout United States history. *First*, a new weapon or weapon technology is invented. *Second*, it may then be patented, though the patenting of a design or idea by no means

---

[2] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 55-83.

assures that it will proceed beyond this point. *Third*, it is often developed with a focus on military applications and supplying military needs, not directly for civilian acquisition or use. *Fourth*, some military-designed weapons may then spread to, or be adapted to, civilian markets and use. *Fifth*, if such weapons then circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to weapon policy/law changes.[3] New weapon laws are not enacted when technologies are invented or conceived. They are enacted when those technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers.

6.      These examples include: (1) weapons that were subject to government restrictions in the eighteenth and nineteenth centuries, such as Bowie and similar long-bladed fighting knives, clubs and other blunt weapons, and "trap guns"; (2) multi-shot firearms in the nineteenth century, including Colt revolvers and Winchester rifles, that proved more successful than the experimental multi-shot firearms that preceded them; and (3) restrictions on fully automatic (most famously the Tommy gun) and semi-automatic firearms, both from the early twentieth century.

7.      Firearms and other dangerous weapons were subject to remarkably strict, consistent, and wide-ranging regulation throughout our history when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality. This historical record is even more remarkable given that the United States was an evolving and developing nation-state that could not claim to have reached maturity until the twentieth century. The historical

---

[3] Robert J. Spitzer, "Understanding Gun Law History After *Bruen*: Moving Forward by Looking Back," *Fordham Urban Law Journal* 51(October 2023): 57-115.

record summarized here makes clear that contemporary restrictions among the states pertaining to large capacity ammunition magazines are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.

## I.     CONTEXT

8.     The current controversy surrounding legislative efforts to restrict assault weapons connected to their ability to receive removable large capacity ammunition magazines (LCMs) would seem to be a purely contemporary matter, responding to the modern phenomenon of mass shootings. The effort to restrict these firearms was sparked in part by a shooting at an elementary school in Stockton, California, in 1989, when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others. The assailant fired a total of 105 rounds in about three minutes from a 75-round magazine and then a 30-round magazine, both of which he emptied before killing himself.[4] Thereafter California enacted the nation's first assault weapons restriction law in 1989 (amended in 1999), that restricted assault weapons in part by whether they could accept a detachable ammunition magazine, or if the weapon had a fixed magazine that could hold more than ten rounds.[5] In 1994, Congress enacted a limited ten year ban on assault weapons and large capacity magazines (those holding more than ten rounds).[6] As of this writing, ten states plus the District of Columbia have enacted similar restrictions, as have various localities around the country.[7] These jurisdictions represent approximately 109 million people, or

---

[4] Nelson Kempsky, *A Report to Attorney General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings* (1989) at 7–8, https://schoolshooters.info/sites/default/files/Purdy-&-official&report.pdf
[5] https://giffords.org/lawcenter/state-laws/assault-weapons-in-california/
[6] Robert J. Spitzer, *The Politics of Gun Control,* 9th ed. (NY: Routledge, 2024), 25–26, 205–11.
[7] Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023) 14–15. The ten American states or entities with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland,

approximately 32.7% of the U.S. population.[8] Fourteen states plus the District of Columbia

restrict LCMs.[9] These jurisdictions represent more than 115 million individuals, or

approximately 34.5% of the U.S. population.[10]

---

Massachusetts, New Jersey, New York, and Washington State. Illinois enacted its law, including an LCM limit, in early 2023. C. Mandler, *Illinois governor signs ban on assault weapons and high-capacity magazines*, *CBS News,* January 10, 2023, https://www.cbsnews.com/news/illinois-governor-signs-ban-on-assault-weapons-and-high-capacity-magazines/. The U.S. House of Representatives passed a renewed federal assault weapons ban with magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware enacted its assault weapons and large-capacity magazine restrictions in June 2022. *See* Press Release, DE Office of the Governor, *Governor Carney Signs Package of Gun Safety Legislation* (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

[8] See U.S. Census, National Population Totals and Components of Change: 20202022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates). The total population in these jurisdictions is estimated to be 101,000,000 out of a U.S. total of about 333,000,000.

[9] Giffords Law Center, Large Capacity Magazines, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma* at 30. The fifteen jurisdictions are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington. With four exceptions (Colorado, Delaware, Illinois, and Vermont), all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law. The Illinois and Vermont laws limit magazines for long guns to ten rounds, and handguns to fifteen. Colorado law limits all magazines to fifteen rounds. Delaware law limits all magazines to seventeen rounds. Litigation challenging most of these assault weapon and LCM restrictions is currently pending.

[10] U.S. Census, National Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates). The total population in these jurisdictions is estimated to be over 115,000,000 out of a U.S. total of about 333,000,000. In 2022, the U.S. House of Representatives passed a renewed nationwide assault weapons ban with LCM restrictions. H.R. 1808, 117th Cong. (2022).

9.     As of this writing, fourteen states plus the District of Columbia have enacted laws to restrict large capacity magazines (LCMs).[11] These jurisdictions represent more than 115 million individuals, or approximately 34.5% of the U.S. population.[12]

10.     The pattern of criminal violence and concerns for public safety leading to weapons restrictions is not new; in fact, it can be traced back to the Nation's beginnings. While the particular weapons technologies and public safety threats have changed over time, governmental responses to the dangers posed by certain weapons have remained constant.

## II.     HISTORICAL RESTRICTIONS ON KNIVES, BLUNT WEAPONS, PISTOLS, AND TRAP GUNS

11.     The pattern in America's history of legislative restrictions related to dangerous weapons dates to the country's earliest history.[13] More focused restrictions pertaining to particular weapons began to appear in the late 1700s and early 1800s. These enactments appeared as violent crimes involving dangerous weapons became more widespread in the early

---

[11] Giffords Law Center, Large Capacity Magazines, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma* at 30. The fifteen states are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington. With three exceptions (Colorado, Delaware, and Vermont), all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law. Hawaii's restrictions apply to only handguns. The Illinois law limits magazines for long guns to ten rounds, and handguns to fifteen. Oregon voters approved by referendum a ten-round LCM limit in November 2022, but that law is under court challenge: Jonathan Levinson, "Oregon's new gun laws remain blocked, won't go into effect early Thursday," Oregon Public Broadcasting, December 7, 2022, https://www.opb.org/article/2022/12/07/oregon-measure-114-new-gun-laws-remain-blocked-court-challenges/.

[12] U.S. Census, National Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates). The total population in these jurisdictions is estimated to be over 115,000,000 out of a U.S. total of about 333,000,000. In 2022, the U.S. House of Representatives passed a renewed nationwide assault weapons ban with LCM restrictions. H.R. 1808, 117th Cong. (2022).

[13] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 57-62.

1800s. For example, from 1780-1809, at least four states (Connecticut, Ohio, New Jersey, Maryland) enacted measures that increased the penalties for burglaries or other crimes if the perpetrators were armed.[14] At least three states (New York, Ohio, Maryland) enacted laws to punish the discharge of firearms near populated areas.[15] At least four states (Virginia, Massachusetts, North Carolina, Tennessee) criminalized public arms carrying.[16] In addition, specific weapons that were restricted, following the pattern I outlined above, are discussed in subsequent sections.

### A. Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives

12.     The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie. The knife was named after Jim Bowie, who reputedly

---

[14] 1783 Conn. Acts 633, An Act For The Punishment of Burglary And Robbery; 1788-1801 Ohio Laws 42, An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4. 1788; Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources. 1799 [An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2; The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources, 1809.

[15] James Kent, Laws of the State of New-York Page 41-42, Image 44-45 (Vol. 1, 1802-1812) available at The Making of Modern Law: Primary Sources, 1785; An Act of April 22, 1785, An Act to Prevent the Firing of Guns and Other Fire-Arms within this State, on certain days therein mentioned; 1788-1801 Ohio Laws 42, An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4. 1788; 1792 Md. Laws 22, A Supplement To An Act Entitled, An Act to Improve and Repair the Streets in Elizabethtown, in Washington County, and For Other Purposes Therein Mentioned, chap. 52, § 4.

[16] 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays; 1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof; Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792); Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801, An Act for the Restraint of Idle and Disorderly Persons § 6.

killed one man and wounded another using a "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[17]

13.     The "Bowie knife" rapidly became known beginning in the 1830s for the distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named. While Bowie knives initially "came in a variety of forms—with or without guards, with differently shaped blades," they eventually became more standardized as "a large knife with a cross guard and a blade with a clipped point."[18] The distinctive traits of the Bowie knife are revealed in Robert Abels' book, *Bowie Knives*, which includes pictures of nearly one hundred Bowie knives made between 1835 and 1890.[19] The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo in 1836), and the knife's distinctive features encouraged its proliferation,[20] referred to by one historian as "the craze for the knives."[21] As was true of other knives with long, thin blades,[22] they were widely used in fights and duels, especially at a time

---

[17] "Bowie Knife," *Encyclopedia of Arkansas*, n.d.,
https://encyclopediaofarkansas.net/entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8. Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77). David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional." David Kopel, "Bowie knife statutes 1837-1899," *The Volokh Conspiracy*, November 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/
[18] "Bowie Knife," *Encyclopedia of Arkansas*, n.d.,
https://encyclopediaofarkansas.net/entries/bowie-knife-2738/.
[19] Robert Abels, *Bowie Knives* (NY: Abels, 1979).
[20] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.
[21] Davis, *Three Roads to the Alamo*, 583.
[22] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

when single-shot pistols were often unreliable and inaccurate.[23] Indeed, such knives were known as "fighting knives"[24] that were "intended for [interpersonal] combat."[25] In the early nineteenth century, "guns and knives accounted for a growing share of the known weapons that whites used to kill whites."[26] In 1834, for example, a grand jury in Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[27]

As early as 1836, "most of the American public was well aware of the Bowie knife."[28] (Very much like the allure of contemporary assault weapons to some,[29] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[30])

14.     As homicide rates increased in the South in the early nineteenth century, so did laws restricting the use and carrying of weapons. Some of the earliest such laws focused specifically on dueling. Dueling persisted during this time, even as the practice was widely

---

[23] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485.

[24] Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 218.

[25] Flayderman, *The Bowie Knife*, 59.

[26] Roth, *American Homicide*, 218. White on white violence is more relevant from a social science perspective in order to better understand the dynamics of homicide, which is typically intra-racial.

[27] Quoted in Roth, *American Homicide*, 218–19.

[28] Flayderman, *The Bowie Knife*, 43.

[29] Cameron McWhirter and Zusha Elinson, *American Gun: The True Story of the AR-15* (NY: Farrar, Straus and Giroux 2023), 207-9; Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,* March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

[30] Flayderman, *The Bowie Knife*, 46.

deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[31] Arms expert Norm Flayderman provides abundant and prolific evidence of the early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in duels, as well as fights, robberies, brawls, and other criminal activities.[32] Pistols were likewise prominently used in such affairs.[33] All this contributed to widespread enactment of laws prohibiting dueling in the states.[34] In 1839, Congress passed a measure barring dueling in the District of Columbia.[35]

15.     The ubiquity of the concern about the criminal and violent consequences of carrying Bowie knives and other, similar long-bladed knives also gave rise to the widespread adoption of laws barring or restricting these weapons.[36] In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[37] From then to the start of the twentieth century, every state[38] plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives: a total of at least 42 states (including the District of Columbia) restricted Bowie knives by name; and another 8 states enacted laws restricting the category or type of knife

---

[31] Baugh, *Rendezvous at the Alamo*, 51.

