UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

J. MARK LANE and JAMES SEARS,

                          Plaintiffs,

- against -

STEVEN G. JAMES, in his official capacity as
Acting Superintendent of the New York State
Police, and MIRIAM E. ROCAH, in her official
capacity as District Attorney for the County of
Westchester, New York,

                          Defendants.

No. 22 Civ. 10989 (KMK)

---

## DECLARATION OF JAMES YURGEALITIS

        Pursuant to 28 U.S.C. § 1746, I, James Yurgealitis, declare and state as follows:

        1.        I have been retained by the Office of the Attorney General for the State of New York

to render expert opinions in this case and to prepare an expert report for disclosure addressing the

types and operation of firearms, the evolution and operation of assault weapons, and the use of

firearms in self-defense. This report is based on my own personal knowledge and experience. I hold

all opinions expressed herein to a reasonable degree of professional certainty.

        2.        I am currently self-employed as a Legal and Forensic Consultant providing firearms

related technical and public policy consulting, forensic case reviews, and testing and training services

to corporations, legal counsel, and the public sector. During my previous 26-year career as a Federal

Law Enforcement Officer, I have been recognized, and testified as, an expert witness in numerous

local, state, and federal courts. I have toured numerous firearms and ammunition manufacturers'

facilities both in the United States and overseas. I maintain a personal library of firearms- and

ammunition-related books and periodicals and maintain contact with other recognized experts in the

field. My final assignment in government service was as Senior Special Agent and Program Manager for Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), U.S. Department of Justice, at the ATF National Laboratory Center in Ammendale, Maryland, .a position I held for nine years. During that time, I was responsible for all Bureau firearms, and forensic-firearms-related training and research at the ATF National Laboratory Center in Ammendale, Maryland.

3.      My credentials, training, background, and experience are stated in my curriculum vitae, a true and correct copy of which is attached as **Exhibit A**. My credentials, training, background, and experience as an expert witness, including all cases where I have testified at trial or by deposition within the last four years, are detailed on my Statement of Qualifications, a true and correct copy of which is attached as **Exhibit B**.

4.      I am being compensated at the rate of $400 per hour for my work and at the New York State government rate, if any travel is required.

5.      My opinion or opinions as stated in this report are the result of my training, knowledge, and experience, technical, statistical, and historical research, review of the regulated firearms in this case, as well as the Plaintiffs' pleadings in this case as submitted.

6.      During the course of my work in this case, as additional research, technical or statistical materials become available or relevant, they will be reviewed. As such, I reserve the right to amend my report, opinion, or testimony to include consideration of those materials should their relevance warrant.

## SUMMARY OF OPINIONS

7.      As discussed in this report, many of the firearms regulated under N.Y. PENAL LAW §§ 265.00(22)(a)-(f); 265.02(7), 265.10, 70.02 ("the Law") directly trace their origins to weapons initially developed for use in military combat. As such, these weapons were never initially intended for general distribution to the public or sale in the civilian market.

8.     The regulated features under the Law were designed to increase the effectiveness of the firearm in a military combat scenario. However, such features are not necessary or suitable for civilian self-defense.

9.     Firearms without these features are not regulated under the Law and widely available to civilian customers and provide effective means for civilian self-defense.

10.     Firearms traditionally considered "sporting" or "hunting" firearms traditionally do not have features regulated under the Law.

11.     As tragically demonstrated by recent mass shootings in Las Vegas, Orlando, Colorado, Uvalde, Buffalo and elsewhere, assault weapons (as defined under the Law) are capable of inflicting significant carnage upon civilians in a short period of time.

12.     Additionally, assault weapons pose a significant risk to law enforcement officers and other first responders charged with responding to such a mass casualty event. It has been my experience that soft body armor issued to most Uniformed Officers has a "Level II" or "Level IIIA" National Institute of Justice (NIJ) protection rating. These two ratings are suitable for protection against most handgun bullets as those projectiles range up to a 1200FPS (+ or -) velocity. Rifle caliber assault weapons (AR & AK type) can, as stated previously in this report, achieve muzzle velocities of 3200FPS (+ or -) which can readily penetrate Level II & IIIA Body Armor (as well as some Level III hard body armor which is not universal standard issue amongst law enforcement agencies nationwide). This threat was graphicly illustrated during the July 7th, 2016 killing of five Dallas, Texas area Police Officers by an assailant wielding a AK-74. Not only do the firearms banned under the Act pose a threat to overall public safety they increase the likelihood that first responders charged with stopping such a threat may be seriously injured or killed in the performance of their duty.

## DISCUSSION

### I.  Firearms Terminology, Types, and Operation

13.    As the issues in this case center around firearms terminology and technology, it is important to discuss different types of modern firearms and how they function.

#### A.  Handguns and Long Guns

14.    Modern firearms as currently manufactured for civilian ownership fall into two general types: handguns and long guns (or shoulder-fired weapons).

#### i.  Handguns

15.    **Handguns**. Handguns are generally defined as a firearm having a short stock (grip), and are designed to be held, and fired, with one hand. The term "handgun" defines two distinct types of modern firearms: the revolver and the semi-automatic pistol.

16.    **Revolver**. A revolver is a handgun designed and manufactured with a revolving cylinder to contain, chamber, and feed multiple rounds of ammunition. In a modern double-action revolver, pulling the trigger rotates the cylinder, bringing an unfired ammunition cartridge in line with the barrel and firing pin. Pulling the trigger also cocks the hammer and then releases it either directly (or indirectly via a firing pin) to strike the primer of the cartridge, initiating the firing sequence. In this type of revolver, the trigger must again be pulled to rotate the cylinder in order to fire another cartridge. When all cartridges have been fired, the user must unlock the cylinder from the frame and swing it out to the side of the frame to facilitate removal of cartridge casings and insert unfired cartridges. The cylinder is then closed and relocked within the frame and the handgun is again ready to fire when the trigger is pulled.

17.    **Semi-automatic pistol**. A semi-automatic pistol is a handgun designed and manufactured with the firing chamber as an integral part of the barrel and generally utilizes a detachable "box" magazine to contain and feed multiple rounds of ammunition. In this type of

handgun, generally, the box magazine is inserted into the firearm and the slide or bolt is pulled back and released. It then springs forward and loads a cartridge into the chamber. When the trigger is pulled, the firing pin or striker is released and impacts the primer of the cartridge and initiates the firing sequence of the ammunition. In most pistols, a portion of the recoil or gas pressure generated by firing the cartridge is utilized to move the slide or bolt rearward, extract and eject the expended cartridge case, and chamber another round from the magazine. This sequence can be repeated by pulling the trigger once for each shot. The pistol can then be reloaded by removing the empty magazine and inserting a loaded magazine.

### ii. Long Guns

18.     In terms of modern firearms manufacture, long guns are generally of two distinct types: rifles and shotguns.

19.     **Rifle**. A rifle is a firearm which is designed and intended to be fired from the shoulder. It fires a single shot through a rifled bore for each pull of the trigger.

20.     **Shotgun**. A shotgun is a firearm that is also designed and intended to be fired from the shoulder. It fires either a number of ball shot (commonly termed "buckshot" or "birdshot") or a single projectile (commonly termed a "slug") through a smooth (non-rifled) bore for each pull of the trigger.

21.     In terms of rifle "types," there are numerous variations. All of these variations, generally speaking, are defined and distinguished by the way they are loaded and reloaded.

22.     **Single-shot rifle**. For example, single-shot rifles fire one shot for each pull of the trigger. They have no internal or external magazine capacity and must be reloaded with a new unfired cartridge by hand for each shot. Many of these have a hinged or "break open" receiver to facilitate loading and unloading.

23.     **Pump-action rifle**. A pump-action rifle requires the operator to manually manipulate a forearm piece which is traditionally found underneath the barrel. After firing, the forearm is pulled rearward, which unlocks the bolt and extracts and ejects the fired cartridge case. Pushing the forearm forward feeds an unfired cartridge from the magazine, cocks the firearm mechanism, and locks the bolt for a successive shot. Pump-action rifles have been manufactured with both tubular and detachable box magazines.

24.     **Bolt-action rifle**. Bolt-action rifles require the operator to manually manipulate the bolt of the rifle. After firing, the bolt is first unlocked from the chamber and then moved rearward. This action also extracts and ejects the expended cartridge case. The bolt is then moved forward, which feeds an unfired cartridge from the magazine into the chamber. Once the bolt is then locked again by the operator, it is ready to fire. Bolt-action rifles usually have an internal fixed magazine or tubular magazine which will facilitate reloading via manipulation of the bolt until that capacity is exhausted, but models that use detachable magazines are also available. Bolt-action rifles are popular among hunters to this day and were generally the choice among military forces through the end of World War II.

25.     **Lever-action rifle**. A lever-action rifle is similar to the bolt-action rifle in that the operator is required to manipulate the mechanism of the firearm. A lever at the bottom of the rifle's receiver is manipulated in a up and down motion in order to unlock the bolt and move it rearward, extract and eject the expended cartridge case, feed an unfired cartridge into the chamber, and lock it. This action is required for each shot fired through the rifle. Generally speaking, lever-action rifles are usually manufactured with tubular magazines which will vary in capacity depending on the caliber of the firearm and length of the magazine tube.

26.     **Semi-automatic rifle**. A semi-automatic rifle utilizes the energy generated by the firing of the cartridge to power the cycle of fire. This is accomplished by siphoning off a portion of

the gases generated by firing to operate the mechanism, or by utilizing the recoil generated by firing, much like a semi-automatic pistol, as described previously. Once loaded, the operation of this cycle of fire is not dependent on the operator for any portion of the process other than to pull the trigger. Semi-automatic rifles are, and have been previously, manufactured with both fixed internal magazines and a capacity to accept detachable external magazines. As such, this type of rifle is capable of firing with each pull of the trigger until the supply of ammunition is exhausted. As stated previously, the majority of military firearms through World War II were bolt action. The exception to this rule was the United States entering the war with the semi-automatic M1 Garand rifle in .30-06 caliber as standard issue. The Garand had a fixed internal magazine with an 8-round capacity. Some soldiers also carried the select-fire Browning Automatic Rifle (BAR), which used 20-round detachable magazines, and the U.S. military also developed the semi-automatic M1 carbine that entered service in 1942 for paratroopers, tankers, and support troops with 15-round detachable magazines.

27.    Modern shotguns, as stated previously in regard to rifles, are generally classified and characterized by their operating system (i.e., the manner in which they function, are loaded, and are reloaded). Additionally, in the case of shotguns with multiple barrels, they are defined by the placement or orientation of their barrels.

