UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

J. MARK LANE, et al.,

                Plaintiffs,

          v.

MIRIAM E. ROCAH, in her official capacity as District
Attorney for the County of Westchester, New York, and
DOMINICK L. CHIUMENTO, in his official capacity as
Acting Superintendent of the New York State Police,

                Defendants.

_____

Civil Action No.:
7:22-cv-10989-KMK


## MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY
## JUDGMENT


Respectfully submitted,

FPC ACTION FOUNDATION
Attorneys for Plaintiffs
5550 Painted Mirage Rd.
Ste. 320
Las Vegas, NV 89149
(916) 378-5785

Cody J. Wisniewski, Esq.
  -Of Counsel-

SECOND AMENDMENT FOUNDATION
Attorneys for Plaintiffs
12500 NE 10th Place
Bellevue, WA, 98005
(800) 426-4302

Adam J. Kraut, Esq.
  -Of Counsel-

FLUET
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
(703) 590-1234

Nicolas J. Rotsko, Esq.
  -Of Counsel-

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................. ii

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................1

  I.   *Cuomo* Does Not Control This Case...................................................................................1

  II.  The Firearm Ban Regulates Conduct Falling Within the Plain Text of the Second
      Amendment..................................................................................................................2

      A.  The Banned Firearms Are "Arms."..................................................................2

      B.  The State Inappropriately Imports Non-Textual Issues Into *Bruen*'s Threshold
          Inquiry. ...........................................................................................................5

         1.  "Common Use" Is A *Historical* Rule of Decision. ..............................5

         2.  The State's Reframed "Dangerous And Unusual" Test Has No Place In the
            *Bruen* Analysis...................................................................................2

  III. The Firearm Ban Cannot Be Historically Justified........................................................11

      A.  The Banned Rifles Are "In Common Use" for Lawful Purposes. .........................11

      B.  New York Has Not Pointed To Any Relevantly Similar Tradition of Firearm
          Regulation to Justify Its Ban...................................................................................16

         1.  The State Cannot Shirk Its Burden to Find a Valid Historical Tradition of Reg-
            ulation to Justify the Ban. .................................................................................16

         2.  There Is No Tradition of Banning "New and Dangerous Weapons." ..............19

         3.  There Is No Tradition of Banning "Weapons That Cause Public Terror.".......22

  IV. Plaintiffs Do Not Need to Provide Admissible Evidence of Common Use and Can
      Succeed on this Facial Challenge. .......................................................................23

  V.  Any Injunction Should Not Be Stayed Pending Appellate Review. ...............................25

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                          <u>**Page**</u>

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d Cir. 2023) ................................................................................2

*Antonyuk v. James*,
    No. 23-910, 2024 WL 32559671 (Mem.) (U.S. July 2, 2024) ...........................2

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ......................................................................................8, 15

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) ..........................................................................................25

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..............................1, 4, 5, 6, 8, 9, 11, 13, 14, 15, 17, 19, 24

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ............................................................................25

*Frank v. Walker*,
    773 F.3d 783 (7th Cir. 2014) ............................................................................23

*Garland v. Cargill*,
    602 U.S. 406 (2024)..........................................................................................12

*Heller v. District of Columbia*,
    670 F.3d 1244 (2011) .......................................................................................8, 9

*Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*,
    916 F.2d 1174 (7th Cir. 1990) ..........................................................................24

*Langevin v. Chenango Court, Inc.*,
    447 F.2d 296 (2d Cir. 1971) .............................................................................23

*LaRouche v. Kezer*,
    20 F.3d 68 (2d Cir. 1994) .................................................................................25

*Marshall v. Sawyer*,
    365 F.2d 105 (9th Cir. 1966) ............................................................................24

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).......................................................................................1, 18

*Md. Shall Issue, Inc. v. Moore*,
    2024 WL 124290 (Jan. 11, 2024) ......................................................................5

*Md. Shall Issue, Inc. v. Moore*,
    86 F.4th 1038 (4th Cir. 2023) ............................................................................5

*Miller v. Bonta*,
    No. 19-cv-1537, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) ......................12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)...........................1, 2, 3, 5, 7, 8, 10, 11, 13, 16, 17, 18, 19, 21, 22, 23, 24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F.3d 242 (2015) ...................................................................................1, 2, 9, 10

*Simpson v. State*,
  13 Tenn. 356 (1833) ........................................................................................22

*Teter v. Lopez*,
  76 F.4th 938 (9th Cir. 2023) ........................................................................7, 21

*Teter v. Lopez*,
  93 F.4th 1150 (2024) ..........................................................................................7

*United States v. Afriyie*,
  27 F.4th 161 (2d Cir. 2022) ................................................................................2

*United States v. Berger*,
  No. 5:22-cr-00033, 2024 WL 449247 (E.D. Pa. 2024) ...................................6, 7

*United States v. Rahimi*,
  602 U.S. ---, 2024 WL 3074728 (June 21, 2024) .........................8, 13, 18, 22, 23

*Wiesmueller v. Kosobucki*,
  547 F.3d 740 (7th Cir. 2008) ............................................................................24

## Rules and Laws

1 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FED. EVID. § 2:12 (4th ed. 2013) ..........24

FED. R. EVID. 201(a), 1972 Advisory Committee Note ........................................23, 24

N.Y. Penal Law § 265.00(22)(a) ....................................................................................3

## Other Authorities

87 Fed. Reg. 24652 (Apr. 26, 2022) ...............................................................................12

Bureau of Alcohol, Tobacco, & Firearms, U.S. Dep't of the Treasury, *Report and Recommendation on the Importability of Certain Semiautomatic Rifles*, ATF (1989)...........................16

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 10, 35, GEO. UNIV. (May 13, 2022); *see also New York*, U.S. CENSUS BUR., https://bit.ly/3S4RtwK (last visited July 10, 2023) ........................................................15

Ltr. from Stephanie M. Boucher to Jeffrey E. Folloder (Feb. 24, 2016), http://bit.ly/3tksUCT....14

Matthew Hendrickson, *Most owners of assault-style weapons in Illinois appear not to have registered them as required by law*, CHI. SUN-TIMES, https://bit.ly/4eUwK8D ( last updated Jan. 8, 2024)........................................................................................................................15

*Introduction to the Weapons of the American Revolution*, AM. BATTLEFIELD TRUST, https://bit.ly/3Lhpx4H (last visited July 10, 2024) ....................................................4, 5

*New York*, U.S. CENSUS BUR., https://bit.ly/3S4RtwK (last visited July 10, 2023)...................15

Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD.............18

## INTRODUCTION

In *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court held that New York had not learned the lessons of *District of Columbia v. Heller*, 554 U.S. 570 (2008) or *McDonald v. City of Chicago*, 561 U.S. 742, 792 (2010), and that its ban on public carry by ordinary people with ordinary self-defense needs violated the Second Amendment to the United States Constitution and could not be justified under the analytical framework the Court followed in *Heller*. New York's summary judgment brief in this case makes clear it has not learned the lessons of *Bruen* either. Rather, in seeking to defend its ban on common semiautomatic rifles, the State fights *Bruen* at every turn, repeatedly turning its focus to issues that are irrelevant under *Bruen*. The State also contorts the "plain text" of the Second Amendment to create a carveout for common semiautomatic rifles to avoid having to justify the ban by reference to history. In perhaps the most egregious instance of this open defiance of *Bruen*, the State alleges that this case is con-trolled by the Second Circuit's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2015), which upheld the challenged law by applying the Second Circuit's pre-*Bruen* interest balancing test—the very test that *Bruen* expressly overruled.

The reason for this *Bruen* avoidance is clear: if forced to carry its burden, the State will fail. Under *Heller*, the only firearms that can be banned are those that are "dangerous and unusual," and the banned rifles, which include the most popular rifle in American history and one of the most popular firearms of any type in the country today, the AR-15, are not "dangerous and unusual" but rather "in common use." The State has pointed to no historical tradition of regulation that would excuse banning arms in common use, so Plaintiffs are entitled to summary judgment.

## ARGUMENT

### I. *Cuomo* Does Not Control This Case.

At the outset, the State argues that this case is still controlled by the Second Circuit's

decision in *Cuomo*, which assessed the challenged law "under the constitutional standard of 'intermediate scrutiny' " and concluded that, "[b]ecause the [law is] substantially related to the important governmental interests of public safety and crime reduction, [it] pass[es] constitutional muster." 804 F.3d at 269. *Bruen* held that interest balancing of this sort, on which *Cuomo*'s holding rests, "is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny," 597 U.S. at 24, and explicitly overruled a decision of the Second Circuit that had followed the same analytical framework as *Cuomo* (in fact, citing to *Cuomo* for the framework), *id.* at 19 n.4 (overruling *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d. Cir. 2020)), so it is hard to understand how the State can make this argument. The State asserts that "there is no basis to conclude that *Bruen* 'fatally abrogated' *Cuomo* or that the Circuit is 'all but certain' to overrule it." State Br. in Opposition to Mot. for Summ. Judg., Doc. 81 at 8 (May 15, 2024) ("State Br."). But the Second Circuit *itself* has indicated (albeit in a now-vacated opinion) that *Bruen* "abrogat[ed] . . . the general approach we took to Second Amendment claims." *Antonyuk v. Chiumento*, 89 F.4th 271, 298 (2d Cir. 2023), *vacated by Antonyuk v. James*, No. 23-910, 2024 WL 32559671 (Mem.) (U.S. July 2, 2024). And that clearly is the proper conclusion. *Bruen* definitively stated that the standard *Cuomo* applied was inconsistent with the Second Amendment itself. *Bruen*, 597 U.S. at 26. Therefore, it is incontrovertible that there is the sort of "conflict, incompatibility, or inconsistency" between *Cuomo* and *Bruen* that would lead the Second Circuit to overrule *Cuomo*—or to acknowledge that the Supreme Court itself did so in *Bruen*. *See United States v. Afriyie*, 27 F.4th 161, 168 (2d Cir. 2022) (cleaned up).

## II. The Firearm Ban Regulates Conduct Falling Within the Plain Text of the Second Amendment.

### A. The Banned Firearms Are "Arms."

Because *Bruen* abrogated *Cuomo*'s holding, it falls to this Court to apply in the first

instance the standard laid out in *Bruen* to Plaintiffs' claims in this case. Doing so involves first asking whether the "plain text" of the Second Amendment is implicated by a law banning the purchase and possession of certain semiautomatic rifles. *Bruen*, 597 U.S. at 18. As Plaintiffs have previously explained, because the ban prevents ordinary Americans from acquiring firearms, it necessarily implicates the right to bear "arms"—a broad term that covers, at least, all firearms that are capable of being carried. *See* Plaintiffs' Br. in Support of Mot. for Summ. Judg., Doc. 72 at 5–6 (Mar. 15, 2024) ("Pls.' Br.").

The State disputes this, characterizing this case as not about firearms at all, but about firearm *accessories*, arguing that "New York's assault weapons law does not ban rifles, but rather a combination of features," and that "New Yorkers can and do purchase semiautomatic rifles with detachable magazines so long as they do not include one or more of the enumerated military style features." State Br. at 9. To repeat this argument is to refute it. The State itself calls the challenged law a "ban on assault weapons," *Id.* at 2, and the plain text of the law bans varieties of "semiautomatic rifle[s]" made in certain configurations, not accessories to those firearms. N.Y. Penal Law § 265.00(22)(a). It is of no benefit to the State that it has not yet banned *all* firearms and that other, non-banned rifles "remain widely available to the public." State Br. at 9. The same was true in *Heller* and it was "no answer" to the charge that banning *some* firearms violated the Second Amendment. 554 U.S. at 629.

The State instead tries to argue that the specific features that make a firearm an "assault weapon" are not themselves *arms*, because they "are not used as weapons themselves and are not essential to operate a rifle." State Br. at 10. As an initial matter, the State is wrong to assert with such certainty that it can divine between an optional accessory and an essential feature. Many of the specific features by which the State defines an "assault weapon" are important ergonomic and

accuracy-enhancing features, without which the rifles in question would be *more* dangerous to use, not less. *See* Pls.' Resp. to 56.1 Statement ¶¶ 10–23, 53. For instance, the "pistol grip" banned by the State merely provides a way for a person to securely hold the rifle with his trigger hand—its inclusion is necessitated by the straight-line design of many modern rifles (which does not permit an individual to hold onto the stock itself with the trigger hand) and where pistol grips are outlawed, manufacturers have to devise (often more awkward) alternatives to perform their necessary function. *Id.* ¶ 7.

