UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

J. MARK LANE and JAMES SEARS,

                        Plaintiffs,

        - against -

STEVEN G. JAMES, in his official capacity as
Acting Superintendent of the New York State
Police, and MIRIAM E. ROCAH, in her official
capacity as District Attorney for the County of
Westchester, New York,

                      Defendants.

No. 22-cv-10989 (KMK)

---

**PLAINTIFFS' RESPONSE TO DEFENDANT JAMES'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1(b) of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, Defendant Steven G. James, Superintendent of the New York State Police, respectfully submits the following Statement of Undisputed Material Facts in support of his Motion for Summary Judgment:

**A.**     **Overview of Assault Weapons**

      1.     The AR-15 was developed by the ArmaLite corporation in the 1950s, at the request of the U.S. Army, and began to be adopted for military use in the mid-1960s. *See* Declaration of James Yurgealitis ("Yurgealitis Dec.") ¶¶ 71-75.

     **Plaintiffs' Response to No. 1:** Plaintiffs note at the outset that this fact, and indeed the vast majority of the facts asserted to be true by the State in this document, is a "legislative fact" and not an "adjudicative fact." See FED. R. EVID. 201(a), 1972 Advisory Committee Note. In other words, they are not facts specific to the parties, that need to be established through evidence for the

purpose of resolving this dispute, but rather general facts about the world that "have relevance to legal reasoning . . . in the formulation of a legal principle or ruling by a judge or court." *Id.* They are not, therefore, the types of facts that are found at a trial, and they are facts that may be equally appropriately discussed in the argument section of a brief as they can be laid out in a "statement of facts" like this one. *See Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (discussing Seventh Circuit Rule 28). For those facts below that are relevant to the legal inquiry under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) (many of them are not relevant to any legal issue before the court), the Supreme Court has stated clearly that such facts are truly a part of the legal analysis this Court must undertake. *See id.* at 25 n.6. While Plaintiffs will respond to each of the facts asserted by the State here, they will deal more fully with the relevance and importance of the asserted facts in their legal brief.

Subject to this objection, which applies to each of Plaintiffs' responses, dispute. While the AR-15 was developed for use in the military, its only exclusively military attribute was selective fire capability. The AR-15, the most popular rifle in the country, is a semi-automatic version of the M16, a military rifle with select-fire capability (meaning it can fire in semiautomatic mode like an AR-15, where one round is discharged each time the trigger is pulled, or in automatic mode, where one pull of the trigger discharges more than one bullet), *see* Exhibit 1, *NSSF Fast Facts, Background Information On So-Called "Assault Weapons,"* NSSF (May 2022), https://bit.ly/418TYRJ, but the firearms are not "identical" in any meaningful sense. This is because the M16, as an automatic weapon, has a much higher rate of fire than an AR-15, see Exhibit 2, *Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY, at tbl. 2-1 (Aug. 2008), https://bit.ly/3pvS3SW, and does not require an individual to pull the trigger of the firearm each time it fires a round. In addition to firing at a faster rate, automatic fire is inherently more difficult to control than semiautomatic fire due to the constant recoil caused by the repeated firing of the firearm. Exhibit 3, *Rifle Marksmanship:*

*M16A1, M16A2/3, M16A4, AND M4 CARBINE,* DEP'T OF THE ARMY, at 7–10 (Apr. 2003), https://bit.ly/4eQHp44.

Indeed, having thoroughly reviewed industry and military manuals, former Army officer and infantryman Dennis Chapman concludes, "Semiautomatic rifles such as the AR-15 cannot even approximate—much less replicate—the effective rates of fire of machineguns or selective-fire weapons, and they cannot even remotely approach the extreme capabilities that some poorly informed commentators attribute to them." Exhibit 4, DENNIS P. CHAPMAN, THE AR-15 CONTROVERSY: SEMIAUTOMATIC RIFLES AND THE SECOND AMENDMENT 34 (2022). And "[n]o aspect of the semiautomatic AR-15's capabilities or features render it any more a military arm or 'weapon of war'—or any 'deadlier'—than any other semiautomatic rifle." *Id.* at 100. The Supreme Court has itself observed that, semiautomatic rifles like AR-15s "traditionally have been widely accepted as lawful possessions.*" Staples v. United States*, 511 U.S. 600, 612 (1994). As the Court noted at the very outset of its opinion, the only categorical distinction between a machinegun and a semiautomatic firearm is that the former "fires repeatedly with a single pull of the trigger," while the latter "fires only one shot with each pull of the trigger." *Staples*, 511 U.S. at 602 n.1; *see also Garland v. Cargill*, 602 U.S. 406, 410–11 (2024).

This distinction is supported by the history of firearms development: "At the end of the 19th Century and the beginning of the 20th, a new technology emerged that would set out a clear line of demarcation between firearms adapted solely to military applications and those useful in other shooting applications—technology that would, for the first time, set apart 'weapons of war' from other firearms. That technology was automatic fire: the ability to fire more than one round, whether in a continuous stream or in a burst, with each pull of the trigger." Exhibit 4, Chapman, *supra* at 110–11. Thus, the automatic vs. semiautomatic distinction is central to the nature and function of a firearm—not a peripheral point to be shrugged off—and it is misleading to claim that

the firearm known today as the AR-15 is the same as the one developed under that name by the Armalite Corporation in the 1950s for use in the military that was capable of automatic fire.

2.    After a series of engineering changes, the AR-15 rifle was given a new designation: the M-16, and would become one of the primary weapons carried by infantrymen in the Vietnam War. *Id.* ¶ 75.

**Plaintiffs' Response to No. 2:** Dispute. The M-16 is the military designation applied to a select-fire rifle that was developed under the name AR-15. It is, however distinct from the modern AR-15 which is not capable of automatic fire.

3.    The "AR-15 platform" is a popular configuration of rifle that allows for a wide variety of cosmetic or mechanical modifications. Yurgealitis Dec. ¶ 83.

**Plaintiffs' Response to No. 3:** Admit. Calling it "popular" actually undersells it. The AR-15 is the most popular rifle in the history of the United States. See Exhibit 5, William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 33–34, GEO. UNIV. (May 13, 2022) (finding that 24.6 million Americans, or 30.2% of gun owners, had owned an AR-15 or similar style rifle, and that the most common reasons for owning them were target shooting (66% of owners), home defense (61.9% of owners) and hunting (50.5% of owners)); *see* Exhibit 6, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652-01 (Apr. 26, 2022) (in which ATF refers to "AR-15-type rifle[s]" as "one of the most popular firearms in the United States"); Exhibit 7, *2021 Firearms Retailer Survey Report*, NSSF (2021), https://bit.ly/3gWhI8E (finding AR-15s have been the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns); Exhibit 8, *Firearm Production in the United States With Firearm Import and Export Data* at 7, NSSF (2023), https://bit.ly/42qYo7k (industry data shows that from 1990 to 2021, over 28 million such rifles were produced for sale in the United States, and that AR-15 style rifles constituted approximately 20% of all firearms domestically

4

produced for the American market for over a decade); *see* Exhibit 9, *Poll of current gun owners* at 1, WASH. POST-IPSOS (Mar. 27, 2023), https://bit.ly/46CqzRa (finding 20% of gun owners currently own an AR-15 or similar style rifle, 60% of respondents citing target shooting as a "[m]ajor reason" for owning them and 30% citing that as a "[m]inor reason," and protection of self, family, and property rating as even more important, with 65% reporting it as a major reason and 26% reporting it as a minor reason). A recent survey of over 2,000 owners of such firearms reached the same result as the National Firearms Survey and the Washington Post, showing again that home-defense and recreational target shooting are the two most important reasons for owning these firearms. See Exhibit 10, *Modern Sporting Rifle: Comprehensive Consumer Report* at 5, NSSF (July 14, 2022); see also Exhibit 11, *Sport Shooting Participation in the U.S. in 2020* at iii, NSSF (2021), https://bit.ly/3sPuEQl (noting that in 2020, 20 million Americans participated in sport or target shooting with firearms like those banned by the State). "AR-style rifles are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." Exhibit 12, FRANK MINITER, THE FUTURE OF THE GUN 46–47 (2014). This popularity among a diverse demographic of Americans is, in part, because an AR-15 "firing .223 or 5.56mm ammunition produces *zero* felt recoil—that is, nearly all the recoil produced by firing is absorbed by the buffer assembly, transmitting almost none to the shooter's shoulder." Exhibit 4, Chapman, *supra* at 127.

4.    AR-type rifles are easily customized to suit an owner's personal preference. Yurgealitis Dec. ¶ 85.

**Plaintiffs' Response to No. 4:** Admit.

5.    The AR-15 retains the same performance characteristics (in terms of factors such as muzzle velocity and range) as the military M-16 and its variants, with the exception of automatic fire.

Yurgealitis Dec. ¶ 76.

**Plaintiffs' Response to No. 5:** Admit as to AR-15 rifles that are chambered to fire the same type of ammunition as the military M-16 (those that can fire .223 or 5.56 NATO rounds), but dispute for AR-15 rifles chambered for other calibers of ammunition, which have different performance characteristics. *See infra* Resp. to Statement 99.  Further, Plaintiffs note that the AR-15 also does not permit three-round burst fire, but some versions of the military M-16 do.

6.      Semiautomatic fire remains the preferred mode for military use, however, with the U.S. Army manual on the M-16 emphasizing that semiautomatic fire is the most effective mode for the weapon, and indeed that "[t]he most effective use of the M-16 at ranges beyond 25 yards is rapid semi-automatic fire—not full-automatic fire." *Id.* ¶ 161 (citing U.S. Army Manual 3-22.9, "Rifle Marksmanship M-16A1, M-16A2/3, M-16A4, and M4 Carbine" (April 2003)).

**Plaintiffs' Response to No. 6:** Dispute. While the military recommends semiautomatic fire in situations more akin to what a civilian would face, automatic fire is more desirable in unique, military situations. *See* Exhibit 13, E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. ILL. U. L. J. 193, 207–08 (2018) ("Automatic rifle fire can be used for gaining initial fire superiority over an enemy force, suppressive fire, engaging area targets, breaking contact in close terrain, effecting ambushes, executing certain close-quarters-battle (CQB) situations such as clearing a room or bunker, engaging closely-spaced multiple targets, and providing final protective fire (FPF) against an overwhelming enemy attack. Sometimes the military's need to fire many rounds downrange quickly is more important than precisely-aimed fire.").

7.      An AR-15 need not meet the statutory definition of an "assault weapon," and there are AR-15-platform rifles broadly available at gun stores across New York that comply with State law. *See* Declaration of Suzanna Publicker Mettham ("SPM Dec."), Exhibit A, Deposition of Plaintiff James Sears ("Sears Dep.") 94:6-9.

**Plaintiffs' Response to No. 7:** Dispute. Any AR-15 that is legal under the State's ban would have

to significantly depart from the original design of the firearm; as a result, most AR-15s are banned under the statute. As the State's own expert notes, the design of its precursor, the AR-10, "closely followed what was now becoming standard assault rifle design, i.e., light weight (aluminum forged receivers as opposed to machined steel), separate pistol grip and shoulder stock, foregrip / barrel shroud, detachable magazine, and numerous flash hider / muzzle brake variations." Yurgealitis Dec. ¶ 70. The only reason AR-15 style rifles without the features the State ban exist at all is because of this and similar bans. As one writer said of the California assault weapons ban, it "led firearms owners to seek workarounds in order to remain complaint with the law. A rifle without the banned features became known as a 'featureless AR' …  Springfield Armory, Rock River Arms and Radian Weapons have chosen to go the featureless route and have a fixed stock, muzzle brake and finned pistol grip." Exhibit 14, Alfredo Rico, *California-Compliant AR-15 Rifle?*, GUNS & AMMO (Apr. 20, 2023), https://bit.ly/4cRfGye; *see also* Exhibit 15: Daniel W. Webster, et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States* at 181, 19 CRIMINOLOGY & PUB. POL'Y 171, 188 (2020) ("It should be noted that the federal assault weapons ban and some state bans of assault weapons have resulted in gun manufacturers making slight alterations in the characteristics of weapon models that are banned.").

For instance, ordinarily, an AR-15 rifle would require a "pistol grip" (as opposed to a more "traditional" grip as part of the stock) to be held at all because the AR-15 has a straight-line design that does not permit a more "traditional" configuration, *see infra* Resp. to Statement 13, and alternative features like the "fin grip" largely exist because certain jurisdictions have not allowed pistol grips. *See* Exhibit 16, Paul Yen, *What Are Fin Grips & Why Use Them?*, PEW PEW TACTICAL (Sept. 10, 2022),  https://bit.ly/4cwvfMj.

8.    A magazine holds the ammunition for a firearm before it is chambered and fired. Yurgealitis Dec. ¶ 46.

**Plaintiffs' Response to No. 8:** Dispute. This statement is incomplete. In addition to holding the

ammunition before it is chambered and fired, a magazine also feeds ammunition into the chamber for it to be fired. *See* Exhibit 17, NICHOLAS JOHNSON ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 1978 (3d ed. 2021). Indeed, most semiautomatic firearms *cannot function semiautomatically* without a magazine (since without a magazine, they cannot automatically load the next round into the chamber).

9. Semi-automatic rifles can be manufactured with either fixed internal magazines or a capacity to accept detachable external magazines. Yurgealitis Dec. ¶ 26.

**Plaintiffs' Response to No. 9:** Admit.

10. Detachable magazines facilitate faster reloading compared to internal fixed magazines. Yurgealitis Dec. ¶ 46.

**Plaintiffs' Response to No. 10:** Admit.

11. Folding and telescoping stocks allow the operator to more easily conceal or maneuver the weapon in a confined space such as a vehicle, and facilitate easier or more comfortable firing from positions other than the shoulder. Yurgealitis Dec. ¶ 110.

**Plaintiffs' Response to No. 11:** Dispute. Broadly termed "[a]djustable stocks," these accessories are "ergonomic improvements over earlier fixed-stock rifle configurations" that are "designed to allow adjustments in the rifle's length of pull, making the firearm more comfortable to shoot in both military and civilian applications." Exhibit 13, Wallace, *"Assault Weapon" Myths*, *supra* at 232. "A telescoping stock makes a rifle easier to shoulder properly for different users, or for one user when shooting from different positions or wearing different thicknesses of clothing." *Id.* Adjustable stocks serve a perfectly sensible function, one in fact rooted in American tradition: "Most people cannot afford to have a rifle custom-stocked to fit their precise size and shape and certainly cannot afford to have custom stocks made for each member of their family. Collapsible or adjustable stocks provide a standard, off-the-shelf solution that allows each shooter to adjust the rifle to their own body and thus optimize their shooting experience; adjustable buttstocks enable multiple members

of a family to practice shooting with the same rifle, optimizing the shooting experience for each. In this respect, adjustable buttstocks reflect the American shooting tradition, wherein hunting, target shooting, and arms for self-defense have always been the province of ordinary working people of modest means as opposed to the European tradition wherein the shooting sports were the domain of the wealthy and privileged classes who could afford to indulge in fine handcrafted and extremely expensive custom sporting arms." See Exhibit 4, Chapman, *supra* Resp. to Statement 9 at 83–84. In this way, adjustable stocks serve a similar function as adjustable steering wheels and seats in an automobile: allowing the user to better fit the item to the user's build.

On the other hand, a collapsible stock does little to make a rifle more concealable or to facilitate shooting "from positions other than the shoulder." As to the first point, a rifle with an adjustable stock is not necessarily lighter than a rifle with a more traditional stock, *see id.* Resp. to Statement 9 at 85–86, and collapsing a stock fully does little to reduce the overall length of a rifle, *id.* at 86 (noting that the military rifle, the M4 Carbine, has a length of 33 inches with the stock extended and 29.75 inches with the stock fully collapsed, a difference of just 3.25 inches). Any modest gain in concealability by this change is insufficient to overcome the other features of so-called "assault weapons" that make them difficult to conceal: "The AR-15 is an extremely well-designed rifle from a shooting perspective, but it's a bumpy rifle with numerous snags and protuberances that can make deploying it from behind a truck seat or other hiding place a frustrating effort." Exhibit 18, Nathanial F., *Is There Room for a Traditional Civilian Semiauto Rifle?*, TFB (June 11, 2016), https://bit.ly/3XVno6A. As Chapman explains, "it is possible to construct an AR-15 with few or none of the features that gun control advocates seek to ban but, ironically, *such a rifle would actually be easier to conceal for evil purposes than an ordinarily configured AR-15*." Exhibit 4, Chapman, *supra* Resp. to Statement 9 at 87. And even then, such a rifle would not be "concealable" in the same way that any garden variety handgun is. As to the second point, Yurgealitis does not specify from which

positions a rifle with a collapsible stock can allegedly be more efficiently fired, but the point certainly requires more clarity. As explained, the purpose of a collapsible stock is to facilitate a better fit for a rifle on the shoulder.

12.    Folding stocks were added to the M1 carbine in World War II for paratrooper use, and more recent variants of the M-16 (M-4 carbine) have incorporated telescoping stocks as a standard feature. Yurgealitis Dec. ¶ 110.

**Plaintiffs' Response to No. 12:** Admit in part. Regardless of their provenance on the M1 specifically, folding and telescoping stocks are not exclusively useful for military use, but also help fit the firearm to the user in the civilian context as well. *See* Resp. to Statement 11.  Folding stocks long precede their use in the military: known as the "wolf killer[]," an 18th century Italian blunderbuss featured an early folding stock. Exhibit 19, *Lot 3238: Italian Flintlock Blunderbuss with Folding Stock*, RIA, https://bit.ly/3VXIOgy (last visited July 3, 2024). The folding stock was also featured prominently on the popular Marble Game Getter, increasing the versatility of a firearm that was designed particularly for hunting purposes. It went on the market in 1909. Exhibit 20, Arni Dunathan, *Webster Marble's Masterpiece*, MARBLE ARMS, https://bit.ly/4bBBT2z (last visited July 3, 2024).

