

**Office of the New York State Attorney General**

**Letitia James Attorney General**

November 4, 2024

<u>Via ECF</u>

The Honorable Kenneth M. Karas
Charles L. Brieant, Jr. Federal Building and Courthouse
United States District Court for the Southern District of New York
300 Quarropas Street
White Plains, New York 10601-4150

Re: <u>Lane v. Rocah</u>, No. 22 Civ. 10989 (KMK)

Dear Judge Karas,

    This Office represents Steven G. James, sued in his official capacity as Superintendent of the New York State Police, in the above-referenced action. We write to update the Court regarding significant developments in firearms cases that have occurred since the pending cross-motions for summary judgment, ECF Nos. 71 & 78, were fully submitted. These include 1) the Second Circuit's recent revised opinion in <u>Antonyuk v. James</u>, reaffirming the methodology to be applied in Second Amendment cases; 2) decisions in other federal courts across the country affirming the constitutionality of assault weapon laws, particularly the Fourth Circuit's *en banc* decision in <u>Bianchi v. Brown</u>; and 3) the voluntary discontinuance of a major Second Amendment case in Colorado, <u>Gates v. Polis</u>, after the Director of Research of the National Shooting Sports Federation ("NSSF") refused to defend his organization's statistics about "common use" – statistics like the ones Plaintiffs in this case ask the Court to accept as "legislative fact."

The Second Circuit Reaffirms the Historical Methodology Governing Second Amendment Cases

    On October 24, 2024, the Second Circuit released its updated opinion in <u>Antonyuk v. James</u>, No. 22-2908, 2023 WL 11963034 (2d Cir. Oct. 24, 2024), reaffirming its prior guidance about how to administer the history-and-tradition test announced by the Supreme Court in <u>NYSRPA v. Bruen</u>, 597 U.S. 1 (2022). <u>See</u> 2023 WL 11963034 at *14-19. In a unanimous opinion jointly signed by the entire panel of judges, the Circuit explained that "<u>Bruen</u> requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation." <u>Id.</u> at 14. The Circuit included seven precepts to guide judicial decision-making, emphasizing that "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum era, and Reconstruction" and that "a court should not search in vain for a 'historical *twin*'; 'a well-

established and representative historical *analogue* is sufficient." Id. at *15, 16 (quoting Bruen, 597 U.S. at 30) (emphasis in the original).

The Second Circuit's updated Antonyuk decision undermines several of the key arguments made by Plaintiffs in this case, beginning with their attempt to shirk the burden of showing that assault weapons fall into the definition of "arms" contemplated by the Second Amendment's text. Plaintiffs have asked the court to adopt a circular form of logic at Bruen's textual step, asserting that "all firearms are arms. Because the New York law challenged here bans firearms, the plain text is implicated."[1] ECF No. 72 at 6. But Antonyuk explains that the test is more complicated than that: a plaintiff must demonstrate that the conduct at issue falls into "the plain text of the Amendment as historically understood." 2023 WL 11963034 at *14. Thus, the burden is on Plaintiffs to establish that the weapons they want to use fall into the historically understood definition of "arms," a definition that requires them to show that the weapons are "'in common use' today for self-defense." Bruen, 597 U.S. at 32 (quoting District of Columbia v. Heller, 554 U.S. 570, 627 (2008)); see id. at 28-29 ("we use history to determine which modern 'arms' are protected by the Second Amendment"). As discussed extensively in the Superintendent's moving and reply briefs, Plaintiffs have not made (and cannot make) that showing.

It is only at Bruen's second prong where "the government must *then* justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," Antonyuk, 2023 WL 11963034 at *10 (quoting Bruen, 597 U.S. at 24) (emphasis added). But here too, Antonyuk weighs in favor of New York. Most notably, the Second Circuit again rejected the argument pressed by Plaintiffs here that "the critical period for interpreting the scope of the Second Amendment is at or around the time of its ratification—1791—so even laws from the mid-1800s come too late to be very informative." ECF No. 93 at 18. Indeed, Antonyuk explains that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis," meaning that "1791 and 1868 are both fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation." 2023 WL 11963034 at *17, 19. And the Circuit emphasized that even though "[t]wentieth-century evidence is not as probative as nineteenth-century evidence . . . . such laws are not weightless." Id. at *29 n.41. As discussed in the Superintendent's summary judgment briefing and the supporting declarations of historical experts, assault weapon laws are fully consistent with a centuries-long American tradition of banning particularly dangerous weapons when they become associated with mass violence and criminality. See ECF No. 81 at 21-26.

