

(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

**VIA CM/ECF**　　　　　　　　　　　　　　　　　　　　　　　　　November 25, 2024

Hon. Kenneth M. Karas
United States District Court
for the Southern District of New York
The Hon. Charles L. Brieant Jr. Federal Building
and United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

　　　　Re:　　*Lane, et al. v. James, et al.*, **Case No.: 7:22-cv-10989 (Karas, J.)**

Dear Judge Karas:

　　We represent plaintiffs J. Mark Lane and James Sears in this case, and submit this letter in response to Superintendent James' letter filed November 4, 2024 (Dkt. No. 97). None of the cases discussed by the Superintendent change the fundamental analysis that resolves this case: Under binding U.S. Supreme Court precedent, New York State's categorical ban of semi-automatic rifles with certain features (so-called "assault weapons") violates the Second Amendment because such weapons are commonly used throughout the country for lawful purposes.

　　**I.**　　***Antonyuk* is not a hardware ban case, and does not change the applicable standards from *Heller*.**

　　The Second Circuit's reissued decision in *Antonyuk v. James*, No. 22-2908, 2023 WL 11963034 (2d. Cir. Oct. 24, 2024), does nothing to undermine the conclusion that the banned firearms at issue here are "arms" within the plain text of the Second Amendment. Quoting *Bruen*, the Second Circuit explained that courts are required "to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'"  *Id.* at *14. Contrary to the Superintendent's unfounded contention that Plaintiffs "shirk[ed]" the burden of showing that the plain text encompasses so-called "assault weapons," Plaintiffs have simply followed the Supreme Court's directive in *Heller* that the meaning of "arms" at the time of the Founding has the same meaning it does today, encompasses "weapons of offence, or armour of defence," and therefore "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms."  554 U.S. 570, 581-82 (2008). There is no suggestion in *Heller*, *Bruen*, or *Antonyuk* that at the textual analysis step, the meaning of "arms" is somehow limited to just handguns or another subset of



(703) 590-1234 Tel  
(703) 590-0366 Fax  
1751 Pinnacle Drive, Suite 1000  
Tysons, VA 22102  
www.fluet.law

arms, as the Superintendent argues. Dkt. 97, at 1. Firearms are arms. The historical tradition that allows for restricting "dangerous and unusual" weapons, that are not commonly owned by law-abiding citizens, is a rule derived from *history*, relevant to the historical analysis under *Bruen*, but not to the plain text. The plain text analysis here is not complicated. It should be beyond legitimate dispute that so-called "assault weapons" fall within the meaning of "arms" established by *Heller*. *E.g.*, Dkt. No. 72, at 5-6. *Antonyuk* does not undermine that.

Thus, the burden shifts to the State to justify its ban by showing that it is consistent with the Nation's tradition and history of firearms regulation. *Antonyuk* dealt with gun-free zones and licensing requirements, not a ban on a class of common firearms. *Antonyuk* does not change that *Heller* has already provided the relevant historical tradition to be applied in hardware ban cases like this one. Under *Heller* and *Bruen*, a government restriction must be consistent with the historical tradition that allowed for restrictions on "dangerous and unusual weapons" that are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Indeed, *Antonyuk* recites that "the Second Amendment protects the right to keep and bear the sorts of weapons that are in common use—a limitation [that] is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." 2023 WL 11963034, at *8 (alteration in original; internal quotations removed; quoting *Heller*, 554 U.S. at 627).

II. ***Hanson* held that firearm magazines that can hold more than ten rounds are "arms" within the plain text of the Second Amendment, and in common use for lawful purposes.**

*Hanson v. District of Columbia* undermines the Superintendent's contention that what he calls "accessories" (*e.g.*, detachable magazines, telescoping stocks, pistol grips) are not "arms" within the meaning of the Second Amendment. Dkt. No. 81, at 9-10. The *Hanson* majority observed that if "accessories" such as magazines are not encompassed by "arms," it would "allow the government to sidestep the Second Amendment with a regulation prohibiting possession at the component level, such as a firing pin." No. 23-7061, 2024 WL 4596783, at *3 (cleaned-up). The *Hanson* majority also rejected the argument—advanced by the Superintendent here—that arms can be banned if they are particularly useful in a military context. *Id.* at *4.

While concluding that magazines that can hold more than ten rounds are in common use, the *Hanson* majority mistakenly folded the "common use" test into the textual analysis step, instead of the historical tradition step (even while, paradoxically, conceding that *Heller*'s "common use" test derives from the "**historical tradition** of prohibiting the carrying of dangerous and unusual weapons"). *Id.* at *4-5 (quoting *Heller*, 554 U.S. at 627) (emphasis added). Contrary to *Hanson*, for arms ban cases, *Heller* leaves



no doubt that the relevant historical tradition at step two is the prohibition on dangerous and unusual weapons, *i.e.* the common use test. The *Hanson* majority disregarded this holding from *Heller*, and instead folded the applicable historical tradition into the "plain text" step, then sidestepped the "common use" test when it undertook its own novel historical tradition analysis. *Id.* The flaws in this methodology were carefully identified by D.C. Circuit Court Judge Walker in his instructive *Hanson* dissent, which distilled *Heller*'s holdings and explained that, among other things, "*Bruen* reaffirmed *Heller*'s third holding—that in view of our nation's history and tradition, the government cannot categorically ban a class of arms in common use for lawful purposes." *Id.* at *25-27, 29-35 (Walker, J., dissenting).

