UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                             :

J. MARK LANE and JAMES SEARS,     :

                       Plaintiffs,         :

             - against -           :
                                           :    Case No. 22 Civ. 10989 (KMK)

SUSAN CACACE, in her official capacity as   :
District Attorney for the County of Westchester,  :
New York, and STEVEN G. JAMES, in his   :
official capacity as Superintendent of the New  :
York State Police,                                   :

                     Defendants.      :
--------------------------------------------------------------- X

# SUPERINTENDENT JAMES' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THE PARTIES' JOINT MOTION FOR RECONSIDERATION AND IN FURTHER SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General
State of New York
*Attorney for Superintendent Steven G. James*
28 Liberty Street
New York, New York 10005
(212) 416-6295

Suzanna Publicker Mettham
Yuval Rubinstein
James M. Thompson
Assistant Attorneys General
  *Of Counsel*

Defendant Steven G. James, in his official capacity as Superintendent of the New York State Police, by his attorney Letitia James, Attorney General of the State of New York, respectfully submits this supplemental memorandum of law in support of the parties' joint motion for reconsideration and in further support of his motion for summary judgment, ECF No. 78. The Second Circuit's recent decision in *National Association for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir. 2025) ("*NAGR*") is controlling precedent that both clarifies the how the Second Amendment issue before the Court is analyzed and, as all parties agree, requires that judgment be entered in the Superintendent's favor.

## ARGUMENT

### I. The Second Circuit in NAGR Rejects Plaintiffs' "Common Use" Theory

*NAGR* establishes that it is American legal history and tradition, not 21st Century gun sales patterns, that determine the balance between gun rights and public safety. The Second Circuit unanimously rejected Plaintiffs' core legal theory in this case, where "common use" would be "decisive on the issue of [] firearms' constitutional protection." ECF No. 93 at 7; *see, e.g., id.* at 17 ("the semiautomatic rifles banned by the state are in common use. Any further historical analysis is entirely unnecessary and the Court can and should end its analysis there."); ECF No. 72 at 3 ("Because the arms banned by New York are in common use, no historical evidence the State could put forward could possibly justify its law."). The plaintiffs in *NAGR*, like Plaintiffs here, argued that common use alone was "'sufficient' for finding that possessing the regulated weapons is protected by the Second Amendment." 153 F.4th at 232-33. The Second Circuit, however, found that this argument "distort[ed] the precedents on which their argument relies." *Id.* Instead, the Court of Appeals found that "[t]he cases do not hold that the Second Amendment *necessarily* protects *all* weapons in common use," and that they "do not shield popular weapons from review of their potentially unusually dangerous character." *Id.* at 233 (emphasis in original). Judge Walker wrote that the plaintiffs' common-use-only test "would strain both logic and administrability, as it would hinge the right on

what the Fourth Circuit aptly called a 'trivial counting exercise' that would 'lead[] to absurd consequences.'" *Id.* (quoting *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024)).

The Second Circuit's holding in *NAGR* justifies reconsideration because it establishes that any factual dispute over the "common use" test and the admissibility of relevant evidence does not prevent summary judgment in favor of the Defendants. *Cf. Wildlife Preserves, Inc. v. Romero*, 153 F.4th 192, 205 n.14 (2d Cir. 2025) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). This Court previously denied summary judgment after identifying "disputes about whether an assault rifle is an 'arm,' whether it is in common use, and where the common use inquiry is located in the *Bruen* framework" as "a threshold inquiry that must be resolved before proceeding." *Lane v. Cacace*, No. 22 Civ. 10989, 2025 WL 903766, at *7 (S.D.N.Y. Mar. 25, 2025). But the *NAGR* Court upheld the constitutionality of Connecticut's assault weapons law without resolving these issues, finding them "not necessary to resolve th[e] appeal." 153 F.4th at 235.

Instead, the *NAGR* Court proceeded to step two of the *Bruen* analysis, considered the pertinent history, and upheld assault weapon laws as "one more chapter in the historical tradition of limiting the ability to keep and carry dangerous and unusual weapons." *Id.* at 236 (quotation omitted). This Court can and should do the same.