[32] Flayderman, *The Bowie Knife*, 25–64; 495–502.

[33] Roth, *American Homicide*, 180–83, 210–17.

[34] A search under the term "dueling" in the Duke Center for Firearms Law database of old gun laws yields 38 results. See https://firearmslaw.duke.edu/repository/search-the-repository/.

[35] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

[36] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[37] A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law. See Exhibit C.

[38] For these purposes, the word "state" includes territories which eventually became states, such as the Washington Territory, which became a state in 1889, and which first enacted a law restricting Bowie knives in 1854 during its territorial period.

embodied by the Bowie knife but without mentioning them by name (see Exhibits B and C) totaling 49 states plus the District of Columbia.[39] For example, 17 states banned all carrying of Bowie knives (by banning both concealed carry and open carry), while others imposed taxes on the ability for individuals to acquire or possess them (see Exhibit B). The desirability and utility of such restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence.

16.     States were imaginative and persistent in their effort to suppress fighting knives and other weapons.  For example, an 1881 Arkansas law combined no-carry provisions (whether concealed or openly) applying to any dirk, bowie knife, sword, spear in a cane, brass or metal knuck[le]s, razors, "or any pistol of any kind whatever" with another provision in the same law that made it a misdemeanor to "sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person" the aforementioned weapons, including "any kind of cartridge."[40] Even though the law allowed persons to have the weapons on their own premises, it begs the question of how, exactly, a person could legally obtain such weapons in the first place if they weren't already owned within a family before the 1881 law was enacted.

17.     States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 30 states enacted laws to bar their concealed carry; 17 states barred their carry whether

---

[39] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states. See Exhibits B and C.

[40] The law also made exceptions for military weapons, for officers, and legal transport for people on a journey, a common exception in such laws. An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), §§1-3, 1881 Ark. Acts 191.

concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see Exhibit B).

18.      The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why didn't more states ban their possession outright? The answer is two-fold. First, America was a developing nation-state in the nineteenth century. The federal and state governments did not yet possess the maturity, powers, tools, or resources to implement and effectively enforce any measure as sweeping as a knife ban, especially since knives are technologically very simple to produce. After all, the front-line administrative entity on which we today rely for law enforcement, the police, barely existed (in the way we think of policing today) in the early nineteenth century (up to this time policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes). Modern police forces only came into being in a handful of large cities before the Civil War.[41] Second, the chief remedy enacted by the states to address the problem of knife fighting was far more focused and feasible: to bar the carrying of knives, along with the other two categories of weapons that also threatened public safety, clubs and pistols. The fact that all three types of weapons were consistently treated together shows that all were

_____

[41] William R. Kelly and Daniel P. Mears, *The Reinvention of Policing* (Lanham, MD: Rowman and Littlefield, 2023), 54-59; Chris McNab, *Deadly Force* (Oxford, Great Britain: Osprey Publishing, 2009), 13-24. Boston created a police force in 1838, New York City created a standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, "The Invention of the Police," *The New Yorker,* July 13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore emphasize the role of slavery and slave suppression as key to the development of policing.

considered so dangerous and inimical to public safety that they were subjected to anti-carry laws and bundled together in legislative enactments.

19.     At least three state court cases dealt in some manner with fighting knives like the Bowie knife.  In the 1840 case of *Aymette v. State*[42] the Supreme Court of Tennessee upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837–1838, ch. 137, sec. 2, providing

> that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.[43]

In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[44]  The court continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens . . . ."[45]  Further, the court added that the state law existed "to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms . . . ."[46]

20.     Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law violation and challenge. In the case of *Haynes v. Tennessee* (1844),[47] Stephen Haynes was indicted for carrying a concealed Bowie knife.  He was convicted of wearing a knife that

---

[42] See *Heller*, 554 U.S. at 613 (citing *Aymette v. State*, 21 Tenn. 152 (Tenn. 1840)).
[43] *Aymette*, 21 Tenn. at 153.
[44] *Id.* at 156.
[45] *Id.* at 157.
[46] *Id.*
[47] 24 Tenn. 120 (1844).

resembled a Bowie knife but appealed his conviction on the grounds that he was actually

carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade.  (At the trial,

witnesses disagreed as to the proper name for the knife in question.)  He also argued that the

state law, in listing various types of knives including those "similar" to Bowie knives, was "too

indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement.

. . ."[48] On appeal, the court upheld his conviction and commended the Tennessee state

legislature's enactment:  "The design of the statute was to prohibit the wearing of bowie knives

and others of a similar description, which the experience of the country had proven to be

extremely dangerous and destructive to human life; the carrying of which by truculent and evil

disposed persons but too often ended in assassination."[49]  The court continued: "The design,

meaning, and intent was to guard against the destruction of human life, by prohibiting the

wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[50]  The

court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or

any other weapon in form, shape or size, resembling them."[51]  Noting the similarity among

knives and the possibility of an unjust outcome where, say, a person might be convicted of

carrying a mere pocket knife, the court posed this question:  "what is to protect against

conviction, when the words of the statute cover the charge, and its true spirit and meaning does

not?"  Their answer:  "the judge and jury who try the case."[52]  As the author of a book on Bowie

---

[48] *Id.* at 122.
[49] *Id.*
[50] *Id.* at 123.
[51] *Id.* at 122.
[52] *Id.* at 123.

knives noted, "the fact that the term 'bowie knife' had never been precisely defined did not help his [Haynes's] case."[53]

21.     A third state court case relevant to the legal status of Bowie knives is *Cockrum v. State of Texas*, 1859.[54]  The *Cockrum* case involved John Cockrum, who was charged with the murder of his brother-in-law, William Self, with a Bowie knife.[55]  Under Texas law, "a homicide, which would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be deemed murder and punished as such. . . ."[56]  The court upheld the added penalty provision of the law relating to use of a Bowie knife, despite the court's very expansive interpretation of the right to bear arms, but reversed and remanded the man's conviction because of an error related to statutory changes and jury instructions.  It described the Bowie knife as "an exceeding destructive weapon," an "instrument of almost certain death," and "the most deadly of

---

[53] Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques* (Boulder, CO: Paladin Press, 2010), 43.

[54] *Cockrum v. State,* 24 Tex. 394, 401 (1859). David Kopel says that a fourth case, *Nunn v. State*, 1 Kelly 243 (1846), is a "major state supreme court case[ ]involving Bowie knives." David Kopel, *The Legal History of Bans on Firearms and Bowie Knives Before 1900*, VOLOKH CONSPIRACY (Nov. 20, 2022), https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/. But *Nunn* involved a man who was prosecuted for carrying a pistol (openly, not concealed), not a knife. 1 Kelly at 243. A state law criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list. *Id.* Noting the "great vagueness" in the statute's wording, the court reversed the man's conviction and wrote that there was a constitutional right to open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State." *Id.* at 246, 251. By contrast, the court upheld the constitutionality of the concealed carry restrictions and noted that those restrictions were enacted "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*." *Id.* at 246.

[55] *My Genealogy Home Page: Information About John T. Cockrum*, GENEALOGY.COM https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html *Excerpts From the Trial of John Cockrum*, SELF ROOTS (Feb. 17, 2015), http://www.selfroots.com/revel5.htm.

[56] *Cockrum*, 24 Tex. at 394

all weapons in common use."[57]   Further, the court said:  "He who carries such a weapon. . .makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon."[58]

22.    All of these cases underscore courts' recognition of the dangerous nature and nefarious use of Bowie knives not only by their characterizations of them, but by the fact that they are treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons including pistols and various named clubs.[59]

23.    All of these cases underscore the courts' recognition of the dangerous nature and nefarious use of Bowie knives not only by their characterizations of them, but by the fact that

---

[57] *Id.* at 402–03. Kopel says, incorrectly, that "Bowie knives. . . were regulated the same as a butcher's knife." *See* Kopel, "Bowie knife statutes 1837-1899." According to the Duke Center for Firearms Law Repository of Historical Gun Laws ten states had laws that restricted butcher knives by name, whereas at least 42 states restricted Bowie knives by name. https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search

[58] *Cockrum*, 24 Tex. at 403.

[59] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. *See* David Morgan, *Lincoln Assassination: The Other Murder Attempt*, CBS NEWS, (May 10, 2015), https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-attempt/; *William Seward*, HISTORY (updated Aug. 21, 2018) https://www.history.com/topics/american-civil-war/william-seward. John Wilkes Booth also carried what was later identified as a Bowie knife which he used to slash the man who accompanied Lincoln to the theater and who tried to stop Booth after he shot the president. Booth slashed the man in the arm with his knife to make his escape. *See also* Dave Taylor, *Cloak and Daggers: Cutting Through the Confusion of the Assassination Knives*, LINCOLNCONSPIRATORS.COM (Dec. 31, 2018), https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-through-the-confusion-of-the-assassination-knives/.

they are permissibly treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons including pistols and various named clubs.[60]

## B.  Historical Restrictions on Clubs and Other Blunt Weapons

24.     Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons. (See Exhibits C and D.) As discussed above, these weapons were primarily regulated by anti-carry laws, which lumped them together with pistols and specific types of knives. Although some states extended prohibitions to these weapons' manufacture, possession, sale, or use in crime.[61] These laws follow the same pattern mentioned above with regulations not coming about until the weapons become associated with interpersonal violence.

25.     The table in Exhibit D shows the various types of clubs and blunt objects that were regulated in the United States. Notably, every state in the nation had laws restricting one or more types of clubs. According to a detailed reference book on the subject of these blunt instruments by Robert Escobar, they were considered "objectionable objects, once feared but

---

[60] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. David Morgan, "Lincoln assassination: The other murder attempt," *CBS News,* May 10, 2015, https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-attempt/; https://www.history.com/topics/american-civil-war/william-seward. John Wilkes Booth also carried what was later identified as a Bowie knife which he used to slash the man who accompanied Lincoln to the theater and who tried to stop Booth after he shot the president. Booth slashed the man in the arm with his knife to make his escape. https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-through-the-confusion-of-the-assassination-knives/

[61] E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

now forgotten."[62] Escobar provides what he calls "a family history" of these blunt weapons, but adding that "[i]t's a disreputable family to say the least, black sheep even within the study of weaponry."[63] They have been described as "wicked, cowardly, 'Soaked in blood and cured in whiskey.'"[64] Those who carried them (excluding police) "were called vicious, devils and lurking highwaymen."[65] These club-type blunt objects compose a family of objects used for striking others, and while they vary in name and construction, the categories are "somewhat fluid."[66]

26.     Among the states with laws regulating these types of clubs, 16 states barred bludgeon carrying. A bludgeon is a short stick with a thickened or weighted end used as a weapon.[67] The earliest state anti-bludgeon law was in 1799; 12 other such state laws were enacted in the 1800s, and 5 in the early 1900s (as with each of these chronological categories, the state law total exceeds the total number of states because some states enacted the same or similar laws in multiple centuries).