28.    **Single-shot shotguns**. Single-shot shotguns function similarly to the single-shot rifle. They may have a hinged receiver which allows the operator to open the action to facilitate loading and unloading of the firearm. There are also single-shot models that are loaded and unloaded through a bolt-action mechanism and have no additional magazine capacity.

29.    **Bolt-action shotguns**. Bolt-action shotguns are manufactured with internal, tubular, or detachable magazines to facilitate easier and faster reloading. They function in the same way as a bolt-action rifle and require manual manipulation of the bolt by the operator to unload and reload.

30.     **Lever-action shotguns**. Lever-action shotguns again function in the same fashion as similarly designed rifles. Manual manipulation of the lever is required for successive shots.

31.     **Pump-action shotguns**. Pump-action shotguns have the same general operating system as similarly designed rifles. The forearm piece of the shotgun must be worked forward and back by the operator to unlock the bolt, extract and eject the expended shotgun shell, reload, and relock the bolt for firing.

32.     **Semi-automatic shotguns**. Semi-automatic shotguns, as with their rifle-caliber counterparts, utilize energy (either recoil or gas pressure) generated by firing ammunition to "power" the operating system of the firearm. These are manufactured with a number of different magazines, both internal and fixed, as well as external and detachable. They are capable of firing a single shot with each pull of the trigger until the supply of ammunition in the magazine is exhausted.

33.     **Break-open, double-barreled, and "tip-up" shotguns**.  Break-open, double-barreled, and "tip up" shotguns have a hinged receiver which facilitates access to the rear of the chamber for unloading and reloading. They are manufactured in single-shot and double-barreled variations. Double-barreled variations are further delineated by the placement of their barrels. Side-by-side shotguns have two barrels positioned next to one another in a horizontal arrangement. Over-under shotguns have two barrels superimposed upon one another in a vertical plane. The mechanisms in each of these allow staggered firing of each of the two barrels with a separate pull of the trigger. When the hinged action is opened, the expended shotgun shell hulls can be manually extracted, although more complex designs with auto ejectors perform that function when "opened" without action by the operator.

   **B.  General Firearms Definitions**

34.     In discussing modern firearms, it is important to understand how they are defined under statute, how they function, and the differences between types commonly found and available to the public.

35.     Additional terms often used when discussing modern firearms are semi-automatic, full-automatic, select-fire, rifling, caliber, gauge, and magazine.  I define these terms as follows:

36.     **Semi-automatic**. Semi-automatic fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot.

37.     **Full-automatic**. Full-automatic refers to a firearm that will continuously fire successive shots when the trigger is pulled, and will only stop when the trigger is released or the supply of ammunition is exhausted. Fully automatic weapons are commonly known as machine guns.

38.     **Select-fire**. A select-fire firearm is capable of switching between and functioning in either full- or semi-automatic firing mode.

39.     **Rifling**. Rifling refers to a series of grooves cut or impressed inside the barrel in a spiral pattern. The "high" portions of these patterns are called "lands." The "lower" portion of this pattern are called "grooves." When a projectile (or bullet) is fired in a "rifled" firearm, it comes into contact with the lands as it leaves the chamber and begins to travel down the barrel. Because the lands are oriented in a spiral pattern, the rifling imparts spin on the projectile, which improves stability and accuracy.

40.     **Caliber**. Caliber is a dimensional measurement of the inside (or bore) of a rifled barrel. In the United States, caliber is traditionally expressed in fractions of an inch. For example, a .22-caliber firearm is designed to chamber and fire a projectile which measures 0.22 inches (or slightly less than

a quarter of an inch). A .50-caliber firearm chambers and fires a projectile which is approximately a half-inch in diameter.[1]

41.     It is important to note for the purposes of this report that the caliber designation of any given ammunition cartridge usually refers only to the diameter of the projectile (bullet) and not the relative "power" of the cartridge itself (in terms of muzzle energy, effective range, and muzzle velocity). For example, there is an important distinction between cartridges commonly referred to as .22 caliber and cartridges commonly referred to as .223 caliber.

42.     .22-caliber ammunition is a popular and relatively low-power cartridge developed in the 1880s. It is also known as ".22 rimfire," as the primer mixture in the cartridge is seated in the rim of the cartridge and not contained in a separate primer cup in the cartridge base. It is commonly used for target shooting as well as hunting small game and can be fired from both handguns and rifles chambered in that caliber. The bullets for .22-caliber cartridges typically weigh between 30 to 60 grains (0.08 to 0.13 ounces). Their muzzle velocities are usually in the 1,100 to 1,300 feet per second (fps) range.

43.     .223-caliber ammunition, by comparison, is a high-velocity cartridge developed in the 1950s in part for use in the original AR-15 and M-16 rifles. It is a "centerfire cartridge," meaning the primer is contained in a separate cup in the center of the cartridge base. Although the diameter of the bullet is only slightly greater (approximately the width of a human hair) than the .22-caliber cartridge mentioned previously, it is a vastly more powerful cartridge in terms of muzzle velocity and range. This ammunition is also somewhat interchangeable with 5.56mm NATO ammunition (AKA:

---

[1] In Europe, and. most other countries that utilize the metric system, "caliber" has historically been expressed in millimeters (mm). Therefore, a 9mm firearm is designed to chamber and fire a projectile with a diameter of 9mm. European caliber designations may also include the measurement of the length of the cartridge case (9x19mm, 7.62x39mm, etc.). A number of widely manufactured firearm calibers have two separate caliber designations, one in inch measurements and one in metric, which are equivalent and interchangeable. For example, .380 ACP caliber ammunition in the U.S. is referred to as 9x17mm (or 9mm Kurz – short) caliber in Europe.

5.56x45mm). Here is a side-by-side comparison of a 5.56mm-caliber cartridge (left) and a .22LR-caliber cartridge (right) with a quarter for size reference:



44.     The bullets used in .223/5.56mm ammunition are heavier than .22-caliber rimfire projectiles, typically weighing between 50 to 62 grains (0.11 to 0.14 ounces). Common muzzle velocities are approximately 3,200 to 3,500 fps—about three times as fast as .22 caliber projectiles. A heavier bullet and increased velocity equate to more of the cartridge's energy being transferred to the target. A writer for *American Rifleman*, a National Rifle Association (NRA) magazine, tested the U.S. Army's 5.56mm .223-caliber M885Al cartridges in 2014, and the results are published here: https://www.americanrifleman.org/content/testing-the-army-s-m855a1-standard-ball-cartridge/. (link checked 04/08/2024).

45. **Gauge**. Gauge is a dimensional measurement which is traditionally used to denote the bore of a non-rifled or "smoothbore" firearm (i.e., a shotgun). Shotguns were initially designed to fire a mass of round shot as opposed to one solid projectile, and therefore a caliber designation is not readily applicable. Gauge refers to the number of lead spheres that will fit inside the bore and equal one pound. For example, in a 12-gauge shotgun, you can fit 12 spheres of lead, which are approximately 18.52mm or 0.73 inches in diameter, the total weight of which will equal one pound. If the diameter of the spheres is increased, less of them are required to equal one pound. Therefore, the smaller the "gauge," the larger the bore diameter. The exception to this measurement system is .410-gauge ammunition for shotguns and handguns, which is actually a caliber designation.

46. **Magazine**. A magazine holds the ammunition for a firearm before it is chambered and fired. The earliest magazines were "fixed," or integral, to the firearm, such as the tubular magazines located underneath the barrels of lever-action rifles and, later, pump-action shotguns. Toward the very end of the 19th century, inventors developed firearms that utilized detachable magazines, which facilitate faster reloading.

### C. General Firearms Operation

47. Modern firearms operate utilizing the expanding gases generated by the rapidly burning gunpowder contained in modern ammunition. Gunpowder (or smokeless powder) is the propellant contained within metallic cartridges or shotshells utilized by modern firearms. A single cartridge or shotshell is also referred to as a "round" of ammunition. Once a cartridge or shotshell is chambered or loaded in a modern firearm, and the trigger is pulled, the primer at the base of the cartridge or shotshell is struck by a firing mechanism. The primer contains a pressure-sensitive explosive compound which ignites when struck. The ignition of the primer, in turn, ignites the main powder charge contained in the case of the cartridge or shotshell. The main powder charge ignites and burns rapidly in what is essentially a contained explosion.

48.     This contained explosion generates gases at enormous pressures. The generated gases push the projectile out of the mouth of the cartridge, down the barrel of the firearm, and out of the firearm through the muzzle.

49.     More simply defined, a firearm is a weapon that utilizes the gas pressure generated by combusting gunpowder in a modern ammunition cartridge to propel a projectile through the barrel and out of the firearm through the muzzle.

50.     All modern breech-loading firearms,[2] no matter the type, operate according to a nine-step process known as the "cycle of fire."[3] These steps are:

1) **Feeding**: Feeding refers to the process for insertion of cartridges into the chamber; the breech bolt pushes the cartridge into final position. Typically, the incoming round slides across the bolt or breech face during this caroming action. The feeding function can be manual or performed by various kinds of magazines and clips. For example, machine guns use belts of cartridges.

2) **Chambering**: Chambering is the insertion of the cartridge into the chamber. If a cartridge of the incorrect length or diameter is used or if there is foreign matter in the chamber, chambering may be obstructed, causing a malfunction. Excess oil or grease in the chamber may cause overpressure, resulting in a ruptured cartridge case and potentially serious accidents.

---

[2] A breech-loading firearm is one in which the cartridge is loaded and fired from the breech (rear) end of the barrel as opposed to a muzzle-loading firearm, wherein the propellant/powder and bullet are loaded from the muzzle (front) end.

[3] This nine-step process is outlined in the training program for apprentice forensic firearm and toolmark examiners, a program developed by the Association of Firearm and Toolmark Examiners (AFTE) in conjunction with the U.S. Department of Justice (DOJ) and the National Institute of Justice (NIJ). *Cycle-of-Fire Steps*, Firearm Examiner Training (2008), https://projects.nfstc.org/firearms/module08/fir_m08_t04.htm. An animated illustration of these steps as they occur in the AR-15 and M-16 is viewable here: https://www.youtube.com/watch?v=omv85cLfmxU&t=261s.

3) **Locking**: The breech bolt mechanism locks the cartridge into position in the barrel before firing. Most quality firearms are equipped with an interrupter mechanism that disconnects the trigger from the firing pin, thus making it impossible to fire until the mechanism is safely locked. This critical relationship is referred to as timing. (Blowback mechanisms involve a spring-held bolt; the mechanism is not technically locked, but is held together by spring tension and bolt inertia.)