More importantly, even if the State could accurately decide which features are truly "optional," there is no warrant in Supreme Court precedent or the "plain text" of the Second Amendment for drawing the distinction the State proposes. Indeed, it is hard to imagine why such a rule should exist except to carve out an exception from the Amendment's coverage for a features-based prohibition like the one at issue here. Rather, the Amendment protects *firearms*, and thus necessarily protects the component parts of those same arms. Any other rule would invite this Court and the State to set about determining what is *really* necessary for an individual to exercise their Second Amendment rights, and that is a road the Supreme Court has refused to go down. *See Heller*, 554 U.S. at 629. The State attempts to manufacture a textual hook for this argument by claiming that "the distinction between weapons and accessories would have … been familiar to 'ordinary citizens in the founding generation,' " who would have considered "precursors to modern-day magazines" to be " 'accoutrements', not arms." State Br. at 10 (quoting *Heller*, 554 U.S. at 577). Other Founding era items that the State argues were not considered " 'arms' "—"ammunition, ammunition storage containers, or 'detachables' such as flints and ramrods," *id.* at 10—demonstrates inconsistency of the line the State purports to draw. Although it suggests that such items were not necessary to the functioning of "arms," it is obvious enough that a firearm cannot work without

ammunition, and "flints" were a critical component of the firing mechanism of some Revolution-ary-era muskets. *Introduction to the Weapons of the American Revolution*, AM. BATTLEFIELD TRUST, https://bit.ly/3Lhpx4H (last visited July 10, 2024). To the extent that such "accoutrements" (if indeed they could be so classified) affected at all the use of a firearm, restricting them would implicate the plain text as well, because a restriction that affects a person's ability to use a firearm *infringes*—i.e., hinders—a person's ability to use that firearm. *See Md Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044 n.8 (4th Cir. 2023), *reh'g en banc granted*, 2024 WL 124290 (Jan. 11, 2024).

**B.  The State Inappropriately Imports Non-Textual Issues Into *Bruen*'s Thresh-old Inquiry.**

*Bruen* could hardly have been clearer that, at this point, the burden is on the State to prove that its presumptively unconstitutional law is, in fact, valid, through reference to history. *See Bruen*, 597 at 32. But the State resists the straightforward application of *Bruen* (and the imposition of the burden), by arguing that two other factors must be considered at the threshold. First, it argues that "Plaintiffs must show that the assault rifles and accessories they seek to possess are 'in com-mon use today for self-defense," State Br. at 11, and second, that Plaintiffs must show they are not "dangerous and unusual," *Id.* at 15. Neither of these considerations are relevant to the textual anal-ysis of the Second Amendment and indeed, the "dangerous and unusual" analysis proposed by the State (which bears no relation whatsoever to the historical tradition of that label identified in *Hel-ler*) is not relevant *at all*.

**1.  "Common Use" Is A *Historical* Rule of Decision.**

The State's claim that whether a firearm is "in common use" impacts the *textual* analysis is foreclosed by the plain language of the Second Amendment, which extends to "arms" and says nothing at all about commonality, as well as the Supreme Court's clear statement in *Heller* and *Bruen* that it was the "*historical tradition* of prohibiting the carrying of 'dangerous and unusual

weapons,' " that lead to the rule that arms "in common use at the time" are protected. *Heller*, 554 U.S. at 627 (emphasis added) (cleaned up); *see also* Pls.' Br. at 7–8.

The State devotes a single paragraph of its brief to arguing otherwise. *See* State Br. at 11. In so doing it offers no explanation, at all, of where it purports to find "common use" in the text of the Second Amendment, but rather focuses its interpretative efforts on Plaintiffs' brief, which it misconstrues to suggest that Plaintiffs have somehow already agreed to this faulty reading. This is false. Plaintiffs never "concede[d] that *Heller* analyzed 'common use' separately prior to its historical analysis." *Id.* at 11. The State cites, for this claim, a passage in Plaintiffs' summary judgment brief that says the opposite: While *Heller* foreshadowed its "common use" conclusion where relevant in earlier portions of its opinion, it did not "analyze" the issue except as an historical one. *See* Pls.' Br. at 8–9 ("[E]ven though this discussion took place outside of the Court's analysis of historical limits on the right, the Court made clear that those historical limits were what was being addressed."). When *Heller* explained that even though all weapons are "arms," weapons that were "not typically possessed by law-abiding citizens for lawful purposes" may be banned, it explicitly stated that the limitation was founded on "the historical understanding of the scope of the right," and cited to its own, later analysis of the *history* of the issue (at "Part III, infra.") to support that conclusion. 554 U.S. at 625. Similarly, Plaintiffs have not argued that the common use "inquiry has migrated from 'step one' to 'step two' under *Bruen*." State Br. at 11. The State cites nothing for this proposition, but Plaintiffs' argument has always been that *both Bruen* and *Heller* treated "common use" as a finding relevant (and conclusive of) the historical inquiry. *See* Pls.' Br. at 7–10.

The State's only support for the proposition that "common use" should be considered at the textual level, other than its misinterpretations of Plaintiffs' own brief, is a single out-of-circuit

district court decision involving criminal prosecution for unlawful possession of a machine gun. *See United States v. Berger*, No. 5:22-cr-00033, 2024 WL 449247 (E.D. Pa. 2024). In that case, though the Court noted some confusion on this topic and said that there were features of both *Heller* and *Bruen*'s analysis that suggested "common use" was part of the historical test, it nevertheless decided to treat the issue as a textual one because, in its view, the *Bruen* majority "addressed whether 'handguns are weapons in common use today for self-defense' at step one of the analysis." *Id.* at *6 (quoting *Bruen*, 597 U.S. at 32). The State uses this same claim to distinguish *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), *reh'g en banc granted, op. vacated*, 93 F.4th 1150 (2024), criticizing that opinion for failing to "address *Bruen*'s explicit reference to common use as part of the 'step one' textual analysis." State Br. at 11 n.6. But *Bruen* made no such "explicit reference" and did not treat "common use" as part of the textual analysis at all. Rather, *Bruen* stated at the outset of its analysis: "It is undisputed … that handguns are weapons 'in common use' today for self-defense. We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense." 597 U.S. at 32 (cleaned up). Two things are evident from this brief discussion. First, *Bruen*'s mention of "common use" comes *before* it turns to the textual question—it was merely clearing away an issue that was not disputed in the case. Second, *Bruen*'s mention of "common use" was *conclusive* as to the Second Amendment's coverage of the firearms the petitioners in that case wanted to carry, meaning that no further work was needed on the issue, textual *or* historical. *See* Pls.' Br. at 9. The only way that makes sense is if "common use" was decisive on the issue of those firearms' constitutional protection. Because "common use" is the *historical* test in this case, Plaintiffs' will discuss its substance below.