13.    A semi-automatic rifle that includes a pistol grip (without a shoulder stock) increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in a confined space such as a vehicle. Yurgealitis Dec. ¶ 111.

**Plaintiffs' Response to No. 13:** Dispute. As an initial matter, New York defines a firearm as an "assault weapon" if it has a pistol grip, whether or not it also has a "shoulder stock," and discussing the very rare combination of a rifle with a pistol grip but no shoulder stock provides a misleading picture of the use of a pistol grip. "The straight-line design [of an AR-15] requires a pistol grip separate from the buttstock because it is too awkward to pull the trigger while gripping the raised buttstock when firing the rifle from the shoulder, whether standing, kneeling, or prone. The

Department of Defense's Advanced Research Projects Agency (ARPA), in its 1962 final report on testing of the military's AR-15/M16 in Vietnam, described the rifle as having 'a plastic stock with a rubber butt, assembled in line with the bore. This, in conjunction with its high line of sight and *separate hand grip*, is designed to minimize rotation about the shoulder during firing.' The ARPA report refers to the military AR-15/M16 six times as a 'shoulder weapon.' The pistol grip thus allows for accurate firing from the shoulder, which is how the rifle was designed to shoot." Exhibit 13, Wallace, *"Assault Weapon" Myths*, *supra* at 229. The pistol grip is positioned "in such a manner as to provide a more natural, comfortable, and effective grasp of the rifle. It is this purpose, and no other, for which the modern pistol grip is intended." *See* Exhibit 4, Chapman, *supra* Resp. to Statement 9 at 38. Contrary to the State's expert, a pistol grip makes concealing the rifle more difficult: "Features such as the vertical front sight post and the magazine and pistol grip projecting at nearly right angles from the rifle's receiver conspire to make the AR-15 a poor choice if deploying the firearm from concealment is the intention." *See* Exhibit 4, Chapman, *supra* Resp. to Statement 1 at 87.

14.     The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator). Yurgealitis Dec. ¶ 111.

**Plaintiffs' Response to No. 14:** Dispute. "Firing 'from the hip' is a species of 'quick fire' or 'quick kill' firing techniques long present in US Army marksmanship doctrine. However, such techniques have never occupied more than an extremely minor place in that doctrine; they have been disfavored techniques to the extent that they were accepted at all; they have received very little attention in marksmanship training programs; and, even to the limited extent that they existed in the doctrine, they are implicitly obsolete. Importantly, these techniques have been present in doctrine irrespective of whether the firearm in question had either a pistol grip, 'barrel shroud' handguards, both, or neither." *See* Exhibit 4, Chapman, *supra* Resp. to Statement 9 at 41; *also id. generally* at 42—59.

15.     During the time the Federal Assault Weapons Ban was in effect (from 1994 to 2004), a number of AK-style firearms (amongst others) were equipped with thumbhole stocks to circumvent

the ban's prohibition on pistol grips. Yurgealitis Dec. ¶ 111.

**Plaintiffs' Response to No. 15:** Admit that during the time period in question a number of firearms were equipped with thumbhole stocks, but dispute that this was to circumvent rather than comply with the law. *See* Resp. to Statement 7.

16.    A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low-light conditions, and also helps to conceal the flash from view. Yurgealitis Dec. ¶ 112.

**Plaintiffs' Response to No. 16:** Admit. It has additional benefits as well: a flash suppressor "reduces noise and potentially increases accuracy." Exhibit 21, STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 332 (2022) (quoting Murphy v. Guerrero, No. 1:14-CV-00026, 2016 WL 5508998, at *19 (D.N. Mariana Islands Sept. 28, 2016)).

17.    The flash suppressor allows the operator to more easily acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash, and also helps conceal the shooter's position. Yurgealitis Dec. ¶ 112.

**Plaintiffs' Response to No. 17:** Admit. The flash suppressor can be extremely useful in self-defense situations: when facing a home invader in the middle of the night, a homeowner would do well to not be blinded by the flash from his first shot. "Civilian applications for flash hiders include hunting in low light or at night. Probably the greatest practical benefit of a flash hider for civilians is that it protects the crown of the barrel from dirt and other obstructions. There is no evidence that flash hiders have given terrorists or criminals any advantage in mass shootings or other crimes involving 'assault weapons.'" Exhibit 13, *"Assault Weapon" Myths*, *supra* at 233–34.

18.    A threaded barrel allows for attachment of a suppressor (commonly referred to as a silencer) which allows the operator to better conceal themselves from their target by reducing the report of their firearm. Yurgealitis Dec. ¶ 114.

**Plaintiffs' Response to No. 18:** Dispute as incomplete. A threaded barrel has other uses as well. It

"can allow the firearm to be more easily disassembled for cleaning or maintenance … provide a tighter seal between the barrel and the suppressor, which can help to reduce noise signature … [and] offer greater precision and accuracy than non-threaded barrels." Exhibit 22, *What Does a Threaded Gun Barrel Do?*, SPRINGHILL OUTFITTERS (July 13, 2022), https://bit.ly/3WdUa1t. And a suppressor is valuable for training and other lawful uses of firearms by protecting the hearing of the user. *See* Exhibit 23, Lila Chen & Scott E. Brueck, *Noise and Lead Exposures at an Outdoor Firing Range – California* at 5, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH (Sept. 2011), https://bit.ly/3YSzcDD (in which the CDC called suppressors "[t]he only potentially effective noise control method to reduce . . . noise exposure from gunfire"). Suppressors offer important protections for individuals engaged in self-defense. In addition to dampening sound, suppressors reduce recoil and help reduce muzzle flinch, allowing greater control of a firearm and improved accuracy. Exhibit 24, Richard A. Mann, *A Can In Hand: The Band And Very Good Of Owning A Suppressor*, GUNDIGEST (Nov. 30, 2023), https://bit.ly/3RZqfaP. And despite misleading depictions in movies, a suppressor does not "silence" a firearm but rather suppresses the sound of firing by approximately 20-30 decibels. Exhibit 25, Glenn Kessler, *Are firearms with a silencer 'quiet'?*, WASH. POST (Mar. 20, 2017), https://wapo.st/3KcOz59.

19.     A threaded barrel also allows the attachment of some flash suppressors. *Id.*

**Plaintiffs' Response to No. 19:** Admit.

20.     A secondary handgrip allows increased stability of the firearm by the operator by better controlling recoil and muzzle climb, thus increasing the shooter's hit probability for successive shots. Yurgealitis Dec. ¶ 115.

**Plaintiffs' Response to No. 20:** Admit.

21.     A protruding foregrip is not a feature found on traditional sporting firearms. It appeared on some versions of AK-based rifles, but it was not until the advent of the Rail Attachment

Systems (RAS) and acceptance by the U.S. military that foregrips for semi-automatic rifles became more widespread. Yurgealitis Dec. ¶ 115.

**Plaintiffs' Response to No. 21:** Dispute. It is unclear what the State's expert means by "traditional sporting firearms," which is not a recognized category of firearms. Furthermore, as the State's expert admits, a protruding foregrip has been a part of the AR-15's design since its inception, *see* Yurgealitis Dec. ¶ 70 At any rate, the non-trigger hand must go somewhere on a long gun, and a protruding foregrip is a convenient and effective place for it to go without risk of burning one's hand on a hot barrel.

22. A bayonet mount provides an attachment point for a bayonet which, on a military rifle, provides an additional weapon for close quarter combat. Yurgealitis Dec. ¶ 116.

**Plaintiffs' Response to No. 22:** Admit.

23. Bayonet mounts and bayonets are not a feature commonly found on sporting rifles or shotguns. Yurgealitis Dec. ¶ 116.

**Plaintiffs' Response to No. 22:** Dispute. Bayonets are very old features of rifles, dating back to the early 17th century. Exhibit 26, Bobby Cervantes, *10 facts about bayonets*, POLITICO (Oct. 23, 2012), https://politi.co/4eUaRpR. They have been used on rifles in what the State's expert considers more "traditional" configurations (lacking the AR-15's straight-line design) like the M1 Garand. Exhibit 27, Garry James, *The Iconic M1 Garand,* GUNS & AMMO (Apr. 11, 2016), https://bit.ly/4bz5Wrm.

24. A grenade launcher allows a combatant to launch an indirect fire intermediate range weapon which, if deployed in a civilian event, would likely result in mass casualties. Yurgealitis Dec. ¶ 117.

**Plaintiffs' Response to No. 23:** Dispute. Plaintiffs are not challenging the State's ban on grenade launchers.

25. Rifle launched grenades are not, as with bayonet mounts, a feature found on traditional sporting firearms. Yurgealitis Dec. ¶ 117.

**Plaintiffs' Response to No. 24:** Dispute. *See* Resp. to Statement 24.

**B.    The State of New York's Longstanding Regulation of Assault Rifles and Accessories**

26.    In 1994, Congress enacted a ban on assault weapons that defined such weapons as, inter alia, semiautomatic rifles with the capacity to accept a detachable magazine and certain "combat-designed features" such as certain stocks, grips, bayonet mounts, flash suppressors, or grenade launchers—all features which "serve specific, combat-functional ends." *See* Yurgealitis Dec., Ex. D, H.R. Rep. No. 103-489 (1994), at 19.

**Plaintiffs' Response to No. 26:** Dispute. This is not a "fact" but rather a statement of the law. The law speaks for itself.

27.    Congress recognized that "[t]he net effect of these military combat features is a capability for lethality-more wounds, more serious, in more victims-far beyond that of other firearms in general, including other semiautomatic guns." *Id.* at 19–20.

**Plaintiffs' Response to No. 27:** Dispute. Among the so-called "military combat features"—which are a misnomer, as discussed, these features are downstream from the core design of the firearms at issue—the statute lists "high-capability magazines" which are not at issue in this case. *See* Yurgealitis Dec., Ex. D, H.R. Rep. No. 103-489 (1994), at 35. What is more, government-commissioned research on the effect of the federal ban concluded that it could not be said to have reduced the incidence or lethality of gun crimes. *See* Exhibit 28, Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* at 2, 96, U.S. DEP'T OF JUST. (June 2024), https://bit.ly/3hZiy5v. And scholarly research on assault weapons bans have found that they are not associated with a decrease in lethality in mass shootings. *See* Exhibit 15, Webster, *supra* Resp. to Statement 7 at 188.

28.    In 2000, New York adopted a substantially identical assault weapon prohibition, with the legislation passing both the Republican-majority State Senate and the Democratic-majority State

Assembly before being signed into law by Governor George Pataki. *See* SPM Ex. N, 2000 N.Y. Laws Ch. 189.

**Plaintiffs' Response to No. 28:** Admit that this fact accurately describes the passage of the New York "assault weapon" prohibition. Dispute that it is "substantially identical" to the federal prohibition as a statement of law, and the federal and state prohibitions speak for themselves.

29.     To meet the statutory definition of an "assault weapon" under § 265.00(22) of the New York State Penal Law, a rifle must have each of three characteristics:

(a) it must be semiautomatic, which is defined as a "repeating" weapon "which utilizes a portion of the energy of a firing cartridge or shell to extract the fired cartridge or spent shell and chamber the next round," allowing for the weapon to fire a bullet each time the trigger is pulled without the shooter needing to take any additional action. See N.Y. Penal Law §§ 265.00(21), (22)(a);

(b) it must have "an ability to accept a detachable magazine," allowing for reloading within seconds. *See* N.Y. Penal Law § 265.00(22)(a). "A magazine is a 'container that holds ammunition for a firearm,' typically by holding bullets and feeding the ammunition into the firearm, but does not contain a firing mechanism;

(c) it must have one or more one or more enumerated features, namely (i) "a folding or telescoping stock;" (ii) "a pistol grip that protrudes conspicuously beneath the action of the weapon;" (iii) "a thumbhole stock;" (iv) "a second handgrip . . . that can be held by the non-trigger hand;" (v) "a bayonet mount;" (vi) "a flash suppressor, muzzle break, [or] muzzle compensator;" or a "threaded barrel designed to accommodate those features," or (vii) "a grenade launcher." N.Y. Penal Law § 265.00(22)(a).

**Plaintiffs' Response to No. 29:** Dispute. This is not a "fact" but rather a statement of the law. The State's laws speak for themselves.

30.     New York's prohibition on assault weapons is subject to an exception for persons who owned assault weapons prior to the enactment of the relevant legislation as well as active or retired law enforcement officers who utilized the weapons "in the course of his or her official duties." N.Y. Penal Law § 400.00(16-a); *see also* N.Y. Penal Law § 265.00(22)(g) (listing exceptions).

**Plaintiffs' Response to No. 30:** Dispute. This is not a "fact" but rather a statement of the law. The State's laws speak for themselves.

31.     Persons who legally own assault weapons are required to register them with the New York state police, and to periodically recertify that registration. *See* N.Y. Penal Law § 400.00(16-a)(a).

**Plaintiffs' Response to No. 31:** Dispute. This is not a "fact" but rather a statement of the law. The State's laws speak for themselves.

**C.     Plaintiffs' Challenge to New York's Assault Weapons Ban**

32.     Plaintiff Lane possesses semiautomatic rifles, including Ruger 10-22s. *See* SPM Dec. Ex. B, Deposition of J. Mark Lane ("Lane Dep.") 53:11-17.

**Plaintiffs' Response to No. 32:** Admit.

33.     Plaintiff Sears possess semiautomatic rifles, including an AR-compatible Smith & Wesson M&P 15 Sport. *See* SPM Dec. Ex. A, Sears Dep.  21:16-22:6.

**Plaintiffs' Response to No. 33:** Admit.

34.     Plaintiff Lane testified that a reason he wants to purchase an assault rifle is that if a person sees one, that person would "think twice," and that a handgun does not have that impact. Lane Dep. 137:9-16.

**Plaintiffs' Response to No. 34:** Dispute. Plaintiff Lane said this in the context of defending himself against a potential attacker: "You know, there is an optics component to it, as well. If you need to defend yourself, and the person that you need to defend yourself sees something that looks like the Saint, I would hope that they would think twice. A handgun doesn't have quite that impact." Lane Dep. 137:9-16.

35.     Plaintiff Sears testified that, while he typically carries a pistol concealed with him anywhere for which he is legally permitted to do so, he would not publicly carry an assault rifle because it would cause fear in others. Sears Dep. 87:3-88:15.

**Plaintiffs' Response to No. 35:** Dispute. Plaintiff Sears said he would not carry an "assault rifle" to a grocery store because it is not as easily concealable as a pistol is. Sears Dep. 86:21-87:12. He said that carrying an "assault rifle" might lead to someone calling the police on him. *Id.* 87:24-88:4.

36.    Plaintiff Lane did not have personal knowledge of any incidents where someone used an AR-15 style rifle in defense of themselves or others. Lane Dep. 165:5-166:9.

**Plaintiffs' Response to No. 36:** Admit.

37.    Plaintiff Sears did not have personal knowledge of any incidents where someone used an AR-15 style rifle in defense of themselves or others. Sears Dep. 89:7-13.

**Plaintiffs' Response to No. 37:** Admit.

38.    In support of their belief that AR-15 style rifles are used in self-defense, Plaintiffs' interrogatory answers cite 12 inadmissible news articles, without any supporting information, spanning 14 years from 2010 to today. *See* SPM Dec. Ex. C, at Response to Interrogatory No. 5.

**Plaintiffs' Response to No. 38:** Dispute. The cited articles are not "inadmissible." Like so many of the State's assertions of fact in this document, the question of when and how often AR-15s are used in self-defense is an issue of "legislative fact." *See* Resp. to Statement 1. These news articles present general facts about the world that "have relevance to the legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court in the enactment of a legislative body." FED. R. EVID. 201, 1972 Advisory Committee Note. Unlike so-called "adjudicative facts," *i.e.*, facts "about the parties and their activities, businesses, and properties," *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 300 (2d Cir. 1971) (Friendly, C.J.) (cleaned up), the rules of evidence do not apply to this Court's consideration of legislative facts. FED. R. EVID. 201, 1972 Advisory Committee Note; *see also Landell v. Sorrell*, 382 F.3d 91, 203 (2d Cir. 2004) (Winter, J., dissenting). Furthermore, at least four of the articles have been cited in a federal court opinion. *See Miller v. Bonta,* No. 19-cv-01537, 2023 WL 6929336, at **5–6 (S.D. C.al. Oct. 19, 2023).

39.    Most of the articles indicate that the weapons used were AR-15s, but do not indicate whether they meet the definition of an assault weapon under New York law, the articles indicate that the weapon was never fired, and all of the articles appear to have been published within days of the events at issue, without the benefit of trials, completed investigations, or testimonial evidence. *Id.*

**Plaintiffs' Response to No. 39:** Dispute. As noted in response to Statement 7, almost all AR-15s fit the definition of "assault weapon" under New York law; the few that do not are those that are specifically manufactured to avoid similar bans. And as noted in response to Statement 38, it is irrelevant that the articles in question were published "without the benefit of trials" because the facts in question are not subject to the rules of evidence. Finally, it is irrelevant that in some cases the firearm was "never fired." A firearm is "used" in self-defense if it is merely kept for that purpose, just as an insurance policy is used if it is merely owned for peace of mind and no claim is ever made on it. And a firearm is indisputably used in self-defense if it is brandished to ward off an attacker.

Furthermore, while most AR-15s are banned in New York so it is generally safe to assume an AR-15 in a news article is of the type that would be banned in New York, in some cases we do not need to assume. The AR-15 in this article plainly has a pistol grip and detachable magazine, which would qualify it as an assault weapon under New York law, *see* Exhibit 29, *Santa Monica Owner Protects His Store With Guns Amid Looting*, CBS L.A. (June 1, 2020), https://cbsn.ws/47BxwDk.