Antonyuk, like Rahimi, further contradicts Plaintiffs' assertion that "there is no tradition of banning 'weapons that cause public terror.'" ECF No. 93 at 22. To the contrary, Antonyuk recognized the validity of these laws and found them to be evidence of "a well-established, representative, and longstanding tradition of regulating firearms in places that serve as public forums and, as a result, tend to be crowded." Id. at *58; accord Rahimi, 144 S.Ct. at 1901 (discussing these "'going armed' laws" and how they "were incorporated into American jurisprudence"). These historical laws serve as a separate and sufficient set of analogues supporting

---

[1] Plaintiffs are incorrect that the assault weapons law "bans firearms." Instead, it prohibits only certain combinations of firearm attachments and accessories, see N.Y. Penal Law § 265.00(22), which were not historically regarded as "arms." See generally ECF No. 81 at 8-10.

modern assault weapon prohibitions, just as they did the modern sensitive locations laws in <u>Antonyuk</u> and the modern domestic violence prohibitors in <u>Rahimi</u>.

<u>Federal Courts Continue to Uphold Assault Weapon Prohibitions as Constitutional</u>

Federal courts across the country have continued to uphold the constitutionality of assault weapon prohibitions in recent months, recognizing that the People retain the right to enact laws to protect themselves from these abnormally dangerous weapons. The most significant new precedent is the Fourth Circuit's *en banc* opinion in <u>Bianchi v. Brown</u>, which upheld Maryland's assault weapons ban at both prongs of the <u>Bruen</u> test. <u>See</u> 111 F.4th 438 (4th Cir. 2024).

The majority opinion by Judge J. Harvie Wilkinson III held that "[t]he assault weapons at issue fall outside the ambit of protection offered by the Second Amendment because, in essence, they are military-style weapons designed for sustained combat operations that are ill-suited and disproportionate to the need for self-defense." <u>Id.</u> at 441. And even if assault weapons were "arms" as contemplated by the Second Amendment's text, Maryland's law would still "fit[] comfortably within our nation's tradition of firearms regulation" because "[i]t is but another example of a state regulating excessively dangerous weapons once their incompatibility with a lawful and safe society becomes apparent, while nonetheless preserving avenues for armed self-defense." <u>Id.</u> at 441-42. The Circuit rejected the vision of the law presented by Plaintiffs here, where the "common use" test would swallow up all other legal analysis, explaining that it "misreads <u>Heller</u> and <u>Bruen</u>" and "leads to absurd consequences" where the meaning of the Constitution would change based on how quickly the gun industry could sell a weapon, and how quickly elected legislatures could react to their proliferation. <u>Id.</u> at 460-61. As Judge Wilkinson writes, "a constitutional right with a 'meaning . . . fixed according to the understandings of those who ratified it' cannot be read to expand or contract based on nothing more than contemporary market trends." <u>Id.</u> at 461 (quoting <u>Bruen</u>, 597 U.S. at 28).

Other federal courts cases in recent weeks have reached the same conclusion. On September 26, 2024, a district court upheld Washington State's assault weapons prohibition, noting at <u>Bruen</u>'s first step that "the majority of the existing authority favors a Second Amendment test requiring Plaintiffs to demonstrate that the weapons at issue are not only in common use for self-defense but also tailored to that end, or that the weapons at issue are otherwise not too dangerous or unusual," and that "Plaintiffs fail to meet the high standard required," at least at the preliminary injunction stage. <u>Banta v. Ferguson</u>, No. 23 Civ. 112, 2024 WL 4314788, at *6, *9 (E.D. Wash. Sept. 26, 2024). The <u>Banta</u> court likewise surveyed American firearms history, Washington's historical materials, and relevant case law to conclude that, "even if the Court were to continue to <u>Bruen</u> step two, it appears that the State Defendants are likely to meet their burden." <u>Id</u> at *11.