  III.   **The other cases the State points to are neither instructive nor persuasive.**

The Superintendent points to *Banta v. Ferguson*, No. 2:23-CV-00112-MKD, 2024 WL 4314788 (E.D. Wash. Sept. 26, 2024), as further support, but that decision is not persuasive or helpful in applying binding Supreme Court precedent. *Ferguson* denied a preliminary injunction concerning the State of Washington's "assault weapons" ban, finding that it was unlikely that the banned firearms are "arms" within the plain text of the Second Amendment. *Id.* at *4. The *Ferguson* court's rationale is vacuous. On one hand, the court recited multiple Supreme Court cases stating that ***all*** firearms are encompassed by the plain text of "arms," then on the other hand wrongly concluded that "[b]eyond handguns, the Court is without binding authority as to what other weapons the Second Amendment protects as 'arms.'" *Id.* (quoting, then ignoring, *Heller*, 544 U.S. at 581, for the proposition that "Arms are weapons of offence, or armour of defence, or any thing that a man wears for his defense, or takes into his hands, or useth in wrath to cast at or strike another" and "[a]t the time of the founding, it was understood that all firearms constituted arms" (cleaned up); and quoting, then ignoring, *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (per curiam), for the proposition that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding" (cleaned up)). The *Ferguson* court failed to explain why the Supreme Court's holding encompassing "all firearms" somehow does not extend beyond handguns. The *Ferguson* court also failed to assess the "how" and "why" of the government's proffered historical analogues, despite the Supreme Court's reaffirmation of this requirement in *Rahimi*. *Id.* at *10-11. This case does not undermine Plaintiff's position.

Nor is the Fourth Circuit's decision in *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc), useful in helping this Court decide this case. *Bianchi*'s analysis of Maryland's "assault weapons" ban was directly contrary to the Supreme Court's decisions in *Heller* and *Bruen*. The *Bianchi* majority's approach permits the banning of firearms if they are sufficiently useful in military service, *see* 111 F.4th at 453, the result of a misreading of



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

*Heller*'s acknowledgment that certain "dangerous and unusual weapons" like "M-16 rifles" could be banned *despite* their utility to the military, not because of it, *see Heller*, 554 U.S. at 627; *see also Hanson*, 120 F.4th at 233 ("The Supreme Court in *Heller* did not hold, however, that Second Amendment protection does not extend to weapons that are 'most useful in military service.' Rather, the Court acknowledged that the Second Amendment protects those weapons that are 'in common use at the time,' but not dangerous and unusual weapons.'"). The majority likewise endorsed a historical rule that would permit the state to ban any weapon judged "excessively dangerous" by the legislature, *Bianchi*, 111 F.4th at 441–42; indeed, the court "shudder[ed] to imagine the hubris with which a court would disable representative government" by daring to enforce the hard limits Constitution sets on laws restricting firearms, *id.* at 473, in direct defiance of *Heller*'s rejection of interest balancing and declaration that the Second Amendment "takes certain policy choices off the table," banning common firearms among them, *Heller*, 554 U.S. at 636. Judge Richardson, in dissent, had the much more faithful and straightforward interpretation of Supreme Court precedent (in agreement with Judge Walker's in *Hanson*), explaining that "[w]hile history and tradition support the banning of weapons that are both dangerous *and* unusual, Maryland's ban cannot pass constitutional muster as it prohibits the possession of arms commonly possessed by law-abiding citizens for lawful purposes." *Bianchi*, 111 F.4th at 483 (Richardson, J., dissenting).

Neither *Delaware State Sportsmen's Association v. Delaware Dep't of Homeland Security*, 108 F.4th 194 (3d Cir. 2024) ("*DSSA*"), nor *Association of New Jersey Rifle and Pistol Clubs v. Platkin*, 2024 WL 3585580 (D.N.J. July 30, 2024) ("*ANJRPC*"), support the State's case here either. The Third Circuit in *DSSA* specifically did not reach the merits in reviewing the denial of a preliminary injunction but resolved the case on its (mistaken) view of irreparable harm, 108 F.4th at 204–05. Judge Roth's dissent unpersuasively committed the same error as *Bianchi* in misreading *Heller*'s language about the M-16 rifle as condoning bans on arms *because* of their utility in military service, going so far as to say that they are not even "arms" within the meaning of the Second Amendment's plain text. *Id.* at 215. This misguided conclusion is only possible by misreading (or ignoring) the Supreme Court's clear definition of the term "arms." And *Cheeseman v. Platkin* (consolidated as *ANJRPC*) is affirmatively *helpful* to Plaintiffs, as the court in that case held that a ban on the Colt AR-15 rifle is unconstitutional because, as Plaintiffs have argued here, "*Heller* was clear" that "a categorical ban on a class of weapons commonly used for self-defense is unlawful." 2024 WL 3585580, at *20. That Court, however, mistakenly stopped short of the remedy consistent with that holding, limiting its injunction to such Colt AR-15 rifles.

Finally, the State's most tenuous claim for support relies on *Gates v. Polis*, No. 22 Civ. 1866 (D. Colo.) a case that was voluntary dismissed by the Plaintiffs over an alleged expert witness participation dispute. *See NSSF Refuses to Defend Study, Killing Colorado*



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

*Magazine Ban Lawsuit*, NAGR (Aug. 12, 2024), https://gunrights.org/nssf-refuses-to-defend-study-killing-colorado-magazine-ban-lawsuit/.  Contrary to the State's claim, whatever the reason for the dismissal, it does not cast doubt on the veracity of the data.  Furthermore, NSSF's industry data is just one data point among many here that proves that AR-15-style semiautomatic rifles—the quintessential firearm banned by New York—are "commonly available, semiautomatic rifles," *Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting), that are "one of the most popular firearms in the United States," Definition of 'Frame or Receiver' & Identification of Firearms, 87 F.R. 24562-01, 24,652 (2022).

                                            Respectfully submitted,

                                            Nicolas J. Rotsko

cc:     Counsel of record (*via CM/ECF*)