**II.    *NAGR*'s Historical Analysis Controls This Case**

The *NAGR* Court upheld assault weapon bans at the second step of the *Bruen* analysis, concluding that these modern laws are supported by "historical arms regulations that singled out the unusually dangerous weapons of their day," but also "did not impair the Second Amendment right to self-defense by allowing many weapons to go unchecked." *Id.* at 246-47. That historical analysis is controlling in the context of New York's assault weapon law, which is substantially similar to Connecticut's. *See generally NYSRPA v. Cuomo*, 804 F.3d 242, 249-51 (2d Cir. 2015) (comparing the two

2

state laws and noting that Connecticut's features-based approach is "[l]ike its New York analogue" and "us[es] a list of military-style features similar to New York's"); *but see NAGR*, 153 F.4th at 225 (noting additional restrictions enacted by Connecticut in 2023).

Prior to engaging in the historical analysis, the Second Circuit explained the contours of the legal doctrine allowing the prohibition of "dangerous and unusual" weapons. Judge Walker rejected the vision proposed by Plaintiffs here, under which "arms that are in common use are protected because such arms by definition cannot be unusual," ECF No. 72 at 2, writing that such an approach "strips coherence from the historical limitation to the Second Amendment right." *NAGR*, 153 F.4th at 233. Instead, Judge Walker's panel opinion and Judge Nathan's concurrence (which the panel opinion joined and incorporated by reference)[1] trace the historical understanding of "dangerous and unusual" through text, treatises, and Supreme Court jurisprudence, concluding that "this historical tradition encompasses those arms that legislators determined were *unusually dangerous* because of their characteristics." *Id.* (emphasis in the original).

The Court of Appeals began its historical analysis by noting that modern assault weapons are a dramatic technological change posing unprecedented societal concerns, requiring a "more nuanced approach" under the governing *Bruen* standard. *Id.* at 236-37 (quoting *NYSRPA v. Bruen*, 597 U.S. 1, 26-27 (2022)). In so doing, the panel traced the history of firearm technology and reached the same conclusion as New York's expert Brian DeLay: that "[t]he prevalent firearms of the founding and reconstruction eras, . . . are technologically distinguishable from modern AR-15 style firearms." *Id.* at 238; *cf.* DeLay Dec., ECF No. 85 ¶ 5 (concluding that "[r]ifles that meet New York's criteria of 'assault weapons' have only been significant consumer items in the United States for a generation"). The

---

[1] Although Judge Nathan's concurrence is written separately from Judge Walker's majority opinion, the entire panel joined it and incorporated its analysis in the text of the majority opinion. *See NAGR*, 153 F.4th at 234 ("We fully join in Judge Nathan's concurrence."). Even if the concurrence were not viewed as integrated into the majority opinion, it would nonetheless constitute profoundly persuasive precedent given its approval by the entire Second Circuit panel. *See id.* (endorsing it as "excellent").

3

Circuit also identified mass shootings as an unprecedented social concern, citing to Professor Louis Klarevas—also offered as an expert by New York in this case—for the proposition that "[t]he Founders faced no problem comparable to a single gunman carrying out a mass murder in seconds," given that "there was no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948." *NAGR*, 153 F.4th at 239.

Judge Walker then surveyed the history of American firearm regulation, pointing to many of the same laws and traditions identified by New York as "evidence of a longstanding tradition of restricting novel weapons that are particularly suited for criminal violence." *Id.* at 242. This included laws from "pre-colonial England," such as prohibitions on launcegays that were "generally worn or carried only when one intended to . . . breach the peace," *id.* at 243; *cf.* ECF No. 81 at 22 (citing these laws in New York's summary judgment brief); continuing on to 19th century restrictions on unusually dangerous weapons like dirks and Bowie knives, *NAGR* 153 F.4th at 243-45; *cf.* ECF No. 81 at 22-24; and concluding with 20th century laws regulating automatic and semiautomatic weapons once those technologies developed. *NAGR*, 153 F.4th at 245-46; *cf.* ECF No. 81 at 24-26.