27.     A billy (sometimes spelled "billie") club is a heavy, hand-held rigid club,[68] usually made of wood, plastic, or metal,[69] that is traditionally carried by police, often called a

---

[62] Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Columbus, OH: Gatekeeper Press, 2018), 1.
[63] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[64] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[65] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[66] Escobar, *Saps, Blackjacks and Slungshots*, 1.
[67] https://www.merriam-webster.com/dictionary/bludgeon.
[68] Some versions were made to have some flexibility to increase their striking power. See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.
[69] https://www.merriam-webster.com/dictionary/billy&club. Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c." "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.

nightstick or baton.[70] Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[71] a synonym for a billy club. As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry. At least 19 states had anti-billy club laws, totaling 47 laws; the earliest law appears to have been enacted in Kansas in 1862,[72] followed by a New York law in 1866.[73] Fourteen states enacted such laws in the 1800s; 13 states did so in the early 1900s.

28.     At least 12 states barred the carrying of "clubs" more generically, without specifying the type. The oldest known anti-club law was 1664; 6 states enacted these laws between 1750 and 1799, 7 states in the 1800s, and 2 in the early 1900s. (See Exhibit D.)

29.     Another weapon long regulated for its use in interpersonal violence is the slungshot (or slung shot; not to be confused with a "sling shot"), also referred to as "a type of blackjack,"[74] is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s (the first "known use" of a slungshot was 1842[75]). These weapons were viewed as especially dangerous or harmful

---

[70] Escobar, *Saps, Blackjacks and Slungshots,* 2, 69-70, 105, 113-30.

[71] Escobar, *Saps, Blackjacks and Slungshots*, 105.

[72] C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[73] Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

[74] Escobar, *Saps, Blackjacks and Slungshots*, 228.

[75] See https://www.merriam-webster.com/dictionary/slungshot. Escobar agrees with this rough date. See *Saps, Blackjacks and Slungshots*, 67.

when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention and their spreading use by criminals and as fighting implements. These devices were invented and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions. The earliest anti-slungshot law was enacted in 1850; 47 states legislated against them in the 1800s (including the District of Columbia): 46 did so in the 1800s and 19 states in the early 1900s (note all these data incorporate multiple laws enacted in more than one century by a few states).

30.     By one account, "[s]lungshots were widely used by criminals and street gang members in the 19th Century. They had the advantage of being easy to make, silent, and very effective, particularly against an unsuspecting opponent. This gave them a dubious reputation, similar to that carried by switchblade knives in the 1950s, and they were outlawed in many jurisdictions. The use as a criminal weapon continued at least up until the early 1920s."[76] Escobar concurs that slungshots and blackjacks "were a regular part of criminal weaponry . . . and gangsters could be merciless in their use."[77]

31.     Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well. Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric (although the weight could also be something dense and heavy, like a lock in the

---

[76] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.
[77] Escobar, *Saps, Blackjacks and Slungshots,* 86. In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slung shot. In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's acquittal. Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon. Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon. Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

end of a sock),[78] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag. (Alternately, they could be made heavier by adding water to the sand.) The first anti-sandbag law was 1664, with at least 11 states enacting such laws—7 in the 1800s and 8 in the early 1900s.

32.     Finally, at least 24 states enacted laws criminalizing the carrying of any concealed/deadly/dangerous weapon. This catch-all category was obviously designed to incorporate any such weapons not covered by other, named weapons mentioned in these laws.

33.     Thus, as shown above, laws regulating these weapons were ubiquitous. Only 3 states did not have any prohibitions in any of these categories of blunt striking objects. But these 3—Louisiana, Ohio, and Washington State—had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons. (See Exhibit D.)

### C.  Historical Restrictions on Pistols and Gun Carrying

34.     Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries. As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels." Massachusetts followed in 1750.[79] Virginia and North Carolina passed similar laws in the 1780s and 1790s.[80] In the 1800s, as interpersonal violence and gun carrying spread, 43 states joined the list; three more did so in the early 1900s. (See Exhibits C and E).[81] The enactment of laws restricting concealed weapons carrying followed the rise of homicides and interpersonal violence described by

---

[78] https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *Saps, Blackjacks and Slungshots*, 20-22. Escobar dates the earliest reference to sandbags as weapons to the 1600s (22).

[79] An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1, 1750 Mass. Acts 544.

[80] 1786 Va. Acts 35; *see also* 1792 N.C. Laws 60, ch. 3.

[81] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

historian Randolph Roth, who noted that restrictions on firearms from the colonial period to the start of the Revolution were few because homicide rates were low. When homicides did occur, guns were seldom used, in large part because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. After the Revolutionary period the spread of violence tied to concealable percussion cap pistols and fighting knives led to the enactment of anti-concealed carry weapons laws.[82] Concealed carry laws normally targeted pistols as well as the types of fighting knives and various types of clubs discussed here (See Exhibit C for text of such laws). In addition, at least three-fourths of the states enacted laws that penalized public weapons brandishing or display. At least four states did so in the 1600s, two in the 1700s, twenty-eight states in the 1800s, and two more in the early 1900s.[83] As of 1938, "the carrying of concealed pistols is either prohibited absolutely or permitted only with a license in every state but two."[84] Thus, the widespread enactment of concealed carry laws was the public policy remedy to the emergent crime problem described here.  In addition, and consonant with a maturing society, at least 30 states broadened their laws to restrict open weapons carrying as well. Most of these laws were enacted in the post-Civil War period (see Exhibit E).

### D.  Historical Restrictions on Trap Guns

35.     Not to be confused with firearms used in trapshooting, trap guns were devices or contraptions rigged in such a way as to fire when the owner was not present to operate the gun.

---

[82] Roth, *American Homicide*, 61-144, 216-21; Randolph Roth, "Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17; Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.
[83] Spitzer, *The Gun Dilemma*, 77-80.
[84] Sam B. Warner, "The Uniform Pistol Act," *Journal of Criminal Law and Criminology* 29 (Winter 1938): 530.

Typically, trap guns could be set to fire remotely by rigging the firearm to be fired with a string or wire which then discharged when tripped.[85]  While the "technology" involved in rigging and setting a trap gun was simple, it was nevertheless a modification that transformed a firearm from something that could only be operated by a person holding the weapon to one that would operate with no one present, aside from the unlucky person who might trip the device and set it off, and which, because of the modification, was then restricted by law.  Also sometimes referred to as "man traps," "infernal machines," or "set-guns,"[86] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders.

36.     This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this type of law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[87]

North Carolina enacted a different sort of trap gun law (called a "set trap" in this law) for purposes of nuisance animal control, providing conditional permission for those seeking to set traps for hunting-related purposes (inferring that the setting of trap guns was otherwise illegal).

---

[85] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

[86] E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3; "The Man Trap," *The Buffalo Commercial*, Nov. 1, 1870, https://www.newspapers.com/image/264632378; 1921 Montana - 17th Legislative Assembly, Regular and Extraordinary Sessions: Chapter 238, 527.

[87] 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

The 1827 state law said "it shall and may be lawful for the citizens of Pasquotank county to set guns in the Great Dismal Swamp of said county, in the night time, viz. between sunset and sunrise, for the purpose of destroying bears and beasts of prey."[88] The law further stipulated that anyone seeking to do so had to give ten days prior notice "in the neighbourhood," presumably so that locals would not fall prey to the trap guns. Any who failed to provide notice would pay a fine. Two years later, the North Carolina legislature enacted an expanded version of the law, saying "it shall be lawful for the citizens of Pasquotank and Perquimans counties to set guns in the desert in said counties, between sunset and sun-rise, for the purpose of destroying beasts of prey."[89] Violators were also subject to a fine.

      37.     At least 25 states had anti-trap gun laws (see Exhibit F).[90] The earliest such law

---

[88] 1826 Laws of North Carolina Regular Session, 83, CHAPTER CLV.

[89] 1829-1830 Laws of North Carolina – Regular Session, 83, CHAPTER CXXXI.

[90] McClain, Emlin, McClain's Annotated Code and Statutes of the State of Iowa, Showing the General Statutes in Force July 4, 1888, Chicago, Callaghan; 1919 Maine - 79th Legislature, Public & Private, Special Acts and Resolves, Regular Session: 3, 242; Sec. 511910 Md. Laws 521, § 16c; 1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1; 1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236; The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873), Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65; 1921 Montana - 17th Legislative Assembly, Regular and Extraordinary Sessions: Chapter 238, 527; 1912 James G.; et al., Sweeney, Revised Laws of Nevada, 1872; 1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18; 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 (1771); 1855 N.M. 406; 1877 N.Y. Laws 434, Chap. 411, 434-39, CHAP. 411; 1886 N.Y. Laws 361, Chap. 194, 361-62, Chap. 194; 1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1; The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895); 1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2; 1826 Laws of North Carolina Regular Session, 83, CHAPTER CLV; Samuel H.; Day Harris,

encountered was the 1771 New Jersey law (above).  Sixteen laws were enacted in the 1700s-

1800s, and 13 in the early 1900s (some states enacted multiple laws across the centuries).

      38.     Opinion was initially divided on the relative merits or wisdom of setting such

devices, with some arguing that thieves or criminals hurt or killed by the devices had it coming,[91]

though the weight of opinion seemed mostly against such devices because of the likelihood that

---

Jean P., et al. Revised Laws of Oklahoma 1910: Being a Compilation, Classification and Revision of All General Laws of the State of Oklahoma in Force and Effect on the 25th Day of February, 1911 (1912); 1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6; 1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6; Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United States and the Constitution of South Carolina Page 404, Image 482 (1873), Hunting, General Provisions, § 21; 1931 S.C. Acts 78; 1909 S.D. Sess. Laws 450, ch. 240, §§ 21-22; An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866); 1901 Utah Laws 97-98, ch. 96, §§ 1-3; 1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1; Vermont Public Acts, No. 80—An Act Revising, in Amendment of and in Addition to the Fish and Game Laws. pp. 89-90, 1892; 1912 Vt. Acts and Resolves 261; 1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3; David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872); 1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1. Trap gun laws discovered from newspaper accounts: Missouri: "Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk; New York: "The Man Trap," The Buffalo Commercial, Nov. 1, 1870, https://bit.ly/3yUSGNF; Ohio:  "How a Melon Thief Came to Grief," Wellington Enterprise, Wellington, Ohio, September 21, 1881, https://www.newspapers.com/image/171228605/?terms=%22trap%20gun%22&match=1; Pennsylvania: The Wrightsville Star, Wrightsville, Pa., March 7, 1873, 3, https://www.newspapers.com/image/774191522/?terms=%22trap%20gun%22&match=1

[91] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window.  A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."

innocent persons could be injured or killed, and also because such devices represented an arbitrary and excessive meting out of private, vigilante-type "justice" that was unjustifiably harsh—to seriously wound or kill a person—for crimes like stealing food or similar commodities.[92]  Those who set gun traps typically did so to defend their places of business, properties, or possessions, or in some cases in game hunting circumstances.  This 1870 newspaper account from an incident in New York City provides an example where a burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino."  After the verdict the man continued to be held under $2,000 bail.[93]

39.     Inevitably, the traps wound up hurting or killing innocents, even including the person who set the trap.  For example, this 1891 newspaper account from Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[94]

---

[92] This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted.  As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

[93] "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.