4) **Firing**: When the breech is fully locked, a pull on the trigger mechanically translates to the firing pin release. In the cocked position, the firing pin has a hammer behind it with a spring forcing it towards the primer, restrained only by a sear that is engaged by the trigger. A pull on the trigger trips the sear from the engaging notch in the hammer. The hammer, actuated by a cocked spring, drives the firing pin sharply against the percussion sensitive primer, which fires the cartridge.

5) **Obturation**: Obturation occurs when powder gases under high pressure (e.g., two and one-half tons per square inch in the .30-06 Springfield cartridge) are sealed to prevent them from jetting between primer cup and cartridge case, cartridge case and primer wall, and projectile and bore. Cartridge cases must be sufficiently flexible to expand against the chamber wall and transmit the instantaneous powder pressure to the barrel metal that surrounds the chamber. When the chamber pressure has returned to zero, the cartridge case must also be flexible enough to release itself from the chamber wall (even though it is now pressure form-fitted to the chamber). Likewise, the primer cup has been pressure-held against the side of the cartridge case and depends upon the face of the breechblock for locked support during the interval of high chamber pressure. Obturation also occurs with the projectile; bullets are made sufficiently larger than the bore diameter to extrude into the rifling grooves and seal the gases. The sharp hammer

action of the instantaneous high pressure and temperature may upset the projectile base, which enhances sealing. Shotgun wads perform the sealing function in smoothbore weapons.

6) **Unlocking**: This is the reverse of the locking process and is frequently performed in conjunction with extraction.

7) **Extraction:** Although cartridge cases do not commonly exceed their elastic limit during firing, they have a tendency to stick to the chamber after firing. After firing, cartridge cases are larger in diameter than before firing. All cartridge cases are designed with a rim or groove (cannelure) at the base so that an extractor claw can grasp this edge in order to achieve extraction.

8) **Ejection**: In the final stages of extraction, the cartridge case encounters a projection that is usually at right angles to the exit portal of the breech. Rotating on the fulcrum of the extractor, the case base is contacted on the opposite side by the ejector, which flips the case out of the actuating mechanism.

9) **Cocking**: The hammer spring is usually cocked when the bolt of a rifle, pistol, or repeater shotgun is retracted. An exception to this is the M1917 Enfield rifle, which cocks upon forward motion of the bolt. Exposed hammers may be cocked by manual retraction, using the thumb. The Walther series of pistols provides for manual cocking or trigger pull cocking (double action), as do most open hammer revolvers.

II.    **Recent Development and Evolution of Firearms with Features Designed for Military Purposes**

51.    In recent years, there has been an increase in the popularity and availability of semi-automatic rifles, pistols, and shotguns with features initially designed (or patterned after those

designed) for a military purpose. It is important to discuss the history of the development and evolution of firearms with these features.

### A. Assault Rifle Development and Evolution

52.     The first "assault rifle" or "assault weapon" was the German StG 44 (*Sturmgewehr* Model 1944), which appeared in production form late in World War II. Earlier pre-production variants included the MP 42 and MP 43 (*Maschinenpistole* 1942 and 1943 respectively). The Germans termed the rifle "*Sturmgewehr*" (literally "storm rifle"), and a number of the features included utilization of a portion of the gas generated by the burning cartridge propellant to operate the rifle, extensive use of steel stampings in its construction, a detachable magazine, a separate pistol-style grip (not integrated with the shoulder stock), a bayonet mounting lug, and a threaded barrel to facilitate the attachment of a grenade launcher. It fired a cartridge that was smaller dimensionally and less "powerful" (in terms of muzzle velocity and foot-pounds of energy) than the standard 8mm Mauser cartridge in use by the German Army in their issued bolt-action Mauser rifles.



`                                                                                     [4]

---

[4] StG 44 Image source: Peter Suciu, "Sturmgewehr, the First Assault Rifle," Recoil: The Ultimate Firearms Destination for the Gun Lifestyle, June 19, 2016, available at https://www.recoilweb.com/sturmgewehr-the-first-assault-rifle-100907.html.

53.     It is important to note that the features designed into the German StG 44 were intended to increase the effectiveness of the individual soldier in combat:

54.     **Gas-powered select-fire**. Gas-powered semi-automatic fire enabled more rapid fire than was possible using standard-issue bolt-action rifles in both semi-automatic and full-automatic modes.

55.     **Steel stampings**. Steel stampings made for a lighter weapon, increasing the amount of ammunition an individual combatant could carry and/or increasing mobility. Additionally, steel stampings were easier and less expensive to manufacture.

56.     **Detachable magazine**. Detachable magazines allow more rapid reloading than previous standard-issue bolt-action firearms.

57.     **Separate pistol-style grip**. A separate pistol-style grip enhanced the ability of combat soldiers to quickly maneuver their firearms into firing position and retain stability for more precise aim while firing rapidly.

58.     **Barrel shroud**. A barrel shroud encircles and protects the barrel while providing an auxiliary grip surface for the soldier's nondominant hand and preventing it from being burned.

59.     **Bayonet mounting lug**. This feature allowed soldiers to mount bayonets on their rifles, providing them with an additional weapon for use in close combat.

60.     **Threaded barrel**. A threaded barrel allowed for the attachment of grenade launcher (on this particular rifle), providing combat soldiers with an additional weapon, albeit for use at a greater distance.

61.     It is widely accepted that in the design of military small arms, "form follows function," and each of these innovations primarily served to increase the firepower and lethality of an individual combatant. Essentially if they didn't aid in achieving those ends more effectively and / or efficiently they would not be present on the firearm.

62.     Following the end of World War II, captured StG 44s were analyzed by the Allies, and although there was reluctance to move to a smaller-caliber cartridge, a number of the features of the StG 44 found favor in the design of successive European, American, and Eastern Bloc military rifles. Noted firearm expert and historian Jim Supica wrote in his foreword to the book *Guns*:

> Most military establishments hesitated to "downsize" the range and power of their primary rifles in the early Cold War years. The semi-auto detachable magazine concept was an obvious success and there was something to be said for full auto capability.[5]

He further writes:

> However the assault rifle concept wouldn't go away. The Soviet Union accepted the lower power round idea in its fixed magazine semi-auto chambered for an intermediate power 7.62 x 39 mm round in 1945, the SKS, which saw wide distribution and production in Soviet client states.[6]

63.     Two years later in 1947, the USSR followed the SKS with what Supica terms "the quintessential assault rifle—the Kalashnikov designed AK-47."[7]

64.     The design of the AK-47 carried forward a number of the features introduced on the German StG 44. These features include a gas-powered operating system, use of steel stampings in its construction, a separate pistol grip, separate shoulder stock, a detachable magazine, a bayonet lug, and provision for attachment of a grenade launcher. Due to the separate stock and pistol grip, the AK, much like the StG 44, also utilized a barrel shroud, or handguard, on the forward third of the rifle. Some variations of the early AK-47s (AKMs) also featured a "compensator" at the muzzle that deflected gas upward and to the right to compensate for the rifle's tendency to kick up and to the right with every shot.

---

[5] Supica, *Guns* (TAJ Books 2006). PP. 26-28.
[6] *Id.*
[7] *Id.*

65.     In the 1950s, many countries sought to replace World War I and World War II vintage bolt-action and semi-automatic rifles with these newer and more effective designs. With the birth of the North Atlantic Treaty Organization (NATO), however, utilization of Soviet Bloc AK or SKS assault rifles was not possible. Accordingly, a number of firearms manufacturers outside the Soviet sphere of influence developed military rifles that carried forward these same features to one extent or another. *Fabrique Nationale* (FN) of Herstal, Belgium, and Heckler & Koch (HK) of Oberndorf, Germany are two noteworthy examples.

66.     FN developed the FAL (*Fusil Automatique Leger*) and HK the G3, which found a ready market among nations that did not favor the Soviet AK-type designs. Both incorporated features that, like the AK, were derived directly from the StG 44. Their designs featured some parts made from metal stampings as opposed to heavier and more expensive machined-steel pieces. Their separate pistol grips and shoulder stocks, detachable magazines, and barrel shrouds followed the basic design of the StG 44. Flash suppressors and muzzle brakes have appeared in production variations of both rifles. These rifles were destined from inception to become widely exported as the domestic market in both countries was relatively limited. The FAL and G3 have been in production since the 1950s, and both FN and HK have licensed production to numerous countries in South America, Africa, and the Middle East.

67.     In the United States, progress in this arena moved at a significantly slower pace.

68.     The prevailing wisdom in the United States was to stay away from lighter, smaller rifle calibers and cartridges, as the .30-06 cartridge used in the M1 Garand rifle during World War II had proven to be very effective. The U.S.'s initial answer to the burgeoning move towards assault rifles was a variation of the basic M1 Garand operating system, the T44, or M-14. Outwardly, the M-14 retained a full-length wood stock similar to the Garand; however, the M-14 featured a detachable magazine, select-fire (both semi-automatic and full-automatic) capability, and a flash suppressor. It

competed directly against the FN FAL (designated the T88) in U.S. Army trials and was selected in 1957. The prevailing attitude could be summarized in the adage "if it ain't broke…don't fix it."

69.   However following the Korean conflict, during which individual U.S. soldiers and Marines were equipped with WWII era semi-automatic M-1 Garand rifles and semi-automatic .30 caliber M-1 Carbines (as well as select fire M2 Carbines and Thompson submachine guns), there were a number of military officials who supported a move to a smaller caliber cartridge and a lighter rifle with which to fight future wars.

70.   In the mid 1950's, Eugene Stoner, chief Engineer of the American company ArmaLite Corporation, developed a number of lightweight assault rifle designs which resulted in the AR-10 in .308 caliber. This was chiefly marketed to numerous countries outside the US however these efforts met with little commercial success. Its design closely followed what was now becoming standard assault rifle design, i.e., light weight (aluminum forged receivers as opposed to machined steel), separate pistol grip and shoulder stock, foregrip / barrel shroud, detachable magazine, and numerous flash hider / muzzle brake variations.

71.   ArmaLite continued to refine the basic design of the AR-10, as a result of a 1957 verbal request from U.S. Army General Willard Wyman, which resulted in the AR-15.[8] The AR-15 was (eventually) designed and produced to chamber and fire the 5.56 x 45mm cartridge (somewhat interchangeable with .223 Remington caliber).