### 2.   The State's Reframed "Dangerous And Unusual" Test Has No Place In the *Bruen* Analysis.

The State also argues that certain firearms do not fall within the text of the Second Amendment because they are "dangerous and unusual," the banned rifles among them. *See* State Br. at 15. As just explained, the Supreme Court has recognized that there is "a historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at 627. New York's error in placing "dangerous and unusual" at the textual level is precisely the same one that Plaintiffs just refuted with respect to common use. But New York's error here is more fundamental still; the State wholly misconstrues what it means for an arm to be "dangerous and unusual."

The State begins its "dangerous and unusual" analysis with this deeply confusing framing of the issue: "Plaintiffs misinterpret the phrase 'dangerous and unusual' in *Heller* to mean that firearms can be prohibited only if they are both dangerous *and* unusual. However, the phrase 'dangerous and unusual' is best read to represent a single concept of 'unusually dangerous.' " State Br. 15 (emphasis in original). There are several errors here. First, the Supreme Court has always used the terms dangerous and unusual conjunctively when describing the historical limitation on the right. *See Heller*, 554 U.S. at 627; *see also Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring); *United States v. Rahimi*, 602 U.S. ---, 2024 WL 3074728, at *5 (June 21, 2024). Second, the Supreme Court has said that firearms in "common use" are protected, full stop. *See, e.g.*, *Bruen*, 597 U.S. at 32. That is incompatible with the State's "unusually dangerous" framing. Indeed, New York's theory would appear to entail a different result in *Heller*, where there was no question that handguns were more commonly used in crime than rifles and shotguns (indeed, that is why the District of Columbia argued it should be able to ban them). *See Heller v. District of Columbia*, 670 F.3d 1244, 1290 (2011) (Kavanaugh, J., dissenting) ("*Heller II*") ("[I]f we are constrained to use [New York's] rhetoric, we would have to say that *handguns* are the

quintessential 'assault weapons' in today's society."). But such criminal misuse was *entirely irrel-
evant* to the Court, even when assessing whether handguns were "dangerous and unusual," because
they were simultaneously widely popular among law-abiding citizens, *see Heller*, 554 U.S. at 627,
629. Third, properly conceived, the State's argument fails on its own terms. A firearm in *common*
use cannot be *unusually* dangerous. Therefore, even if the State were correct that "unusually dan-
gerous" firearms can be banned (and it is not), a type of firearm that is in common use (or that is
functionally similar to those that are) simply would not qualify. And fourth, the State seems to
believe that an arm may be exempted from Second Amendment protection once it reaches a "level
of lethality or capacity for injury beyond societally accepted norms." State Br. at 15 (citation omit-
ted). But unless societally accepted norms are determined by the types of firearms in common use
and not by the independent assessment of legislatures or judges, this position would inject the very
type of interest balancing into the analysis that the Supreme Court squarely rejected in *Heller* and
*Bruen*.

A brief review of the reasons the State suggests the arms in question are "dangerous and
unusual" shows that this mode of analysis is directly contrary to *Bruen* as well. Taking them in
turn, the State claims that the banned firearms are "dangerous and unusual" because (1) they are
similar to (and in some cases, share design histories with, military weapons), (2) they have "phe-
nomenal lethality" and are "engineered to generate maximum wound effect," (3) they "are desira-
ble for persons intending to commit mass shootings," and (4) their dangerousness can be proved
by noting that historically, laws banning such firearms "save lives, prevent mass shootings, and
render the mass shootings that do happen less effective." *Id*. at 15–17. It is notable that *each* of
these arguments formed a part of the Second Circuit's interest-balancing reasoning in *Cuomo. See
Cuomo*, 804 F.3d at 262 (discussing "military-style features"); *id.* (lethality and wounding

potential); *id.* at 262–63 (mass shootings); *id.* at 263 (effectiveness of similar bans). As discussed above, *Cuomo*'s interest-balancing did not survive *Bruen*, and *Bruen* explicitly warned against litigants smuggling "means-end scrutiny" back into Second Amendment litigation "under the guise of an analogical inquiry." *Bruen*, 597 U.S. at 29 n.7. New York does something worse, attempting to smuggle interest balancing into the *plain text*, so that the question of whether there is a connection between the banned firearms and the problems New York identifies is not even relevant, and the Court is effectively asked to take the State's word for it. *Heller* and *Bruen* make clear that neither the State's nor a court's judgment as to the merits and demerits of a given firearm is relevant. The Court should entirely disregard the argument that the banned firearms are unusually dangerous.

To the extent these arguments are not ignored, they are all wrong. The banned firearms are not military weapons, though they share design history with some military firearms. Most notably, the AR-15 is a semiautomatic version of the M-16, but the M-16's only exclusively military attribute is its ability to fire in an automatic mode (wherein more than one bullet is discharged from a single action of the trigger). Its military history led to design choices that make the AR-15 more useful to an individual seeking to defend himself, but not more inherently "dangerous." *See, e.g.*, Pls.' 56.1 Resp. ¶¶ 1–6, 11–14, 16–17. All firearms are "lethal," and there is nothing uniquely lethal about the banned rifles. The AR-15, for example, is a middlingly powerful rifle which is too weak to use for deer hunting and is most commonly chambered to fire a round that was chosen for its light weight, not any special wounding capability. To the extent it is capable of penetrating body armor or drywall, that is true of *all* centerfire rifle rounds (and more true of some), and, in any event, considerations totally irrelevant to the "features" by which the State defines "assault weapons." *See, e.g., id.* at ¶¶ 55, 62, 99. It is simply false that the banned rifles are particularly prone to

misuse in mass shootings. As with other crimes, it is handguns, not rifles, that are the overwhelming weapon of choice in mass shootings, with so-called "assault weapons" used in between about 10% and a third of mass shooting incidents, depending on how those incidents are defined (and a vanishingly small percentage of all "assault weapons" ever misused in crime at all). *Id.* at ¶ 82. And shootings are no more lethal because they are committed with "assault weapons"—quite the opposite, as researchers have shown that the use of handguns not "assault rifles" is associated with both a greater number of total wounds and a greater probability of fatal injury in mass shootings. *See id.* at ¶88. In keeping with the foregoing, and despite many attempts to do so, laws banning rifles like the AR-15 have not been shown to have any of the salutary effects the State claims. Indeed, a government commissioned review of the effect of the federal ban in place from 1994–2004 found that it could not be said to have reduced either the incidence or the lethality of gun crimes. *See id.* at ¶¶ 26, 108.