Finally, the AR-15 was fired in all of the following articles: Exhibit 30, Joe Tacopino, *Pregnant Florida mom uses AR-15 to kill home intruder*, N.Y. POST (Nov. 4, 2019), https://bit.ly/4cRwOEo; Exhibit 31, Austin L. Miller, *MCSO: 2 of 4 intruders dead, homeowner injured in home invasion*, OCALA STAR BANNER (July 10, 2019), https://bit.ly/3R49MAN; Exhibit 32, *Homeowner's son shoots, kills three would-be burglars*, FOX NEWS (Mar. 27, 2017), https://fxn.ws/47DrNgv; Exhibit 33, *Investigators: 15-year-old son of deputy shoots burglary suspect*, KHOU11 (June 29, 2010), https://bit.ly/3Llka4t ; Exhibit 34, John Allen, *Shooting Deemed Justifiable: Authorities Say Zach Peters Acted Lawfully When He Shot, Killed Three Intruders*, AM. TRIBUNE (April 3, 2017), https://bit.ly/3VXQL5x; Exhibit 35, David French, *Texas Hero Reportedly Used His Own AR to Confront the Sutherland Springs Shooter*, NAT'L REV. (Nov. 6, 2017), https://bit.ly/3RWzCb4; Exhibit 36, Garrett Pelican, *Deputies: 30 Rounds Fired From AR-15 in Deadly Florida Home Invasion*, NEWS4JAX (Apr. 17, 2018), https://bit.ly/4eQyekd ; Exhibit 37, *Police: Tallahassee homeowner shot 2 out of 4 home invasion suspects, all 4 charged*, WTXL ABC 27 (May 14, 2019),

https://bit.ly/3RZuXVN.

40.     Plaintiff Sears testified that he believes it is unconstitutional to prohibit civilians from possessing M-16 military rifles, drones with Hellfire missiles, and intercontinental ballistic missiles. Sears Dep. 43:19-45:16.

**Plaintiffs' Response to No. 40:** Admit that Plaintiff Sears so testified, dispute that such testimony has any relevance to this case. Plaintiff Sears is not a lawyer, and Plaintiffs have not advanced any of these positions here.

41.     Plaintiff Lane testified that when he fires his rifles, he never needs to fire more than one shot, and that only once did his son need to fire two shots. Lane Dep. 92:4-14.

**Plaintiffs' Response to No. 41:** Dispute. Plaintiff Lane testified that he never needs to fire more than one shot with his rifle *while hunting*. Lane Dep. 92:4-14. Lane never testified that he would require just one shot in a self-defense situation, as the statement implies.

42.     Plaintiff Sears testified the reason a fixed magazine is insufficient for his purposes is that, if a bullet jams, it is easier to replace the magazine than it is to clear the jam. Sears Dep. 58:12-18.

**Plaintiffs' Response to No. 42:** Admit.

43.     Plaintiff Sears testified that a detachable magazine could have the same jam with the next magazine. Sears Dep. 40:22-25.

**Plaintiffs' Response to No. 43:** Admit.

44.     Plaintiff Sears testified that he does not have any firsthand knowledge of telescoping stocks being necessary for self-defense, and testified that he has seen on the news people grabbing their husbands' or spouses' rifles and fitting it to themselves. Sears Dep. 66:20-67:3.

**Plaintiffs' Response to No. 44:** Dispute to the extent it mischaracterizes testimony. Plaintiff Sears testified that a telescoping stock would both facilitate easy storage of a firearm in a firearm safe as

well as permit both himself and his wife to fit the firearm to themselves for maximum accuracy. Sears Dep. 65:11-66:5.

45.    Plaintiff Lane testified that his wife and children do not have access to the single key used to access the multiple gun safes he maintains in his home, in which all of his weapons are stored. Lane Dep. 43:23-44:16.

**Plaintiffs' Response to No. 45:** Admit.

46.    Plaintiff Sears testified that he believes a muzzle device is a safety feature, in that using a suppressor or silencer on a semiautomatic rifle could decrease the chance of hearing loss if fired in a small room. Sears Dep. 74:9-75:6.

**Plaintiffs' Response to No. 46:** Admit.

47.    When asked how a suppressor is necessary for self-defense, Plaintiff Sears testified that the "main reason" is to spare his hearing. Sears Dep. 76:19-24.

**Plaintiffs' Response to No. 47:** Admit.

**D.    Magazines and Firearm Accessories Are Not Bearable "Arms" As That Term Was Historically Understood**

48.    At the Founding, "Arms" was used as general term for weapons such as swords, knives, rifles, and pistols. *See* Declaration of Professor Dennis Baron ("Baron Dec.") ¶ 10.

**Plaintiffs' Response to No. 48:**  Dispute. The "corpus linguistics" approach advocated by Baron relies on computerized searches of databases of historical documents and analyzing how certain words or phrases were used in those documents. This approach was unequivocally rejected by the Supreme Court in *District of Columbia v. Heller*, which derided the ways in which the "data" used by the proponents of the approach led them to a nonsensical interpretation of the phrase "bear arms" that was "worthy of the Mad Hatter." 554 U.S. 570, 589 (2008). For a more complete critique of the method in this context, *see generally* Exhibit 38, Mark W. Smith & Dan M. Peterson, *Big Data Comes for Textualism: The Use and Abuse of Corpus Linguistics in Second Amendment Litigation*, 70 DRAKE L. REV.

387 (2022). "Arms" within the context of the Second Amendment has been definitively and bindingly interpreted by the Supreme Court to be broader than this and includes, for instance "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (quoting 1 A NEW AND COMPLETE LAW DICTIONARY); see also *id.* at 580–82. That Baron's method would lead him to define the term more narrowly than it is defined in binding Supreme Court precedent well demonstrates why his method should not be accepted.

49.    "Arms," when used as a stand-alone term, referred to weapons. Baron Dec. ¶ 32. "Arms" almost never referred to ammunition or ammunition storage containers such as cartridge boxes. Baron Dec. ¶ 32.

**Plaintiffs' Response to No. 49:** Dispute. *See* Resp. to Statement 48. Cartridge boxes qualify as "arms" within the meaning of that term as used in *Heller*. *See* 554 U.S. at 580–82.

In another demonstration of the limitations of Baron's methods, although he makes much of the fact that he consulted several founding era sources to conclude that these items were not "arms," he omits to discuss the most important sources. The Constitution gives Congress the authority to "provide for organizing, arming, and disciplining the Militia," U.S. CONST. art. I, § 8, cl. 16 (emphasis added), and, in the first exercise of that authority in 1792 (one year after the ratification of the Second Amendment), Congress required militiamen to acquire firearms as well as "a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges." The Militia Act of 1792, Act of May 8, 1792, ch. 33, 1 Stat. 271 § 1. Congress therefore understood "arming" the militia to include outfitting the militia with containers for ammunition. *See Abbott v. Biden*, 70 F.4th 817, 830 (5th Cir. 2023).

50.    The "cartridge box" or "cartouch box," which was the precursor to today's "magazine," was typically mentioned in lists of accoutrements, often in connection with other items worn with a soldier's uniform. Baron Dec. ¶ 33.

**Plaintiffs' Response to No. 50:** Dispute. *See* Resp. to Statement 49. "Cartridge boxes" were, as the name suggests, simply boxes used to store extra ammunition. They were carried by soldiers but not part of a firearm. See Exhibit 39, DON TROIANI, DON TROIANI'S SOLDIERS OF THE AMERICAN REVOLUTION 4 (2007). The State's attempt to reduce "magazines" to "cartridge boxes" is baseless. Semiautomatic magazines are integral components of semiautomatic firearms which both hold and feed ammunition into the chamber to be fired, *see* Exhibit 17, Johnson, *supra*. Indeed, most semiautomatic firearms cannot function semiautomatically if they are not equipped with a magazine (since without the magazine, they cannot automatically load the next round into the chamber).

51.    "Arms" did not refer to other weapons accessories, such as flints and ramrods. Baron Dec. ¶ 35.

**Plaintiffs' Response to No. 51:** Dispute. *See* Resp. to Statement 48.

52.    Even though repeating rifles date to approximately the mid-nineteenth century (with a few outliers predating even that time frame), the Winchester rifles of the 1860s and 1870s were the first repeating rifles with a magazine capacity greater than ten which were produced in sufficient numbers to be available for purchase by Americans. Declaration of Brennan Rivas ("Rivas Dec.") ¶ 52; Declaration of Brian DeLay ("DeLay Dec.") ¶¶ 57–60 (discussing advent of Winchester firearms in 1860s and 1870s).

**Plaintiffs' Response to No. 52:** Dispute. While the Winchester rifles of the 1860s and 1870s are the most famous examples of the repeating rifles that became ubiquitous among the American people at that time, *see Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020) ("[O]ver 170,000" Winchester 66's "were sold domestically," and the successors that replaced the Model 66, the Model 73, and Model 92 sold more than ten times that amount in the ensuing decades.), they were hardly unique or the first that were "available for purchase by Americans." *See, e.g.,* Exhibit 40, HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 28–31 (1952) (discussing the Henry lever action rifle, which could fire 16 rounds without reloading); Exhibit 41, NORM FLAYDERMAN,

FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 305 (2007) (noting that 14,000 Henry rifles were sold between 1860 and 1866).

Moreover, repeating rifles had been around for a long time before the Henry or Winchester rifles of the 1860s, and the technology was well known to the founders, who ordered 100 repeating rifles for the Continental Army in 1777. Letter from Joseph Belton to the Continental Congress (Apr. 11, 1777), in 139 PAPERS OF THE CONTINENTAL CONGRESS, Compiled 1774-1789, vol. 1 A-B. They were ultimately not produced, however, because the creator demanded an "extraordinary allowance," not because they were infeasible. 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789, at 324, 361 (1907)

**E.    Assault Rifles and Accessories Are Not in Common Use Today for Civilian Self-Defense**

53.    Assault weapons, as defined by Penal Law § 265.00(22), are "are a poor choice for civilian self-defense." Yurgealitis Dec. ¶ 142.

**Plaintiffs' Response to No. 53:** Dispute. The common firearms that the State tendentiously labels "assault weapons," and their features, are, in fact, well-suited for self-defense. For instance, a pistol grip helps to stabilize a firearm and permits its operator to maintain accuracy. Exhibit 42, David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 396 (1994); *see also* Resps. to Statement 13, 14. A muzzle brake or compensator reduces recoil by redirecting energy and so permits the operator to aim the firearm more effectively. *Id.* "Recoil can be painful, and muzzle movement interferes with accuracy. A telescoping stock… 'allows the user to adjust the length of the stock,' which, 'like finding the right size shoe, simply allows the shooter to rest the weapon on his or her shoulder properly and comfortably.'" Exhibit 21: Halbrook, *supra* at 313 (quoting *New York State Rifle & Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349, 368 (2013)); *see also* Resp. to Statement 11. Similarly, a flash suppressor "reduces noise and potentially increases accuracy," while "there is no law enforcement concern for pistol grips or thumbhole stocks, which simply

assist a shooter in absorbing recoil." *Id.* at 399 (quoting *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 WL 5508998, *19 (D. N. Mariana Islands, Sept. 28, 2016); *see also* Resp. to Statement 16. "[S]uch features…do not render the AR-15 more deadly by making it fire faster . . . or impact with far more power. They mostly serve the same ergonomic functions as similar features on non-banned firearms, making the AR-15 easier and safer to use." Exhibit 43, E. Gregory Wallace*, "Assault Weapon" Lethality*, 88 TENN. L. REV. 1, 232 (2020).

Other features New York bans also make the rifles well-suited to self-defense. Generally known as "handguards," a barrel shroud "is the metal or plastic enclosure that covers typically all but a few inches of the barrel" and, on an AR-15, "has multiple functions: (1) it provides the shooter with a forward grip on the rifle using the non-trigger hand; (2) it protects the shooter's hand from a hot barrel; (3) it protects the barrel and gas tube or piston from damage; (4) it helps ventilate and cool the barrel; and (5) it provides a base for attaching accessories to the rifle such as sights, slings, flashlights, forward vertical grips, and bipods. None of these functions make the AR-15 exceptionally lethal, especially when compared to non-banned rifles." See Exhibit 13, Wallace, *"Assault Weapon" Myths*, *supra* Resp. to Statement 20 at 231. Rifles also "have been equipped with "barrel shroud" handguards for more than 100 years," with bolt-actions being "the first rifles so equipped." See Exhibit 4, Chapman, *supra* Resp. to Statement 1 at 65. Because burned hands pose "a critically important safety concern" for the millions of Americans who own these rifles, these handguards "exist to protect shooters from injury by contact with hot rifle barrels during ordinary, routine shooting activities." *Id.* at 66–67. The bottom line is that none of the "assault" features identified by the State are nearly as nefarious as it suggests. Rather, they improve the functions of a rifle, render its operation simpler and more accurate, and so render the rifles they accessorize favored firearms for defense of self and home. Accordingly, the ATF has found that a majority of technical experts recommended the AR-15 for lawful purposes such as for purposes of self-defense.

Exhibit 44, Bureau of Alcohol, Tobacco, & Firearms, U.S. Dep't of the Treasury, *Report and Recommendation on the Importability of Certain Semiautomatic Rifles* at 11 (1989).

AR-15s have other advantages over other firearms when used for self-defense. It is useful compared to handguns in limiting collateral damage: "On interior walls it has less penetration than that of common handgun cartridges, even when those feature JHP bullets." Exhibit 45, Patrick Sweeney, *Why An AR-15 For Home Defense Is The Best Choice*, GUN DIGEST (June 21, 2018), https://bit.ly/4cQktjH. In contrast to a shotgun, the "much lower recoil of the AR-15 makes it possible to teach form and control, and not have recoil as a hindrance." *Id.* Indeed, "Pistols, and especially shotguns, can produce significant recoil when firing, making them difficult to use in a stressful home defense situation. An AR-15, on the other hand, produces little to no recoil, which contributes to its accuracy and ease of use." Exhibit 46, *Why Choose An Ar-15 For Home Defense?*, WING TACTICAL , https://bit.ly/3W9bu7D (last updated Mar. 10, 2021). The ease with which one can control an AR-15 also gives the rifle an advantage in accuracy: "While it is true that you can quickly grab and aim a pistol, you are also more likely to miss your target. Shotguns are also notorious for their poor precision. The AR-15 offers several points of contact that provide greater stability when firing, and the barrel length can improve aiming. What's more, the AR-15 provides greater accuracy if you need to fire at an intruder from a distance." *Id.* The AR-15 is also more easily adapted to the user with its panoply of accessories, so that it can be better fitted to someone's particular need in a self-defense situation. *Id.* Sergeant Major Kyle E. Lamb, who spent over 21 years in the Army and 15 years in Special Operations, extolled the virtues of the AR-15 for use in self-defense, including its ease of use, versatility, accuracy, and lack of recoil. Exhibit 47, American Rifleman Staff, *The AR-15: Best Home-Defense Gun?*, NRA EXPLORE (May 28, 2020), https://bit.ly/4ePVnmP.

Indeed, the AR-15 is the perfect choice for self-defense: "Contrary to the claims of

gun control activists … the AR-15 [][is] admirably suited to th[e] role [of self-defense]. [F]irst[, it has] superior accuracy. … [Furthermore,] as LaGarde, Evans, and Sanow and others have shown, more powerful rounds are much more likely to stop an attacker on the first hit, again giving a defender equipped with an AR-15 chambered in .223 Remington or 5.56mm, or an AK-47 chambered in 7.62x39mm a much greater chance of quickly disabling his assailant than he would have with a handgun chambered in a standard pistol caliber." *See* Exhibit 4, Chapman, *supra* at 221. Its adaptability makes it a good choice for anyone caught in a self-defense situation: "The first significant advantage of the AR-15 comes in its ease of use. Eugene Stoner took pride in the fact that the AR-15 was engineered to ensure anyone could efficiently utilize the controls and operate the firearm. Controls, such as magazine release and safety lever, are conveniently placed to allow the operator to use the index finger and thumb to manipulate both, respectively. Other controls, like the charging handle and bolt catch, are placed so that people with different body types can operate without too much issue. The detachable box magazine also makes for easy reloads and can be done by almost anyone with minimal training in how a firearm works. The AR-15 has also continued to be updated to keep pace with the consumer's needs like the adoption of ambidextrous controls, free-floating barrels and handguards, and swapping iron sights for optics." Exhibit 48, *The AR-15 for Home Defense: Things to Consider*, PALMETTO STATE ARMORY, https://bit.ly/3VX4HNf (last visited July 3, 2024). The caliber and build of the firearm also help reduce recoil: "One advantage of the modular nature of the AR is the ease of caliber changes. ARs can be chambered in something as small as a .22lr or even larger calibers such as .458 SOCOM, 6.5 Grendel, or .50 Beowulf. The user-friendliness and selection of barrels and ammo make the AR-15 a better option than most shotguns. Due to its light recoil, nearly any family member can use it to defend a home, which can level the playing field if a weaker victim confronts a burglar. It also provides a more stable platform to protect yourself with than a handgun. An AR-15 allows four points of contact (left hand, right hand, cheek, and shoulder) to stabilize the weapon rather than the two points of contact (left hand

& right hand) you will use with a handgun." *Id.* All of these factors give the AR-15 a high level of accuracy: "One of the primary advantages of the AR-15 is its precision and accuracy. The weapon's lightweight design and adjustable stock make it easy to hold steady and aim accurately, even for novice shooters. Additionally, the AR-15's short-stroke gas system minimizes recoil, reducing the likelihood of flinching or missing your target." Exhibit 49, Peter Kim, *Why the AR-15 is an Ideal Firearm for Self Defense*, ROOFTOP SHOOTING RANGE, https://bit.ly/45Y9KSc (last visited July 3, 2024).