Elsewhere, although the plaintiffs' failure to demonstrate irreparable harm led the Third Circuit to decline to reach the merits of the preliminary injunction in <u>Del. State Sportsmen's Ass'n v. Del. Dep't of Safety and Homeland Sec.</u>, Judge Jane Roth examined the merits in her concurring opinion, finding that "assault long guns [] are most useful as weapons of war. As such, they fall outside the scope of 'Arms presumptively protected by the Second Amendment," and that in any event the history before the Court "leaves no doubt that Delaware's laws are consistent with the nation's historical tradition of firearm regulation." 108 F.4th 194, 215, 217 (3d Cir. 2024) (Roth, J., concurring). On October 29, 2024, the D.C. Circuit affirmed the denial of a preliminary

injunction in Hanson v. District of Columbia, upholding D.C.s' ban on large-capacity magazines due to a tradition of "historical restrictions on particularly dangerous weapons and on the related category of weapons particularly capable of unprecedented lethality."  No. 23-7061, 2024 WL 4596783, at *8 (D.C. Cir. Oct. 29, 2024).  And as to the district court opinion in Ass'n of N.J. Rifle & Pistol Clubs v. Platkin, on August 21, 2024, the Chief Judge of the District of New Jersey so-ordered an indefinite stay of the judgment in that case, further undermining any persuasive effect it may have had.  See Case No. 18 Civ. 10507 (D.N.J.), ECF No. 236; see also 2024 WL 3585580 (D.N.J. July 30, 2024).[2]  The overwhelming body of federal case law, including opinions by the First, Fourth and Seventh Circuits, along with district court opinions in every other state within this Circuit, strongly supports the constitutionality of New York's prohibition on assault weapons.

Plaintiffs Voluntarily Discontinue a Significant Case After NSSF Refuses to Defend Its Research

On August 12, 2024, the plaintiffs in Gates v. Polis, No. 22 Civ. 1866 (D. Colo.), withdrew their challenge to Colorado's large-capacity magazine ban after the NSSF's Director of Research refused to sit for a deposition regarding the conclusions he stated in an out-of-court declaration about whether the devices in question were "in common use."  See Press Release, Nat'l Ass'n for Gun Rights, NSSF Refuses to Defend Study, Killing Colorado Magazine Ban Lawsuit (Aug. 12, 2024), available at https://tinyurl.com/ysv8anbj.  In an address on Twitter, the Executive Director of the National Association for Gun Rights, which brought the Gates case, explained their decision to withdraw the lawsuit as a consequence of how "the NSSF refused to testify to the facts in their own study."  See https://x.com/NatlGunRights/status/1823069919132705149.  She pointed out that "at the merits stage of the case, you can't just put a study on the judge's desk and ask him to read it.  Anyone can put together a 'study.'"  Id.

The demise of the Gates case underscores the importance of the Federal Rules of Evidence, the unreliability of the NSSF material submitted by Plaintiffs in this action, and why the Court must not accept Plaintiffs' hearsay assertions as "legislative fact."  Cf. Or. Firearms Fed'n v. Kotek, No. 22 Civ. 1815, 2023 WL 4700378, at *1 (D. Or. June 2, 2023) ("such legislative facts are not admissible to resolve disputed facts essential to the elements of Plaintiffs' claims unless they comply with the Federal Rules of Evidence.").

The Superintendent thanks the Court for its time and consideration.

Respectfully submitted,

James M. Thompson
Special Counsel
james.thompson@ag.ny.gov

cc:   Counsel for all parties (via ECF)

---

[2] The Firearms Policy Coalition, which brought that case and this one, tweeted that it agreed to the stay because New Jersey "was going to get a stay extension anyway," see https://x.com/gunpolicy/status/1826787217492382132, a determination that necessarily would have involved a judicial finding that New Jersey had "made a strong showing of the likelihood of success on the merits," and that suspending the district court's judgment was "in the public interest."  See In re Revel AC, Inc., 802 F.3d 558, 565 (3d Cir. 2015).