The panel opinion in *NAGR* traces the same history adduced by New York and its experts, and based on that history the Second Circuit "ha[d] no difficulty" in upholding Connecticut's assault weapon law. *NAGR*, 153 F.4th at 247. New York's law strikes the same balance based on the same history, under which "[h]istorical legislators regulated these unusually dangerous arms, like here, after observing the regulated weapons' unprecedented lethality," and "did so, like here, to prevent the use of these especially dangerous variants of otherwise lawful weapons in further acts of mass homicide and terror." *Id.* at 246.

### III. *NAGR* Supports the Superintendent's Contention That Assault Weapons Can Also Be Prohibited Based on Their Propensity to Cause Terror

Lastly, *NAGR* lends further support to New York's argument, not made in the Connecticut

4

case, that assault weapon laws are additionally supported by the centuries-long Anglo-American tradition of prohibiting modes of weapon carriage that cause terror for peaceful citizens. *See* ECF No. 81 at 27-29; *see, e.g., Aymette v. State*, 21 Tenn. 154, 159 (1840) (recognizing that state legislatures have a right to prohibit "wearing or keeping weapons dangerous to the peace and safety of the citizens" and may "preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce"). The *NAGR* Court explicitly recognized this "ancient common law tradition of singling out weapons capable of producing a terror," and block-quoted the passage from *Aymette* cited above. 153 F.4th at 245-46 (quotation omitted). The proposition is particularly supported by Judge Nathan's concurrence, a fully-incorporated part of the majority opinion, which identifies "a tradition of restrictions on public affray—that is, terrifying the public," and found that the pertinent historical sources "reveal a common concern about how 'terrifying' dangerous and unusual weapons are to the public." *Id.* at 251 (Nathan, J., concurring).

Assault weapons cause precisely this sort of terror among the public, as demonstrated by uncontradicted expert testimony, *see* Schildkraut Dec. ¶¶ 26-31, Plaintiffs' own admissions, *see* 56.1 ¶¶ 34-35, 79, and a continuing string of incidents of panic both in New York and across the country involving real or reported assault weapons. *See, e.g.,* Quinlan Bentley, *Man who prompted NKY school lockdown had handguns, and AR-15 and 64 rounds, police say*, Cincinnati Enquirer (Oct. 9, 2025), https://tinyurl.com/5evhjvh4; Ariel Zilber, *Shoppers at NY mall mistake umbrella for AR-15 rifle, prompting chaos and police lockdown*, N.Y. Post (Aug. 31, 2025), https://tinyurl.com/5n84v3e4; Phil Tenser, *Police recover replica rifle, identify juvenile after UMass Lowell campus scare*, WCVB5 (Sep. 4, 2025), https://tinyurl.com/4jsbnx9e; Brandon Cruz, et al., *Long Island schools under 'lockout' after AR-15 threat from bullied teen – schools say it's a hoax*, N.Y. Post (May 15, 2025), https://tinyurl.com/a6nsr4ed. The long tradition of public terror laws represents a separate and sufficient basis to find New York's assault weapon laws to be historically justified.

5

**CONCLUSION**

All parties agree that the Second Circuit's *NAGR* decision "requires judgment to be entered in favor of the Defendants." ECF No. 107 at 1; *see also* ECF No. 109 at 1. Accordingly, the Superintendent respectfully requests that the Court grant the joint motion for reconsideration, grant Defendants' motions for summary judgment, deny Plaintiffs' motion for summary judgment, and grant such further relief as it deems just and proper.

Dated: New York, New York
November 10, 2025

        LETITIA JAMES
        Attorney General
        State of New York
        *Attorney for Superintendent Steven G. James*

        By:

        _____
        Suzanna Publicker Mettham
        James M. Thompson
        Yuval Rubinstein
        *Assistant Attorneys General*
        28 Liberty Street
        New York, New York 10005
        suzanna.mettham@ag.ny.gov
        james.thompson@ag.ny.gov
        yuval.rubinstein@ag.ny.gov