[94] "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk.

## III.   THE HISTORY OF PRE-TWENTIETH CENTURY FIREARMS TECHNOLOGIES AND THEIR REGULATIONS

### A. Early Multi-Shot Weapons Did Not Achieve Any Kind of Commercial Success or Popularity

40.     As researchers and experts of gun history have noted, experimental multi-shot guns existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier). For example, a firearm from the late 1500s that could fire up to sixteen rounds is described in a book titled, *Firearms Curiosa*. But this book's very title indicates why this narrative is irrelevant to the modern gun debate. The definition of "curiosa" is something that is rare or unusual. As the book's author, Lewis Winant says, his book is about "oddity guns" and "peculiar guns."[95] That is, they were anything but common, ordinary, or found in general circulation. Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[96] A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[97] In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited.

41.     Roman candle firing was one type of "superposed" or "superimposed" firing. The other type was controlled, where the gun "was charged with one load on top of another, but the operator had control of the interval between shots. It might have one movable lock or several

---

[95] Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.
[96] Winant, *Firearms Curiosa*, 168.
[97] Winant, *Firearms Curiosa*, 166.

fixed locks. Each shot would be fired by trigger pull, presumably when the operator felt he had the proper aim."[98] Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[99] Several "multi-shot" guns invented prior to the perfection of the revolver and repeating rifle relied on this strategy, which had a number of defects all stemming from the difficulty of loading multiple charges in one barrel, with potentially catastrophic results should a charge go off before it was supposed to.

42.     An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle, could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully automatic weapons of the twentieth and twenty-first centuries). The patent drawing of this weapon shows it sitting on a tripod on the ground.[100] It was not a hand-held weapon. In the patent, Puckle described it as "a portable Gun or Machine (by me lately invented) called a DEFENCE."[101] It was indeed a military weapon, as Winant says: "Of the oddities among military weapons none has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first crank-operated machine gun. It embodied several elements that closely resemble construction features of Gatling, Hotchkiss and other manually-operated machine guns." Winant continued, "It is doubtful that any of the Puckle guns that may have been actually produced ever saw service."[102] A different account of this weapon says: "There is in fact no record of such a gun ever having been built,"[103] although there are claims to the contrary. A

---

[98] Winant, *Firearms Curiosa*, 166.
[99] Winant, *Firearms Curiosa*, 166.
[100] Winant, *Firearms Curiosa*, 220.
[101] Winant, *Firearms Curiosa*, 219.
[102] Winant, *Firearms Curiosa*, 219-20.
[103] John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 13.

contemporaneous poet, commenting on 'Puckle's Machine Company,' wrote 'Fear not, my friends, this terrible machine. They're only wounded who have shares therein.'"[104] This weapon "never advanced beyond the prototype stage."[105] Among its problems: "the flintlock mechanism[s] that ignited the cartridges were unreliable, which is highly important when trying to fire shots in rapid succession."[106]  As one analyst concluded, the gun "was absolutely rubbish and made zero sense."[107]  And it certainly never made its way to American shores.

43.     In short, it was an experimental weapon designed for military use, and the patent's reference to "DEFENCE" was clearly a reference to military defense, not personal defense. As this account confirms, it was likely never even manufactured beyond perhaps a prototype. It was a failed effort, even though later gun inventors learned from its failure.

44.   The example of the Belton flintlock is sometimes cited to argue that the Second Amendment was written with firearms capable of firing multiple times in mind.[108] Joseph Belton was an inventor who corresponded with Congress in 1777, claiming that he could produce and provide a flintlock that could fire as many as sixteen to twenty consecutive rounds without reloading. After showing preliminary interest on May 3, Congress balked at Belton's proposed

---

[104] Winant, *Firearms Curiosa*, 219-21. See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.
[105] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* (NY: Scribner, 2021), 3.
[106] *See* Jack Dunhill, *The Puckle Gun: The First "Machine Gun" from 1718 That Fired Square Bullets*, IFLSCIENCE (Mar. 6, 2023), https://www.iflscience.com/the-puckle-gun-the-first-machine-gun-from-1718-that-fired-square-bullets-67831.
[107] Dunhill, *The Puckle Gun*.
[108] *See* David Kopel, "The Founders Were Well Aware of Continuing Advances In Arms Technology," Volokh Conspiracy (May 26, 2023, 1:08 PM), https://reason.com/volokh/2023/05/26/the-founders-were-well-aware-of-continuing-advances-in-arms-technology/.

"extraordinary allowance" and decided on May 15 that the idea "be dismissed."[109]  Belton

reportedly demonstrated the rifle, which by his account fired projectiles a distance of 20 to 30

yards, to several government officials, including General Horatio Gates, Major General Benedict

Arnold, and scientist David Rittenhouse.  These individuals, and some others, signed a

cautiously worded letter submitted by Belton to Congress on July 10 saying that "Muskets of his

Construction with some small alterations, or improvements might be Rendered, of great Service,

in the Defense of lives, Redoubts, Ships &c, & even in the Field. . . ."[110]  That same day,

however, Congress decided again that "the petition of Thomas [Joseph] Belton be dismissed."[111]

45.  The problems with Belton's scheme were evident. It relied on "superposed loads" as

a firing method, a "discredited" and dead-end technology (see earlier discussion).  Despite

Belton's offer to demonstrate the gun, not only are there "no known surviving examples of

Belton's gun," but "the only evidence" of the gun's existence is "the correspondence between

Belton and Congress."[112]  From this account, there is no reason to believe that the gun "had been

produced, and was possible to produce in quantity" at a reasonable price.[113]  In all, Belton's

claims about his experimental weapon bore no relationship to actual firearms in circulation in

America — since Belton's weapon was never proven feasible, much less reproduced, much less

distributed — during this time.  For anyone to claim based on the Belton case that "our Founding

---

[109] *Correspondence between John Belton and the Continental Congress*, WIKISOURCE,
https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress (last visited Sept. 13, 2023).
[110] *Id.*
[111] *Id.*
[112] *Belton Flintlock*, MIL. WIKI, https://military-history.fandom.com/wiki/Belton_flintlock.
Harold L. Peterson similarly noted that the only evidence of the alleged existence or operation of
the Belton gun was his "meager description" of it, from which "it is impossible to determine
exactly how the Belton improvement operated." Harold L. Peterson, *Arms and Armor in
Colonial America, 1526-1783* ((Harrisburg, PA: The Stackpole Co., 1956), 218.
[113] Kopel, "The Founders Were Well Aware of Continuing Advances in Arms Technology."

Fathers . . . knew about repeating rifles" and therefore "the Second Amendment was. . .designed to protect the right to own a repeating rifle"[114] is not only an unsupported claim, but a preposterous claim.

46.   To take a different example, an advertisement appeared in a South Carolina newspaper in 1785 placed by a gunsmith offering for sale four-shot repeating guns.[115] The ad, however, was an apparent reference to "imported Belgian or French-made Segales pistols which had four rifled barrels." Two of the four barrels could be discharged by pulling two triggers; the barrels could then be rotated to discharge the other two. Yet this exotic weapon suffered from the same technological and safety problems as similar guns of the time, and no evidence has been offered to suggest that these European-made guns were widely replicated, much less circulated in early American society.[116]

---

[114] Logan Metesh, *As a Matter of Fact, the Founding Fathers Did Know About Repeating Rifles*, TRUTH ABOUT GUNS (Nov. 24, 2019), https://www.thetruthaboutguns.com/founding-fathers-knew-repeating-rifles-bill-rights-drafted/; *see also* Dave Duringer, *Founding Fathers Knew About Repeating Rifles Before Bill of Rights*, LAWNEWS.TV (July 17, 2016), https://lawnews.tv/founding-fathers-knew-about-repeating-rifles-before-bill-of-rights/; Eli D. Camacho, *5 Myths About the 2nd Amendment and the AR-15*, MEDIUM (Apr. 2, 2018), https://medium.com/@EliDCamacho/5-myths-about-the-2nd-amendment-and-the-ar-15-a080a94e9a2c. Kopel makes the similar, meaningless claim that the country's Founders "were well aware" of these pioneering, experimental, but unproven multishot technologies, as though this "awareness" somehow means that they would have disapproved of contemporary regulations of multi-shot weapons. *See* Kopel, "The Founders Were Well Aware of Continuing Advances in Arms Technology." The Founders' "awareness" that such experimental weapons existed centered around their hope that the weapons might eventually be suitable for military use, a prospect that in any case never came to fruition. Kopel also conflates early American leaders' abiding interest in the government funding, advancing, and reproducing new weapons technologies for the country's military forces, on the one hand, with the notion that it had anything whatever to do with private citizen gun acquisition and use, on the other.

[115] The ad appeared in the *Columbian Herald* of Charleston on October 26, 1785. Kopel, "The Founders were well aware of continuing advances in arms technology."

[116] Declaration of Kevin M. Sweeney in Support of Defendants' Opposition To Plaintiffs' Motion For Preliminary Injunction, *Delaware State Sportsmen's Association v. Delaware Department of Safety and Homeland Security*, Case 1:22-cv-00951-RGA, Document 41, Filed 01/31/23, 23-24.

47.     Isaiah Jennings' multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading,[117] is also cited as an early multi-shot gun. Yet according to *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[118] By one account, "probably not more than 100 rifles of this type [were] manufactured."[119] It was not a popular repeater, despite the fact that it received some public attention. Similar problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century. According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some practical use very early in the nineteenth century, but the loose priming powder in the pan of each cylinder constituted a hazard that was never eliminated."[120]

48.     Another example often cited is the Girandoni (or Girardoni) air rifle, a military weapon developed in Europe for marksmen—highly skilled target shooters—in the Austrian army that was capable of firing up to 20 rounds. One of these made its way to the U.S. where it was taken along on the Lewis and Clark expedition of 1804-1806.[121] But these guns were a rarity, as they were extremely expensive, fragile, and complex, and few were made—no more

---

[117] David Kopel, "The History of Firearm Magazines and Magazine Prohibitions," *Albany Law Review* 78 (2014-2015): 853.
[118] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.
[119] "Isaiah Jennings," https://www.littlegun.info/arme%20americaine/artisan%20i%20j%20k%20l/a%20jennings%20gb.htm
[120] Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.
[121] David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.

than about 1,500. As one writer noted: "The Girandoni air rifle is a might-have been; a footnote to military history."[122] Indeed, the rifles never caught on as they proved to be impractical on the battlefield, and even more so for civilian use. To wit: "Leather gaskets needed to be constantly maintained and swelled with water to sustain pressure. Once empty the reservoirs required a significant effort and 1500 strokes to restore full power. A supply wagon was subsequently outfitted with a mounted pump to readily supply soldiers but this negated one of the key features—mobility. The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon. The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort."[123] First introduced to the Austrian army in the late 1700s, "[t]he guns became inoperable after a very short time" of use and were "entirely phased out" by 1810.[124] One American manufacturer, Isaiah Lukens of Pennsylvania, apparently produced perhaps four such weapons.[125] The rest were made and used in Europe. And while Lewis and Clark did bring a Girandoni with them, they never intended to use for hunting, in combat or battle, but to impress and deter the Native Americans they encountered (which it did). Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that the Indians were not aware of the extensive pre-fire preparations needed.[126]

---

[122] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

[123] John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[124] Frederick J. Chiaventone, "The Girandoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon," *Warfare History Network,* January 2013, https://warfarehistorynetwork.com/article/lewis-and-clarks-girandoni-air-rifle/.