72.   Gen. Wyman essentially wanted to replace the .30 caliber WWII M-1 Garand, and newly adopted .308 caliber M-14 with the smaller caliber, and lighter, AR-15.  For comparison purposes it should be noted that the WWII M-1 Garand rifle and newer M-14 had a muzzle velocity of approximately 2800 FPS. Both the M-1 and M-14 have an effective range of approximately 500

---

[8]  Stevens, R. Blake & Ezell, Edward C., "The Black Rifle", 2004 Collector Grade Publications, Coburg, Ontario, Canada, pp. 55-58.

yards. As initially designed and produced the AR-15 fired a 5.56mm (approximately .223 caliber) bullet at approximately 3200 FPS with an approximate effective range of 600 yards.        The U.S. Army's "Report of M-16 Rifle Review Panel" reported the overall genesis, history and introduction of the AR-15 (subsequently redesignated M-16) into the standard issue rifle for the U.S. Army. The report references numerous tests and evaluations which prompted the shift to the design, production and introduction of a lightweight rifle firing a smaller caliber high velocity bullet.[9]

73.    Armalite delivered a number of prototype AR-15 rifles to the U.S. Army for testing in 1958 and it fared well against the recently adopted M-14.

74.    In 1961, the Department of Defense purchased a quantity of AR-15 rifles from Colt for evaluation. A number of these were subsequently shipped to U.S. Army advisors in Vietnam to test their suitability for issue to South Vietnamese Army forces. Following the field evaluation, the Department of Defense Advanced Research Projects Agency (ARPA, later DARPA) prepared a report (AD-343778, dated August 20, 1962) summarizing the results. Amongst the data compiled via surveys of the U.S. Army advisors are a number of comments regarding actual field use of the weapon and cartridge. These comments describe various catastrophic injuries to Viet Cong (VC) combatants who were shot by AR-15s.[10]

---

[9] Report of the M-16 Rifle Review Panel, History of the M-16 Weapon System, available here: https://apps.dtic.mil/sti/pdfs/ADA953110.pdf. (checked 03/22/2024).
[10] Advanced Research Projects Agency, Office of the Secretary of Defense, Field Test Report, AR-15 Armalite Rifle, at 24 (July 31, 1962), available at https://apps.dtic.mil/sti/pdfs/AD0343778.pdf.

9.  (C) Remarks.  Unit Commanders' and Advisors' remarks concerning the value of the AR-15 to Vietnamese Units and its worth as a combat weapon in the war in South Vietnam as opposed to existing weapons were also requested. Generally, the comments were extremely favorable to the AR-15.  All of the comments received are presented below in their entirety and in the form in which they were received.

(1) (C) "On 160900 June 62, one platoon from the 340 Ranger Company was on an operation vic. YT260750 and contacted 3 armed VC in heavily forested jungle.  Two VC had carbines, grenades, mines, and one had a

4

ANNEX "A"

CONFIDENTIAL

CONFIDENTIAL

SMG.  At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic hitting one VC with 3 rounds with the first burst.  One round in the head-took it completely off.  Another in the right arm, took it completely off, too.  One round hit him in the right side, causing a hole about five inches in diameter.  It cannot be determined which round killed the VC but it can be assumed that any one of the three would have caused death.  The other 2 VC ran, leaving the dead VC with 1 carbine, 1 grenade and 2 mines. " (Rangers)

(2. ) (C) "On 9 June a Ranger Platoon from the 40th Inf Regt was given the mission of ambushing an estimated VC Company.  The details are as follows:

      a.  Number of VC killed:  5
      b.  Number of AR-15's employed:  5
      c.  Range of engagement:  30-100 meters
      d.  Type wounds:
            1.  Back wound, which caused the thoracic cavity to explode.
            2.  Stomach wound, which caused the abdominal cavity to explode.
            3.  Buttock wound, which destroyed all tissue of both buttocks.
            4.  Chest wound from right to left, destroyed the thoracic cavity.
            5.  Heel wound, the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip.

These deaths were inflicted by the AR-15 and all were instantaneous except the buttock wound.  He lived approximately five minutes.

75.     This rifle was adopted as standard issue by the U.S. Army in the mid 1960s. The production of the rifle had been licensed to Colt, and initially the model designation was, as produced, AR-15.



Later, after a series of minor engineering changes, the standard U.S. military designation was changed to M-16. When first deployed as a standard-issue rifle for U.S. military forces, the AR-15/M16 platform was maligned as unreliable and prone to jamming. This was due, in part, to inadequate maintenance by the operators themselves. Once the problems were addressed and rectified, the rifle proved to be as reliable and accurate as the AK-type rifles deployed by the North Vietnamese and Viet Cong.

**B: Sales to the Civilian Market**

76.     Arguably, the AR type rifle is in second place behind AK type firearms in terms of production, sale and use by military forces worldwide. Colt sought to capitalize on the military acceptance of the AR-15 / M16 and soon proposed production of a 'civilianized' model for sale to

---

[11] Colt AR-15 Image Source: Stevens, R. Blake & Ezell, Edward C., *The Black Rifle,* (Collector Grade Publications Inc., 2004). P.95.

the public. Colt submitted a sample to the Treasury Department on October 23, 1963 for approval. The sole difference between the military and civilian versions was removal of fully automatic capability. This modification was achieved through nine changes to the fire control system. These modifications did not change the general overall appearance or semiautomatic rate of fire of the rifle:

"1. Removal of the automatic sear.

2. Elimination of the automatic sear hole in the lower receiver.

3. Elimination of the automatic sear well in the lower receiver.

4. Removal of the automatic sear hook on the hammer.

5. Removal of the automatic sear trip notch from the bottom rear portion of the bolt carrier.

6. Modification of the selector to eliminate the automatic setting.

7. Elimination of the "AUTO" position identification marking on the lower receiver.

8. Mechanical restriction of selector lever movement to two positions only: SAFE and FIRE.

9. Enlargement of the front pivot pin holes in both the upper and lower receivers, and use of a larger-diameter front pivot pin."[12]

77.     The U.S. Treasury Department approved Colt's semiautomatic version of the rifle, called the Model R6000 Colt AR-15 SP-1, in December 1963.

78.     All of the other features on these rifles that enhanced their capability as military firearms remained. For example, the civilian versions retained the performance capacities of the military rifle it was based on, including the effective range, muzzle velocity and semiautomatic rate of fire. military use. The R6000 Colt AR-15 SP-1 "Sporter" even

---

[12] Bartocci, Christopher R., "The Black Rifle II", 2004 Collector Grade Publications, Coburg, Ontario, Canada. PP 233-235.

included the bayonet lug and flash hider.

79.    Popular Science magazine reported in 1965:

"Out of the jungles of Vietnam comes a powerful, battle-proven rifle …. The sport

version is an exact duplicate of the military weapon except for one alteration."[13]

80.    As the AR-15 / M-16 gained a reputation for reliability in military use, its popularity

in terms of sales to the civilian market gradually increased. Colt, in its advertising, specifically

mentioned the link between the 'civilianized' semi-automatic variant and the military M16 in their

1964 catalog:



---

[13] Popular Science, February 1965, P. 171
[14] 1964 Colt Catalog, https://thecoltar15resource.com/1964-catalog/

81.     Other than the elimination of the select fire capability the firearms remained identical. The additional features on these rifles intended to enhance their capability as military firearms remained. They remain largely identical today, in jurisdictions that do not regulate features, having all or most of the features they possessed when originally designed, manufactured and issued for use in combat.

82.     This animation thoroughly details the key operational components of the M16 / AR-15 in both full-automatic, semi-automatic and burst modes: https://www.youtube.com/watch?v=omv85cLfmxU

83.     In the ensuing 50-plus years, both the military and civilian versions of the M-16/AR-15 platform have undergone numerous modifications both cosmetic and mechanical. However, the basic configuration, appearance, construction, and operation of the internal gas-operating system (as designed) has remained unchanged since its initial inception and acceptance as a military weapon.

84.     The expiration of Colt's patents in the late 1970s naturally spawned competition in the marketplace. Throughout the design's lifespan, many of the internal fire-control components have remained unchanged and their specifications standardized industry wide. There are multiple internal parts that are completely interchangeable between military M16s manufactured in the 1960s by Colt and an AR-15 type rifle produced today by any one of hundreds of U.S. manufacturers who produce either receivers or internal operating parts. For example, a bolt carrier manufactured in 1967 by Colt will fit, and function as designed, in an AR copy manufactured today. Additionally, the overall configuration of "copycat" AR rifles remains virtually identical to the original production design of the early 1960s. The overall design configuration (two-piece hinged receiver, shoulder stock in line with the chamber and barrel, placement of the magazine, external switches, and other features) are identical or nearly so.

85.    As stated previously, due to their modular construction, AR-type rifles are easily customized to suit the owner's personal preference. This also applies to pistols which are based on AR- and AK- type rifle receivers. The rifle receiver itself is a hinged two-piece unit and the "upper receiver" and "lower receiver" can be swapped out for other similar pieces with relative ease. The design also facilitates replacement of internal fire control components and assemblies. The following video illustrates this: https://www.youtube.com/watch?v=F00FEJZbrb0.

86.    It is important to note the respective characteristics of the 5.56mm/.223 caliber cartridge that influenced the U.S. military's decision to switch over from the 7.62 x 51mm/.308 caliber round used in the preceding model M-14 rifles. Dimensionally, the 7.62 x 51mm cartridge is 71mm (2.8 inches) long overall and weighs approximately 0.9 ounces. The 5.56mm cartridge is 57mm (2.24 inches) long overall and weighs approximately 0.4 ounces.



Five pounds (80 oz.) of 7.62 ammunition would consist of 89 cartridges. Five pounds of 5.56 would consist of 200 cartridges. The lighter weight and smaller dimensions of a 5.56/.223 caliber cartridge

---

[15].223 and .308 caliber ammunition Image Source: https://www.intherabbithole.com/e176/

would allow more ammunition to be carried by an individual combatant for an equivalent weight. The shorter overall dimensions of the 5.56 also commensurately allowed for smaller detachable magazines and/or larger capacity magazines for the same size. A 20-round magazine for a 5.56mm AR-15 rifle is smaller than a 20-round magazine for a 7.62mm M-14 rifle.

87.     Performance in terms of muzzle velocity was also a consideration. The 7.62x51mm (.308) cartridge has a muzzle velocity of approximately 3,200 fps. The 5.56mm cartridge has approximately the same velocity (for reference, a 9mm pistol cartridge has a muzzle velocity of approximately 1,100 fps). 5.56mm bullets, upon contacting tissue, will "yaw" (begin to rotate on its axis), which contributes to the creation of both temporary and permanent large wound cavities. In contrast, because  handgun-caliber bullets are heavier and travel at lower velocities, they do not typically yaw upon contact with tissue and do not create as large of a wound cavity nor commensurate destruction of tissue. The yaw movement of  .223/5.56mm bullet can also cause it to fragment upon striking bone, which contributes to additional tissue damage not immediately adjacent to the cavity itself.