### III. The Firearm Ban Cannot Be Historically Justified.

#### A. The Banned Rifles Are "In Common Use" for Lawful Purposes.

If the ban is to survive, the State must prove that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As Plaintiffs have explained, both *Bruen* and *Heller* have already established the relevant contours of the tradition at issue: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 21 (quoting *Heller*, 554 U.S. at 627). And a law by definition will not fit into that tradition if it bans "possession and use of weapons that are 'in common use at the time.' " 597 U.S. at 21; *see also Heller*, 554 U.S. at 625. The State bears the burden of proving its law is consistent with history by showing the firearms it bans are not in common use.

The State cannot carry its burden because the rifles banned by New York are among the

most common firearms of any type in the country. *See* Pls.' Br. at 10–17. Indeed, the State does not seriously dispute this fact. Instead, it complains that Plaintiffs have relied upon "biased survey data" that is "inadmissible hearsay" in proving it. The hearsay objection is baseless and is addressed at length below, *see infra* Section IV, and the "biased" claim is no better. For one thing, Plaintiffs' assertion that the AR-15 and similarly styled banned rifles are owned by millions of Americans is also readily apparent from government sources, *see* Definition of "Frame or Receiver and Identification of Firearms," 87 Fed. Reg. 24652 (Apr. 26, 2022) (stating that the "AR-15 type rifle[]" is "one of the most popular firearms in the United States"), and caselaw, *see Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) ("The AR-15 is the most popular semi-automatic rifle" in America and is therefore "in common use today."); *Garland v. Cargill*, 602 U.S. 406, 430–31 (2024) (Sotomayor, J., dissenting) (describing "semiautomatic rifles" like the AR-15 as "commonly available"); *see also* Pls.' Br. at 12 (collecting cases).

Furthermore, the State's "biased" claim fails to account for the broad agreement among *all* relevant sources (industry produced or not) that the banned firearms are very popular. The State's own expert's opinion aligns with them. *See Miller v. Bonta*, No. 19-cv-1537, 2023 WL 6929336, at *33 (S.D. Cal. Oct. 19, 2023) (citing Klarevas for the proposition that there are over 24 million AR-15 and AK-47 platform and similar rifles). Indeed, Klarevas has conceded in this case that Washington Post and Ipsos—the sponsors of one of the key surveys on which Plaintiffs have relied—are generally "considered to be organizations that conduct credible public opinion polls," and the only mild criticism he offered of the poll was that its margin of error could put "the number of Americans who own AR-15 platform firearms can be as low as 14.1 million adults and as high as 18.2 million adults." Klarevas Rep., Doc. 87 ¶ 30 (May 15, 2024). The Court can take the low end of that range and the firearms banned by New York still unquestionably qualify as "in common

use."

The State offers three other meritless objections in an effort to sidestep the fact that common use is essentially indisputable.

**1.** The State argues that it is not enough for the banned firearms to be commonly owned, they must be "actually commonly used in self-defense." State Br. at 12. This is wrong as a legal matter. *Heller* said that arms that were " 'in common use at the time' for lawful purposes *like* self-defense" were protected. 554 U.S. at 624. Elsewhere, *Heller* recognized that the Second Amendment served multiple other purposes, including but not limited to "preserving the militia," "self-defense and hunting." *Id.* at 599. The State would take an illustrative example of *a* lawful purpose and make it a limitation on the scope of the Second Amendment's protections. The State is wrong that *Bruen* "went a crucial step further" than *Heller* by making it clear that only self-defense matters. *See* State Br. at 12. The portion of *Bruen* cited for that purpose is the same line explaining it was undisputed that "handguns are weapons in common use today for self-defense," on which the State also hangs its "common use is textual" argument. 597 U.S. at 32. But that line no more said that other purposes were irrelevant than it said that shotguns were categorically unprotected. *See Rahimi*, 2024 WL 3074728, at *11 (rejecting the parallel argument that the preceding line's characterization of petitioners as "responsible" limited the Second Amendment to only "responsible" citizens). That the State would suggest this line silently narrows *Heller* and reads out of the Second Amendment's protections *the only purpose the Amendment explicitly mentions*, is a sure sign that the State is grasping at interpretative straws.

In any event, the banned rifles *are* commonly used for self-defense. *See* Pls.' 56.1 Resp. ¶ 53 (collecting examples). As Plaintiffs have explained at length, a vast majority of owners of AR-15s report that they own them for that defense of themselves, their loved ones, and their homes.

*Id.*; *see also* Pls.' Br. 13–14. To the extent the State is arguing that mere ownership for the purpose of self-defense is insufficient and that an arm is not protected unless it is regularly *fired* in self-defense, it is wrong. *Heller* did not ask how often individuals fired handguns in self-defense before noting they were protected, that they were "chosen" for that purpose was enough. *See Heller*, 554 U.S. at 629. The Second Amendment, by its terms, protects "keeping" and "bearing" arms. If a firearm is "kept" for self-defense, it is "used" for that purpose, the same as an insurance policy is "used" to hedge against the risk of a housefire, even if the policyholders' house never burns down. The State briefly makes the claim that this argument would entail finding machine guns protected because there are more lawfully registered machine guns than, say, the 200,000 stun guns that Justice Alito found sufficient for protection in *Caetano*. State Br. at 13 n.7. This Court need not determine exactly where the lower bound of "common use" is, since, whatever the cutoff, the banned semiautomatic rifles easily clear it. But it is not true that this mode of analysis, or *Caetano*, necessarily entails protection for machineguns, of which only approximately 176,000 are lawfully possessed by ordinary Americans. That is the number that that were registered before new machine guns were outlawed in 1986 and therefore may lawfully be possessed by typical Americans. *See* Ltr. from Stephanie M. Boucher to Jeffrey E. Folloder (Feb. 24, 2016), http://bit.ly/3tksUCT. Regardless, the issue of machineguns is not before this Court and need not be considered.