It is not surprising, then, that millions of Americans have chosen the banned firearms for exactly these purposes. See Exhibit 5,  English, *supra* at 33–34 (finding that 24.6 million Americans, or 30.2% of gun owners, had owned or did own an AR-15 or similar style rifle, and that the most common reasons for owning them were target shooting (66% of owners), home defense (61.9% of owners) and hunting (50.5% of owners)); *see* Exhibit 9, *Poll of current gun owners*, *supra* at 1 (finding 20% of gun owners currently own an AR-15 or similar style rifle, 60% of respondents citing target shooting as a "[m]ajor reason" for owning them and 30% citing that as a "[m]inor reason," and protection of self, family, and property rating as even more important, with 65% as a major reason and 26% reporting it as a minor reason). A recent survey of over 2,000 owners of such firearms reached the same result, showing again that home-defense and recreational target shooting are the two most important reason for owning these firearms. *See* Exhibit 10, *Modern Sporting Rifle: Comprehensive Consumer Report*, *supra* at 5; see also Exhibit 11, *Sport Shooting Participation in the U.S. in 2020*, *supra* at iii, (noting that in 2020, 20 million American participated in sport or target shooting with firearms like those banned by the State). "AR-style rifles are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes

it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." Exhibit 12, Miniter, *supra* at 46–47. This popularity among a diverse demographic of Americans is, in part, because an AR-15 "firing .223 or 5.56 mm ammunition produces zero felt recoil—that is, nearly all the recoil produced by firing is absorbed by the buffer assembly, transmitting almost none to the shooter's shoulder." Exhibit X, Chapman, *supra* at 127.

But not only are semiautomatic rifles useful in self-defense generally, they are particularly useful when one is confronted by multiple assailants. Indeed, 51.2 percent of all self-defense incidents annually involve two or more attackers, while 20.4 percent of such incidents involve three or more attackers. See Exhibit 5, English, *supra* at 15. In 2019, a Houston homeowner repelled five armed home invaders with his semiautomatic AK-47. Exhibit 50, Stefania Okolie, *5 Shot and 3 Killed After Homeowner Opens Fire on Suspects in East Houston*, ABC13 (Jan. 20, 2019), https://abc13.co/46V92DX. An eight-months-pregnant mother in Florida used an AR-15 to defend herself and her family when two masked men forcibly entered her home, pistol-whipped her husband, and grabbed her daughter. She fatally shot one of the attackers, while the other ran away. Exhibit 30, Tacopino, *supra*. When the owner of a Santa Monica liquor store and his friends, stood in front of his store armed with AR-15s, the looters who had plundered and razed neighboring stores simply passed them by without incident. Exhibit 39, *Santa Monica Owner Protects His Store With Guns Amid Looting*, *supra*. A homeowner in Florida used his AR-15 to fight off four home invaders in Summerfield, Fla. Two died from their injuries, two were arrested near the house, and the homeowner was injured. Exhibit 31, Miller, *supra*. The 19-year-old son of a homeowner in Oklahoma shot and killed two of three home invaders who had entered the house through the back door with the goal of burglarizing it. Exhibit 32, *Homeowner's son shoots, kills three would-be burglars*, *supra*. In Texas, the teenage son of a police officer's son was babysitting his 12-year-old sister when two burglars who had ransacked neighboring homes broke into their house through a back window.

The boy repelled them with his father's rifle, hitting one of them and sending them both scurrying to the local hospital. Exhibit 33, *Investigators: 15-year-old son of deputy shoots burglary suspect, supra*. The rifles used in all these instances of self- or home-defense are banned by the State on account of their cosmetic features.

54.     Situations involving home defense and/or self-defense (including on the street or commercial robberies) are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire. Yurgealitis Dec. ¶ 144.

**Plaintiffs' Response to No. 54:** Dispute. As detailed in Resps. to Statements 39 and 53, shootouts with assailants occur, and a majority of defensive firearm uses occur against multiple assailants. See Exhibit 5, English, *supra* Resp. to Statement 53, at 15. The benefits of AR-style firearms, also detailed in Resp. to Statement 53, are particularly pronounced in those contexts. In fact, "lengthy shootouts with extensive exchanges of gunfire" are often avoided precisely because of the unique defensive advantages AR-style firearms offer a means to speedily and effectively end violent encounters, as the features and incidents recounted in Resp. to Statement 53 demonstrate.

More fundamentally, the State is wrong to presume that firearms and the Second Amendment are meant only for those situations it considers normal, frequent, or routine. After all, home invasions or self-defense situations of *any* type are "rare" by any understanding of that word. But "[t]he Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances." *Silveira v. Lockyer*, 328 F.3d 567, 568–70 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc). "The reality is that essentially everything the Second Amendment is about is rare, for which we should all be very grateful. … [T]he average person will fire an average of 0.0 rounds in self-defense in their entire lifetime. If the rarity alone of *exercising* one's Second Amendment rights cuts so dispositively against their protection, then the Second Amendment protects nothing." *Duncan v. Bonta*, 19 F.4th 1087, 1168 (9th Cir. 2021) (VanDyke, J., dissenting), *granted, vacated and remanded in light of* Bruen, 142 S. Ct. 2895 (2022), *remanded*, 49 F.4th 1228 (9th Cir.

2022).

55.    Assault weapons, as defined by § 265.00(22), were designed to be effective at battlefield ranges of up to 500 yards, with the typical muzzle velocity of a .223-caliber bullet at 3,200 fps. Yurgealitis Dec. ¶ 144.

**Plaintiffs' Response to No. 55:** Dispute. The definition of "assault weapon" in N.Y. Penal Law § 265.00(22) makes no reference to the effective range, muzzle velocity, or type of cartridge fired by the firearm in question. Firearms chambered in sizes other than .223 caliber will not share these characteristics. *See infra* Resp. to Statement 99. Rather, the State has banned certain features of firearms, including for example the type of grip or the type of stock with which it is equipped, which do not affect muzzle velocity or effective range in the slightest. Furthermore, popular hunting calibers, such as the 6.5 PRC, are effective beyond 1,000 yards. Exhibit 51, *6.5 PRC*, HORNADY, https://bit.ly/4eMWvYt (last visited July 3, 2024). Long-range training is essential in facilitating the militia readiness that the prefatory clause announces as a principal purpose of the Second Amendment. The Civilian Marksmanship Program, a federally chartered program that dates to 1903, was established to develop the marksmanship skills of American citizens and holds competitions at long ranges. Exhibit 52, *CMP History,* CIVILIAN MARKSMANSHIP PROGRAM, https://bit.ly/4eREk3Q (last visited July 3, 2024). The competitions feature lengths of up to 1,000 yards. Exhibit 53, *Camp Perry Matches*, CIVILIAN MARKSMANSHIP PROGRAM, https://bit.ly/3XUFoxN (last visited July 3, 2024).

56.    Projectiles travelling at velocities found in these weapons pose a serious risk of overpenetration in most home construction materials, such as gypsum board/sheet rock and typical 2x4 lumber. Yurgealitis Dec. ¶ 144.

**Plaintiffs' Response to No. 56:** Dispute. As noted in Resp. 55, the muzzle velocity Yurgealitis is discussing here is not the result of any feature banned by New York. Furthermore, the

overpenetration issue noted here is not unique to so-called "assault weapons." According to E. Gregory Wallace, "[n]early all handgun, rifle, and shotgun rounds will pass through walls. FBI testing indicates that to be reliably effective, bullets must penetrate soft body tissue twelve to eighteen inches, a range necessary to reach and disrupt a vital organ in a human target. This penetration capability also means that bullets will penetrate walls if the shooter misses the target." *See* Exhibit 43, Wallace, *"Assault Weapon" Lethality*, *supra* Resp. to Statement 53 at 37.

Indeed, .223/5.56 bullets are *safer* to use in public areas than 9mm bullets: "Generally, .223/5.56 bullets penetrate less through building materials than common handgun and shotgun rounds. This is one reason law enforcement officers often use the select-fire M4 or semiautomatic AR15 for raiding buildings and hostage situations, especially in urban areas" *Id.* at 38. "Since all of the 5.56rmm/.223 bullets fired through the interior wall had significantly less penetration than 9mm, .40 S&W, .45 ACP, and 12 ga. Shotgun projectiles which were fired through an interior wall, stray 5.56mm/.223 bullets seem to offer a reduced risk of injuring innocent bystanders and an inherent reduced risk of civil litigation in situations where bullets miss their intended target and enter or exit structures. 5.56mm/.223 caliber weapons may be safer to use in CQB situations and in crowded urban environments than 9mm, .40 S&W, or 12 ga. Weapons." Exhibit 54, Gary K. Roberts, *The Wounding Effects of 5.56MM/.223 Law Enforcement General Purpose Shoulder Fired Carbines Compared with 12 GA. Shotguns and Pistol Caliber Weapons Using 10% Ordnance Gelatin as a Tissue Simulant*, WOUND BALLISTICS REV. at 24 (1998). FBI tests have confirmed the lesser penetration of 5.56mm/.223 bullets: "The FBI recently subjected several various .223 caliber projectiles to 13 different ballistic tests and compared their performance to that of SMG-fired hollow point pistol bullets in 9mm, 10mm, and .40 S&W calibers … In every test, with the exception of soft body armor, which none of the SMG fired rounds defeated, the .223 penetrated less on average than any of the pistol bullets." Exhibit 55, R.K. Taubert, *Detailed Information Regarding Penetration Of .223 Ammunition*, available at

Decl. of Emanuel Kapelsohn, Exhibit 8, *Miller v. Becerra*, No. 3:19-cv-01537, Doc. 22-12 at 48 (S.D. Cal. Dec. 6, 2019). Other studies have found similar results: "The 55 grain HP .223 has less penetration than any of the other ammunition tested. Based on the results of this testing, there appears to be no basis for concern regarding the over penetration of the .223 [HP] round. In fact, it seems even safer in this regard than .40 S&W handgun ammunition." Exhibit 56, *Real World Testing: .223/5.56 Penetration Tests vs. 40 S&W and 12 ga. Slug,* available at Decl. of Emanuel Kapelsohn, Exhibit 9, *Miller v. Beceerra*, No. 3:19-cv-01537, Doc. 22-12 at 59 (S.D. Cal. Dec. 6, 2019).

57.    When this cartridge was designed for the AR-15/M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards, not dozens of feet. Yurgealitis Dec. ¶ 144.

**Plaintiffs' Response to No. 57:** Dispute. A firearm that is effective at 500 yards is just as effective at 5 yards, and it was designed to incapacitate enemies at whatever range necessary. The .223 caliber round was not a wholly new military round when it was created. It is based on a pre-existing rifle round (a "varmint" round) of similar size—the .222 Remington. See Exhibit 57, Richard A. Mann, *The .223 Family Tree*, GUN DIGEST (June 3, 2022), https://bit.ly/43HXvYp. The round was not created because of any particularly great killing or wounding capacity. Rather, the common complaint from military users has been that the round is *insufficiently* lethal. *See* Exhibit 58, Anthony F. Milavic, *It's the Cartridge, Stupid—Not the Rifle*, U.S. NAVAL INST. (Aug. 2002), https://bit.ly/4agrZDP. It is not even generally favored for deer hunting because it is insufficiently damaging upon impact. Indeed, "the M4 rifle, which is equivalent to a .223 caliber rifle [like the AR-15 chambered in such]… is relatively light in both force and velocity compared to many other shoulder-fired weapons used for hunting and recreation." Exhibit 59, Joseph W. Galvin et al., *Rate and time to return to shooting following arthroscopic and open shoulder surgery*, 6 JSES INT'L 963, 968 (2022).  So much so, in fact, that "[w]hen compared to many hunting rifles, the M4 often produces 3 to 4 times less recoil energy and typically about half of the recoil velocity." *Id.*

The development of the .223 caliber round was intrinsically linked to the development of a lighter weight rifle., and the desire to have more ammunition carrying capacity: "The 5.56-mm round was spawned by the proposition that volume fire is as effective as aimed fire. Therefore, warriors with lighter-weight cartridges (in terms of physical weight as opposed to impact) could carry more bullets in their same basic load, put out a higher volume of fire, kill more enemy soldiers, and require fewer ammunition replenishments." Exhibit 58, Milavic, *supra*.

58.     In August 2014, the National Rifle Association's *American Rifleman* published an article by Stanton Wormley titled "The AR-15 for Home Defense: Penetration Tests." Yurgealitis Dec. ¶ 145.

**Plaintiffs' Response to No. 58:** Admit.

59.     Wormley conducted penetration tests on nine different types of .223/5.56mm ammunition by firing them through simulated wall sections constructed of gypsum board/sheet rock and wooden 2x4 studs. Yurgealitis Dec. ¶ 145.

**Plaintiffs' Response to No. 59:** Admit.

60.     When fired at a 90-degree angle to the walls, all nine types of ammunition (including "frangible" rounds designed to disintegrate when hitting a hard surface) easily penetrated the wall sections as well as the water jugs placed three feet behind them. Yurgealitis Dec. ¶ 145.

**Plaintiffs' Response to No. 60:** Admit.

61.     The tests conducted by Wormley also included firing longitudinally through the wall sections, resulting in the penetration of three successive 2-inch-thick 2x4 studs by a number of the projectiles. Yurgealitis Dec. ¶ 146.

**Plaintiffs' Response to No. 61:** Admit.

62.     The (former) NATO-issue M855 SS109 5.56mm is readily available for purchase by civilians, and was designed to penetrate up to 3mm of "soft" (non-hardened) steel. Yurgealitis Dec. ¶ 147.

**Plaintiffs' Response to No. 62:** Admit, noting that this is true of *all* rifle rounds. *See* Exhibit 43, Wallace, *"Assault Weapon" Lethality*, *supra* Resp. to Statement 53 at 38–39 ("Soft body armor (Levels I-IIIA) only stop rounds from handguns and shotguns; rifle rounds require steel, ceramic, or composite hard plates (Levels III-IV)").

63.    This capability is unnecessary for self-defense and poses substantial risks to individuals in adjoining rooms, neighboring apartments, or other attached dwellings. Yurgealitis Dec. ¶ 147.

**Plaintiffs' Response to No. 63:** Dispute. *See* Resps. to Statements 56, 60. Penetration is necessary for self-defense, and the risk of "over penetration" is a natural byproduct: "Nearly all handgun, rifle, and shotgun rounds will pass through walls. FBI testing indicates that to be reliably effective, bullets must penetrate soft body tissue twelve to eighteen inches, a range necessary to reach and disrupt a vital organ in a human target. This penetration capability also means that bullets will penetrate walls if the shooter misses the target." *See* Exhibit 43, Wallace, *"Assault Weapon" Lethality*, *supra* Resp. to Statement 11 at 37. For this reason, it is all the more important that rifles be made as accurate as possible—as the banned features do.

64.    During a stressful situation such as a home invasion or break-in, there may be multiple steps required by the operator to bring the weapon from a "safe" condition to a firing condition. Yurgealitis Dec. ¶ 148.

**Plaintiffs' Response to No. 64:** Dispute. This statement makes a claim about "weapon[s]" in general, and as such is far too general to permit a response. Some firearms may require multiple steps in order to be ready to fire immediately, but that is not true of all firearms.

65.    Manipulation of a charging handle, safety switch, or inserting a magazine may be difficult to accomplish under stress, particularly if the operator has not adequately trained or practiced with their firearm, while family members may not be familiar with bringing the weapon to a firing condition or fail to complete adequate steps to do so under duress. Yurgealitis Dec. ¶ 148.

**Plaintiffs' Response to No. 65:** Dispute. *See* Resp. to Statement 64. An AR-15 or similarly styled rifle is often easier to operate accurately under pressure than a handgun. *See, e.g.*, Exhibit 60, CHRIS BIRD, THE CONCEALED HANDGUN MANUAL: HOW TO CHOOSE, CARRY, AND SHOOT A GUN IN SELF DEFENSE 40 (1998).

66.     Unloaded, an AR-platform rifle weighs approximately 6.5 to 7 pounds and requires two hands to aim and fire. Yurgealitis Dec. ¶ 148.

**Plaintiffs' Response to No. 66:** Admit.

67.     In a home-defense scenario, a homeowner would likely be attempting to call 911 while addressing the intruder, which is difficult if not impossible while wielding their AR-15 effectively and safely. Yurgealitis Dec. ¶ 148.

**Plaintiffs' Response to No. 67:** Dispute. The scenario in which a homeowner would be attempting to call 911 while addressing the intruder is only one possible scenario of many, and an unlikely one at that if the homeowner is in immediate danger and needs to subdue the intruder quickly. As detailed extensively above, AR-15s have many features that make them well-suited to self-defense in many situations. *See* Resp. to Statement 53. In its brief in *Heller*, the city of Washington, D.C. argued that rifles are better for self-defense and cited to a magazine article asserting that rifles were preferable, with a picture of an AR-15- style rifle. Brief for Petitioners, No. 07-290, 2008 WL 102223, at *54 (U.S. Jan. 4, 2008) (citing Clint Smith, *Home Defens*e at 50, GUNS MAG. (July 2005)).

68.     Additionally, it would hamper, if not prevent, leading a vulnerable adult away from danger or guiding/carrying a small child. Yurgealitis Dec. ¶ 148.

**Plaintiffs' Response to No. 68:** Dispute. *See* Resp. to Statement 67.

69.     Detachable magazines are useful for offensive military applications in combat settings but are not necessary or suited for civilian self-defense. Yurgealitis Dec. ¶¶ 118-19.