[125] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CTR. OF THE WEST (Aug. 3, 2014), https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/.

[126] Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 108, 158, 160, and passim.

49.     To take another example, the Volcanic repeating pistol, patented in 1854, was said to have the ability to fire up to "ten or greater rounds."[127] The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations. But the company was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[128] Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[129] dubbed "radical defects" by Winchester himself.[130] In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[131]

50.     Another account laboring to establish early gun firing provenance asserts that "[s]emi-automatic technology was developed in the 1880s" with the "Mannlicher rifle. . . generally attributed to be the first semi-automatic rifle."[132] Yet this "development" was initially a failure: "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."[133] The true semi-automatic weapon did not

---

[127] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 6 (Plaintiffs' Trial Exhibit 2).
[128] These are the three men who came together to form what became the Smith & Wesson gun company. Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51-52.
[129] "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.
[130] Quoted in Haag, *The Gunning of America*, 56.
[131] Haag, *The Gunning of America*, 60.
[132] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 8 (Plaintiffs' Trial Exhibit 2).
[133] Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

become feasible and available until the beginning of the twentieth century, and the primary market was the military.[134]

51.     The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together, found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver, owing to pepperboxes' "frightening flaws."[135]  The reason: pepperboxes were "heavy, lumpy, and impractical."[136]  The addition of more barrels added more weight, and less practicality, to the gun, resulting in an inverse relationship between more barrels and less gun utility.  By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[137]  Further, "[t]hey also had a nasty habit of discharging all their barrels at once.  No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[138]  Indeed, the Colt revolver was "the first widely used multishot weapon,"[139] although it took decades for this and similar revolvers to catch on.

52.     Thus, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun repeaters appeared late in the Civil War.[140] Even so, the "standard

---

[134] Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom,* July 2022, 32-39.

[135] *Pepperbox Pistols: Last Line of Defense*, RELICRECORD, https://relicrecord.com/blog/pepperbox-pistols-last-line-of-defense/ [https://perma.cc/8AJU-6XT8].

[136] Rasenberger, *Revolver,* 54.

[137] Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[138] Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster ed., 1959), 154. By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison." Winant, *Pepperbox Firearms,* 32.

[139] Rasenberger, *Revolver,* 401.

[140] Kopel, "The history of magazines holding 11 or more rounds"; Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 112-13.

infantry weapon [in the Civil War] remained the single-shot, muzzle-loaded weapon."[141] Historian James M. McPherson concurred that, even though some repeating rifles appeared in the Civil War as early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout the war."[142]

### B.  The Colt Revolver Did Not Achieve Popularity Until Decades After its Invention

53.     The Colt revolver was "the first widely used multishot weapon,"[143] although it took decades after its invention for this and similar revolvers to catch on. The idea of an available, affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s. Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading.[144] Even then, Colt could not readily manufacture multi-shot weapons for many years because he could find no market for them, either from the government or the public. The government, in fact, dismissed such firearms as mere "novelties."[145] After an 1837 test of Colt's gun and others the government concluded that it was "entirely unsuited to the general purposes of the service."[146] The government also rejected the weapon after tests in 1836, 1840, and 1850. Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments starting in the 1840s. The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through

---

[141] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 90.
[142] James M. McPherson, *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.
[143] Rasenberger, *Revolver,* 401.
[144] Rasenberger, *Revolver*, 3-5, 401.
[145] Haag, *The Gunning of America*, 24.
[146] Rasenberger, *Revolver*, 136.

most of the war. . . ."[147] And though the Colt-type revolver "had proved itself, the official

sidearm of the United States Army [in the Civil War] remained a single shot pistol."[148] It took

the Colt's limited use during the Civil War to finally spur the post-Civil War proliferation of the

Colt-type revolver and similar firearms into society.[149]

54.     Beyond that, the early Colt revolvers were "single action"—that is, the trigger had

to be pulled back ("cocked") each time to then fire a round. Thus the single action revolver did

not fire in a semi-automatic fashion. Colt developed a "double action" revolver in 1877 where

the "trigger pull then performs two functions: it cocks the hammer and then releases the hammer

to fire the gun."[150] The double action gun, however, was initially "plagued with problems."[151]

The U.S. military didn't adopt the Colt double action revolver until 1892, and even then

requested improvements thereafter.[152]

55.     As detailed below, once revolvers began to spread from the military to the civilian

market following the Civil War, and became associated with lawless violence, they were swiftly

met by laws and regulations aimed at curbing their possession and use.

### C.  The Winchester Repeating Rifle Did Not "Win the West"

---

[147] Rasenberger, *Revolver,* 390.

[148] Kennett and Anderson, *The Gun in America*, 91.

[149] Haag, *The Gunning of America,* 34-37, 46-64. As Haag said, "the Civil War saved" the gun industrialists (65).

[150] McKenzie Hanson, "Single Action vs. Double Action Revolvers," Targetbarn.com, October 13, 2022, https://www.targetbarn.com/broad-side/single-action-vs-double-action-revolvers/

[151] "I Have This Old Gun: Colt 1878 Double-Action Revolver," *American Rifleman,* September 20, 2023, https://www.americanrifleman.org/content/i-have-this-old-gun-colt-1878-double-action-revolver/

[152] Will Elsbury, "Military Sidearms, from Revolvers to Semi-Automatic Pistols: A Resource Guide," Library of Congress, April 9, 2024, https://guides.loc.gov/military-sidearms-from-revolvers-to-semiautomatic-pistols

56.     Even the famous Winchester repeating rifle did not obtain popularity until the onset of the twentieth century, despite the fanciful claim that it won the American West. Inventor Benjamin Henry claims credit for developing the first practical, lever action repeating rifle (patented in 1860), however his competitor Winchester "deftly gutted" the Henry Arms Company, coopting it to form the Winchester Arms Company in 1866, paving the way for Winchester's dominance.[153] The Winchester rifle could fire up to fifteen rounds without reloading. Yet the widely known Winchester 1873, "was designed for sale to the Government as a military arm."[154] A gun whose legendary status wildly outdistanced its actual production and impact, it was nevertheless an important firearm in the late nineteenth century, although this "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s. Its celebrity biography backdated its diffusion and even its popularity."[155] In fact, the slogan stating that the Winchester "won the West" was invented by Winchester executive Edwin Pugsley as a marketing ploy in 1919.[156]

57.     As historian Michael Vorenberg concluded: "Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction."[157] An analysis of production runs of Henrys and Winchesters from 1861-1871 concluded that they produced a total of 74,000 guns. Most of them—about 64,000—were sold to foreign militaries, leaving about 9,200 for domestic American sales. Of those, 8,500 were acquired by Union

---

[153] Haag, *The Gunning of America*, 96.
[154] Koller, *The Fireside Book of Guns*, 112.
[155] Haag, *The Gunning of America*, 179.
[156] Haag, *The Gunning of America*, 353.
[157] Declaration of Michael Vorenberg ¶42, *Ocean State Tactical v. Rhode Island*, No. 1:22-cv-00246-JJM-PAS, Dkt. 19-2 (D. R.I. Oct. 14, 2022).

soldiers, leaving a very small supply of guns for domestic civilian acquisition.[158] By comparison, 845,713 Springfield "trap-door" single shot rifles were manufactured during this same time period.[159] Thus, the Henry and Winchester rifles certainly could not have been considered popular, nor is it true that magazines holding more than ten rounds "were very commonly possessed in the United States since 1862."[160]

58. Additionally, the Winchester was not a semi-automatic firearm; it was a lever-action rifle that required the shooter to manipulate a lever in a forward-and-back motion before each shot. And when the gun was emptied, it had to be manually reloaded, one round at a time.[161] Winchester did not produce a true semi-automatic rifle—then called a "self-loading" rifle—until the Winchester Model 1903 was released in 1903, and did not produce a semi-automatic rifle with a detachable magazine until the Winchester Model 1905, two years later. The Model 1905 could receive a five or ten round box magazine, although from 1905 to 1920 only about 30,000 of the guns were made. Even in World War I, soldiers primarily used bolt-action one shot rifles that could fire about twelve rounds per minute.[162]

---

[158] Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* (Iola, WI: Krause Publications, 2004), 21, 36–41, 51, 59, 65–66, 71, 73, 75; Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[159] According to an account of the Springfield, "The end of the Trapdoor series came in 1892, when the government adopted a bolt-action repeating rifle known as the Krag-Jorgensen." "The Trap Door Rifle," National Park Service, July 22, 2020, https://www.nps.gov/spar/learn/historyculture/trapdoor-rifle.htm

[160] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 871.

[161] Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

[162] Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense,* December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

59.     With all this, the Winchester was by no means universally embraced by long gun users. Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader."[163] According to A.C. Gould, writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[164] Historian Vorenberg confirms this analysis: "There were civilians during Reconstruction who owned high-capacity rifles, to be sure. Yet almost all such civilians were 'frontiersmen' of the Western Territories, and the population of the Western Territories was tiny compared to the population of the United States as a whole. Furthermore, Henrys and Winchesters, the only high-capacity firearms of the era, were not the preferred firearms of the 'frontiersmen' of the region."[165]

### D.  The Rise of Post-Civil War Multi-Shot Handguns Was Accompanied by Escalating Firearm Violence and then Firearm Regulations

60.     Following the Civil War, revolvers were marketed to the civilian population in newspaper advertisements extolling their virtues. For example, when Smith & Wesson's near-monopoly over the manufacture of cartridge revolvers ended with the expiration of its Rollin White patent in 1870, "dozens of other [gun] makers"[166] entered the market. Soon these other

---

[163] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129. Historian Michael Vorenberg says that "Henrys and Winchesters were. . . repeating rifles, but because they were in a class of their own, due to their high capacity, they were generally known only as Henrys or as Winchesters." Declaration of Michael Vorenberg ¶ 15.
[164] Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894*, 131.
[165] Declaration of Michael Vorenberg ¶ 97.
[166] Kennett and Anderson, *The Gun in America,* 98.

manufacturers were producing abundant cheap revolvers at low cost to the consumer. As Kennett and Anderson noted, Colt's initial revolvers sold for $35, but by 1900 the "'two dollar pistol' was a fixture in American life."[167] Further, as the mail order business boomed from the 1870s on, companies like Montgomery Ward and Sears began selling revolvers through their catalogs—especially small, cheaper, lighter-weight models that cost less to mail. Cheap handguns were advertised not only through catalogs, but also through newspaper and magazine advertisements.[168]

61.     The rise in the circulation of multi-shot handguns in society following the Civil War was accompanied by escalating interpersonal violence associated with the weapons and, soon thereafter, the rapid spread of concealed carry restrictions (see Exhibits C and E).[169] By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[170] In addition, in the late 1800s and early 1900s several states and localities barred possession of such weapons outright, regardless of other circumstances.[171]

---

[167] Kennett and Anderson, *The Gun in America,* 99.