88.     Noted wound ballistics expert Vincent DiMaio, in *Gunshot Wounds*, writes:

> As the bullet enters, the body, there is "tail splash" or backward hurling of injured tissue. This material may be ejected from the entrance. The bullet passes through the target, creating a large temporary cavity whose maximum diameter is up to 11-12.5 times the diameter of the projectile. The maximum diameter of the cavity occurs at the point at which the maximum rate of loss of kinetic energy occurs. This occurs at the point where the bullet is at maximum yaw, i.e., turned sideways (at a 90[-degree] angle to the path) and/or when it fragments. If fragmentation does not occur and the path is long enough, the yawing continues until the bullet rotates 180[ degrees] and ends up in a base-forward position. The bullet will continue traveling base first with little or no yaw as this position puts the center of mass forward.
>
> The temporary cavity will undulate for 5-10 msec before coming to rest as a permanent track. Positive and negative pressures alternate in the wound track, with resultant sucking of foreign material and bacteria into the track from both entrance and exit. In high-velocity centerfire

rifle wounds, the expanding walls of the temporary cavity are capable of doing severe damage. There is compression, stretching and shearing of the displaced tissue. Injuries to blood vessels, nerves, or organs not struck by the bullet, and a distance from the path, can occur as can fractures of bones, though, in the case of fractures, this is relatively rare. In the author's experience, fractures usually occur when the bullet perforates an intercostal space fracturing ribs above and below the bullet path.[16]

89.     DiMaio further states:

Projectile fragmentation can amplify the effects of the temporary cavity increasing the severity of a wound. This is the reason for the effectiveness of the 5.56 x 45-mm cartridge and the M-16 rifle. For the M-193 55-gr. bullet, on the average, the yaw becomes significant at 12 cm with marked issue disruption occurring most commonly at 15-25 cm due principally to bullet fragmentation.[17]

90.     This video graphically illustrates the temporary wound cavity as described by DiMaio:

https://www.youtube.com/watch?v=8HM96wpPVoQ.

91.     Because of the propensity of the 5.56/.223 caliber round to create significant damage upon impacting living tissue, it is not generally considered to be nor favored as a hunting cartridge.

**B.  Evolution and Development of Pistol-Caliber Firearms**

92.     It is also important in terms of this particular case to address the evolution and development of firearms that chamber and fire pistol-caliber ammunition, including those firearms known as submachine guns. Submachine guns are defined as machine guns that fire "sub caliber" (i.e., pistol-caliber) ammunition. A number of the pistols that are prohibited under the Law are direct evolutionary descendants of submachine guns initially designed and produced for military use.

93.     Many of the construction and design features attributed to assault weapons, and the StG 44, were first utilized in the design and manufacture of mid-20th-century submachine guns. Nazi Germany entered World War II with the innovative *Maschinenpistole* 38 (MP38). It was chambered in

---

[16] DiMaio, *Gunshot Wounds*, 2d (CRC Press LLC, 1999). P. 54-55
[17] *Id.,* P. 56

9mm and later, after a number of engineering changes, re-designated as the MP40.  It has design features commonly found in later assault weapons, including an adjustable stock, a separate pistol grip, a detachable magazine, and the use of steel stampings in its construction. The MP40 is pictured here:



[ 18 ]

94.     While the United States initially entered World War II with a military variant of the Thompson .45-caliber submachine gun, it was heavy and expensive to manufacture because a number of the major components were machined from solid steel. Before the end of the war, the Thompson had been supplemented by the M3 "Grease Gun" initially produced by General Motors. The receiver was a stamped and welded sheet-metal assembly with an adjustable, sliding shoulder stock. Like the MP38 and MP40, it had a separate pistol grip, a sliding/adjustable shoulder stock, and a detachable box magazine with a 30-round capacity. In a utilitarian sense, it was as effective as the Thompson and, at approximately $20, it was less than half as expensive.

95.     The United Kingdom produced over one million Sten submachine guns during World War II. A rugged and reliable firearm made largely from welded steel stampings, it is known for its utility, reliability, and ease of manufacture. Features shared with the American M3 and German MP38/MP40 include an adjustable shoulder stock, a detachable magazine, and, on some variations, a

---

[18] MP40 Image Source: https://www.rockislandauction.com/detail/84/613/german-erma-mp40-submachine-gun

barrel shroud allowing the operator to utilize the area surrounding the barrel as an auxiliary grip without touching a heated barrel.

96.     Prior to and during World War II, a number of other nations developed submachine guns which followed the same design and construction philosophy. Notable examples include the Soviet PPSh-41, the Italian Beretta Model 38/42, and the Swedish Carl Gustav Model 45.

97.     Following World War II, most new submachine gun designs continued the design philosophy which combined utility, ease of manufacture, and the features of wartime firearms. In the early 1960s, HK introduced the MP5 which became an immensely popular choice for military and law enforcement agencies worldwide due to its inherent reliability and accuracy. The MP5 was produced in multiple iterations to include a semi-automatic civilian version as well as a pistol variant without a provision for a shoulder stock (HK SP89). The SP89 is pictured here:



[ 19]

98.     Israeli Military Industries also successfully marketed their Uzi submachine gun for export in select-fire and civilian semi-automatic variants. The  Uzi Pro" pistol is shown below:

---

19  SP89 Image Source:   https://www.gunsinternational.com/guns-for-saleonline/pistols/9mm-pistols/excellent-condition-factory-german-hk-sp89-9mm-pistol.cfm?gun_id=101037518.



[ 20]

99.      Additionally, a number of submachine gun designs proved unsuccessful in terms of military and government sales but nonetheless found a ready market when re-engineered as semi-automatic pistols. Notable examples include the Military Armaments Corporation (MAC) MAC-10 (and successive variants) and the Intratec TEC-9, which was initially designed and produced in Sweden as the Interdynamic MP-9 submachine gun. A MAC-10 is pictured here:

---

[20] Image Source: https://blog.cheaperthandirt.com/shot-2013-iwi-uzi-pro-pistol/



A TEC-9 pistol is shown in the following picture:



## C.  Features of Assault Weapons Under the Law

---

[21] Image Source: https://www.armslist.com/posts/11522946/st-louis-missouri-handguns-for-sale--vulcan-mac-10

[22] Image Source: https://www.egunner.com/intratec-tec-dc99mmpara,name,11952922,auction_id,auction_details

100.    Equipment designed, produced, and issued to modern military forces for utilization in the field emphasizes functionality. In terms of small arms designed and produced for military use, form follows function, and features are present to maximize effectiveness. Maximizing effectiveness in terms of military small arms includes the ability to deliver reliable lethality or the ability to incapacitate the chosen target and provide increased survivability for the operator in battle.

101.    Numerous assault weapons available for purchase by the public are, save the lack of select-fire capability, identical copies of military firearms. As such, they retain a number of features originally designed to maximize their effectiveness in battle. Other firearms available to the public that were not initially intended for sale to government or military customers incorporate features mimicking those found on military firearms. There are countless accessories available to add to firearms traditionally considered "sporting firearms" (i.e., those initially designed and manufactured for target shooting or hunting), which brings their functionality more towards the military side of the spectrum and away from the sporting side.

## A.  Prohibited Firearms and Features Under the Law

102.    In paragraphs 21-22, the plaintiffs make a number of claims and comparisons that are misleading. In paragraph 21, contrary to the plaintiffs' claim of political or media contrivance, the term "assault weapon" had already entered common use in the firearms community as early as 1986 when the "Gun Digest Book of Assault Weapons"[23] was first published. Edited by Jack Lewis the front cover states that it contains:

"Test Reports – Firing the latest in full and Semi Autos, centerfires, rimfires and shotguns

---

[23]   Lewis, Jack (editor), "The Gun Digest Book of Assault Weapons", 1986, DBI Books, Northbrook, IL. ISBN 0-910676-96-8.



In the book, which contains "a detailed analysis of Assault Type Weapons," editor Jack Lewis reviewed and test fired the Springfield SAR-48 (among other firearms) which is a semiautomatic reproduction of the Fabrique Nationale (FN) FAL rifle. He found it to be "a weapon of war."[24]

103.  It is also worth noting the two comparative weapons systems cited by the plaintiffs in paragraph 22 of their complaint. The first cited is the M249 Light Machinegun also known as the Squad Automatic Weapon (or SAW) pictured here:



[25]

---

[24] Id. P.89
[25] https://man.fas.org/dod-101/sys/land/m249.htm#:~:text=Each%20squad%20has,three%20automatic%20rifles.

104.   The M249 is a belt or magazine fed light machinegun. It is not a firearm which is issued to each individual combatant as are the M16 or M4 (the current standard issue military select fire variants of the AR-15). According to the link provided by the plaintiffs the M249 weighs approximately 17 pounds empty as compared to the approximate 6.5 pound weight of an empty M4. The M249, although it can utilize a AR-15 / M16 / M4 magazine, is normally fed via a 200 round box of linked ammunition when utilized in a squad machinegun role.

105.   The next comparative weapons system cited by the plaintiffs is the M60A1 / M60A2 20mm "Vulcan" six barreled rotary gun. It is electrically driven, fires 20mm electrically primed ammunition and weighs between 228 and 248lbs empty depending on the model.[26] It has been mounted both internally and externally to U.S. Air Force and U.S. Navy fighter aircraft since the 1950's for utilization in air to air combat. It is not an individually issued weapon as are the M4 and M16 AR type rifles and, at over 200lbs, is not capable of being borne by an individual combatant in



the field.

---

[26] https://www.gd-ots.com/armaments/aircraft-guns-gun-systems/m61a1/
[27] https://www.nationalmuseum.af.mil/Visit/Museum-Exhibits/Fact-Sheets/Display/Article/579640/m61a1-vulcan-cannon/

### i. Prohibited Firearms

106.    The Law does not ban all firearms, all semi-automatic firearms, or even all firearms chambered to fire .223/556mm (AR-platform) or 7.62x39mm (AK-platform) caliber ammunition.

107.    Instead it regulates a number of firearms and features with obvious military (i.e., non-sporting) heritage. The features delineated are direct descendants from those on military firearms. These features are not necessary for civilian self-defense; firearms without these features are permitted under the Law, and these lawful alternatives are widely available to civilian customers and provide effective means for civilian self-defense.

### ii. Prohibited Features

108.    Included in the Law's definitions of "assault weapon" are a number of features that when present, or added to certain firearms, bring those firearms under the statutory definition of assault weapons under the Law. Specifically, a semi-automatic rifle or pistol that has the capacity to accept a detachable magazine (or can be readily modified to do so) or a semi-automatic shotgun is considered an assault weapon if the firearm includes one of the features delineated in the Law.