**2.** The State complains that whatever the case might be nationwide, "lawful assault weapon ownership in New York is vanishingly rare" and Plaintiffs' argument "is predicated on the idea that the meaning of the Constitution in New York has changed due to the gun industry's sales patterns elsewhere." State Br. at 13-14. It is doubtful that the State is correct about the number of banned firearms owned by New Yorkers, all of whom, it assumes, registered their firearms when it banned them, rather than moving them out of state or simply not complying with the law. Professor English

estimates that approximately 37.8% of New York firearm owners have ever owned an AR-15 style rifle, a figure, given the overall firearm ownership rate of 22.7%, that would mean there are approximately 1.7 million current or former AR-15 owners in the state. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 10, 35, GEO. UNIV. (May 13, 2022); *see also New York*, U.S. CENSUS BUR., https://bit.ly/3S4RtwK (last visited July 10, 2023) (estimating New York state population of 20,201,249). It is perfectly plausible, as the recent registration effort in Illinois demonstrates, that the State's official registration data understates how common these firearms actually are. *See* Matthew Hendrickson, *Most owners of assault-style weapons in Illinois appear not to have registered them as required by law*, CHI. SUN-TIMES, https://bit.ly/4eUwK8D (last updated Jan. 8, 2024).

More importantly, it *does not matter* how common these firearms are *in New York*. In determining whether handguns were "unusual" and could be banned, *Heller*, did not ask whether they were common in the District of Columbia but noted that they are "overwhelmingly chosen by *American* society." 554 U.S. at 628 (emphasis added); *see also Bruen*, 597 U.S. at 26 ("It is this balance—struck by the traditions *of the American people*—that demands our unqualified deference.") (emphasis added); *Caetano*, 577 U.S. at 420 (Alito, J., concurring). And it is doubtful that handguns were commonly owned by law-abiding citizens in the District of Columbia when *Heller* was decided, given that they had generally been banned for civilian possession since 1976. The common use analysis must be national in scope or else which firearms are protected by the Second Amendment could vary by jurisdiction and the same law could be constitutional if passed by New York, but in violation of the Second Amendment if enacted in New Hampshire. There is not one "meaning of the Constitution in New York" that differs from its meaning elsewhere. State Br. at 14.

**3.** The State argues that, regardless of how often the banned firearms are chosen for self-defense, they are, in its judgment, not "suitab[le]" for that purpose. *Id.* at 12. It notes that they have "high muzzle velocities" that result in projectiles that "will penetrate the walls in most homes," claims that they are "cumbersome" and "require two hands to use, making it difficult or impossible to call 911, lead a vulnerable adult out of danger, or carry a small child," and that they are "disproportionately used *offensively* to commit mass shootings." *Id.* at 14. As in the case of the State's "dangerous and unusual" analysis discussed above, this argument is wholly inappropriate for consideration at all under *Bruen*. There is, to put it simply, no room under the Second Amendment for courts or legislatures to assess the features of commonly owned firearms and decide for themselves that they are not the sorts of firearms Americans should be using for self-defense. The American people are *solely* entrusted with that judgment. *Bruen*, 597 U.S. at 26.

The State's arguments are incorrect anyway. The banned rifles are useful for self-defense and the State's enumerated concerns are overstated. *See* Pls.' Resp. to State's 56.1 Statement, ¶ 53–56 (overpenetration is a feature of all rifles and is not impacted by the features by which the State defines an "assault weapon); *id.* at ¶ 67 (rifles are well-suited for defense in many situations); *id.* at ¶ 82 (mass shootings, like all crimes, are most commonly committed with handguns, which are also the deadliest weapons in those scenarios). Indeed, the ATF found that most technical experts recommend the AR-15 for lawful purposes like self-defense. *See id.* ¶ 53; Bureau of Alcohol, Tobacco, & Firearms, U.S. Dep't of the Treasury, *Report and Recommendation on the Importability of Certain Semiautomatic Rifles* at 11, ATF (1989).

### B. New York Has Not Pointed To Any Relevantly Similar Tradition of Firearm Regulation to Justify Its Ban.

#### 1. The State Cannot Shirk Its Burden to Find a Valid Historical Tradition of Regulation to Justify the Ban.

The State begins its historical argument by claiming its arguments regarding history are

"uncontradicted" because "Plaintiffs have declined to put forward any affirmative evidence about history in their case-in-chief." State Br. at 18. It is hard to imagine how the Supreme Court could have been clearer that the State, and the State alone, bears the burden of coming forward with historical evidence to support its narrow reading of the Second Amendment. *See, e.g.*, *Bruen*, 597 U.S. at 24. In any event, this claim is false—as Plaintiffs have explained repeatedly, the relevant historical principle at issue here is that arms in common use cannot be banned, and Plaintiffs have shown the semiautomatic rifles banned by the state are in common use. Any further historical analysis is entirely unnecessary, and the Court can and should end its analysis there. To the extent it considers the State's alternative historical narrative, as discussed in detail below, Plaintiffs dispute every element of it.

The State also argues this case requires a "more nuanced approach" to historical comparisons because it involves "dramatic technological changes" and implicates "unprecedented societal concerns." State Br. at 19 (quoting *Bruen*, 597 U.S. at 27–28). Even if the State were right, it would not matter. A "more nuanced approach" makes no difference when the analogy in this case has *already been drawn* by the Supreme Court. *See* Pls.' Br. at 7. But this case involves neither a technological nor a societal change that softens the analysis in any way—if anything, those factors work in Plaintiffs' favor. The State's proposed technological change is simply that the firearms bans are different from those that were available at the Founding. State Br. at 19–20. This is irrelevant. *Heller* rejected as "bordering on the frivolous" the argument that the Second Amendment only protected "those arms in existence in the 18th century," 554 U.S. at 582, and in *Bruen*, the Court clarified that *Heller*'s statement was a demonstration of properly interpreting the Second Amendment to account for modern developments by recognizing that it generally "covers modern instruments that facilitate armed self-defense," 597 U.S. at 28. In other words, changes in firearms

17

technology do not support banning certain arms, but rather expands the universe of arms "in common use" that cannot be banned. By seeking to hold the banned rifles modern features against them, the State seeks the sort of "law trapped in amber" the Supreme Court has decisively rejected. *Rahimi*, 2024 WL 3074728, at *6. As for "unprecedented societal concerns," the State argues that the banned rifles contribute to a modern problem of mass violence and mass shootings, *id.* at *20–21, but as already discussed, that was even more true of the firearms at issue in *Heller*, since ordinary handguns, and not "assault weapons," are the most common firearm used in mass shootings, and the same are overwhelmingly the weapon of choice for criminals generally. *see* Pls.' 56.1 Resp. at ¶ 82. Here again, though the State attempts to disguise it, the State is attempting to inappropriately smuggle interest balancing back into this case, and its attempt should be denied. *See Bruen*, 597 U.S. at 29 n.7.