**Plaintiffs' Response to No. 69:** Dispute. Detachable magazines are not unique to AR-15s, and they are useful to civilians for the very same reasons they are useful in the military: they provide an

easy way to reload a firearm, even under intense pressure. "Civilian semiautomatic rifles and handguns are designed to use detachable magazines, as are most modern bolt-action rifles." *See* Exhibit 13, Wallace, *"Assault Weapons" Myths*, *supra* Resp. to Statement 13 at 234. Detachable magazines have numerous advantages in the civilian context. If the magazine jams, it "can be easily removed from the firearm for reloading". Exhibit 61, *Detachable vs. Fixed Magazines*, GUN CREED, https://bit.ly/4f4p1oC (last visited July 3, 2024). Additionally, "in self-defense situations where quick access to ammunition is crucial, having spare loaded magazines readily available allows for swift response without compromising safety." *Id.*

70.    Accessories to assault weapons, such as folding, telescoping, or collapsible stocks and forward pistol grips, serve military-style offensive purposes as opposed to traditional sporting or self-defense uses. Yurgealis Dec. ¶¶ 124-25.

**Plaintiffs' Response to No. 70:** Dispute. As discussed at length above, these features further the use of these firearms for civilian self-defense purposes as well. They all exist to improve the accuracy and reliability of the firearm. That many are not present on more traditional rifles is attributable to the design of the AR-15 and similarly styled firearms, as well as improvements in firearm technology. *See* Resp. to Statement 53.

71.    The data in William English's inadmissible 2021 survey does not contain any evidence that rifles are the preferred firearm for defense of self, others, or property, not even for owners of AR-15-style rifles. *See* Declaration of Professor Louis Klarevas ("Klarevas Dec.") ¶ 69.

**Plaintiffs' Response to No. 71:** Dispute. As noted above, statements regarding the inadmissibility of certain sources are misguided. *See* Resp. to Statement 38. In any event, this statement is not accurate. In response to why they owned an AR-15, 34.6% of respondents indicated they owned it for self-defense outside of the home, and 61.9% of respondents indicated they owned it for home defense. *See* Exhibit X, English, *supra* Resp. to Statement 3 at 34. As discussed above, Professor English reached similar results as others who have looked at this issue. *See* Resp. to Statement 3

(discussing recent poll conducted by Washington Post-Ipsos). Finally, even if the AR-15 were not in fact chosen for self-defense, the reason for which Americans buy AR-15s in such vast numbers is irrelevant to the Second Amendment inquiry under *Heller* and *Bruen*. *See Heller*, 554 U.S. at 629 ("There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.").

72.    Nor is there any evidence in English's survey that AR-15-style rifles are used in Defensive Gun Uses ("DGUs"). Klarevas Dec. ¶ 69.

**Plaintiffs' Response to No. 72:** Dispute. *See* Resp. to Statement 71. According to the English survey, there are approximately 1.67 million defensive gun uses a year, and a rifle is used in 13.1% of those. *See* Exhibit 5, English, *supra* Resp. to Statement 3 at 9, 15. The AR-15 is the most popular rifle in the country, *see supra* Resp. to Statement 1, so even if only half of defensive gun uses of a rifle were done with an AR-15 or similar styled modern rifle (to estimate conservatively), there would be over 100,000 defensive gun uses of an AR-15 every year.

73.    The Federal Bureau of Investigation ("FBI") has been documenting active shooter incidents since 2000, and defines active shootings as violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area." Klarevas Dec. ¶ 71.

**Plaintiffs' Response to No. 73:** Admit.

74.    Between January 1, 2000, and December 31, 2022, the FBI identified 456 active shootings occurring in the United States. Klarevas Dec. ¶ 72.

**Plaintiffs' Response to No. 74:** Admit.

75.    Out of these 456 active shooter incidents, 18 incidents (3.9%) involved DGUs by civilians, excluding law enforcement or armed security.  Klarevas Dec. ¶ 72.

**Plaintiffs' Response to No. 75:** Admit that this accurately describes the 456 active shooter incidents identified, but dispute that this is an accurate way to gauge the frequency of defensive gun uses. Klarevas is only looking here at "active shooter" incidents, which must take place in a "populated area," but of course, firearms can be used defensively in other situations, including in home defense. Klarevas's definition would therefore fail to account for some defensive gun uses. *See, e.g.*, Exhibit 36, Pelican, *supra*. Klarevas fails to explain why analysis of this small subset of defensive gun uses is an appropriate proxy for defensive gun uses as a whole.

76.    Of these 18 DGUs, the firearm used by an armed private citizen intervening was identifiable in 17 incidents; 14 of the incidents involved handguns and the remaining three involved long guns (one shotgun, one bolt-action rifle, and one rifle that would qualify as an assault weapon. Klarevas Dec. ¶ 72.

**Plaintiffs' Response to No. 76:** Dispute. *See* Resp. to Statement 75.

77.    There are 24,720 individuals, or 0.12% of New Yorkers, with registered legal ownership of an assault weapon in New York State. *See* Declaration of Michael Deyo; U.S. Census Bureau, New York, https://data.census.gov/profile/New_York?g=040XX00US36. (2020 Census population of 20,201,249).

**Plaintiffs' Response to No. 77:** Admit.

78.    Plaintiff Sears acknowledged at his deposition that semiautomatic fire, detachable magazines, and military-style accessories are features that would make the weapons particularly useful for carrying out a mass shooting. Sears Dep. 117:22-118:22.

**Plaintiffs' Response to No. 78:** Dispute. Plaintiff Sears is not an expert qualified to give his opinions on these issues, and this characterization of his testimony is misleading. In response to

whether such characteristics would be useful in carrying out a mass shooting, Plaintiff Sears said, "Anything can used to commit a mass act of violence." Sears Dep. 117:7-8. He added that, "I am not a mass shooter. I don't know what they would prefer." *Id.* 118:25-119:2. Plaintiff Sears also testified as to why they would be useful to him in a self-defense scenario. As to detachable magazines, he said he chooses them "for the detachable magazine variation, because if a load fails to—if a round fails to load into the gun, you can't clear out a malfunction if you can't release the magazine." *Id.* 40:8-12.

79.     Plaintiff Sears testified that "there is something to be said, psychologically and socially, about the guy who is toting a rifle on his back," though carrying one in public means that "you are going to have the police called on you, because no one knows what your intentions are. You know, it doesn't look good in the community that we live in." Sears Dep. 87:4-6, 87:24-88:4.

**Plaintiffs' Response to No. 79:** Dispute. Plaintiff Sears is not an expert to give his opinions on these issues. Sears also testified that carrying the rifle could "make[] some people feel safer." Sears Dep. 87:16-17.

80.     Plaintiff Sears acknowledged at his deposition that he was not an expert or testifying as an expert. Sears Dep. 98:15-24.

**Plaintiffs' Response to No. 80:** Admit.

81.     Plaintiff Lane acknowledged at his deposition that he was not an expert or testifying as an expert. Lane Dep. 143:18-144:3.

**Plaintiffs' Response to No. 81:** Admit.

## F.    Assault Rifles Are the Weapon of Choice in Mass Shootings

82.     The ten deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings. Klarevas Dec. ¶ 46. Nine of these ten incidents involved the use of assault weapons. *Id.* ¶ 48.

**Plaintiffs' Response to No. 82:** Dispute. It is highly misleading to focus on exceptionally rare instances of mass shootings to make determinations about gun violence generally. The total number of deaths in these incidents was 286. In comparison, 146,812 people have been killed by handguns alone from 2001 to 2022. *See* Exhibit 62, *Crime Data Explorer*, 2022, FBI, U.S. DEP'T OF JUST., https://bit.ly/3IF5A6M. Adding to this difficulty, Professor Klarevas does not distinguish between "assault weapons" and "large capacity magazines." Without distinguishing these features, Professor Klarevas's numbers cannot say anything informative about assault weapons alone, even leaving aside the selection bias inherent in focusing on such rare events. Mass shootings, despite their prevalence in the media, are a very rare form of crime. In 2018, for instance, "mass public shootings . . . represent[ed] fewer than one of every 200 homicides." See Exhibit 63, Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, RAND CORP. (Apr. 15, 2021), https://bit.ly/3L9kzH4.

Even considering mass shootings in isolation, handguns, and not assault weapons, are the most common firearm used in mass shootings, see Exhibit 64, James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newton*, 18 HOMICIDE STUDIES 125, 136 (2013); *accord* Exhibit X, Webster , *supra*, just as they are overwhelmingly the weapons of choice for criminals generally, Exhibit 65, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018, Crime in the United States*, FBI, U.S. DEP'T OF JUST.  (2018), https://bit.ly/2p0bw4D (64% of murders in 2018 committed with handguns); see also, e.g., Exhibit 66, Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking,* THE TRACE (Jan. 6, 2016), https://bit.ly/41tIDv7 (showing that, of the top 20 firearms seized by Chicago Police in 2014, all 20 were handguns).

A Congressional Research report concluded that "offenders used firearms that could be characterized as 'assault weapons' in . . . 9.78% [of mass shootings]." Exhibit 67, William J. Krouse et al., CONG. RSCH. SERV., R44126, MASS MURDER WITH FIREARMS: INCIDENTS AND VICTIMS, 1999-2013, at 29 (2015). In addition, handguns are the firearm most commonly involved in active shootings

and mass shootings; semiautomatic rifles or 'assault-style' weapons are used in an estimated 10 to 36 percent of active shootings and mass shootings. *See* Exhibit X, Smart & Schell, *supra*. One study suggests that "assault weapons" were used only in 10–36% of mass shootings. Exhibit 68, Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 CRIM'Y & PUB. POL'Y 147, 151 (2020).

"Assault weapons" are rarely used in crime at all. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'" Exhibit 69, GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997). As of 2016, only 0.8% percent of state and federal prisoners reported using any kind of rifle during the offense for which they were serving time. Exhibit 70, Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates*, 2016, U.S. DEP'T OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. at 5 tbl. 3 (Jan. 2019), https://bit.ly/419UzTa. FBI data tells a similar story. From 2015 through 2020, only 2.2% of murders were committed with *any* type of rifle. *See* Exhibit 62, *Crime Data Explorer*, *supra* at 2020; Exhibit X, *Expanded Homicide Data Table 8*, *supra* (90,594 total murders; 2,028 with rifles). Murder by "hands, fists, feet, etc." was almost twice as common, at 4,008, over the same time period—and murder by handgun, at over 40,000, was over *20 times* as common. *Id.* Assuming for the sake of argument that every rifle-related murder from 2015 to 2020 had been committed with a different semiautomatic rifle and every one of them was an AR- or AK-style rifle, that would still mean that just an infinitesimal percentage of the approximately 24 million such rifles in circulation in the United States during that time period—around .01%—would have been used for that unlawful purpose.

83.    Within the past five years, 50% of high-fatality mass shooting incidents and 58% of mass public shooting incidents involved the use of assault weapons. Klarevas Dec. ¶ 47; Figure 13 (showing growing share of high-fatality of mass shootings involving assault weapons).

**Plaintiffs' Response to No. 83:** Dispute. *See* Resp. to Statement 82. Klarevas's use of the phrase "high fatality mass shooting" is idiosyncratic, and it paints a misleading picture of the prevalence of "assault weapons" in mass shootings. As Klarevas has said elsewhere, most "studies…have found that assault weapons are used in 25% to 36% of active shootings and mass shootings." Exhibit 71, Louis Klarevas, *Letter to the editor re: DiMaggio, C. Et al. "Changes in U.S. mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data,* 86 J. TRAUMA ACUTE CARE 926 (2019).

84.    Within the past five years, 61% of high-fatality mass shooting deaths and 67% of mass public shooting deaths resulted from incidents involving assault weapons. Klarevas Dec. ¶ 47.

**Plaintiffs' Response to No. 84:** Dispute. *See* Resps. to Statements 82, 83.

85.    Assault weapons were used in 69% of mass public shootings resulting in more than 12 deaths and 80% of such incidents resulting in more than 24 deaths. Klarevas Dec. ¶ 48.

**Plaintiffs' Response to No. 85:** Dispute. *See* Resp. to Statements 82, 83. Furthermore, as was the case above, *see* Resp. to Statement 82, Klarevas's sample size is 18 shootings, much too small to draw general conclusions about firearm violence. Additionally, the definition is incredibly gerrymandered: for mass shootings with more than 11 casualties, the percentage in which assault weapons were used drops to 59%. *Id.* If the timeline is extended to 1949, the percentage drops again to 54%. *Id.*

86.    In addition, assault weapons were used in 78% of all high-fatality mass shootings resulting in more than 20 deaths and 100% of such incidents resulting in over 40 deaths. Klarevas Dec. ¶ 48.

**Plaintiffs' Response to No. 86:** Dispute. *See* Resps. to Statements 82, 83, 85.

87.    Of the 137 high-fatality mass shootings in the last 50 years in which the type of firearm used is known, 43 involved assault weapons, resulting in 540 deaths. Klarevas Dec. ¶ 49.

**Plaintiffs' Response to No. 87:** Dispute. *See* Resps. to Statements 82, 83. Even using Klarevas's gerrymandered definition of "high-fatality mass shootings," "assault weapons" are only used in 31%

of such shootings—hardly the weapon of choice.

88.    The average death toll for these 43 incidents is 12.6 fatalities per shooting. Klarevas Dec. ¶ 49. The average death toll for the 94 incidents in which it is known assault weapons were not used (which resulted in 732 fatalities) is 7.8 fatalities per shooting. *Id.*

**Plaintiffs' Response to No. 88:** Dispute. *See* Resps. to Statements 82, 83. Professor Klarevas's work has found an unusually marked effect on the presence or absence of so-called "assault weapons" at mass shootings. The RAND Corporation noted that a 2019 paper by Klarevas showed "improbably large" effect sizes, which it concluded were "likely biased" because of the limited number of incidents considered by Klarevas and his coauthors. *See* Exhibit 72, *Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, RAND CORP. (Jan. 10, 2023), https://bit.ly/3RDN3xe. Professor Klarevas fails to control for magazine size in his analysis. Moreover, Klarevas is only looking at simple correlations. One study found that "[w]hen taking a closer look at the incidents themselves … the use of assault weapons is not generally associated with an increase in the number of victims or the number of fatalities. On the other hand, the uses of high-capacity magazines, handguns and shotguns are all consistently associated with increases in both the number of victims and fatalities." Exhibit 73, Benjamin M. Blau et al., *Guns, laws, and public shootings in the United States,* 48 APPLIED ECON. 1, 14 (2016). That conclusion was in line with the finding of other researchers, who have found that "as with homicide in non-[mass shooting] events, the handgun was the most commonly used firearm in [mass shooting] events studied and was associated with a greater total number of wounds and probability of fatal organ injury, as compared to rifle or shotgun." Exhibit 74, Babak Sarani et al., *Wounding Patterns Based on Firearm Type in Civilian Public Mass Shootings in the United States*, 228 J. AM. COLL. SURG. 228, 232 (2019). Klarevas's omission of large capacity magazines in his analysis inflates the role of "assault weapons" in mass shootings. *See* Exhibit 68, Koper, *Assessing the Potential to Reduce Deaths*, supra Resp. to Statement 82, at 149. Indeed, assault weapons are not correlated with reduced incidence or lethality of mass shootings. "Furthermore,

most mass shootings do not involve assault rifles, but many involve the use of LCMs … bans on assault weapons had no clear effects on either the incidence of mass shootings or on the incidence of victim fatalities from mass shootings." *See* Exhibit 15, Webster, *supra* Resp. to Statement 7, at 188. Klarevas also includes shootings in which multiple types of firearms were used but codes them as involving an "assault weapon" regardless of the extent to which the other firearms were used.

89.     In the 56 years from 1949 through 2004, there were a total of ten mass shootings resulting in double-digit fatalities. Klarevas Dec. ¶ 44.

**Plaintiffs' Response to No. 89:** Admit that this is what Klarevas found based on his assessment of the evidence.

90.     In the 19 years since the federal Assault Weapons Ban expired in 2004, there have been 22 double-digit fatality mass shootings. Klarevas Dec. ¶ 44.

**Plaintiffs' Response to No. 90:** Admit that this is what Klarevas found based on his assessment of the evidence.

91.     Nearly 8-in-10 (78%) of the mass shootings resulting in ten or more deaths involved assault weapons and/or Large Capacity Magazines (LCMs). Klarevas Dec. ¶ 45.

**Plaintiffs' Response to No. 91:** Dispute. *See* Resp. to Statement 88.

92.     In the time-period between January 1, 1990, and December 31, 2023, accounting for population, states with assault weapons bans in place experienced 60% fewer high-fatality mass shootings involving the use of assault weapons and 40% fewer mass public shootings involving the use of assault weapons. Klarevas Dec. ¶ 62.

**Plaintiffs' Response to No. 92:** Dispute. *See* Exhibit 15, Webster, *supra* Resp. to Statement 88 ("most mass shootings do not involve assault rifles, but many involve the use of LCMs … bans on assault weapons had no clear effects on either the incidence of mass shootings or on the incidence of victim fatalities from mass shootings.") *See* Resp. to Statement 88.

93.    Jurisdictions with bans in effect experienced 67% fewer deaths resulting from high-fatality mass shootings perpetrated with assault weapons and 58% fewer deaths resulting from mass public shootings perpetrated with assault weapons. Klarevas Dec. ¶ 62.

**Plaintiffs' Response to No. 93:** Dispute. *See* Resps. to Statements 88 and 92.

94.    Nearly one out of every four (24.0%) mass shootings occurring between August 1, 1966, and December 31, 2023, were perpetrated using one or more semiautomatic assault-style rifles. *See* Declaration of Jaclyn Schildkraut ("Schildkraut Dec.") ¶ 13.