[168] Kennett and Anderson, *The Gun in America,* 99-100. See also Haag, *The Gunning of America*, 251-55.

[169] Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Roth, *American Homicide*, 218-19.

[170] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

[171] Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) § 410; Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) § 209; 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1; 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1-3, 5; 1917 Cal. Sess. Law 221-225; 1923 Cal. Stat. 695; 1931 N.Y. Laws 1033, ch. 435, § 1. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors)

62.     It was only in the post-World War I era when multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern, leading to the enactment of anti-machine gun laws in at least 32 states, between eight and eleven state laws restricting semi-automatic firearms, and the first significant national gun regulatory law in 1934.

63.     As noted earlier, the problems with arguments claiming that historical multi-shot weapons were both viable and commonly possessed before the late nineteenth century are two-fold: they misrepresent the actual past of the weapons cited, and even more importantly fail to understand the connection between gun technology developments and the steps leading up to changes in weapons-related public policy to regulate threats posed by those developments.

64.     As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps. *First*, a new gun or gun technology must be invented. *Second*, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution and dissemination. As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[172] And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[173] *Third*, in many cases, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications. Military weaponry is developed without consideration of potential civilian use and

---

or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.
[172] Winant, *Firearms Curiosa*, 36.
[173] Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

the consequences of dissemination in the civilian market.[174] *Fourth*, some weapons may then spill over into, or be adapted to, civilian markets and use. *Fifth*, if such weapons then circulate sufficiently to pose a public safety or criminal problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes. This general sequence is echoed in works like the *Buyer's Guide to Assault Weapons*, a standard reference work on assault weapons.[175]

65.     Again, to simply assert or assume that past firearms design/development, invention, or patenting equals commonality, viability, or a measurable presence or impact on society, is a leap in logic without historical foundation. It would be as logical to reject modern governmental regulation of electric power through such government agencies as state power commissions and the Federal Energy Regulatory Commission (founded in 1977) because no such regulation was enacted around the time of Benjamin Franklin's experiments with electricity in the mid-eighteenth century. The fact that inventors worked on new firearm designs and modifications tells us nothing about the consequences of such designs for society and public policy. And the existence of such designs does not equal technological viability or reliability, much less general availability, much less societal circulation and use of these weapons. Other weapons subject to government restriction in our history further illustrate these principles.

---

[174] Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular the Bowie knife and various clubs. These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War. Knives and clubs are far simpler technologically compared to firearms (and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

[175] Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest Books, 2008), 4-7. Peterson's Foreword summarizes a similar relationship between weapons development and subsequent calls for regulation.

## IV.   HISTORY AND REGULATION OF FULLY AUTOMATIC AND SEMIAUTOMATIC FIREARMS

### A.  The History

65.     A clear example of this historical pattern is provided by early twentieth-century restrictions related to fully automatic firearms. While weapons capable of firing rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[176] it and its successors were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus, owing to the Gatling gun's size and weight. Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger. The development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, came to fruition during World War I. These tripod-mounted military guns, like the Maxim, operated to devastating effect on the battlefield. They initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[177]

66.     Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon: the Thompson submachine gun, widely known as the Tommy gun. Though it

---

[176] The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and in the Spanish-American War of 1898. Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* at 367-68 (Washington, D.C.: Center of Military History, 2008); Gatling Gun, *History.com*, September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

[177] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* 127 (Armonk, NY: M.E. Sharpe, 1994); "How the Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

was developed for use in World War I as "purely a military weapon,"[178] it came too late in the war to have much effect. Its inventor, John Thompson, patented his .45 caliber gun in 1920.[179] It typically fired with either a 20–30 round stick magazine or a 100-round drum magazine. The Tommy gun was initially unregulated after World War I. In an effort to boost anemic post-war sales, the manufacturer marketed the gun for civilian purchase. (The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[180])

67.     It was only at this point—in the early 1920s—that reliable hand-held automatic weapons were made available to civilians and began to circulate in society,[181] though sales in the early 1920s were sluggish. By 1925, Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[182] This pattern of anemic sales typified the gun's commercial trajectory: "Despite its initial publicity and later notoriety, the Thompson submachine gun was a failure from the start."[183] This was especially true for sales to police forces, to whom Thompson and his company marketed the gun aggressively, even as criminals began adopting the gun. "As a

---

[178] William J. Helmer, *The Gun That Made the Twenties Roar* (Highland Park, NJ: The Gun Room Press, 1969), 75.

[179] Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now,* January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

[180] Ellis, *The Social History of the Machine Gun*, 149–52; Helmer, The Gun That Made the Twenties Roar, 161-64.

[181] Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" *The National Interest*, July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

[182] Kennett and Anderson, *The Gun in America*, 203. Helmer confirms the number of 3000 guns sold by 1925. *The Gun That Made the Twenties Roar*, 74. Helmer says that "sales declined steadily" after 1921; see 130.

[183] Helmer, *The Gun That Made the Twenties Roar*, 129.

criminal's weapon, the Tommygun was an unqualified success. As a police weapon, it was such a flop that many law-enforcement officials wished sincerely that it had never come off the drawing board."[184] For example, after the St. Valentine's Day massacre, a representative of Auto-Ordnance visited Chicago police captain John Stege to offer assistance. Captain Stege "practically ran him out of the office. . . .It was Stege's opinion that not even the police should be armed with machine guns," an opinion shared "by many other lawmen in the country."[185] Another police chief explained why: "It is not possible for a police officer to open a machine gun up on a crowded street . . . because you are going to kill possibly ten innocent people to one criminal."[186] Poor military and law enforcement sales forced the company to "peddle the new gun in peacetime" by trying "to think up something else it might be good for." Their conclusion was to market the gun as "good for anything"[187] as seen by this 1922 advertisement from Auto-Ordnance:

---

[184] Helmer, *The Gun That Made the Twenties Roar,* 126. Helmer quotes numerous police officials denouncing the weapon as useless for the police; see 126-28.
[185] Helmer, The Gun That Made the Twenties Roar, 126.
[186] Helmer, *The Gun That Made the Twenties Roar,* 126. The gun's rare actual use by police confirmed this fear. In an attack on John Dillinger, for example, FBI agents "mistakenly shot three innocent customers." (128).
[187] Helmer, *The Gun That Made the Twenties Roar,* 75.



# The Thompson Submachine Gun
## *The Most Effective Portable Fire Arm In Existence*

THE ideal weapon for the protection of large estates, ranches, plantations, etc. A combination machine gun and semi-automatic shoulder rifle in the form of a pistol. A compact, tremendously powerful, yet simply operated machine gun weighing only seven pounds and having only thirty parts. Full automatic, fired from the hip, 1,500 shots per minute. Semi-automatic, fitted with a stock and fired from the shoulder, 50 shots per minute. Magazines hold 50 and 100 cartridges.

THE Thompson Submachine Gun incorporates the simplicity and infallibility of a hand loaded weapon with the effectiveness of a machine gun. It is simple, safe, sturdy, and sure in action. In addition to its increasingly wide use for protection purposes by banks, industrial plants, railroads, mines, ranches, plantations, etc., it has been adopted by leading Police and Constabulary Forces, throughout the world and is unsurpassed for military purposes.

*Information and prices promptly supplied on request*

### AUTO-ORDNANCE CORPORATION
302 Broadway   *Cable address: Autordco*   New York City

47

68.     Another automatic weapon developed for World War I was the Browning

Automatic Rifle (BAR). It fired a .30-06 caliber round, could receive a 20-round box magazine,

and could fire up to 650 rounds per minute. The BAR first appeared on the battlefield in 1918.[188]

It was "a heavy machine rifle weighing nearly twenty pounds with bipod and loaded magazine. .

. ."[189] It, too, made its way into civilian life and found favor among criminals and gangsters in

the 1920s and early 1930s.[190]

69.     Before the early 1920s, these fully automatic weapons were unregulated for the

obvious reason that they did not exist or were not circulating widely in society. When they did

begin to circulate, however, their uniquely destructive capabilities rapidly became apparent,

especially to the emergent Prohibition-fueled gangster organizations of the 1920s. Guns like the

Tommy gun and the BAR were actually used relatively infrequently by criminals generally, but

when they were used, they exacted a devastating toll and garnered extensive national attention,

such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929.[191]

70.     I conducted a search of Newspapers.com from 1920-1930 using the search terms

"Tommy Gun," "Thompson submachine" and "machine gun." The term "Tommy Gun" turned

---

[188] Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?" *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.
[189] Helmer, *The Gun That Made the Twenties Roar*, 37.
[190] Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12. The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example. Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.
[191] Chris McNab, *Deadly Force: Firearms and American Law Enforcement* (NY: Osprey Publishing, 2009), 97–98.

up essentially no hits until 1928, a clear indication that this particular term did not come into wide use until fairly late in the decade. The search for "machine gun" turned up more, but many of them referenced the weapons owned or used by the military (including many stories about World War I). The search for "Thompson submachine," by contrast, yielded many articles from across the country. Starting in the fall of 1920, a few newspaper articles described regular reports of demonstrations of the gun for police and other government officials and agencies, and reports of local police forces sometimes purchasing a few of the guns. Reports of demonstrations of the gun to police forces and other state and local officials and also of some purchases appeared regularly starting in 1921, and continued throughout the 1920s, as did numerous articles describing the gun's development and capabilities by inventor John Thompson. These articles also reprinted standard accounts of the Tommy gun's weight, size, firing capabilities and possible uses by law enforcement.