109.    Each of the following features, whether incorporated into the firearm by the manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing the firearm's effectiveness in a military combat scenario.

110. **Folding or telescoping stock**: Folding and telescoping stocks allow the operator to more easily conceal or maneuver the weapon in a confined space such as a vehicle. They also facilitate easier or more comfortable firing from positions other than the shoulder. However, a firearm does not need an adjustable stock to operate. Folding stocks were added to the M1 carbine in World War II for paratrooper use. More recent variants of the U.S. military's M-16 (M-4 carbine) have incorporated telescoping stocks as a standard feature.

111.    **A pistol grip or thumbhole stock** (A semi-automatic rifle or shotgun that includes a pistol grip (without a shoulder stock) increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in a confined space such as a vehicle. The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator). During the time the Federal Assault Weapons Ban was in effect (1994 to 2004), a number of AK-style firearms (amongst others) were equipped with thumbhole stocks to circumvent the ban's prohibition on pistol grips.

112.    **Flash suppressor** (for semi-automatic rifles and pistols). A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low-light conditions and also helps to conceal the flash from view. This allows the operator to more easily acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash as well as helps conceal the shooter's position.

113.     **Shroud attached to the barrel, or that partially or completely encircles the barrel** (for semi-automatic rifles and pistols). Historically, barrel shrouds were a feature of military rifles produced and adopted at the beginning of the 20th century. The bolt-action U.S. Model 1903 Springfield Rifle (standard issue for U.S. Forces in WWI) incorporated a wooden barrel shroud to protect the shooter's nondominant hand. The M1 Garand rifle utilized by the U.S. military during WWII also incorporated a traditional wooden stock and a wooden handguard that covered two-thirds of the barrel. Barrel shrouds encircle and protect the barrel from damage and provide the operator with an auxiliary grip point without being burned. In a modern gas-operated semi-automatic military rifle, it also serves to protect the gas tube/piston mechanism from inadvertent damage and provides additional space for the operator to grip and control the rifle during rapid repeat firing without risking being burned by a hot barrel.

114.     **Threaded barrel:** A threaded barrel allows for attachment of a suppressor (commonly referred to as a silencer) which allows the operator to better conceal themselves from their target by reducing the report of their firearm. It also allows the attachment of some flash suppressors with the resultant effect mentioned previously.

115.     **A secondary handgrip:**  Foregrips allow increased stability of the firearm by the operator. This allows the operator to better control recoil and muzzle climb, thus increasing their hit probability for successive shots. A protruding foregrip is not a feature found on traditional sporting firearms. It appeared on some versions of AK-based rifles; however, it was not until the advent of the Rail Attachment Systems (RAS) and acceptance by the U.S. military that foregrips for semi-automatic rifles became more widespread. Adding a foregrip to a pistol also renders it "any other weapon" under the National Firearms Act and subjects it to more restrictive controls, including registration in a national database.[28]

---

[28] https://www.atf.gov/firearms/docs/open-letter/all-ffls-may2006-open-letter-adding-vertical-fore-grip-

116. **Bayonet mount:** a bayonet mount provides an attachment point for a bayonet which, on a military rifle, provides an additional weapon for close quarter combat. Bayonet mounts and bayonets are not a feature commonly found on sporting rifles or shotguns.

117. **Grenade launcher:** Rifle launched grenades are not, as with bayonet mounts, a feature found on traditional sporting firearms. A grenade launcher allows a combatant to launch an indirect fire intermediate range weapon which, if deployed in a civilian event, would likely result in mass casualties.

118. **An ability to accept a detachable magazine:** Detachable magazines allow shooters to replace an empty or depleted magazine with a fresh magazine to resume firing quickly.

119. For more than 30 years, these types of prohibited features—useful for offensive military applications in combat settings but not necessary or suited for civilian self-defense—have been the subject of study and regulation.

120. For example, in 1989, an ATF working group formed under the President George H.W. Bush administration evaluated the importability of semi-automatic rifles and completed a report, which is attached as **Exhibit C**.[29] That working group determined that certain civilian rifles were generally semi-automatic versions of select-fire military assault rifles.[30] As the working group explained, select-fire military assault rifles can fire in fully automatic mode (AKA: a machine gun). By contrast, civilian semi-automatic assault weapons cannot fire in fully automatic mode, but they have the same "general characteristics which are common to the modern military assault rifle."[31]

121. These characteristics are associated with features that are designed for offensive military applications. As the working group found, these characteristics and features carried over from

---

handgun/download
[29] *Report and Recommendation on the Importability of Certain Semiautomatic Rifles*, Department of the Treasury Bureau of Alcohol, Tobacco and Firearms (July 6, 1989).
[30] *Id*. at 5-6.
[31] *Id*. at 6.

the military assault rifle to the semi-automatic versions, and distinguished the semi-automatic assault weapons from traditional sporting rifles.[32] The ability to accept a detachable magazine, folding and telescoping stocks, pistol grips, and other identified characteristics were "military configurations."[33] As a result, the ATF working group determined that semi-automatic assault weapons were not "generally recognized as particularly suitable for or readily adaptable to sporting purposes."[34]

122.    In 1994, Congress enacted the federal assault weapons ban, creating criminal penalties for the manufacture, transfer, or possession of assault weapons and large-capacity magazines. In enacting the federal ban, Congress recognized the tragic threat posed by gangs, drug-traffickers, mentally deranged persons, and others armed with assault weapons.[35] Specifically, Congress noted that assault weapons had become the weapon of choice for gangs, and law enforcement faced a "rising level of lethality … from assault weapons on the street."[36]

123.    Congress, when drafting the 1994 Federal Assault Weapons Ban, incorporated the technical work of the 1989 ATF working group.[37] Congress recognized that "semiautomatic assault rifles … represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle."[38] Congress further recognized that these features serve "specific, combat-functional ends" that provide "a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns."[39]

---

[32] *Id.*
[33] *Id.* at 6-7
[34] *Id.* at 12.
[35] H.R. Rep. No. 103-489, Public Safety and Recreational Firearms Use Protection Act (May 2, 1994) (attached as **Exhibit D**) at 12.
[36] *Id.* at 13-14.
[37] *Id.* at 17.
[38] *Id.*
[39] *Id.* at 18–20.

124.    ATF organized two subsequent working groups in 1998 and 2011. The 1998 working group concurred with the conclusions of the 1989 study and added a finding that "the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989."[40] The 2011 working group then considered the importability of certain shotguns, finding that features such as a folding, telescoping, or collapsible stock, magazines holding over 5 rounds, and forward pistol grips were most appropriate for military or law enforcement use and not sporting purposes.[41]

125.    As described above, the prohibited features serve military-style offensive purposes as opposed to traditional sporting or self-defense uses. And the ATF's concerns about the offensive nature of these firearms have certainly been borne out by their subsequent criminal use in mass shootings and assaults on law enforcement in the past decade.

### B. Prohibited Large-Capacity Magazines

126.    Magazine capacity plays a role in defining assault weapons under the Law, and the Law also separately restricts large-capacity magazines themselves, which are generally defined as magazines with the capacity to accept more than ten rounds of ammunition.

127.    Modern semi-automatic rifles that are designed, manufactured, and marketed as "hunting rifles" traditionally have an internal magazine capacity of less than 10 rounds depending on caliber. For example, the Browning BAR in .30-06 caliber as currently manufactured has an internal magazine capacity of four (4) rounds.

128.    The operation (or cycle of fire) of any firearm designed and manufactured to accept a detachable magazine will function regardless of the maximum capacity of the magazine itself. For

---

[40] *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles, Department of the Treasury Bureau of Alcohol, Tobacco and Firearms* (April 1998) (attached as **Exhibit E**) at 2.
[41] *ATF Study on the Importability of Certain Shotguns, U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives* (January 2011) (attached as **Exhibit F**), at iv, 9-13.

example, firearms such as the Glock 17 semi-automatic pistol and AR-15 type semi-automatic rifle will function as designed whether the operator utilizes a magazine limited to 10 rounds or one of greater capacity (In fact, both of those examples will still fire a chambered round if there is no magazine inserted). Generally speaking, any firearm designed to accept a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity of 10 rounds or fewer. This includes the vast majority of handguns and shoulder-fired firearms designed and manufactured to utilize detachable magazines.

129.    Large-capacity detachable magazines were not initially designed or intended for the civilian marketplace. The lineage and refinement of large-capacity detachable magazines and belt-feeding mechanisms can be traced directly to a military heritage. WWI introduced numerous magazine-fed light machine guns to combat, and the trend continued through WWII. As far as the individual infantryman's rifle was concerned in WWII, the standard-issue semi-automatic rifle for the U.S. Army as well as the U.S. Marine Corps was the M1 Garand chambered in .30-06. The M1 has an internal fixed magazine with a capacity of 8 rounds. The magazine was loaded via an 8 round "en bloc" clip which was ejected from the magazine after those 8 rounds were expended. It was not until the mid-1950s, with the adoption of the M14, that a rifle with a detachable magazine was approved as standard issue to front line members of the U.S. military. The M14 was issued with a 20-round magazine.[42]

130.    Although technological advances in military firearms accelerated at a rapid pace following WWII, large-capacity detachable magazines were not commonly marketed for the general public. For example, when the AR-15 (later designated M16) was first purchased and issued to U.S. Forces in the early 1960s, it was intended to be utilized, and was issued, with 20-round detachable

---

[42] Hogg, Ian V. & Weeks, John S., Military Small Arms of the 20th Century, 7th Ed., (Krause Publications, 2000), P. 291

magazines.[43] However, when the first semi first semi-automatic variants of the M16, the Colt AR-15 SP1 Sporter, became available for sale to the public in 1964, it came supplied with two five-round magazines, not the military-issue 20-round magazines.



131. "Initially, Colt simply added a five round limitation spacer to the 20-round magazine which could be installed or removed at will by simply removing the floor plate of the magazine. This was primarily intended for hunters, in compliance with the laws in states which limit magazines in the field to a five-round capacity for hunting. With the introduction of the Colt Sporter series, the configuration of this magazine was altered by the addition of a permanent rivet in the floorplate to

---

[43] Stevens, R. Blake & Ezell, Edward C., The Black Rifle (Collector Grade Publications, 2004), P. 108

prevent the removal of the spacer, thus making this a magazine of dedicated five-round capacity for hunting applications."[44]

| MODEL NO. | MODEL | CALIBER | BBL LENGTH (inches) | FINISH | APPROX. WEIGHT (lbs.) | O/A LENGTH (inches) | SIGHT RADIUS (inches) | ROUNDS MAG. |
|---|---|---|---|---|---|---|---|---|
| R6600DH | AR-15A2 DELTA H-BAR w/scope and acces. | 223 Rem (5.56mm) | 20 | M | 10 | 39 | 19.75 | 5 |
| R6600 | AR-15A2 H-BAR | 223 Rem (5.56mm) | 20 | M | 8.0 | 39 | 19.75 | 5 |
| R6500 | AR-15A2 SPORTER II | 223 Rem (5.56mm) | 20 | M | 7.5 | 39 | 19.75 | 5 |
| R6420 | AR-15A2 CARBINE | 223 Rem (5.56mm) | 16 | M | 5.8 | 35 extended 32 closed | | 14.5 | 5 |

Rifles

© 1986 Colt Industries Inc
Printed in U.S.A.