One final, general note on the State's historical analysis. The State relies on laws from the fourteenth to the twentieth century to attempt to justify its ban, but the critical period for interpreting the scope of the Second Amendment is at or around the time of its ratification—1791—so even laws from the mid-1800s come too late to be very informative about the scope of the right, to say nothing of the period when the State finds its closest (though not close) analogues, the early 1900s. *See* Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD. This follows from the twin facts that incorporated Bill of Rights provisions have the same meaning as applied against the States and the federal government, *see McDonald*, 561 U.S. at 765, and the ratification of the Bill of Rights has always been treated as the critical period for understanding the scope of those rights, 597 U.S. at 37 (collecting cases). To be sure, the Supreme Court has "acknowledge[d] that there is an ongoing scholarly debate" on this point, but its precedent dictates treating 1791 as

the critical date for determining the Amendment's meaning. *Id.* at 37–38. And time is not the only factor impacting the value of a proposed historical analogue. *Bruen* weighed many others, and the State ignores them. *Compare* State Br. at 23 n.13 ("Historical laws adopted in … the territories have particular doctrinal importance.") *with Bruen*, 597 U.S. at 67 (discounting territorial laws, noting that because of the "transitional and temporary character of the American territorial system" and the "miniscule territorial populations who would have lived under them" such laws "are most unlikely to reflect the origins and continuing significance of the Second Amendment") (cleaned up).

### 2.    There Is No Tradition of Banning "New and Dangerous Weapons."

Turning at last to the task set for it under *Bruen*, the State posits that there is a tradition of regulating "new and dangerous" weapons. State Br. at 27. This is, of course, half of the correct answer, as the Supreme Court has repeatedly made clear that there is no history of banning arms unless they are "dangerous and unusual weapons." *Bruen*, 597 U.S. at 47. The State writes "unusual" out of the formulation because it is necessary to sell its inaccurate historical narrative that throughout history "[n]ew weapons laws … are enacted when [new] technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers." State Br. at 22. Indeed, the State's proposed narrative might be properly labeled the "dangerous and popular weapons"—but doing so would give away the State's game. At the risk of sounding like a broken record, if that historical narrative were true, then *Heller* was wrongly decided, since handguns, more than any other weapon, have proliferated in society and have become the overwhelming weapon of choice for violent criminals. *See, e.g., Heller*, 554 U.S. at 698 (Breyer, J., dissenting). Indeed, the State's alternative formulation only serves to demonstrate the centrality of the "unusual" element of this historical tradition, as the only way to understand *Heller* is that firearms in

common use for lawful purposes—no matter how useful they are found to be for criminals—cannot be banned.

The historical laws to which the State points do not support the proposition that an arm in common use for lawful purposes may nevertheless be banned because it is "dangerous." They rather demonstrate *Plaintiffs*' point that common use is an essential element of the constitutional equation. The State points to early English laws, from 1300s and 1500s, that restricted launcegays and crossbows. *See* State Br. at 22. In *Bruen* the Court made clear *both* were targeting not just dangerous but "unusual" weapons, explaining that the anti-crossbow law was borne primarily out of Henry VIII's concern that preferences for other weapons would "threaten[] Englishmen's proficiency with the longbow," 597 U.S. at 42 (discussing 25 Hen. 8, ch. 6 (1533)), and the anti-launcegay law the Court distinguished on the ground that a launcegay, unlike any modern carried weapon, was "a 10- to 12-foot-long lightweight launce" which was generally "carried only when one intended to engage in lawful combat or . . . to breach the peace," *id.* at 41 (discussing 7 Rich. 2, ch. 13 (1383)). In any event, both of these ancient laws are far too remote to tell us much about the scope of the right adopted at the Founding.

The State's American analogues fare no better. The State first points to "severe restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity in the hands of murderers became apparent." State Br. at 22 (quoting *Ocean State Tactical*, *LLC v. Rhode Island*, 95 F.4th 38, 46 (2024)). These laws come too late in time to help the State. And what both it and *Ocean State Tactical* miss is that noting that there were "restrictions" on Bowie knives is not sufficient to carry the State's burden under *Bruen*, which requires an analysis of *how* the historical laws burdened the right. 597 U.S. at 27. In fact, the State and its expert significantly overstate the burden these laws placed on owning and carrying Bowie knives.

Far from the "every state except New Hampshire" that the State claims, there is evidence of just three states that actually prohibited all forms of carry of Bowie knives at some point before 1900 and none "banned" Bowie knives the way the State has banned so-called "assault weapons." *See* Pls.' 56.1 Resp. ¶ 116.

The story is much the same with the State's claims that "every state in the nation adopted laws… restricting blunt weapons" like the "slungshot" which the State claims was "ban[ned]" in "more than 40 states and the District of Columbia passing bans throughout the 19th century," or pistols which the State claims were "swiftly met by laws and regulations aimed at curbing their possession and use." State Br. at 23–24 (citation omitted). Again, what matters is *how* these laws regulated these weapons, and while some anti-slungshot laws were fairly stringent, many were not, *see Teter*, 76 F.4th at 951 n.11 (collecting laws). Only five states truly banned them before the 20th century, and two of those laws (which also banned carriage of revolvers and pistols) were clearly inconsistent with the Second Amendment, Pls.' 56.1 Resp. ¶¶ 119–120. The pistol laws fare no better. As *Heller* establishes, no historical laws support the banning of pistols today, and indeed *Bruen* specifically rejected the claim that restrictions on concealed carry of pistols could justify a ban on all forms of carriage today. *Bruen*, 597 U.S. at 47. If they cannot even support a ban on carriage, it is hard to understand how the State could think that they support a ban on possession of common firearms.

Laws regulating "trap guns," or guns that fired automatically, e.g., when a trip wire was triggered, *see* State Br. at 24, are an even worse fit. A trap gun is not a type of firearm but way to rig a firearm to go off without a human deciding to pull a trigger. The State attempts to relate these laws to the challenged law by claiming both "concern certain dangerous modifications of publicly available guns, and ban possession of the modified weapons outright," *Id.* at 24, but the trap gun

laws did not outlaw possession of any type of weapon, just rigging them to fire indiscriminately, something that none of the "features" targeted by the State do to semiautomatic rifles.

Finally, the State relies upon laws regulating machine guns from the twentieth century. Such laws come too late to be relevant so that even if they stood for the proposition the State claims, they would not change this case. *See Bruen*, 597 U.S. at 66 n.28 (declining to address 20th-century evidence noting that it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence"). Moreover, the laws are not relevantly similar because they targeted firearms that are notable for *not* having gained popularity with American citizens despite widespread availability, and so were not in "common use." *See* Pls.' 56.1 Resp. ¶¶ 106, 114, 130, 134. The State attempts to conflate the AR-15 with automatic weapons, because they can be modified to increase their rate of fire, but the challenged law does not ban *any* modification that would effectuate such a change.