**Plaintiffs' Response to No. 94:** Dispute. *See* Resp. to Statement 82. Demonstrating the difficulty of consistently classifying mass shootings, Schildkraut uses a completely different definition than the State's other expert, Professor Klarevas: "[A]n incident of targeted violence carried out by one or more shooters at one or more public or populated locations. Multiple victims (both injuries and fatalities) are associated with the attack, and both the victims and location(s) are chosen either at random or for their symbolic value. The event occurs within a single 24-hour period, though most attacks typically last only a few minutes. The motivation of the shooting must not correlate with gang violence or targeted militant or terroristic activity." Schildkraut Dec. ¶ 8; cf. Klarevas Dec. ¶ 40 n.45 ("I employ two prominent definitions of mass shootings from the field of firearm violence research. 'High-fatality mass shootings' (also referred to as 'gun massacres') are shootings resulting in six or more fatalities, not including the perpetrator(s), regardless of location or underlying motive. 'Mass public shootings' are shootings resulting in four or more fatalities, not including the perpetrator(s), occurring largely in a public setting and not undertaken in pursuit of an underlying criminal objective (e.g., robbery, illicit trafficking, organized crime, gang violence, or domestic violence.")). By arbitrarily excluding gang violence and other criminal activity from their definitions, Klarevas and Schildkraut massively inflate the prevalence of "assault weapons" in mass shootings. Handguns are overwhelmingly the weapon of choice in gang crime. *See* Exhibit 65, *Expanded Homicide Data Table 8:*

*Murder Victims by Weapon*, *supra* (64% of murders in 2018 committed with handguns); see also, e.g., Exhibit X, Kollmorgen, *supra* (showing that, of the top 20 firearms seized by Chicago Police in 2014, all 20 were handguns).

95.     In 46.8% of these cases, the semiautomatic assault-style rifle was the only type of firearm used, while in the remaining 53.2%, these weapons were used in conjunction with a handgun and/or shotgun. Schildkraut Dec. ¶ 13.

**Plaintiffs' Response to No. 95:** Dispute. *See* Resp. to Statement 82, 94.

96.     In the 109 shootings where a semiautomatic assault-style rifle was used, there were 640 fatalities, averaging 5.9 fatalities per case. Schildkraut Dec. ¶ 15.

**Plaintiffs' Response to No. 96:** Dispute. *See* Resp. to Statement 88. Schildkraut also fails to control for magazine size in her analysis.

97.     In the 346 cases in which a semiautomatic assault-style rifle was not used, there were 996 fatalities, or an average of 2.9 deaths per shooting. Schildkraut Dec. ¶ 15.

**Plaintiffs' Response to No. 97:** Dispute. Just like Klarevas, Schildkraut fails to control for magazine size in her analysis, which, as discussed in detail above, renders her conclusions both faulty and misleading. She also does not take into account how a shooter's intent may affect the number of casualties per shooting. *See* Resps. to Statements 88, 94, 96.

98.     In the 109 shootings involving a semiautomatic assault-style rifle, there were 1,272 people who sustained non-fatal gunshot injuries. Schildkraut Dec. ¶ 16. This translates to an average of 11.7 persons injured per shooting in which a semiautomatic assault-style rifle was used. *Id.* In the 346 shootings where such a firearm was not used, there were 1,131 people who sustained gunshot injuries, averaging 3.3 injured persons per case. *Id.*

**Plaintiffs' Response to No. 98:** Dispute. Just like Klarevas, Schildkraut fails to control for magazine size in her analysis, which, as discussed in detail above, renders her conclusions both

faulty and misleading.  *See* Resps. to Statements 88, 94, 96.

99.    Semiautomatic assault-style rifles are considered high velocity, with projectiles traveling at rates between 1,500 and 4,000 feet per second, often exceeding 2,500 feet per second. Schildkraut Dec. ¶ 18.

**Plaintiffs' Response to No. 99:** Dispute. Blanket statements about the velocity of an "assault-style rifle" are misleading, because the State's definition of such a rifle does not impact muzzle velocity: there are many different possible muzzle velocities for firearms deemed "assault rifles" by the State. While an AR-style rifle chambered for .223 caliber ammunition can exceed 2,500 feet per second, the velocity one chambered for .45 ACP is 875 feet per second, and the velocity of one chambered for .22LR Rimfire is 1,070 feet per second. Exhibit 75, David Kopel, *AR rifle ammunition is less powerful than most other rifle ammunition*, REASON (Apr. 11, 2023), https://bit.ly/4btYMF2. *See* Resp. to Statement 56.

100.    Bullets fired from handguns are lower velocity, traveling at rates between 700 and 1,500 feet per second, though generally less than 1,000 feet per second. Schildkraut Dec. ¶ 18.

**Plaintiffs' Response to No. 100:** Dispute. *See* Resps. to Statements 55, 56. Furthermore, Plaintiffs dispute that the comparison to a handgun is material or even relevant. Other centerfire rifles not targeted by "assault weapon" bans are equal to or more powerful than the AR-15 in these respects. See Exhibit 76, Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms*, REASON (Oct. 31, 2018), https://bit.ly/46IZbB7. Further, "virtually all rifle ammunition will pierce soft body armor, which is why federal law defines 'armor piercing ammunition' as a projectile for use in a *handgun* with certain metallic properties." *See* Exhibit 21, Halbrook, *supra* Resp. to Statement 16, at 326 (quoting 18 U.S.C. § 921(a)(17)(B)) (emphasis in original).

An "AR-15 rifle is no better at piercing soft body armor than any other rifle of the same caliber." *Id.* Indeed, "the M4 rifle, which is equivalent to a .223 caliber rifle [the standard AR-15 caliber]… is relatively light in both force and velocity compared to many other shoulder-fired

weapons used for hunting and recreation." Exhibit 59, Galvin, *supra* at 968.  So much so, in fact, that "[w]hen compared to many hunting rifles, the M4 often produces 3 to 4 times less recoil energy and typically about half of the recoil velocity." *Id.* So-called "assault rifles" only use "intermediate-sized cartridges", and don't have even half the muzzle energy of legal firearms under the Statute like the M1 Garand. *See* Exhibit 77, Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. TRAUMA ACUTE CARE SURG. 853, 861 (2016).

101.    Higher muzzle (kinetic) energy leads to significantly more deaths in the context of mass shootings, with a difference of two more fatalities over low muzzle energy firearms and a 31% increase in the number of expected deaths. Schildkraut Dec. ¶ 19.

**Plaintiffs' Response to No. 101:** Dispute. *See* Resps. to Statement 55, 56, 88, 100. The wounding potential of a particular rifle depends on both the velocity and the mass of the bullet it fires. For example, the energy at the muzzle of the 5.56 round is 1,325 ft.-lbs. *See* Exhibit X, Kopel, *AR rifle ammunition is less powerful than most other rifle ammunition*, *supra* at Resp. to Statement 99. The .30-06 round, which is nearly two and a half times heavier than the 5.56 round, has 2,998 ft. lbs. of energy at the muzzle, and thus over twice as much wounding potential. *Id.* This demonstrates that there are many factors which determine the damage of a firearm in particular circumstances. In addition to velocity and kinetic energy, other factors include "the location of impact, the bullet's physical characteristics (mass, shape, and construction), and the type of tissues disrupted along the bullet's path." See Exhibit 43, Wallace, *"Assault Weapon" Lethality*, supra Resp. to Statement 11, at 45 (summarizing research from Martin L. Fackler, *Civilian Gunshot Wounds and Ballistics: Dispelling the Myths*, 16 EMERGENCY MED. CLINICS 17, 19 (1998) and Martin L. Fackler, *Gunshot Wound Review*, 28 ANNALS EMERGENCY MED. 194, 202 (1996)).

Once again, it is handguns that are associated with higher death tolls, not rifles: "As with homicide in non-CPMS [Civilian Public Mass Shooting] events, the handgun was the most commonly used firearm in the CPMS events studied and was associated with a greater total number

of wounds and probability of fatal organ injury, as compared with a rifle or shotgun." Exhibit 74, Sarani, *supra* Resp. to Statement 88 at 232. Another study found that "while handguns and shotguns also correlated with the number of victims, assault weapons are not." *See* Exhibit 73, Blau *supra* Resp. to Statement 88 at 11.

102.    Shootings conducted using firearms with high muzzle energy also produce significantly higher numbers of total casualties (fatalities plus injuries), with an average difference of nearly seven victims more than low energy firearms such as handguns and a 96% increase in the expected count of victims. Schildkraut Dec. ¶ 19.

> **Plaintiffs' Response to No. 102:** Dispute. As the State's expert admits, "It bears noting that, in this study, the caliber of ammunition used was not statistically significantly correlated with the number of expected deaths or total casualties." Schildkraut Dec. ¶ 19. This statement is simply another way of saying that the rare shootings that involve a rifle are more deadly than handguns shootings generally, which is neither a true nor a relevant comparison. *See* Exhibit 73, Blau, *supra* Resp. to Statement 88 at 14 ("[w]hen taking a closer look at the incidents themselves … the use of assault weapons is not generally associated with an increase in the number of victims or the number of fatalities. On the other hand, the uses of high-capacity magazines, handguns and shotguns are all consistently associated with increases in both the number of victims and fatalities."). Schildkraut also fails to control for magazine capacity. *See* Resps. to Statements 55, 56, 100, 101.

**G.    Assault Weapons and Mass Shootings Are Fundamentally Modern Technological Problems**

103.    At the time of the Founding and well into the 19th century, the only firearms that Americans owned in significant numbers were single-shot muzzle-loading smoothbore muskets, rifles, and pistols, which lacked the accuracy, reliability, or rate of fire to cause mass casualties. *See* DeLay Dec. ¶¶ 31, 33.

> **Plaintiffs' Response to No. 103:** Dispute. "[W]ell into the 19th century" is an overstatement: the

Colt revolver was patented in 1836. Exhibit 78, Richard C. Rattenbury, *Colt Revolvers*, TSHA, https://bit.ly/3t3Yd4x (last updated Oct. 2, 2019).

104.    Weapon technology grew more sophisticated over the 19th century, with the advent and popularization of concealable bladed weapons, and then repeating pistols such as the Colt revolver. *See* DeLay Dec. ¶¶ 5, 6, 87; Declaration of Robert Spitzer ("Spitzer Dec.") ¶¶ 13-15, 53-55.

**Plaintiffs' Response to No. 104:** Dispute. "Bladed weapons", also known as knives, long predate the 19th century. "The first knives date back as far as 2 and a half million years ago and were crafted by early ancestors of modern humans … About 10,000 years ago, modern humans discovered how to make knives out of copper, and around 5,000 years ago, craftsmen in the Near East began to make them out of bronze." Exhibit 79, David M. Ewalt, *No. 1 The Knife*, FORBES, https://bit.ly/3WcAU4c (last updated July 13, 2012). As noted above, the Colt revolver was patented in 1836, not as late as the State's expert suggests. *See* Exhibit 78, Rattenbury, *supra* Resp. to Statement 103.

105.    Repeating rifles began to be manufactured in the 1860s and 1870s, but were almost exclusively sold to foreign militaries, with few in the hands of American civilians. *See* DeLay Dec. ¶¶ 56-61; Spitzer Dec. ¶¶ 56-57.

**Plaintiffs' Response to No. 105:** Dispute. Repeating rifles have a long history that predates the 19th century: for example, the Danish flintlock was produced in great quantities as early as 1646. Exhibit 80, David Kopel, *Firearms technology and the original meaning of the Second Amendment*, WASH. POST (Apr. 3, 2017), https://wapo.st/48kj5Un. Additionally, a type of repeating flintlock became very popular in England in the 17th century and was manufactured in Massachusetts in the 18th century. *Id.* The Girandoni air rifle, another repeating weapon, was used for decades by the Austrian military and was used effectively in the Austro-Turkish War, 1787-1791. Exhibit 81, Frederick J. Chiaventone, *The Girandoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon,* WARFARE HIST.

NETWORK (Jan. 2013), https://bit.ly/47GQw3s. While it was primarily used by the military, it would "set a high standard that would eventually become attainable by firearms made for ordinary consumers." Exhibit 82, David Kopel, *Fast Reloading of Guns in the 19th Century*, REASON (Jun. 5, 2023), https://bit.ly/3R67jpw. Meriwether Lewis carried such a rifle on his expedition with William Clark in 1803. Exhibit 83, S.K. Wier, *Firearms of the Lewis and Clark Expedition* (July 2007), https://bit.ly/4cOkWCM.

Repeating firearms became hugely commercially successful in the 19th century. The introduction of the Spencer lever action repeating rifle in 1860, eight years prior to the enactment of the Fourteenth Amendment, was a great military and commercial success. Exhibit 82, Kopel, *Fast Reloading of Guns in the 19th Century*, *supra* Resp. to Statement 13. Indeed, the Spencer Repeating Rifle Company of Boston made 144,500 rifles and carbines and sold 107,372 to the U.S. government. The rest were presumably sold privately. The Spencer held 7 rounds in a tubular magazine in the buttstock. After firing 7 rounds, using the Blakeslee speedloader, the user could pour in 7 new rounds. The Blakeslee cartridge box kit could hold up to 13 tubes, with 7 rounds each. The Henry model of 1860 was also commercially successful, with 14,000 rifles produced. Exhibit 82, Kopel, *Fast Reloading of Guns in the 19th Century*, *supra*; Exhibit 84, Patrick Roberts, *The History of Henry*, GUN DIGEST (Aug. 26, 2022), https://bit.ly/47T7qf2. Multi-shot arms were ubiquitous among civilians by the end of the Civil War. "[O]ver 170,000" Winchester 66's "were sold domestically," and the successors that replaced the Model 66, the Model 73, and the Model 92 sold more than ten times that amount in the ensuing decades. *Duncan*, 970 F.3d at 1148. And Winchester rifles, while certainly the most popular, were by no means unique. See, e.g., Exhibit 40, Williamson, *supra* at 28–31 (discussing the Henry lever action rifle, which could fire 16 rounds without reloading); Exhibit 41, Flayderman, *supra* at 305 (noting that 14,000 Henry rifles were sold between 1860 and 1866).

106.    Self-loading machine guns and detachable magazines only came onto the market in the

early 20th century, and when these weapons (such as the Thompson submachine gun, known as the "Tommy Gun") began to proliferate, states and the federal government passed laws banning them. *See* DeLay Dec. ¶¶ 73-78; Spitzer Dec. ¶¶ 76-85.

**Plaintiffs' Response to No. 106:** Dispute. The comparison to a Tommy gun, or machine guns in general, is neither material nor relevant. Furthermore, the Tommy gun was notable for *not* proliferating among the law-abiding. As Spitzer himself notes, sales were "sluggish" and "anemic": "[b]y 1925, Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals. This pattern of anemic sales typified the gun's commercial trajectory: 'Despite its initial publicity and later notoriety, the Thompson submachine gun was a failure from the start.'" Spitzer Dec. ¶ 67. Self-loading machine guns and detachable magazines are not arms that can be equated to each other as Spitzer does here.

107.     Assault rifles, meanwhile, are a modern innovation, with the semiautomatic AR-15 only being introduced on the civilian market after 1963, *see* Yurgealitis Dec. ¶¶ 76-77, without achieving significant popularity. *See* Klarevas Dec. ¶¶ 22 n.27, 24.

**Plaintiffs' Response to No. 107:** Dispute. Unlike machine guns, AR-15s have gone on to achieve significant popularity. *See* Resp. to Statement 3. Furthermore, semiautomatic rifles have been around for over a century: they "were invented in 1884. The first ones to become major commercial successes were the Mauser C96 pistol starting in 1896, and the Luger in 1899." Exhibit 82, Kopel, *Fast Reloading of Guns in the 19th Century, supra.* The ATF has also noted that it is a "misnomer" to refer to semiautomatic rifles as "assault rifles." *See* Exhibit 44, *Report and Recommendation on the Importability of Certain Semiautomatic Rifles, supra* at 5.

108.     When, in 1994, the Federal Assault Weapons Ban made civilian possession of AR-15s unlawful, few civilians owned AR-15s. *See* Klarevas Dec. ¶ 24.

**Plaintiffs' Response to No. 108:** Dispute. When the Federal Assault Weapons Ban went into

effect, there were approximately 400,000 AR-15s in circulation. Exhibit 85, Zusha Ellinson & Cameron McWhirter, *America's Failed Attempt to Ban Assault Weapons*, WALL ST. J. (Apr. 1, 2021). This is likely a low estimate. According to the National Shooting Sports Foundation, there were an estimated 856,000 "modern sporting rifles" (a category made up of AR-15s and other similarly styled rifles) produced for sale in the United States market in just the five years from 1990-94. *See* Exhibit 86, *Firearm Production in the United States With Firearm Import and Export Data* at 6, NSSF (2020), https://bit.ly/3LwJvKh.

109.    Likewise, the problem of high-casualty mass shootings carried out by a single perpetrator is an unprecedented societal concern, only made possible by 20th century advances in firearm technology. Indeed, it was not until 1949 when America first suffered an incident where a single shooter killed more than ten people with a firearm. *See* Klarevas Dec. ¶ 41.

**Plaintiffs' Response to No. 109:** Dispute. The "single perpetrator" limitation is arbitrary. The State's rationale for banning "assault weapons" is not that they are used by a single shooter, but that they are used to carry out mass shootings. Applying this same principle to the Founding era, we look to see whether certain weapons were used to carry out mass killings, and whether they were also banned.

Mass killings have a long, unfortunate history in the United States. Consequently, our Founding Fathers were no stranger to them. In 1622, one of the worst massacres in American history was perpetrated at the Jamestown colony, where Native Americans of the Powhatan tribe slaughtered 347 men, women, and children, totaling one-third of the English population. Exhibit 87, W.E. White, *The Anglo-Powhatan War of 1622*, BILL OF RIGHTS INST., https://bit.ly/3VY4YiT (last visited July 3, 2024). Over a century later in 1755, the Draper's Meadow Massacre occurred during the course of the French and Indian War, where a group of Pawnees killed three men, a woman, and a child, and took numerous captives. Exhibit 88, *Mary Draper Ingles*, U.S. NAT'L PARK SERV., https://bit.ly/3xPCyzC (last visited July 3, 2024). The same year saw the Penn's Creek massacre, in

which 14 people were killed. Exhibit 89, *On The Knife's Edge*, CENT. SUSQUEHANNA VALLEY HIST. PROJ., https://bit.ly/3Len62V (last visited July 3, 2024).