71.     To cite a few examples of early news coverage, an account in the Western Sentinel from December 3, 1920,[192] reported on a demonstration of the Tommy gun, saying that it weighed about seven pounds, fired .45 caliber rounds, could fire up to 1500 rounds per minute, and could receive a box magazine holding 20 rounds, or a drum magazine with either 50 or 100 rounds. It went on to say that the gun was "without equal for riot use and for the police chasing thieves and other lawbreakers who attempt to escape in automobiles, for with this little weapon it is a very easy thing to rip the tires off of an escaping car, and the gun is so light and simple that an inexperienced man can fire with the effect of an expert marksman and moving targets can be

---

[192] "New Type of Gun is Demonstrated Here," Winston-Salem, North Carolina, December 3, 1920;
https://www.newspapers.com/image/89498556/?terms=%22Thompson%20submachine%22&match=1

hit with the ease that a fireman sprays a hose on a flame." Other articles touted the gun's usefulness in controlling riots and mobs. An account from the Jamestown Weekly Alert reported that state and county officials were provided with ten of the guns for "hunting down whiskey runners in the northern part of the state."[193]

72.     Starting in roughly late 1921 and early 1922, a handful of small news items reported thefts of Tommy guns from armories or police stations. The one notable crime-related case to receive enormous press attention was a major seizure of about 600 Tommy guns with ammunition and magazines, first reported about June 16, 1921, from a ship docked at the port of Hoboken, New Jersey, bound for Ireland for use by the IRA in the ongoing Irish rebellion (Ireland won its independence from Britain in 1922).[194]

73.     Newspaper reports of criminal use of Tommy guns were few, small, and spare until 1926, when a few very sensational news reports of their criminal use received widespread and extensive attention in newspapers across the country. Most of these initial stories were reports of Chicago gangster use (notably one "Al Caponi" in an early account) along with stories from the New York City-New Jersey area. For example, an AP story from October 16, 1926, with the dateline Somerville, N.J. reported on "the advance of 500 city, state and volunteer police on the mountain stronghold of New Jersey's machine gun mail bandits."[195] According to the account, eight men robbed a truck of over $100,000 and were holed up at the stronghold. The

---

[193] "New Submachine Guns Received," Jamestown, North Dakota, May 12, 1921; https://www.newspapers.com/image/465633429/?terms=%22Thompson%20submachine%22&match=1
[194] Helmer, *The Gun That Made the Twenties Roar*, 53-64.
[195] "Use Expert Riflemen to Hunt Robbers," Ithaca Journal, N.Y., https://www.newspapers.com/image/254505945/?terms=%22Thompson%20submachine%22&match=1

authorities were also armed with weapons that included machine guns, and were contemplating the expansion of the search party with 2000 militiamen.

74.     Coinciding with these extensive stories were articles, editorials, and exposés calling for changes in the law to address this growing gun crime problem. For example, an article from the Boston Herald began by quoting a magazine story from Collier's Weekly that observed: "The police authorities are powerless to interfere with the sale and distribution of the highest powered instrument of destruction that has yet been placed at the convenience of the criminal element in this country." The Herald sent out a man to see if an average person could buy a machine gun "without trouble." The buyer's conclusion: "He had no trouble" purchasing the gun, which the article labeled "a diabolical engine of death." The article detailed that for the prospective gun purchaser, "Pistols would not be shown unless the customer exhibited a permit, but machine guns could be had over the counter with no such formalities." The article concluded this way: "Here is a case where it seems that 'there ought to be a law.' This weapon . . . was designed for war. . . . a machine gun is the greatest aid to crime that yet has been placed within the reach of criminals."[196]

75.     Reports and exposés, juxtaposed with lurid and sensational accounts of Tommy gun criminality, built pressure on the states to enact anti-machine gun laws and also put pressure on Congress to act. A long-stalled bill in Congress to restrict the interstate shipment of guns received renewed interest and support in 1926, eventually leading to congressional enactment of the Mailing of Firearms Act of 1927, a limited measure that failed to restrict interstate handgun shipment because it did not affect non-Postal Service shipments. From 1926 on, news stories

---

[196] "Machine Guns for All," Kennebec Journal, Augusta, Maine, December 4, 1926, https://www.newspapers.com/image/857617757/?terms=%22Thompson%20submachine%22&match=1

were filled with the kind of sensational gangster-related stories that led to the Tommy gun being labeled the weapon that "made the Twenties roar," and that also led to many anti-machine gun laws. For example, an article dated November 27, 1928, reported that "Chicago's war on gangsters and racketeers was reopened tonight with the drafting of a law to prohibit the sale of machine guns. 'Tommy guns,' the bullet spitting little Thompson submachine guns which are inseparable from gang fights, bank robberies, assassinations and other major crimes . . . could be purchased as easily and legally in Chicago as a pound of meat. . . . practically every sporting goods establishment in Chicago carried the firearms and sold them readily."[197] (Illinois adopted an anti-machine gun law in 1931.[198])

## B. State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices

76.     In response to the wider availability of firearms like the Tommy gun and the BAR, between 1925 and 1935, at least 36 states enacted anti-machine gun laws (see Exhibit F). These state (and eventually federal) enactments were anticipated, justified, and promoted by the National Conference of Commissioners on Uniform State Laws, a national organization formed in 1892 to provide "non-partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical areas of state statutory law."[199] (Today, the organization is known as the Uniform Law Commission.) In 1923, the Commission organized a special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms." In 1928, it issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots

---

[197] "Machine Gun Ban Plan of Chicago," The Salt Lake Tribune, https://www.newspapers.com/image/542285510/?terms=%22Thompson%20submachine%22&match=1

[198] Former Ill. Rev. Stat. ch. 38, ¶¶ 414a to 414g, "An Act to regulate the sale, possession and transportation of machine guns," approved July 2, 1931.

[199] Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.

semi-automatically without reloading."[200] In 1930, it issued a model firearms act focusing on

"guns of the pistol type." In 1932, it issued a model act "intended not only to curb the use of the

machine gun, but to make it unwise for any civilian to possess one of the objectionable type."

The Commission explained that, between 1923 and 1930, "the infant industry of racketeering

grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn

displaced by a partly concealable type of machine gun—the Thompson .45 inch caliber

submachine gun becoming most popular. . . ."[201]

77.     Congress enacted a machine gun ban for the District of Columbia in 1932 which

defined a machine gun as "any firearm which shoots automatically or semiautomatically more

than twelve shots without reloading."[202] The National Rifle Association endorsed D.C.'s ban,

stating "it is our desire [that] this legislation be enacted for the District of Columbia, in which

case it can then be used as a guide throughout the states of the Union."[203] In his testimony before

Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton

A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the

association I represent is absolutely favorable to reasonable legislation. We are responsible for

the uniform firearms act. . . . in the District of Columbia. It is on the books now."[204]

---

[200] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

[201] "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4-10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

[202] "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

[203] S. Rep. No. 72-575, at 5–6 (1932).

[204] "Hearings Before the Committee on Ways and Means," 36.

78.     In 1934, Congress enacted the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and general circulation of fully automatic weapons, like the Tommy gun. The National Firearms Act imposed a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities. Such weapons had to be registered with the Treasury Department, and the owners fingerprinted and subject to a background check, with the payment of a $200 tax.[205] The early models of the Tommy gun could fire "an astounding 1,500 rounds per minute. A Tommy gun could go through a 100-round drum magazine in four seconds. Later versions fired 600 to 700 rounds per minute."[206]

79.     In his opening statement to the Ways and Means Committee of the U.S. House of Representatives, Attorney General Homer Cummings made clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. . . . there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. . . . In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.[207]

---

[205] 48 Stat. 1236.

[206] Moss, "From Gangland to the Battlefield."

[207] "Hearings Before the Committee on Ways and Means," 4. The version of the bill that appears on page 1 of the Hearings had this definition of machine gun: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading." Congress eventually settled on strict regulation of fully automatic weapons, sawed-off shotguns, and silencers. This political compromise was the result of the Congressional focus on weapons used by organized criminals of the era.

80.     In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period at least seven states plus the District of Columbia, and as many as ten states plus D.C., enacted laws restricting semi-automatic weapons (see Exhibit F).[208] The reason for restricting semi-automatic firearms is not hard to discern. These restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology: an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[209] During the time that Thompson and his company were developing and marketing the Tommy gun (which could fire in semi- or full-auto modes[210]), they were also developing the Thompson Autorifle, a "strictly semiautomatic rifle" for which the military showed greater interest than it did for the Tommy gun.[211] The Autorifle was also promoted to police and military organizations, though it was overshadowed in the public mind by the Tommy gun.[212]

81.     As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time, and the related understanding that these weapons had no justifiable civilian use. By that time, gun

---

[208] *See also* Spitzer, "Gun Law History in the United States and Second Amendment Rights," 68–71. The language of the restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

[209] Spitzer, *The Gun Dilemma*, 32–33. In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns." While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a semi-automatic weapon fires a single shot with each pull of the trigger.

[210] Helmer, *The Gun That Made the Twenties Roar*, 48-49, 255-56.

[211] Helmer, *The Gun That Made the Twenties Roar*, 37, 50.

[212] Ultimately, the military opted for the semiautomatic M1 Garand over the Autorifle. Helmer, *The Gun That Made the Twenties Roar*, 161.

technology was available that made it possible for ammunition to be reliably fired in rapid

succession and guns to be reloaded through interchangeable ammunition magazines or similar

devices. Again, the lesson is the same: once these technologies began to spread in civil society

and be used for criminal or other dangerous purposes, and because of the belief that it was

"unwise for any civilian to possess" such weapons,[213] regulatory efforts ensued.

82.     Restrictions on fully automatic and semi-automatic firearms were closely tied to

restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic

weapons are predicated on some kind of mechanical loading function or device that

automatically feeds new rounds into the firing chamber after the previous round is fired. As is

the case with contemporary state limitations on ammunition magazine capacity, state laws

enacted early in the twentieth century imposed restrictions based on the number of rounds that

could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up

to a high of eighteen (Ohio).

83.     In fact, magazine capacity/firing limits were imposed in at least 26 states,

representing over 60% of the American population at that time.[214] These state laws fell into three

categories (see Table 1 below): thirteen states plus the District of Columbia regulated semi-

automatic and fully automatic weapons (Arkansas, California, Connecticut, District of Columbia,

Massachusetts, Michigan, Minnesota, Montana, New Jersey, North Carolina, Ohio, Rhode

Island, South Dakota, and Virginia[215]); twelve states regulated fully automatic weapons only,

---

[213] "Uniform Machine Gun Act."

[214] U.S. Census, Historical Population Change Data (1910-1920) (using 1920 census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html.