15

Colt continued to provide five round magazines with their AR-15 rifles as late as 1987.[45]

132.    Post-war development of semi-automatic pistols continued after WWII; however, magazine capacities generally remained under 10 rounds. Notable examples include the Beretta Model 1951 (8 rounds), Sig Sauer P220 (1975, 7 to 10 rounds depending on caliber), Heckler & Koch P7 (1978, 8 rounds).

133.    In 1994, Congress adopted the Violent Crime Control and Law Enforcement Act, (which included provisions also known as the Federal Assault Weapons Ban or "AWB"), which, like the Law, limited the maximum capacity of a detachable magazine to ten rounds. As a result, numerous firearm manufacturers, as well as aftermarket magazine manufacturers, initiated production of what were colloquially termed "post-ban" magazines to conform to the new legislation. The post-ban magazines were modified, or retooled, versions of existing large-capacity magazines, in order to keep their dimensions identical and ensure that the 10-round magazines functioned identically to existing magazines of 11 rounds or more in their firearms. For example, pictured below is a "pre-ban" 13-round magazine for a Browning 9mm "Hi Power" semi-automatic pistol[46]:

---

[44] Bartocci, Christopher R., *The Black Rifle II* (Collector Grade Publications, 2004), P. 263
[45] Colt Firearms 1987 Catalog, (Colt Industries Inc., 1986), P.16
[46] https://www.browning.com/products/shooting-accessories/magazines/13-round-9mm-hi-power-magazine.html



134.    And shown below is a "post-ban" 10-round magazine for the same pistol.[47] You will note the 10-round magazine differs as a portion of the metal magazine body is replaced with a molded polymer plug. This modification effectively limits the interior volume and capacity of the magazine to 10 rounds. Manufacturers have also utilized various other methods to restrict magazine capacity, including dimpling the lower quadrant of the magazine body inwards, placing rivets in the magazine body, or thickening the walls of polymer-bodied magazines to reduce capacity.

---

[47] https://www.browning.com/products/shooting-accessories/magazines/10-round-9mm-hi-power-magazine.html#Black



135.    Following the expiration of the Federal Assault Weapons Ban, numerous states and localities enacted their own legislation, which also contained magazine capacity limitations. As a result, many manufacturers of popular semi-automatic handguns and rifles during the Federal Assault Weapons Ban continued to offer "state compliant" versions to customers in states so affected. Manufacturers such as Glock, Sig Sauer, FN USA, Beretta, and Smith & Wesson, among numerous others, offer handguns and rifles compliant with individual state regulations. Most major firearm manufacturers offer models that come "standard" with 10-round magazines.

136.    Shown here is a page from the current online catalog of FN USA (the U.S. based subsidiary of Belgian arms manufacturer *Fabrique Nationale*) showing the "California Compliant" version of their "Five-seveN" pistol.



[ 48 ]

137.    And a "California Compliant" Glock Model 19 9mm pistol available from Sportsman's Warehouse:

[48] Image Source: https://fnamerica.com/catalog-and-wallpapers/



[ 49 ]

138.    Additionally, there are numerous well-respected aftermarket manufacturers who offer 10-round magazines specifically for use in handguns that come with LCMs. Mec-Gar and ProMag are two of many:

---

49  Image  Source:  https://www.sportsmans.com/shooting-gear-gun-supplies/handguns/glock-19-9mm-luger-402in-black-nitrite-pistol-101-rounds-california-compliant/p/1155366



[50] Image Source: https://mec-gar.com/shop/magazines/sig-sauer/sig-sauer-p229-1-9mm-10-round/
[51] Image Source: https://promagindustries.com/fits-the-glock-model-17-19-26-9mm-10-rd-black-polymer/

139.     In regard to semi-automatic rifles compliant with the Law, many manufacturers also offer magazines that have a 10-round maximum capacity. For example, magazines compliant with the Law for the Ruger Mini-14 ranch rifle (a weapon generally legal under the Law) are available here: https://gunmagwarehouse.com/magfinder/ruger-mini-14

140.     Without argument, the ability to fire an increased quantity of cartridges without reloading increases the lethality and effectiveness of small arms in combat, or the military would not have incorporated this feature. Less time required to reload can equate to more time spent acquiring targets and shooting. As stated previously, form follows function in regard to equipment designed and intended for military use.

141.     To the best of my knowledge, any semi-automatic capable of accepting a large-capacity detachable magazine will accept a magazine with a capacity of ten rounds or less. I have fired a significant number of handguns and rifles with magazines of varying capacities. The capacity of the magazine did not affect the ability of those firearms to function as designed. In fact, based on my training, knowledge, and experience, I am not aware of a single firearm that specifically requires a large-capacity magazine, as defined in the Law, to operate.

### C.  Assault Weapons and Self-Defense

142.     It is my opinion that assault weapons, as defined by the Law, are a poor choice for civilian self-defense.

143.     I have been asked on numerous occasions over the past 35 years what firearm I would recommend for personal or home defense. My recommendation is based upon my inquiry in return regarding the individual's (and their family members') personal experience and comfort level with firearms. In over 25 years, I have never recommended an AR, AK, or other similar rifle or assault pistol as a personal-defense or home-defense weapon.

144.     Home defense and/or self-defense (including street/commercial robbery) situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire. Assault weapons, as defined by the Law, were designed to be effective at battlefield ranges of up to 500 yards. The typical muzzle velocity of a .223-caliber bullet is 3,200 fps. Projectiles travelling at velocities found in these weapons pose a serious risk of overpenetration in most home construction materials, such as gypsum board/sheet rock and typical 2x4 lumber. When this cartridge was designed for the AR-15/M16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards, not dozens of feet.

145.     In August 2014, the NRA's *American Rifleman* published an article by Stanton Wormley titled "The AR-15 for Home Defense: Penetration Tests."[52] Wormley conducted penetration tests on nine different types of .223/5.56mm ammunition by firing them through simulated wall sections constructed of gypsum board/sheet rock and wooden 2x4 studs. When fired at a 90-degree angle to the walls, all nine types of ammunition (including "frangible" rounds designed to disintegrate when hitting a hard surface) easily penetrated the wall sections as well as the water jugs placed three feet behind them:

> But just how much energy did the penetrating projectiles carry? All the loads, including the Glaser, exploded one-gallon water jugs placed 3 feet behind the wall sections.[53]

146.     The tests conducted by Wormley also included firing longitudinally through the wall sections, resulting in the penetration of three successive 2-inch-thick 2x4 studs by a number of the projectiles. These tests vividly highlight the inherent dangers of utilizing assault weapons with high-velocity ammunition in a home-defense scenario.

---

[52] https://www.americanrifleman.org/content/the-ar-15-for-home-defense-penetration-tests/

[53] *Id.* The "Glaser Safety Slug" was a type of pistol ammunition developed by CorBon Ammunition Inc. in 1974 for potential use by Federal Air Marshals. The bullet was specifically designed to avoid penetration of an aircraft fuselage in the event of a shooting situation while aloft. Glaser subsequently expanded their product line to include rifle caliber ammunition with an eye to limited penetration of materials.

147.     In reference to the *American Rifleman* article mentioned previously, current U.S. Army-issue .223-caliber ammunition is capable of penetrating 3/8-inch hardened steel at 350 yards. Potential overpenetration in a confined environment is problematic in terms of risks to bystanders or family members outside the target location. Most jacketed, commercially available .223/5.56mm ammunition has impressive penetration capabilities in this regard. Additionally, the (former) NATO-issue M855 SS109 5.56mm is readily available for purchase by civilians. This ammunition was designed to penetrate up to 3mm of "soft" (non-hardened) steel. This capability is certainly unnecessary for self-defense and poses substantial risks to individuals in adjoining rooms, neighboring apartments, or other attached dwellings.

148.     During a stressful situation such as a home invasion or break-in, there may be multiple steps required by the operator to bring the weapon from a "safe" condition to a firing condition. Manipulation of a charging handle, safety switch, or inserting a magazine may be difficult to accomplish under stress, particularly if the operator has not adequately trained or practiced with their firearm. Other family members may not be familiar with bringing the weapon to a firing condition or fail to complete adequate steps to do so under duress. Unloaded, an AR-platform rifle weighs approximately 6.5 to 7 pounds. It also requires two hands to aim and fire. In a home-defense scenario, a homeowner would likely be attempting to call 911 while addressing the intruder, which is difficult if not impossible while wielding their AR-15 effectively and safely. Additionally, it would hamper, if not prevent, leading a vulnerable adult away from danger or guiding/carrying a small child. By comparison, common handgun weights are between 2 and 3 pounds and require only one hand to operate.

149.     While employed as a Special Agent with ATF, the agency transitioned to an AR-type rifle in the early 2000s. Each agent was required to attend, and successfully complete, a one-week/40-hour transition training class in order to familiarize themselves, and qualify, with the firearm. The training included repetitive live-fire drills under stressful conditions. Additionally, we were required to

requalify with these firearms quarterly and repeat the same drills as during the initial transition training. Nonetheless, I witnessed agents make errors that resulted in a failure of the weapon to fire during those drills, even though those agents had performed the drills repeatedly under stress. It is worth noting here that the M4 carbines issued to ATF Field Offices were select-fire rifles (i.e., machine guns capable of fully automatic fire) that were converted to semi-automatic fire only.

150.    Assault pistols are also a poor choice for home defense or personal protection. Due to their weight and length, many assault pistols prohibited by the Law require two hands to effectively aim and shoot. (Certainly, the same can be said for a rifle.) In a home-defense situation, an individual may be required to use one hand to call 911 while attempting to operate a two-handed firearm with just one hand. Such a situation would also preclude the homeowner from utilizing their non-gun hand to pick up or guide a small child, or an elderly or disabled individual, during such an event.