### 3.  There Is No Tradition of Banning "Weapons That Cause Public Terror."

The State argues there is a "separate and sufficient American tradition of laws prohibiting bearing firearms in a way that spreads fear or terror among the people." State Br. at 27 (citation omitted). But that alleged "tradition" provides no basis for banning Plaintiffs from *possessing* common firearms like the AR-15. As the Supreme Court has explained, such laws proscribed the carrying of dangerous and unusual weapons, *see Bruen*, 597 U.S. at 47, or of arming oneself publicly in terrifying way that was likely to lead to actual violence, *Rahimi*, 2024 WL 3074728, at *9. Neither concern is applicable here, since the AR-15 is not a dangerous and unusual weapon and Plaintiffs are seeking to *possess* the banned rifles, not carry them in public. In any event, it would be inconsistent with the right to keep and bear arms to posit that the mere sight of a commonly owned weapon could produce terror sufficient to justify a ban. *See Simpson v. State*, 13 Tenn. 356, 360 (1833).

**IV. Plaintiffs Do Not Need to Provide Admissible Evidence of Common Use and Can Succeed on this Facial Challenge.**

Defendants argue that Plaintiffs' motion for summary judgment should be denied because they have failed to "adduce any admissible evidence … that the weapons they desire 'are weapons in common use today for self-defense,' a showing required by *Bruen* for the plain text of the Second Amendment to apply." State Br. at 4 (quoting *Bruen*, 597 U.S. at 32); *see also* Rocah Br., Doc. 80 at 2 (May 15, 2024) (similar). This is wrong twice over. First, as discussed in detail above, whether an arm is "in common use" is not, as the State claims, a prerequisite to trigger the application of the Second Amendment's text. Therefore, the burden is on the *State* to show that it has banned arms that *are not* in common use, to justify its law. *See Bruen*, 597 U.S. at 24; *see also Rahimi*, 2024 WL 3074728, at *6.

Second, Defendants are wrong to suggest that the sources on which Plaintiffs rely throughout their brief in support of summary judgment—sources including "books, law review articles, blog posts, and surveys"—can be disregarded as "hearsay" or should have been included in a separate statement of facts. State Br. at 5–6. There is nothing improper about Plaintiffs' relying on such sources to show that the banned firearms are in common use, because they all concern issues of "legislative fact," or facts "which have relevance to the legal reasoning and lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." FED. R. EVID. 201, 1972 Advisory Committee Note. "Legislative facts," as distinct from "adjudicative facts" "about the parties and their activities, businesses, and properties," *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 300 (2d Cir. 1971) (Friendly, C.J.), "come[] into [their] own when there is no reason to believe that certain facts pertinent to a case vary from locality to locality, or from person to person." *Frank v. Walker*, 773 F.3d 783, 795 (7th Cir. 2014) (Posner, J., dissenting from denial of reh'g en banc).

23

Neither of the State's objections are relevant to legislative facts. Restrictions against "hearsay" (indeed, the entirety of the Federal Rules of Evidence) do not apply. *See* FED. R. EVID. 201(a); *see also* 1 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FED. EVID. § 2:12 (4th ed. 2013). And such facts can be "incorporated in the argument section of [a] brief." *Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (discussing 7th Cir. R. 28).

The State appears to argue that the facts that Plaintiffs rely on to support their argument under *Bruen*—facts like the number of AR-15s in circulation—are "adjudicative" *because* they rely on them. *See* State Br. at 6. This fundamentally misunderstands the distinction. A fact is not "adjudicative" merely because it is important to a party's case. If that were the case, there would be no sense in distinguishing between them at all, since the rules of evidence would apply to all facts, of whatever kind, that are relevant to a legal opinion. That is not the case. *See, e.g.*, *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966). Indeed, it is because the critical facts for "shaping a general rule," *Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990), under the Second Amendment are all "legislative," that in both *Bruen* and *Heller* the Supreme Court declined requests to remand for factfinding and instead weighed the historical and factual record itself. *See, e.g.*, *Bruen*, 597 U.S. at 33 n.8. Indeed, the Solicitor General in *Heller* specifically asked for a remand to assess the questions such as the relative "suitab[ility]" of various types of firearms for "self-defense in the home," but the Court rejected the invitation. *See* Brief for United States, *Heller*, 2008 WL 157201 at *31 (Jan. 11, 2008). If Defendants were right then it would have been improper for *Heller* to find that handguns are "the most preferred firearm in the nation" for self-defense based, ultimately, on the Court of Appeals' citation to a social science paper on the topic. *See* 554 U.S. at 628–29 (citing to the D.C. Circuit's opinion which relied upon Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence & Nature of Self-Defense*

*with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995), to prove the point).

For similar reasons, the State is wrong to suggest that Plaintiffs face any special difficulty because their challenge can be characterized as facial. *See* State Br. at 6. Under *Heller*, it is facially unconstitutional to ban any arms that the State has not proven are dangerous and unusual. *See City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (identifying *Heller* as "[a] facial challenge").

## V.  Any Injunction Should Not Be Stayed Pending Appellate Review.

Finally, the State argues that the any injunction should be stayed pending appellate review. Particularly if relief is limited to the parties, the State has not carried its burden to show that it would meet the factors necessary to support a stay, *see LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994), again emphasizing the sort of concerns that are irrelevant under *Bruen*, threatening "mass casualties" if Plaintiffs' Second Amendment rights are respected, and omitting any discussion of likelihood of success or balance of harms, including the irreparable deprivation of Plaintiffs' Second Amendment rights. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motions.

Respectfully submitted, this 15th day of July 2024.

Cody J. Wisniewski, Esq.*
**FPC ACTION FOUNDATION**
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
5550 Painted Mirage Road, Suite 320
Las Vegas, Nevada 89149
(916) 517-1665
cwi@fpchq.org


Adam J. Kraut, Esq.*
**SECOND AMENDMENT FOUNDA-
TION**

**FLUET**
By:  */s/ Nicolas J. Rotsko*
　　　Nicolas J. Rotsko, Esq.
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
nrotsko@fluet.law
e-file@fluet.law

Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
12500 NE 10th Place
Bellevue, Washington 98005
(800) 426-4302
akraut@saf.org

*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of New York by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/ Nicolas J. Rotsko*
Nicolas J. Rotsko, Esq.

1