What may be the first massacre within a school in America took place in 1764, when a group of Native Americans attacked Enoch Brown's schoolhouse, killing him and nine of his students. Exhibit 90, *Enoch Brown Incident*, NAT'L MEMORIAL TO FALLEN EDUCATORS, https://bit.ly/4eQ83Kr. Mass killings continued apace: 1781 was the year of the Long Run Massacre, which saw over 60 pioneers killed in Kentucky. Exhibit 91, *Long Run Massacre*, KY. HIST. SOC., https://bit.ly/4bBMkmK (last visited July 3, 2024). Then came the Big Bottom Massacre in 1791, in which twelve people were killed. Exhibit 92, *Survivor of Big Bottom Massacre remembered*, THE PARKERSBURG NEWS AND SENTINEL (Aug. 26, 2015), https://bit.ly/3VMQBhe. Mass murders never went away: they were present in the Reconstruction South after the Civil War as well. Exhibit 93, RANDOLPH ROTH, AMERICAN HOMICIDE at 348 (2012). None of the weapons used in these mass killings were subject to a total ban.

110.    Over time, as assault weapons proliferated through the civilian population, more and more mass shootings followed. *See* Klarevas Dec. ¶¶ 43–44, 47–50; *see also* Schildkraut Dec. ¶¶ 13-14.

**Plaintiffs' Response to No. 110:** Dispute. The AR-15 has been commercially available and popular for decades. The supposed increase in mass shootings occurred long after the availability and popularity of the AR-15 was already well-established. Furthermore, as Klarevas's graphs demonstrate, the change in mass shootings over time is not linear and the "trendline" identified only loosely fits the data.

111.    The increasing frequency and lethality of these mass shootings are intimately tied to the spread of assault weapon technology. As Professor Klarevas points out, between the ten-year-period of 1974-1983 and the ten-year-period of 2014-2023, the number of people killed in high-fatality mass shootings and mass public shootings has increased by 230% and 502%, respectively. *See* Klarevas Dec. ¶ 46; *see also* Schildkraut Dec. ¶ 10 and Exs. C & D.

**Plaintiffs' Response to No. 111:** Dispute. The comparison between these two ten-year periods is completely arbitrary and does not account for magazine capacity in its analysis. Furthermore, mass shootings only began to increase decades after the introduction of the AR-15 to the civilian market in 1963. Exhibit 94, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 859 (2015).

112.    This increase in mass shooting lethality has come about at the same time as an increase in the use of assault weapons, with 50% of high-fatality mass shootings and 58% of mass public shooting incidents involving assault weapons. *See* Klarevas Dec. ¶ 47; *see also* Schildkraut Dec. ¶ 14 (discussing how "[t]he use of semiautomatic assault-style rifles by mass shooting perpetrators has increased over time.").

**Plaintiffs' Response to No. 112:** Dispute. *See* Resp. to Statement 111. As noted above, it is very difficult to make generalizations about mass shootings violence, and the State's two experts cannot even agree on their definition of a mass shooting, much less employ a generally accepted definition. *See* Resps. to Statements 82, 94.

## G.    There is a Longstanding Historical Tradition of Regulating Dangerous Weapons

113.    Throughout American history a specific relationship existed between the development of new weapons technologies, their spread into society, and subsequent regulation by the government, as party of a centuries-long effort to protect the public from harm and to dampen weapons-related criminality and violence. *See* Spitzer Dec. ¶ 4.

**Plaintiffs' Response to No. 113:** Dispute. This statement, which makes broad claims about the history of firearm regulation in the country, casting certain regulatory restrictions as responsive to both "technological change" and "unprecedented social concern" states legal conclusions relevant to the *Bruen* analysis. The analysis of regulatory history surrounding firearms is not a factual inquiry, but a legal one. *See Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions

in the abstract; it is to resolve legal questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & HIST. REV. 809, 810–11 (2019)). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis. Plaintiffs will respond to the substance of the statements in this section where appropriate, but when the issue relates to the legal analysis prescribed by *Bruen*, Plaintiffs will engage with their substance in their legal briefing.

Applying the *Bruen* standard to this proposed "fact" the State's central assertion—that there has been "a centuries-long effort to protect the public from harm and to dampen weapons-related criminality and violence" through regulation of new weapons technology—is faulty in at least two respects. First, the claim is made at much too high a level of generality. *Bruen* requires that past constitutional restrictions must be similar to present restrictions both in "how" and "why" they restricted the right to keep and bear arms. *Bruen*, 597 U.S. at 29. The statement does not characterize the laws at issue with enough specificity to even tell "how" the State alleges these past restrictions limited the exercise of the Second Amendment right, and the asserted "why" underpinning the regulations—that they were spurred by "new weapons technologies" and concerns with public safety and minimizing criminal activity—are the sort of broad legislative justifications that *Bruen* held to be irrelevant to a law's constitutionality under the proper text-and-history test. *See, e.g.*, *Bruen*, at 17 & n.3 ("The right to keep and bear arms … is not the only constitutional right that has controversial public safety implications." (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010) (plurality op.)).

114.   First, a new weapon or weapon technology is invented. Second, it may then be patented, though the patenting of a design does not necessarily mean that the technology will spread. Third, the technology is generally developed with a focus on military applications, rather than directly

for civilian acquisition or use. Fourth, military-designed weapons may spread to, or be adapted to, the civilian market. And fifth, if these weapons circulate sufficiently in society to pose a threat to public safety, the people's elected representatives enact laws against their ownership or carriage. Spitzer Dec. ¶ 5.

**Plaintiffs' Response to No. 114:** Dispute. *See* Resp. to Statement 113. Spitzer's historical story here is wrong. While the first four steps of his story of technological innovation in firearms and weapon technology have happened repeatedly in our country's history, firearms that truly represent advances that spread to the civilian market and become popular there have *never* been subject to the type of widespread "laws against their ownership or carriage" that Spitzer suggests. For example, the Winchester and Henry rifles became very popular during the Civil War but have never been regulated in the way Spitzer claims: "[O]ver 170,000" Winchester 66's "were sold domestically," and the successors that replaced the Model 66, the Model 73, and Model 92 sold more than ten times that amount in the ensuing decades. *Duncan*, 970 F.3d at 1148. And Winchester rifles, while certainly the most popular, were by no means unique. See, e.g., Exhibit 40, Williamson, *supra* at 28–31 (discussing the Henry lever action rifle, which could fire 16 rounds without reloading); Exhibit 41, Flayderman, *supra* at 305 (noting that 14,000 Henry rifles were sold between 1860 and 1866). These rifles were never banned. On the other hand, those few weapons that are ever subject to such stringent regulations—machine guns, for example—have been restricted in this way *without ever becoming popular in the first place*. Take, for example, the famous "Tommy gun," the Thompson submachine gun. When it came on the market in 1921, though "virtually anyone with the cash could buy one across the counter," "[s]ales trickled in." Exhibit 95, Dave Campbell, *A Look Back at the Thompson Submachine Gun*, NRA (Apr. 17, 2019), https://bit.ly/3ZlZL5y.

These examples serve to prove that Spitzer's model of the history of firearms technology and firearms law development do not follow the pattern Spitzer claims. Further proof of this fact

comes from *Heller* itself, which, as a case about the banning of a certain class of firearms (handguns) had to access the very same history Spitzer now opines on, held that any arm that is sufficiently popular in the civilian market (those that "circulate in society sufficiently" to use the State's phrasing) are protected and cannot be banned. *See Heller*, 554 U.S. at 627 (cleaned up) (stating that arms "in common use" are protected). This conclusion follows directly from *Heller*'s analysis of history which taught that the only arms that were *not* protected by the Second Amendment were those that were both "dangerous and unusual." *Id.* (citation omitted).

Spitzer's historical theory then is directly at odds with *Heller*. This should be no surprise, as Spitzer has recently testified that he believes *Heller* was wrongly decided, was based on "discredited scholarship" and should be reversed "because it was based on an accurate reading of history only if you are standing on your head." *See* Exhibit 96, Prelim. Inj. H'rg Tr. at 98:10–99:24, *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-710 (D. Vt. June 3, 2024). Spitzer's report is not a reliable guide to the history of firearm rights in this Country as the Supreme Court has bindingly interpreted it and should be ignored.

115. The "Bowie knife" was invented in the 1820s and became popular in the following decade after the adventurer Jim Bowie famously used one in an 1827 duel, with their popularity only spreading after Bowie's death defending the Alamo in 1836. Spitzer Dec. ¶¶ 12-13; Rivas Dec. ¶ 17.

**Plaintiffs' Response to No. 115:** Dispute. *See* Resp. to Statement 113. While the term "Bowie knife" became popular following Jim Bowie's famous duel using a knife made for him by his brother, Rezin Bowie, following that fight, the name "Bowie knife" was used to describe a wide variety of different knives. *See* Exhibit 97, David Kopel, *The legal history of bans on firearms and Bowie knives before 1900*, REASON (Nov. 20, 2022), https://bit.ly/3T5Uu17.

116. From the beginning of the 1830s through the early twentieth century, the District of Columbia and every state except New Hampshire passed laws banning Bowie knives. Spitzer Dec. ¶

15.

**Plaintiffs' Response to No. 116:** Dispute. *See* Resp. to Statement 113. These laws speak for themselves, and the State's expert's descriptions are far too general to satisfy the careful review which Bruen requires. More importantly, his descriptions are simply wrong. Far from "every state except New Hampshire pass[ing] laws banning Bowie knives," the actual laws Spitzer cites demonstrate that only *three* states even went so far as to prohibit all forms of carrying Bowie knives.

In Spitzer Dec. Ex. B, Spitzer lists seven categories of Bowie knife laws. Of the seven, only the "No Carry" category is remotely analogous to a "ban," because every other category of laws permitted not just ownership, but public carriage of Bowie knives in some form. Examining the laws in the "No Carry" category, we hardly find a historical tradition of banning Bowie knives. The following laws can be discarded because they come from territories: Arizona (1889), Hawaii (1852, 1913),[1] Oklahoma (1890, 1891), Utah (1877). These laws can be ignored as mere "territorial restrictions" which *Bruen* discounted because they were frequently short lived, rarely tested in court, and irrelevant to most of the country at the time they were in force. *Bruen*, 597 U.S. at 67.

The laws Spitzer cites that were passed in the 20th century can also be ignored: Missouri (1917, 1923), West Virginia (1925). *See id.* at 66 n. 28. The Colorado law only regulates concealed carry of Bowie knives. Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881) ("No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon"). Four laws cited by Spitzer did not apply statewide but were limited to certain localities (and even in those localities, some of

---

[1]    Of particular note, the Hawaii law from 1852 even predates Hawaii's territory status. It is hard to imagine why Spitzer or the State believes a law from the Kingdom of Hawaii would shed any light at all on the scope of the Second Amendment's protections.

these were still not broad bans on all forms of carry); Nashville, Tenn., Ordinances, pt. 3, tit. 12, ch. 108, §§ 1–6, in WILLIAM KING MCALISTER JR., ORDINANCES OF THE CITY OF NASHVILLE, TO WHICH ARE PREFIXED THE STATE LAWS CHARTERING AND RELATING TO THE CITY 340–41 (1881) (Nashville); Nashville, Tenn., Ordinance, § 738 in CLAUDE WALLER, DIGEST OF THE ORDINANCES OF THE CITY OF NASHVILLE, TO WHICH ARE PREFIXED THE STATE LAWS INCORPORATING, AND RELATING TO, THE CITY, 364–65 (1893) (Nashville); Otoe County, Neb., Ordinance No. 7, § 1, in GILBERT B. COLFIELD, LAWS, ORDINANCES, AND RULES OF NEBRASKA CITY, OTOE COUNTY 36 (1872) (Nebraska City, also notably prohibited all carriage even of rifles, muskets, and pistols, plainly unconstitutional under *Bruen*); CHARTER AND REVISED ORDINANCES OF BOISE CITY, IDAHO 119–20 (1894) (Boise, permitted carrying while traveling).

Other laws cited by Spitzer applied only to certain "sensitive places" or on days of elections, *see, e.g.*, 1870 La. Acts 159–60; Nashville, Tenn., Ordinances, Elections, §§ 2–3, in JAMES H. SHANKLAND, PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE THE YEAR 1858, BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE, at 108 (1869).

Three laws cited by Spitzer only prohibit concealed carry and carry with an intent to injure another or commit a crime. 1859 Ind. Acts 129, AN ACT TO PREVENT CARRYING CONCEALED OR DANGEROUS WEAPONS, AND TO PROVIDE PUNISHMENT THEREFOR. § 1 ("every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man"); GEORGE R. DONNAN, ANN. CODE OF CRIM. P. & PENAL CODE OF THE STATE OF N.Y. AS AMENDED 1882-5, at 172, § 410 (4th ed. 1885) ("A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony."); Laws of

Vermont, PUBLIC ACTS, NO. 85.—AN ACT AGAINST CARRYING CONCEALED WEAPONS, Ch. 85, at

95. (1892). ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the

intent or avowed purpose of injuring a fellow man").

   In the end, far from the "every state except New Hampshire" the State claims, there is

evidence of just three states that actually prohibited all forms of carry of Bowie knives in the relevant

time period under *Bruen*—Arkansas, Texas, and West Virginia—and no evidence that they "banned"

Bowie knives the way the State has banned so-called "assault weapons." Thus, there was no

significant tradition of complete bans of Bowie knives. Spitzer's conflation of various types of carry

laws and characterization of all of them as "bans," his ignoring the critical distinction between mere

territorial laws and those that applied only in certain municipalities rather than statewide, makes the

*Bruen* analysis far more difficult than it needs to be, as one federal judge has noted. *See Fouts v. Bonta*,

No. 19-cv-1662, 2024 WL 751001 (S.D. Cal. Feb. 23, 2024) at *10 ("It makes it difficult to properly

perform the *Bruen* analysis when the State's expert who has studied gun regulations for thirty years is

imprecise in his language, and when the State's briefing employs a mischaracterization. After all, the

subject of the regulatory "what and when" is the central historical tradition inquiry under *Bruen*. More

importantly, it is the government's central burden to show a national tradition of regulation by

reference to state laws and court decisions in effect during the most important historical time

period.").

  117. These restrictions affected not only the public carry of Bowie knives but also their sale.

For example, in 1837, in Georgia, it was unlawful "for any merchant, or vender of wares or

merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to

keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit:

Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying

the same as arms of offence or defense[.]" Rivas Dec. ¶ 48; DeLay Dec. ¶ 87.

**Plaintiffs' Response to No. 117:** Dispute. *See* Resps. to Statement 113 and 116. This Georgia law is not part of our nation's history of firearms regulation that can be considered under *Bruen*, because it was declared entirely unconstitutional (except to the extent it banned concealed carry) under the Second Amendment in *Nunn v. State*, 1 Ga. 243 (1846) (as the State's expert acknowledges, *see* DeLay Dec. ¶ 89 & n.113), in an opinion that *Heller* said, "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause, in continuity with the English right," 554 U.S. at 612.; *see also* Exhibit 97, Kopel, *The legal history of bans on firearms and Bowie knives before 1900*, *supra*.

118.    The following year (1838), Tennessee lawmakers did much the same with an updated public carry law that included a section prohibiting "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick." Rivas Dec. ¶ 48.

**Plaintiffs' Response to No. 118:** Dispute. *See* Resp. to Statement 113. Plaintiffs admit that Tennessee passed such a restrictive law, but again, this law is a poor candidate for historical analysis under *Bruen*. This law was the subject of a challenge under the Second Amendment, and although the Tennessee Supreme Court upheld the law in *Aymette v. State*, 21 Tenn. 154 (1840), that does little to support the claim that this law was representative of a valid tradition of firearm regulation since *Heller* singled out *Aymette* as advancing an "odd reading of the right" that was "to be sure, not the one [the Court] adopt[ed]" in *Heller*. 554 U.S. at 613–14. Tennessee's law was an outlier that was joined only by an Arkansas law from 1881 in banning the sale of Bowie knives. *See* Exhibit 97, Kopel, *The legal history of bans on firearms and Bowie knives before 1900, supra*.

119.    Beginning in 1799, every state in the nation adopted laws restricting types of clubs or other blunt weapons, recognizing them as "wicked, cowardly, soaked in blood and cured in whiskey." Spitzer Dec. ¶ 25. (quoting Robert Escobar, Saps, Blackjacks and Slungshots: A History of Forgotten

Weapons (Gatekeeper Press 2018) at 1). These include batons, billy clubs, blackjacks, bludgeons, or just clubs more generally. *Id.* ¶¶ 25-28; *see also* Spitzer Dec. Ex. D (table of historical blunt object laws).

**Plaintiffs' Response to No. 119:** Dispute. These laws speak for themselves, and the State's expert's descriptions are far too general to satisfy the careful review which *Bruen* requires. More importantly, his descriptions are quite often simply wrong. Spitzer collects a set of general restrictions on a wide variety of "dangerous weapons," including bludgeons, billy clubs, "clubs" more generally, and slung shots. See Spitzer Ex. C. But these laws, like the Bowie knife restrictions, were nowhere near as restrictive as the State's ban on so-called "assault weapons." As Spitzer himself admits, the weapons were "primarily regulated by anti-carry laws," not outright bans. *See* Spitzer Dec. ¶ 24. And even that overstates things. Many of the cited laws applied only locally or merely regulated the method of permissible carry and did not ban it entirely. *See, e.g.*, 1872 Md. Laws 57 (billy club concealed carriage prohibited, but only in Annapolis). Again, the general way in which Spitzer discusses these laws does not comport with *Bruen*, and a close examination demonstrates that they are not "relevantly similar" to the State's bans. *Bruen*, 597 U.S. at 29.