[215] 1931 Ark. Laws 704, 704-6; 1933 Cal. Stat. 1169; 1935 Conn. Laws 389, 389-94; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10,

where the regulation was defined by the number of rounds that could be fired without reloading

or by the ability to receive ammunition feeding devices (Illinois, Louisiana, Minnesota, New

Jersey, North Carolina, North Dakota, Oregon, Pennsylvania, South Carolina, Texas, Vermont,

and Wisconsin[216]); and four states restricted all guns that could receive any type of ammo

feeding mechanism or round feeding device and fire them continuously in a fully automatic

manner (California, Hawaii, Missouri, and Washington State).[217]

---

1933, ch. 190, 1933 Minn. Laws 231, 232; 1935 Mont. Laws 57, 57-60; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137. Two of these states enacted early laws focused on such weapons' use in hunting. New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading." 1920 N.J. Laws 67, ch. 31, Section 9. North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

[216] 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2; Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2; 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2; 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

[217] 1927 Cal. Stat. 938; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

# TABLE 1

# AMMUNITION MAGAZINE RESTRICTIONS IN 26 STATES, 1917-1935[218]

| Semi-automatic and Fully Automatic Firearms (restricted firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (restricted firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -Arkansas (5 rounds; 1935)<br>-California (10 rounds; 1933)<br>-Connecticut (5 rounds; 1935)<br>-District of Columbia (12 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-Montana (6 rounds); 1935)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Louisiana (8 rounds; 1932)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Carolina (16 rounds; 1933)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-South Carolina (8 rounds; 1934)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

84.     A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber

---

[218] Including the District of Columbia. Note that California, Minnesota, New Jersey, and North Carolina appear twice in this table. The dataset from which this information is drawn ended in 1935, so it does not include any states that might have enacted similar restrictions after that. See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/; HeinOnline.

in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.[219]

85.    The other three states in this category (Hawaii, Missouri, Washington[220]) utilized this same description. In all, at least 26 states enacted 30 gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1).

**C. Lessons From the Regulation of Automatic and Semi-Automatic Firearms**

80.    The lesson from this sequence of events early in the twentieth century demonstrates, first, that regulations of fully automatic and semi-automatic weapons were common, and that they were enacted when such weapons began to circulate meaningfully into society. Accompanying that was regulation of ammunition feeding devices relevant to both fully automatic and semi-automatic firearms were regulated in more than half of the states. Second, changes in gun policy followed the series of steps described in this Report that respond to developments in firearms technologies and their use in crime, each dependent on the previous step. This lesson is significant because some argue that the absence of government gun regulations in history—at the time of the invention of various weapons or weapons developments—means that regulations now are unjustifiable, or have no historical basis.

81.    For example, an article asserts that "[m]agazines of more than ten rounds are older than the United States."[221] Drawing on examples like a firearm "created around 1580" capable of firing sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol of the early 1800s,[222] yielding the assertion that "magazines

---

[219] 1927 Cal. Stat. 938.
[220] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.
[221] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 851.
[222] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 852-54.

of more than ten rounds are older than the Second Amendment."[223] Therefore, by this reckoning, since these weapons existed early in (or even before) the country's existence, and were not specifically regulated, ipso facto, today's governments are unable to regulate assault weapons, like AR-platform rifles, or magazines exceeding certain capacities (typically, a ten-round limit).[224]

82.     Such arguments[225] fail for two sets of reasons. First, as explained in the preceding sections, this sort of narrative misrepresents the availability, viability, and capabilities of these early experimental weapons. The claim that ammunition magazines holding "more than ten rounds" were "very commonly possessed in the United States since 1862" and were "owned by many millions of law-abiding Americans" dating back to the "mid-nineteenth century"[226] is simply false, as this narrative demonstrates. Second, the account fails to understand the relationship between firearms' technological development, their spread into civil society, and government gun policy. As one gun history expert noted, "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on

---

[223] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 849.

[224] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 871-72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century.").

[225] Declaration of Ashley Hlebinsky in Support Of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra,* Case No. 3:19-cv-01537-BEN-JLB, United States District Court For The Southern District Of California, filed September 27, 2019 (Plaintiffs' Trial Exhibit 2).

[226] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 871. Kopel insists "that [10-round] magazines" have been "'in common use' and 'typically possessed by law-abiding citizens for lawful purposes'" for "a century and a half' (871-72). This claim is both false and unverified by his article.

its way."[227] The firearms and firearm feeding devices regulated in the early twentieth century in the previous account represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices.

## V.   CLARIFYING TERMS AND CONCEPTS ABOUT ASSAULT WEAPONS AND LCMS

83.     Opponents of assault weapons and LCM laws often assert that "[p]rior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance."[228]

84.     Assertions like this are incorrect. The terms "assault weapon" and "assault rifle" were the very terms used by the gun companies that first produced, marketed, and sold such weapons to the public.

85.     Gun industry use of the terms "assault weapons" and "assault rifles" appeared in the early 1980s (and even earlier), before efforts to regulate them emerged in the late 1980s and early 1990s.[229] A study of the marketing strategies employed by gun manufacturers and gun publications from the time that such weapons emerged in the American civilian market in a

---

[227] Rasenberger, *Revolver*, 3-4. Indeed, as the United States evolved from an agrarian to an urban/industrial society, the resultant industrial revolution that took hold by the latter part of the nineteenth century resulted in the "acceleration in the processes of technical innovation. . . ." "Industrial Revolution and Technology," *National Geographic,* https://education.nationalgeographic.org/resource/industrial-revolution-and-technology/. This was no less true for the development of firearms, which witnessed a similar acceleration in developments by the start of the twentieth century.

[228] *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

[229] Violence Policy Center, *The Militarization of the U.S. Civilian Arms Market*, June 2011, http://www.vpc.org/studies/militarization.pdf#page=33; also Violence Policy Center, *Assault Weapons and Accessories in America*, 1988, http://www.vpc.org/studies/awacont.htm; http://www.vpc.org/studies/thatintr.htm.

significant way in the early 1980s verifies this.[230] It reports on and quotes directly from gun company advertisements and gun magazines. Examples include: Heckler and Koch selling its "HK 91 Semi-Automatic Assault Rifle"; ads for the "Bushmaster assault rifle"; the AKM "imported assault rifle"; the Beretta M-70 that "resembles many other assault rifles"; the AR10/XM-10 (made by Paragon S&S Inc.) advertised as a "Famous Assault Rifle [that] is Now Available in a Semi Auto Civilian Legal Form!" (see Exhibit H); the "AMT 25/.22 Lightning Carbine" that was advertised as an "assault-type semi-auto"; Intratec extolling its TEC-9 as one that "clearly stands out among high capacity assault-type pistols" (see Exhibit G); and the after-market supplier Assault Systems that appealed to civilian owners of "assault weapons," among many other examples. The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public.[231] *Guns & Ammo* magazine described the "success of military assault rifles in the civilian market" in its July 1982 issue.[232] In 1984, *Guns & Ammo* advertised a book called *Assault Firearms* that the magazine extolled as "full of the hottest hardware available today."[233]

86.     As a standard buyer's guide on assault weapons noted, the "popularly-held idea that the term 'assault weapon' originated with anti-gun activists, media or politicians is wrong. The term was first adopted by the manufacturers, wholesalers, importers and dealers in the

---

[230] Tom Diaz, *Making a Killing* (NY: The New Press, 1999).

[231] Diaz, *Making a Killing*, 124–128, 230–231; Tom Diaz, *The Last Gun* (New York: The New Press, 2013), 142–43; Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 8; McWhirter and Elinson, *American Gun,* 251-58.

[232] "Wooters Chooses the 10 Best Gun Designs," *Guns & Ammo*, July 1982, 58, 68; Diaz, *Making a Killing,* 126.

[233] Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times*, January 17, 2013, A1, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html

American firearms industry . . . ."[234] The more expansive phrase "assault weapon" is generally used over "assault rifle" because "weapon" also includes not only rifles but some shotguns and handguns that were also subject to regulation in the federal 1994 assault weapons ban and subsequent laws.

87.     An article in *Outdoor Life* belied the claim that assault weapons are limited only to firearms that fire fully automatically. That article urged its readers to share its information with non-shooting friends to dispel "myths" about "assault weapons." In its account, it correctly noted that "the term 'assault weapon' . . . generally referred to a type of light infantry firearm initially developed in World War II; a magazine-fed rifle and carbine suitable for combat, such as the AK-47 and the M16/M4. These are selective-fire weapons that can shoot semi-auto, full-auto, or in three-round bursts."[235]

88.     The effort to rebrand "assault weapons" as something more benign and severed from its military origins was seen in the publication struggles of Phillip Peterson, whose book, titled as recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons*,[236] is a well-known reference work on the subject. As Peterson explained, the gun industry "moved to shame or ridicule" those who used the phrase "assault weapons," insisting that the term should now only apply to fully automatic weapons. Peterson noted that the origin of the term "assault weapon" was the industry itself.[237] He found that the NRA refused to sell his book until he changed the

---

[234] Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons* (Iola, WI: Gun Digest Books, 2008), 11.
[235] John Haughey, "Five Things You Need to Know About 'Assault Weapons'," *Outdoor Life*, March 19, 2013, http://www.outdoorlife.com/blogs/gun-shots/2013/03/five-things-you-need-know-about-assault-weapons
[236] Peterson, *Gun Digest Buyer's Guide to Assault Weapons*.
[237] Goode, "Even Defining 'Assault Rifles' Is Complicated."

title, which in 2010 he renamed *Gun Digest Buyer's Guide to Tactical Rifles.*[238] The very same pattern played out in Canada, where gun companies also used the term "assault rifle" in the 1970s and 1980s until political pressure began to build to restrict such weapons in the aftermath of a mass shooting in Montreal in 1989. By the 1990s, gun companies marketing guns in Canada and their allies also adopted terms like "modern sporting rifles."[239]

## VI.   CONCLUSION

89.    As I describe in this Report, and as the series of examples examined here illustrate, gun policy changes occur in and through a sequential process. *First*, a new gun or gun technology is invented. *Second*, it may then be patented, though the patenting of a design or idea by no means assures that it will proceed beyond this point. *Third*, it is often developed with a focus on military applications and supplying military needs, not directly for civilian acquisition or use. *Fourth*, some weapons may then spread to, or be adapted to, civilian markets and use. *Finally*, if such weapons then circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes. New gun laws are not enacted when firearm technologies are invented or conceived. They are enacted when those technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers.

---

[238] Phillip Peterson, *Gun Digest Buyer's Guide to Tactical Rifles* (Iola, WI: Gun Digest Books, 2010).

[239] According to Blake Brown, Canadian newspapers ran ads from gun companies selling weapons like the "AR-15 semi-automatic assault rifle," the "Colt AR-15 Semi Auto Assault Rifle," and the "SKS Assault Rifle" among others, in 1976, 1982, 1983, 1985, and 1986 from dealers and companies including MilArm, Colt, and Ruger. "Gun Advocates' Changing Definition of 'Assault Rifles' is Meant to Sow Confusion," *Toronto Globe and Mail*, May 21, 2020, https://www.theglobeandmail.com/opinion/article-gun-advocates-changing-definition-of-assault-rifles-is-meant-to-sow/

90.     Contemporary restrictions among the States pertaining to assault weapons are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions. Gun ownership is as old as the country. But so are gun and other dangerous weapons laws, which have adapted to changes in threats to public safety. Given the importance of history to considerations of contemporary gun laws, the lesson is abundantly clear: Firearms and other dangerous weapons were subject to remarkably strict, consistent, and wide-ranging regulation throughout our history when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality. The historical record from the 1600s through the early twentieth century, as seen in the examples examined here, is even more remarkable given that the United States was an evolving and developing nation-state that could not claim to have reached maturity until the twentieth century.

Dated: Williamsburg, Virginia
        May 13, 2024

*Robert J. Spitzer*
_____
ROBERT J. SPITZER