151.    Additionally, I am not of the opinion that an abundance of ammunition is a substitute for weapons familiarization and shot placement. Repeated practice and shooting with your chosen firearm will make you a more effective deterrent than the capability to fire more rounds should deadly force be required.

152.    If the individual had a preference for shoulder-fired weapons, I have recommended a pump-action 12- or 20-gauge shotgun (Remington 870, Mossberg 500, or 590S etc.) loaded with 00 buckshot (either full size or mini shells depending on the operator's preference and comfort level) and stored with the "hammer dropped" on an empty chamber and the safety off. The only action required to bring the shotgun from a "safe" unloaded condition to a firing condition is to work the pump action of the shotgun. The advantages of this type of firearm and storage condition are unmatched stopping power, low probability of overpenetration (as compared to high velocity, rifle-caliber projectiles), and zero manipulation of safety mechanisms required in high-stress situations. The

53

loading/chambering process itself is an audible deterrent. Training and familiarization with this type of a firearm is simple and straightforward.

153.    For a handgun, my first inclination is to recommend an eight-shot revolver in .3 caliber (such as a Smith & Wesson Model 627, Taurus Model 608, etc.) loaded with hollow-point bullets. As with my rationale for recommending a pump-action shotgun, there are no complicated safety mechanisms to manipulate in a high-stress situation and the probability of overpenetration is low. In addition, it is easy to reload with a speed loader should more than eight shots be required. Revolvers are also easier and less complicated for other family members to learn to operate, especially if they have less familiarity with firearms.

154.    In terms of a carry handgun, I value concealability over ammunition capacity. The advantage of concealed carry is protection without broadcasting the fact. In a street robbery scenario, I believe the best course of action is to quickly extricate yourself from the "kill zone" and not engage in a protracted gunfight. When I was employed as a Special Agent with ATF, our primary duty weapons were Sig Sauer P229 pistols in .40 S&W caliber. We were also given the choice of a Sig Sauer P239 in .40 S&W or a five-shot Smith and Wesson Model 640 in .357 Magnum as a backup firearm. When off duty, I carried the S&W Model 640 and a speed loader extensively as opposed to the P229. I found it easy to conceal and am of the opinion that 10 rounds was an adequate amount of ammunition to enable me, or myself and my wife, or child, to extricate myself from a street or retail location robbery should I encounter one. Consequently, I have most often recommended either a lightweight small revolver (such as a S&W Bodyguard, Ruger LCR, Smith and Wesson Model 36, 640 or variant) carried with a speed-loader or a small, low-profile, small semi-automatic pistol (Sig Sauer P239, Ruger LCP, Colt Mustang Pocketlite, SIG P365, Glock 45 etc., which each generally hold 6 to 10 rounds of ammunition) with a spare magazine.

155.     Essentially, the types of firearms classified as assault weapons under the Law, specifically AR- and AK-type rifles and pistols, are direct developmental descendants of military weapons designed for use in combat. The "civilian" AR-15-type rifles in .223/5.56mm retain the same performance characteristics (in terms of muzzle velocity, range, etc.) as the military M-16 and its variants (M-16A2, M-4, etc.).

156.     According to the U.S. Army Manual 3-22.9 "Rifle Marksmanship M-16A1, M-16A2/3, M-16A4, and M4 Carbine, April 2003," the maximum range of these rifles is 2,650-3,000 meters. They were not designed, nor are they suitable, for personal or home defense in short-range or close-quarter situations.

FM 3-22.9(FM 23-9)

CHAPTER 2
**CHARACTERISTICS, AMMUNITION, AND ACCESSORIES**

*This chapter describes the general components, characteristics, ammunition, and accessories for the M16- and M4-series weapons to include a brief explanation of how to mount the various accessories.*

**2-1.   CHARACTERISTICS**
The M16-/M4-series weapons are 5.56-mm, magazine-fed, gas-operated, air-cooled, shoulder-fired weapons. This section describes the general characteristics (Table 2-1) and the components of the M16-/M4-series weapons. Table 2-2 (page 2-2) shows the characteristics of various accessories.

| CHARACTERISTIC | M16A1 | M16A2/A3 | M16A4 | M4 |
|---|---|---|---|---|
| **WEIGHT (pounds):** | | | | |
| Without magazine and sling | 6.35 | 7.78 | 9.08 | 6.49 |
| With sling and loaded: | | | | |
| 20-round magazine | 6.75 | 8.48 | 9.78 | 7.19 |
| 30-round magazine | 7.06 | 8.79 | 10.09 | 7.50 |
| Bayonet knife, M9 | 1.50 | 1.50 | 1.50 | 1.50 |
| Scabbard | 0.30 | 0.30 | 0.30 | 0.30 |
| Sling, M1 | 0.40 | 0.40 | 0.40 | 0.40 |
| **LENGTH (inches):** | | | | |
| Rifle w/bayonet knife | 44.25 | 44.88 | 44.88 | N/A |
| Overall rifle length | 30.00 | 39.63 | 39.63 | N/A |
| Buttstock closed | N/A | N/A | N/A | 29.75 |
| Buttstock open | N/A | N/A | N/A | 33.0 |
| **OPERATIONAL CHARACTERISTICS:** | | | | |
| Barrel rifling-right hand 1 twist (inches) | 12 | 7 | 7 | 7 |
| Muzzle velocity (feet per second) | 3,250 | 3,100 | 3,100 | 2,970 |
| Cyclic rate of fire (rounds per minute) | 700-800 | 700-900 | 800 | 700-900 |
| **MAXIMUM EFFECTIVE RATE OF FIRE:** | | | | |
| Semiautomatic (rounds per minute) | 45-65 | 45 | 45 | 45 |
| Burst (3-round bursts) (rounds per minute) | N/A | 90 | 90 | 90 |
| Automatic (rounds per minute) | 150-200 | 150-200 A3 | N/A | N/A |
| Sustained (rounds per minute) | 12-15 | 12-15 | 12-15 | 12-15 |
| **RANGE (meters):** | | | | |
| Maximum range | 2,653 | 3,600 | 3,600 | 3,600 |
| Maximum effective range | | | | |
| Point target | 460 | 550 | 550 | 500 |
| Area target | N/A | 800 | 600 | 600 |

**Table 2-1. Characteristics of the M16-/M4-series weapons.**

NOTE:     For further technical information, refer to TM 9-1005-319-10 and TM 9-1005-249-10.

2-1

55

### D.  Assault Weapons as a General Threat to Public Safety

157.     As mentioned previously in this report, many of the firearms prohibited by the Law directly trace their origins to those developed for use in combat. As such, these firearms were never initially intended for general distribution or sale to the public.

158.     As tragically demonstrated by recent mass shootings in New York and elsewhere throughout the country—such as the 2022 shooting at the Tops Friendly Market supermarket in Buffalo (10 fatalities); 2021 shooting at the King Soopers supermarket in Boulder (10 fatalities); the 2022 Club Q nightclub shooting in Colorado Springs (5 fatalities, 17 wounded); the 2012 Aurora movie theater shooting (12 fatalities, 70 wounded); the Pulse Nightclub shooting in Orlando, Florida, in 2016 (49 fatalities, 50+ wounded); the 2017 Las Vegas shooting (60 fatalities, 400+ wounded); the 2022 Uvalde, Texas, school shooting (21 fatalities, 17 wounded); and the July 4, 2022, shooting in Highland Park (7 fatalities, 48 wounded)[54]— assault weapons, in conjunction with detachable magazines, as defined under the Law are capable of inflicting significant carnage upon civilians in a short period of time.

159.     Rifle-caliber assault weapons as prohibited under the Law pose a significant risk to law enforcement officers. It has been my experience that the soft body armor issued to most Uniformed Officers has a "Level II" or "Level IIIA" protection rating[55]. These ratings are suitable for protection against most handgun bullets, as those projectiles range up to 1,200 fps in velocity. Rifle-caliber assault weapons, including AR- and AK-type rifles, can achieve muzzle velocities of  between 2,700 to 3,200 fps and readily penetrate Level II and Level IIIA body armor (as well as some Level III hard body armor, which is not universally standard issue among law enforcement agencies nationwide). Not only

---

[54] https://everytownresearch.org/wp-content/uploads/sites/4/2023/03/data.csv
[55] National Institute of Justice, "Specification for NIJ Ballistic Protection Levels and Associated Test Threats," NIJ Standard 0123.00 (Nov. 30, 2023), available at: https://nij.ojp.gov/specification-nij-ballistic-protection-levels-and-associated-test-threats-nij-standard-012300. The most recent NIJ standard, published in November 2023, changed the rating system. NIJ Level II has been replaced by NIJ HG1. NIJ Level IIIA has been replaced by NIJ HG2.

do the firearms subject to the Law pose a threat to overall public safety, but they increase the likelihood that first responders charged with stopping such a threat or attending to wounded citizens may be injured or killed in the performance of their duty.

160.    This video illustrates the capability of commonly available .223/5.56mm caliber ammunition to penetrate Level III body armor. The narrator states that this test was performed at a distance of "about 7 yards." https://www.youtube.com/watch?v=oMYkEMhPsO8

161.    The argument that commercially available, AR-type firearms are somehow less dangerous or lethal simply because they fire only in semi-automatic mode is misleading. They retain the identical performance capabilities and characteristics (save full-automatic capability) as initially intended for use in combat. With even minimal training, an operator can fire 40 to 50 shots per minute in semi-automatic mode. According to the U.S. Army manual referenced in paragraph 156, the most effective use of the M16 at ranges beyond 25 yards is rapid semi-automatic fire—not full-automatic fire.

**7-8.    RAPID SEMIAUTOMATIC FIRE**
The most important firing technique during modern, fast moving combat is rapid semiautomatic fire. Rapid-fire techniques are the key to hitting the short exposure, multiple, or moving targets described previously. If properly applied, rapid semiautomatic fire delivers a large volume of effective fire into a target area. The soldier intentionally fires a quick series of shots into the target area to assure a high probability of a hit. (Figure 7-10, page 7-8 shows the current training program for rapid semiautomatic fire.)

**Figure 7-10. Rapid semiautomatic fire training program.**

a.    **Effectiveness of Rapid Fire.** When a soldier uses rapid semiautomatic fire properly, he sacrifices some accuracy to deliver a greater volume of effective fire to hit more targets. It is surprising how devastatingly accurate rapid fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures (shots per target, trigger pulls per hit, and even time to hit). The decrease in accuracy when firing faster is reduced with proper training and repeated practice.

162.    Such capability, combined with the performance characteristics of .223/5.56mm ammunition originally intended for combat, can, and has, resulted in catastrophic civilian mass-casualty events.

I, James Yurgealitis, declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on May 3 2024


JAMES E. YURGEALITIS