120.    Of particular concern was a "slungshot," a handheld weapon consisting of a piece of metal or stone attached to a flexible strap or handle, which developed in the 1840s. Spitzer Dec. ¶ 29; Rivas Dec. ¶ 25.

**Plaintiffs' Response to No. 120:** Dispute. The laws speak for themselves, and the State's expert's descriptions are far too general to satisfy the careful review which *Bruen* requires. Only five states banned slungshots before the 20th century: Ill. Act of Apr. 16, 1881, *as codified* in ILL. STAT. ANN., CRIM. CODE, ch. 38 at 88 (1885). Possession or sale forbidden, § 1. ("whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor");  1895 N.D. Rev. Codes 1293, PENAL CODE, CRIMES AGAINST THE PUBLIC

HEALTH AND SAFETY, ch. 40, §§ 7312–13. ("Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony"); TENN. PUB. ACTS (1879), chap. 186, *as codified* in Tenn. Code (1884). 5533 ("It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks"); 1871 Tex. Laws 25, AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS, § 1 ("Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot … shall be guilty of a misdemeanor");  1882 W. Va. Acts 421–22 ("If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor"). Other laws merely regulated the method of carry. 1873 ALA. OFFENSES AGAINST PUBLIC JUSTICE § 4110 (prohibiting *concealed* carriage of brass knuckles and slung-shots).

Two of the more restrictive laws (those from Texas and West Virginia), it should also be noted, also banned the carriage of revolvers and pistols, which they clearly did not have the power to do consistent with the Second Amendment. *See Bruen* 597 U.S. at 19. Indeed, *Bruen* specifically considered and rejected both of these laws as analogues for the New York law restricting handgun carriage, noting their outlier status. *Id.* at 65–66. They cannot be relied on here as anything other than a demonstration that the State's views of Second Amendment history continue to be at odds with binding Supreme Court precedent.

121.    The first known use of a slungshot occurred in 1842 and the first state law banning them was enacted in 1850, with more than 40 states and the District of Columbia passing bans throughout the 19th century. Spitzer Dec. ¶¶ 29; Rivas Dec. ¶ 26.

**Plaintiffs' Response to No. 121:** Dispute. These laws speak for themselves, and the State's expert's

descriptions are far too general to satisfy the careful review which *Bruen* requires. The State's expert does not mention any outright bans: "The earliest anti-slungshot law was enacted in 1850; 47 states legislated against them in the 1800s (including the District of Columbia): 46 did so in the 1800s and 19 states in the early 1900s (note all these data incorporate multiple laws enacted in more than one century by a few states)." Spitzer Dec. ¶ 29. As noted above, very few of these meaningfully restricted all ownership or carry of slungshots, and several of those were rejected as appropriate analogues by the Supreme Court in *Bruen. See* Resp. to Statement 120.

122.    Colonial and early American legislatures also broadly regulated trap guns, which were particularly dangerous because they did not need an operator present to fire, which meant that trap guns could fire at unintended targets or victims. Spitzer Dec. ¶¶ 35-39.

**Plaintiffs' Response to No. 122:** Dispute. Admit that laws regulating trap guns existed at the Founding. Dispute that this characterization of those laws, which speak for themselves, is accurate. Furthermore, these laws were not actually restrictions on owning any sort of firearm. Rather, they forbid, for example, misusing a firearm by "set[ting] [it] in such Manner as [the arm] shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance," and are therefore irrelevant to this case. 1763-1775 N.J. Laws 346, ch. 539 § 10 (1771). As such, they were more akin to laws regarding the reckless firing of firearms, rather than laws restricting what types of firearms may be lawfully owned.

123.    Also known as "man traps," "infernal machines," or "set guns," these weapons were first prohibited by the colony of New Jersey in 1771, and at least 24 more states would go on to enact their own measures. Spitzer Dec. ¶¶ 35-39; and Spitzer Ex. F.

**Plaintiffs' Response to No. 123:** Dispute. *See* Resp. to Statement 122. Again, the State's description of these laws is far too general—in claiming that other states "enact[ed] their own measures" following New Jersey's prohibition, the State implies that those other states similarly prohibited setting trap guns. In fact, that is not the case, as even the State's expert admits in his survey of these

laws, singling out one from North Carolina that "provid[ed] conditional permission for those seeking to set traps for hunting-related purposes." Spitzer Dec. ¶ 36. Furthermore, many of the laws Spitzer relies on were not enacted until the 20th century, a period *Bruen* did not even bother to examine because it comes too late to shed light on the meaning of the Second Amendment. *Bruen*, 597 U.S. at 66 n. 28. And even just considering those that came before, many are less than complete bans. *See* 1875 Mich. Pub. Acts 136 § 1 (permitting trap guns when left "in the immediate presence of some competent person"). In fact, several of the laws cited by Spitzer are merely regulations on the use of traps in hunting (and it is questionable at best whether they all apply to "trap guns" at all). *See, e.g.,* 1890 R.I. Pub. Laws 17 § 6 (making it a misdemeanor to "kill or destroy any quail or partridge by means of any trap, snare, net or spring"); David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes at 1960-61, (1872) available at The Making of Modern Law: Primary Sources (prohibiting "kill[ing] any wild duck, brant or wild goose" with "any gun or fire arm other than such guns or fire arms as are habitually raised at arm's length and fired from the shoulder").

124.    Even though Samuel Colt obtained his first patent in 1836, it took until about midcentury for Colt revolvers be produced in sufficient numbers to begin saturating the American market as a result of two things: 1) the loss of his patent in 1857, which allowed new entrants into the market; and 2) the development of a large manufacturing capacity due to wartime production throughout the Civil War. Rivas Dec. ¶ 22.

**Plaintiffs' Response to No. 124:** Admit that the Colt revolver was patented in 1836 and became ubiquitous by the middle of the nineteenth century. Colt revolver factories emerged in the 1850s,

and almost 500,000 revolvers had been manufactured by 1862: "In 1855, in Hartford along the Connecticut River, he completed a new factory and incorporated his business as the Colt's Patent Fire Arms Manufacturing Company (today Colt's Manufacturing Company LLC) and began regular production. By the time of Colt's death on January 10, 1862, a succession of ten improved revolver models had been introduced, and some 468,000 units manufactured. Before the Civil War, the most popular of these in Texas was the .36 caliber 1851 Navy model, about which traveler Frederick Law Olmsted observed, "Of the Colt's [Navy] we cannot speak in too high terms. . . There are probably in Texas about as many revolvers as male adults, and I doubt if there are one hundred in the state of any other make." Exhibit X, Rattenbury, *supra*.

The Colt revolver was enormously popular with civilians: "By the end of 1874, 12,500 Colt Single Action Army revolvers chambered for the .45 Long Colt cartridge had entered military service, with thousands more sold to the civilian market." Exhibit 98, Chip Lohman, *The History of Colt*, NRA EXPLORE (Jan. 17, 2017), https://bit.ly/3VXz066. Additionally, "Among Union forces, the Colt Model 1860 was the most commonly used revolver of the Civil War. This design was manufactured from 1860 through 1873, with over 200,000 produced. Of these, 127,156 were purchased by the U.S. government" (implying over 70,000 were sold to civilians). Exhibit 99, *U.S. Colt Model 1860 Army Revolver*, NRA MUSEUMS, https://bit.ly/3VR2brL (last visited July 5, 2024).

125.    Firearms were not the weapon of choice for interpersonal violence during the colonial period or the early days of the Republic: they were too cumbersome, too time-consuming to load and reload, and too inaccurate or unreliable when compared to handheld or bladed weapons. Spitzer Dec. ¶ 34.

**Plaintiffs' Response to No. 125:** Dispute. Interpersonal gun violence was hardly an unprecedented problem for the Founders: for example, "[t]hrough 1675, 38 percent of homicides among unrelated colonists in New England and New Netherlands were committed with guns; the figure was probably 40 percent in Maryland." Exhibit 93, Roth, *supra* Resp. to Statement 84, at 56. During the

Revolutionary War era, over 50% of homicides in New England were committed with firearms. Id. at 155.

126.    The Colt revolver diverged from pistols widely available at the time in two critical ways. First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading). Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds. Rivas Dec. ¶ 23.

**Plaintiffs' Response to No. 126:** Admit.

127.    By about the 1870s, technological developments in the design and functionality of ammunition meant that later-model revolvers could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more efficient—a boon on the battlefield, but a new danger in other contexts. Rivas Dec. ¶ 23.

**Plaintiffs' Response to No. 127:** Dispute. The cartridge came into use two decades before the 1870s: "The modern form of the metallic cartridge was invented in 1853 … [t]he first American revolver to use metallic cartridges was the 7-round breechloading Smith & Wesson New Model 1, introduced in 1857." Exhibit 82, Kopel, *Fast Reloading of Guns in the 19th Century*, *supra* Resp. to Statement 107.

128.    As firearms technology improved and pistols became more dangerous—particularly after the popularization of the Colt revolver and other repeating pistols in the late 1800s—states and municipalities adopted laws banning the concealed carry of pistols and revolvers, penalizing their public display, or requiring licensure. Spitzer Dec. ¶¶ 34, 61; DeLay Dec. ¶ 64 (noting that 285 regulations on carrying weapons were enacted between 1865 and 1900).

**Plaintiffs' Response to No. 128:** Dispute. Again, the State's description of these laws as "regulations on carrying weapons" is so general as to be entirely useless for the analysis prescribed by *Bruen*. In any event, the State's attempt to characterize revolving pistols as "dangerous" weapons

that could be meaningfully restricted consistent with the Second Amendment makes clear that their theory of this case is fundamentally at odds with *Bruen* and *Heller*. *Heller* definitively held that handguns are protected by the Second Amendment and cannot be banned, 554 U.S. at 635, and *Bruen* surveyed historic restrictions on their carriage and found that they did not justify modern bans on carriage, *see Bruen*, 597 U.S. at 71. It is impossible to construe either case as permitting the State's arguments that historical laws regulating handguns could justify the banning of firearms in common use today.

129.    By 1938, the carrying of concealed pistols was either absolutely prohibited or permitted only with a license in every state but two. Spitzer Dec. ¶ 34.

**Plaintiffs' Response to No. 129:** Dispute. *See* Resp. to Statement 128. Furthermore, to the extent that Spitzer and the State purport to rely on 20th century laws, they can be disregarded entirely. *Bruen*, 597 U.S. at 66 n. 28.

130.    The Thompson submachine gun (commonly known as the "Tommy gun") had been developed for use in World War I as "purely a military weapon," it came too late in the war to have much effect. Spitzer Dec. ¶ 66 (quoting William J. Helmer, The Gun That Made the Twenties Roar (Highland Park, NJ: The Gun Room Press, 1969) at 75); DeLay Dec. ¶ 74.

**Plaintiffs' Response to No. 130:** Dispute. *See* Resp. to Statement 106. The "Tommy gun" is entirely irrelevant to this case. The Tommy gun, like machine guns generally, has never been in common use, unlike the firearms banned by the State here. When it appeared on the market in 1921, though "virtually anyone with the cash could buy one across the counter," "[s]ales trickled in." Exhibit 95, Campbell, *supra*.

131.    Around the turn of the twentieth century, John M. Browning began working on the design of semi-automatic firearms, which functioned through a "blowback" method in which "the recoil from the exploded cartridge ejects the empty shell, cocks the hammer, and throws a fresh cartridge into the chamber." Rivas Dec. ¶ 54.

**Plaintiffs' Response to No. 131:** Dispute. Semiautomatic rifles have been around for over a century: they "were invented in 1884. The first ones to become major commercial successes were the Mauser C96 pistol starting in 1896, and the Luger in 1899." Exhibit X, Kopel, *Fast Reloading of Guns in the 19th Century*, *supra*. *See* Resp. to Statement 107.

132.    This design was sometimes referred to as "automatic," though its function aligns with our current definition of "semi-automatic." Rivas Dec. ¶ 54.

**Plaintiffs' Response to No. 132:** Dispute. Rivas offers no evidence in her report to support this assertion.

133.    Winchester did not release a semi-automatic rifle featuring a detachable magazine until its Model 1905 Self-Loading Rifle, and that detachable box magazine held only five cartridges in a single column. Rivas Dec. ¶ 54.

**Plaintiffs' Response to No. 133:** Admit.

134.    When the Tommy gun and its close cousin the Browning Automatic Rifle (or BAR), with their large ammunition capacities and automatic fire, began to circulate in the civilian market, they quickly became notorious for their use by gangsters, including in the infamous St. Valentine's Day massacre in Chicago in 1929, or by famous criminals such as Bonnie and Clyde. Spitzer Dec. ¶ 67.

**Plaintiffs' Response to No. 134:** Dispute. *See* Resp. to Statements 106, 130. Despite their use in certain high-profile crimes, the State has not shown that machine guns were ever in common use for lawful purposes among law-abiding citizens.

135.    The guns' association with violence and criminality, rather than lawful self-defense, led at least 36 states to enact anti-machine gun laws in the years between 1925 and 1935. Spitzer Dec. ¶ 76.

**Plaintiffs' Response to No. 135:** Dispute. *See* Resps. to Statements 113, 129, 130. Again, the State's

description of these laws at a high level of generality as "anti-machine gun laws" is insufficiently specific to support an analogy under *Bruen*. In any event, as already explained, the State has not shown that machine guns were ever "in common use for lawful purposes" and so laws restricting them are irrelevant to laws banning firearms that include the most popular rifle in American history, like the State's law does.

136.    Congress organized a special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms," and passing first a machine gun ban for the District of Columbia and then the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and circulation of fully-automatic weapons. Spitzer Dec. ¶¶ 76-80.

**Plaintiffs' Response to No. 136:** Admit. *See* Resps. to Statements 129, 130, 135.

137.    Blackstone's Commentaries on the Laws of England, published in 1769, recognized that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land," and traced its origin all the way back to ancient Greece, where "by the laws of Solon, every Athenian was finable who walked about the city in armour." 4 Sir William Blackstone, Commentaries on the Laws of England 149 (16th ed. 1825), SPM Ex. D (emphasis omitted).

**Plaintiffs' Response to No. 137:**  Admit that Blackstone's Commentaries contain the quoted language; otherwise disputed. Blackstone's Commentaries speak for themselves.

138.    The principle had been codified in English law since at least 1327, when the Statute of Northampton declared "[t]hat no Man great nor small" could "bring [] Force in affray of the Peace" or "go nor ride armed by Night nor by Day, in Fairs, Markets, . . . nor in no Part elsewhere, upon Pain to forfeit their Armour to the King, and their Bodies to Prison at the King's Pleasure." 2 Edw. 3, SPM Ex. E.

**Plaintiffs' Response to No. 138:** Admit that the Statute of Northampton includes the quoted language; otherwise dispute. *Bruen* discussed the Statute of Northampton at length and noted that

had "little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41. *Bruen* also noted that the law did not prohibit being armed in public generally but was focused on armor and certain unusual weapons that were "generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace." *Id.* As such, the Supreme Court held in *Bruen* that Northampton and its later analogues did not prohibit carrying of weapons unless the carrying was done in such a way as to seek to terrify the people or for some other "wicked purpose." *Id.* at 51–52 (quoting *State v. Huntly*, 25 N.C. 418, 423 (1843).

139.    The legal tradition that began in Greece and was codified in England was carried over to America, with Justice James Wilson—one of the first four Justices appointed by President Washington to the Supreme Court and one of only six people to sign both the Constitution and the Declaration of Independence—recognizing that affrays "are crimes against the personal safety of the citizens" and that "[t]hey may, and ought to be suppressed by every person present." 3 Bird Wilson, The Works of the Honourable James Wilson, L.L.D. 79 (Lorenzo Press 1804), SPM Ex. F.

**Plaintiffs' Response to No. 139:** Admit that this statement appears in the cited work; otherwise dispute.

140.    Justice Wilson recognized that "there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally diffuse a terrour among the people." 3 Bird Wilson, The Works of the Honourable James Wilson, L.L.D. 79 (Lorenzo Press 1804), SPM Ex. F.

**Plaintiffs' Response to No. 140:** Admit that this statement appears in the cited work.

141.    Several other states passed similar laws around the time of the Founding, prohibiting the public carriage of weapons in ways that would disturb the peace. *See, e.g.,* 1786 Va. Laws 35, SPM Ex. G (prohibiting anyone to "go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrested and committed to prison"); 1795 Mass.

Acts & Laws 436, SPM Ex. H (similar); 1801 Tenn. Acts 260-61 § 6, SPM Ex. I (similar).

**Plaintiffs' Response to No. 141:** Dispute. *See* Resp. to Statement 138.

Respectfully submitted, this 15th day of July 2024.

Cody J. Wisniewski, Esq.*
**FPC ACTION FOUNDATION**
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
5550 Painted Mirage Road, Suite 320
Las Vegas, Nevada 89149
(916) 517-1665
cwi@fpchq.org

**FLUET**
By:  */s/  Nicolas J. Rotsko*
        Nicolas J. Rotsko, Esq.
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
nrotsko@fluet.law
e-file@fluet.law

Adam J. Kraut, Esq.*
**SECOND AMENDMENT
FOUNDATION**
Attorneys for Plaintiffs
*J. Mark Lane and James Sears*
12500 NE 10th Place
Bellevue, Washington 98005
(800) 426-4302
akraut@saf.org

*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of New York by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Nicolas J. Rotsko
Nicolas J. Rotsko, Esq.

1